2025-1364, 2025-1365, 2025-1430

# United States Court of Appeals for the Federal Circuit

**DIGITAL BROADCASTING SOLUTIONS, LLC,**
*Appellant*

**v.**

**DISH NETWORK L.L.C., DISH TECHNOLOGIES L.L.C.,**
*Cross-Appellants*

Appeal from the United States Patent and Trademark Office in *Inter Partes* Review Nos. IPR2023-00976 and IPR2023-00977

## OPENING BRIEF OF APPELLANT DIGITAL BROADCASTING SOLUTIONS, LLC


*/s/ Fred I. Williams*
Fred I. Williams
*Principal Attorney*
WILLIAMS SIMONS & LANDIS PC
The Littlefield Building
106 East Sixth Street, Suite 900-168
Austin, TX 78701
512.543.1354 telephone
fwilliams@wsltrial.com

John Wittenzellner
WILLIAMS SIMONS & LANDIS PC
1735 Market Street, Suite A#453
Philadelphia, PA 19103
512.543.1373 telephone
johnw@wsltrial.com


April 25, 2025

COUNSEL FOR DIGITAL BROADCASTING SOLUTIONS, LLC

## PATENT CLAIMS AT ISSUE — U.S. Patent No. 8,929,710

1. A digital video recorder ("DVR") for time shifting at least a portion of a transmitted video program, comprising:

a tuner for receiving said video program as transmitted, said video program including at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

a memory device for storing said video program, allowing at least a portion of said video program to be played back at a later time;

a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, and a second command initiates playback of said video program from said memory device; and

at least one processor configured to (i) provide said video program in its entirety to a display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time, (ii) provide said video program in its entirety to said display device in response to receiving said second command if said second command is received during a second period of time and said DVR is in said first playback state, and (iii) provide only a portion of said video program to said display device in response to receiving said second command if said second command is received during said second period of time and said DVR is in said second playback state, said portion of said video program including at least said first and third portions of said video program, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

2. The DVR of claim 1, wherein said controller is configured to receive said commands from a remote control operated by said user of said DVR.

3. The DVR of claim 1, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes said primary video content and only a portion of said secondary video content.

4. The DVR of claim 1, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes only said primary video content.

5. The DVR of claim 4, wherein said memory device is further configured to store at least one time when said secondary video content begins and at least one time when said secondary video content ends.

6. The DVR of claim 1, wherein said first period of time is a period of time that is less than one week from said transmission of said video program, and said second period of time is any time after said first period of time.

7. The DVR of claim 4, wherein said secondary video content comprises at least one advertisement.

8. The DVR of claim 1, wherein said at least one processor is further configured to (i) retrieve said portion of said video program from said memory device if said second command is received during said second period of time and said DVR is in said second playback state, and (ii) retrieve said video program in its entirety from said memory device if another second command is received at a time thereafter and said DVR is switched to said first playback state at or before said time thereafter.

9. A method for time shifting at least a portion of a video program transmitted to a digital video recorder ("DVR"), comprising:

receiving said video program, said video program including at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

storing said video program on a memory device in said DVR;

receiving a first command from at least one user of said DVR, said first command indicating a playback state of said DVR;

receiving a second command from said at least one user of said DVR, said second command indicating a desire to playback at least a portion of said video program; and

providing said at least a portion of said video program to a display device in response to receiving said second command;

wherein said step of providing said at least a portion of said video program to said display device further comprises (i) providing said video program to said display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time, (ii) providing said video program to said display device in response to receiving said second command if said second command is received during a second period of time and said DVR is in said first playback state, and (iii) providing only a portion of said video program to said display device in response to receiving said second command if said second command is received during said second period of time and said DVR is in said second playback state, said portion of said video program including at least said first and second portions of said video program, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

10. The method of claim 9, wherein said step of receiving said video program further comprises receiving said video program from a satellite via an antenna.

11. The method of claim 9, wherein said step of storing said video program on said memory device in said DVR further comprises storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends, wherein said portion of said video program provided during said second time and when said DVR is in said second playback state does not include at least said second portion.

12. The method of claim 9, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes said primary video content and only a portion of said secondary video content.

13. The method of claim 9, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes only said primary video content.

14. The method of claim 9, wherein said first period of time is a first day after said video program has been transmitted, and said second period of time is a time period thereafter.

15. The method of claim 9, wherein said first period of time is a period of time that is less than one week from said transmission of said video program, and said second period of time is a time period after said first period of time.

16. The method of claim 13, wherein said secondary video content is at least one advertisement.

17. The method of claim 11, wherein said step of receiving said video program further comprises receiving said video program, said at least one time of when said second portion of said video program begins, and said at least one time of when said second portion of said video program ends from a satellite, wherein each one of said at least one times is received by said DVR after said video program is stored on said memory device.

18. A digital video recorder ("DVR") for time shifting at least a first portion of a video program, said first portion of said video program consists of first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion, comprising:

a tuner for receiving said video program;

a memory device for storing said video program;

a controller for receiving commands including at least a first command for setting a playback state of said DVR and a second command for initiating a playback of said video program from said memory device; and

at least one processor for (i) providing said first portion of said video program in its entirety to a display device in response to receiving said second command during a first period of time, (ii) providing said first portion of said video program in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in a first playback state, and (iii) providing only said first and third portions of said video program to said display device in response to receiving said second command during said second period of time if said DVR is in a second playback state, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state.

19. The method of claim 18, wherein said first and third portions of said video program include primary content and said second portion includes secondary content.

## PATENT CLAIMS AT ISSUE — U.S. Patent No. 9,538,122

1. A digital video recorder (DVR) for time shifting at least one video program, said video program being transmitted over a data distribution system, comprising:

a tuner for receiving a plurality of video programs, wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system, (ii) said tuner can be tuned to said single channel to receive said plurality of video programs, and (iii) at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

a memory device for storing said plurality of video programs, allowing said one of said plurality of video programs to be played back at a later time;

a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, a second command initiates playback of said one of said plurality of video programs from said memory device, and a third command instructs said DVR to receive and store said plurality of video programs; and

at least one processor configured to (i) provide said one of said plurality of video programs in its entirety to a display device in response to receiving said second command during a first period of time, (ii) provide said one of said plurality of video programs in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in said first playback state, and (iii) provide only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said one of said plurality of video programs, wherein said third portion is provided to said display device immediately following said first portion

if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

2. The DVR of claim 1, further comprising a wireless transmitter in communication with said at least one processor and said memory device, said wireless transmitter being configured to transmit said one of said plurality of video programs in its entirety or said portion of said one of said plurality of programs at least indirectly to said display device, said display device being remotely located from said DVR.

3. The DVR of claim 1, further comprising at least one other tuner, wherein said at least one other tuner allows said DVR to receive at least one other video program while said tuner is being used to receive said plurality of video programs, said at least one other video program being selected by said user.

4. The DVR of claim 1, wherein said one of said plurality of video programs includes at least primary and secondary video content, and said first and third portions of said one of said plurality of video programs consists of said primary video content.

5. The DVR of claim 4, wherein said second portion of said one of said plurality of video programs consists of said secondary video content and said memory device is further configured to store at least one time when said second portion begins and at least one time when said second portion ends.

6. The DVR of claim 1, wherein said first period of time is a period of time that begins when said one of said plurality of video programs is stored on said memory device and available to be viewed and ends within a predetermined time thereafter, said predetermined time being less than one week.

7. The DVR of claim 1, wherein said single channel is stored in said memory and said at least one processor is configured to tune said tuner to said single channel in response to said controller receiving said third command.

8. The DVR of claim 1, wherein data communicated via said single channel is compressed prior to transmission and said at least one processor is configured

to decompress said data after its have been received so that said one of said plurality of video programs or said portion of said one of said plurality of video programs can be displayed, depending on when said second command is received and said playback state of said DVR.

9. The DVR of claim 5, wherein said secondary video content comprises at least one advertisement.

10. The DVR of claim 1, wherein said at least one processor is further configured to (i) retrieve said portion of said one of said plurality of video programs from said memory if said second command is received during said second period of time and said DVR is in said second playback state, and (ii) retrieve said one of said plurality of video programs in its entirety from said memory device if another second command is received at a time thereafter and said DVR is switched to said first playback state at or before said time thereafter.

11. A method for time shifting at least one video program transmitted to a digital video recorder (DVR) over a data distribution system, comprising:

receiving a plurality of video programs, wherein said plurality of video programs are transmitted as the same time and are received by a single tuner in said DVR, and at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

receiving a third command from at least one user of said DVR, said third command indicating a desire to use said single tuner to receive said plurality of video programs and to store said plurality of video programs on at least one memory device in said DVR;

storing said plurality of video programs on said at least one memory device in said DVR in response to receiving said third command from said at least one user of said DVR;

receiving a second command from said at least one user of said DVR, said second command indicating a desire to playback at least a portion of said one of said plurality of video programs;

receiving a first command from said at least one user of said DVR, said first command indicating a playback state of said DVR; and

providing said at least a portion of said one of said plurality of video programs to a display device in response to receiving said second command from said at least one user of said DVR;

wherein said step of providing said at least a portion of said one of said plurality of video programs to said display device further comprises (i) providing said one of said plurality of video programs to said display device in response to receiving said second command during a first period of time, (ii) providing said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said first playback state, and (iii) providing only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said video program, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

12. The method of claim 11, wherein said step of providing said at least a portion of said one of said plurality of video programs to a display device further comprises transmitting said at least a portion of said one of said plurality of video programs to said display device via a transmission path that includes at least one wireless connection, said display device being remotely located from said DVR.

13. The method of claim 11, wherein said step of storing said plurality of video programs on said at least one memory device in said DVR further comprises storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends.

14. The method of claim 11, wherein said one of said plurality of video programs includes at least primary and secondary video content, said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state consists of said primary video content, and said secondary video content includes at least one advertisement.

15. The method of claim 11, further comprising the steps of:

compressing said plurality of video programs prior to said plurality of video programs being transmitted over said data distribution system, and

decompressing said plurality of video programs after said plurality of video programs have been received by said DVRr and before said one of said plurality of video programs or portion thereof is provided to said display device.

16. The method of claim 11, further comprising the step of tuning said single tuner to a particular channel at a particular time in response to receiving said third command, said particular channel and said particular time being stored in said at least one memory device in said DVR.

17. The method of claim 16, further comprising the step of receiving a fourth command from said at least one user of said DVR, said fourth command indicating a desire to record a second video program, which is accomplished using another tuner if said second video program is being transmitted to said DVR while said plurality of video programs are being transmitted to said DVR.

18. A digital video recorder (DVR) for time shifting at least one of a plurality of video programs, said one of said plurality of video programs consisting of first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion, comprising:

a first tuner for receiving data on said plurality of video programs, wherein said data on one of said plurality of video programs is transmitted together with said data on other ones of said plurality of video programs, so that said first tuner receives said data on said one of said

plurality of video programs at the same time that it receives data on said other ones of said plurality of video programs;

at least one memory device for storing said data on said plurality of video programs, including at least said one of said plurality of video programs;

a controller for receiving commands including at least a first command for setting a playback state of said DVR, a second command for initiating a playback of said one of said plurality of video programs from said memory device, and a third command for initiating said reception and said storage of said data on said plurality of video programs; and

at least one processor for (i) providing said first, second and third portions of said one of said plurality of video programs respectively to a display device in response to receiving said second command during a first portion of time, (ii) providing said first, second and third portions of said one of said plurality of video programs respectively to said display device in response to receiving said second command during a second period of time if said DVR is in a first playback state, and (iii) providing said first and third portions of said one of said plurality of video programs respectively to said display device in response to receiving said second command during said second period of time if said DVR is in a second playback state, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state.

19. The system of claim 18, wherein said third command further results in said first tuner being tuned to a particular frequency to receive said data on said plurality of video programs, said particular frequency being provided by a content provider and stored on said DVR.

20. The system of claim 18, wherein said second portion comprises at least one commercial and said data on said plurality of video programs is packetized, with individual packets being linked at least indirectly to individual ones of said plurality of video programs and to individual channels associated with content owners thereof.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1364

**Short Case Caption** Digital Broadcasting Solutions, LLC v. DISH Networks L.L.C.

**Filing Party/Entity** Digital Broadcasting Solutions, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/25/2025

Signature: /s/ Fred I. Williams

Name: Fred I. Williams

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Digital Broadcasting Solutions, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Mark J.E. McCarthy of Williams Simons & Landis PC | Todd E. Landis | Michael J. Fagan, Jr. |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

I. STATEMENT OF RELATED CASES ........................................................ 1

II. JURISDICTIONAL STATEMENT ........................................................ 1

III. STATEMENT OF THE ISSUES ........................................................ 1

IV. STATEMENT OF THE CASE AND FACTS ........................................................ 3

A. Subject Matter of the ’710 and ’122 Patents ........................................................ 3

B. The Final Written Decisions ........................................................ 7

V. SUMMARY OF THE ARGUMENT ........................................................ 9

VI. STANDARD OF REVIEW ........................................................ 10

VII. ARGUMENT ........................................................ 11

A. ’122 Patent: The Board Erred In Determining That The Combination Of *Casagrande*, *Russ*, And *Miller* Renders Obvious The “Third Command” Limitation ........................................................ 11

1. Petitioner/Cross-Appellants Failed to Meet Their Burden Regarding the “Third Command” Limitation. ........................................................ 13

2. Oral Argument Highlighted Petitioner/Cross-Appellants’ Failure of Proof. ........................................................ 16

3. The Board Committed Legal Error by Incorrectly Construing the “Third Command” Limitation ........................................................ 17

4. The Final Written Decision Is Not Supported By Substantial Evidence. ........................................................ 21

B. ’122 Patent: The Board Erred In Determining That The Combination Of *Casagrande*, *Russ*, And *Miller* Renders Obvious The “First Command” Limitation. ........................................................ 22

1. The Board Committed Legal Error by Incorrectly Construing the “First Command” Limitation. ........................................................ 23

2. The Final Written Decision is Not Supported By Substantial Evidence. ....30

C. ’122 Patent: The Board Erred In Determining That The Combination Of *Casagrande*, *Russ*, And *Miller* Renders Obvious The “At Least One Processor Configured To . . .” Limitation. ....31

1. The cited art does not teach or suggest the relationship between the “first command” and the “second command.” ....34

2. The cited art does not teach or suggest that the “second portion” (e.g., a commercial) is both skippable and non-skippable depending on time. ....37

3. Independent Claims 11 and 18 ....41

D. ’710 Patent: The Board Erred In Determining That The Combination Of *Casagrande* And *Russ* Render Obvious Claims 1, 2, 3-11, 13-16, 18, And 19. ....42

1. 1[c] “a controller configured to receive commands from a user of said DVR . . .” ....42

2. 1[d] “at least one processor configured to . . .” ....42

3. Independent Claims 9 and 18 ....42

E. ’710 Patent: The Board Erred In Determining That *Dow* And *Russ* Render Obvious Claims 1-16, 18, And 19. ....43

1. 1[d][i] “at least one processor configured to (i) provide said video program in its entirety. . .” ....43

a. The Board erred by violating the Administrative Procedure Act with respect to claim element 1[d][i]. ....43

b. The Board erred by deviating from the arguments raised in the ’976 Petition. ....45

c. The Board improperly construed the “first period of time” of claim element 1[d][i]. ....48

d. *Dow* alone fails to teach or suggest claim element 1[d][i]. ....................55

2. *Dow* and *Russ* do not teach or suggest claim element 1[d]. .....57

3. Independent Claims 9 and 18 ....................63

VIII. CONCLUSION AND RELIEF SOUGHT ....................63

## TABLE OF AUTHORITIES

### Cases

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ....................17

*Charles v. Hedges*,
783 F.2d 1038 (Fed. Cir. 1986) ....................39

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ....................11

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ....................29

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ....................13

*ERBE Elektromedizin GmbH v. Canady Technology LLC*,
629 F.3d 1278 (Fed. Cir. 2010) ....................53

*Google LLC v. Ecofactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .................... 11, 19

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
607 F.3d 776 (Fed. Cir. 2010) ....................24

*In re Enhanced Security Research, LLC*,
739 F.3d 1347 (Fed. Cir. 2014) ....................39

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) ....................10

*Inphi Corp. v. Netlist, Inc.*,
805 F.3d 1350 (Fed. Cir. 2015) ....................27

*IntelCorp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ....................10

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F. 3d 1345 (Fed. Cir. 2019) ....................54

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) ....................................................................24

*Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*,
50 F.4th 147 (Fed. Cir. 2022) .......................................................................11

*Novartis Pharms. Corp. v. Accord Healthcare, Inc.*,
38 F.4th 1013 (Fed. Cir. 2022) .....................................................................28

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................................................................53

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015) ....................................................................50

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................. 23, 53

*ResQNet.com, Inc. v. Lansa, Inc.*,
346 F.3d 1374 (Fed. Cir. 2003) ....................................................................12

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019 (Fed. Cir. 2017) ....................................................................43

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018)......................................................................................45

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
743 F.3d 1359 (Fed. Cir. 2014) ....................................................................55

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272 (Fed. Cir. 2017) .............23

**Statutes**

28 U.S.C. §1295 ...........................................................................................1

35 U.S.C. § 141 ............................................................................................1

5 U.S.C. § 706 ............................................................................................43

## I. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Digital Broadcasting Solutions, LLC states that no other appeal in or from the same proceeding in the originating tribunal was previously before this or any other appellate court.

Cases pending in this or any other court which will directly affect or be directly affected by this Court's decision in the pending appeal are listed below.

- *Digital Broadcasting Solutions, LLC v. DISH Network L.L.C.*, Case No. 2:22-CV-00335 (E.D. Tex.)

## II. JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board (the "Board") issued its Final Written Decision in IPR2023-00976 on December 9, 2024 (the "'976 Decision"). Appx0001-Appx0079. The Board simultaneously issued its Final Written Decision in IPR2023-00977 (the "'977 Decision"). Appx0080-Appx0174. Appellant/Patent Owner timely filed a Notice of Appeal in both cases on January 13, 2025. Appx1667-Appx01669, Appx2651-Appx2653. This Court has jurisdiction under 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. § 141(c).

## III. STATEMENT OF THE ISSUES

1. For the '122 Patent, on *de novo* review, whether the Board erred by (i) ignoring the requirement that the "third command instructs said DVR to receive and

store said plurality of video programs" or (ii) improperly construing the limitation to remove the reference to the antecedent for "said plurality of video signals."

2. For the '122 Patent, whether the Board's findings that *Casagrande* render obvious the "third command instructs said DVR to receive and store said plurality of video programs" supported by substantial evidence when the only evidence the Board relied on is a figure showing a box labeled "storage unit 1516."

3. For both patents, on *de novo* review, whether the Board erred by incorrectly construing the "first command" limitation.

4. For both patents, whether the Board's findings that the proposed grounds with *Casagrande* and *Russ* render obvious the "first command" and "at least one processor configured to . . .," limitations are supported by substantial evidence.

5. For the '710 Patent, on *de novo* review, whether the Board erred by improperly construing the term "first period of time."

6. For the '710 Patent, whether the Board violated the APA by failing to provide any analysis for claim limitation 1[d][i] for the combination of *Dow* and *Russ*.

7. For the '710 Patent, whether the Board's findings that the combination of *Dow* and *Russ* renders obvious the claims are supported by substantial evidence.

## IV. STATEMENT OF THE CASE AND FACTS

This case involves two patents: U.S. Patent Nos. 8,929,710 (the "'710 Patent") and 9,538,122 (the "'122 Patent"). Appx0175-Appx0186, Appx0187-Appx0200. The '122 Patent is a continuation of the '710 Patent. *See* Appx0187 (code 63).

On May 26, 2023, Cross-Appellants filed petitions for *inter partes* review of claims 1-19 of the '710 Patent and claims 1-20 of the '122 Patent. Appx0201-Appx0286; Appx1757-Appx1842. The Board instituted *inter* partes review on December 11, 2023. Appx0996-Appx1028; Appx2382-Appx2423. The Board held oral arguments on September 10, 2024. Appx1611-Appx1666. The Board issued final written decisions on December 9, 2024. Appx0001-Appx0079; Appx0080-Appx0174.

Appellant/Patent Owner timely filed a Notice of Appeal in each case on January 13, 2025. Appx1667-Appx01669, Appx2651-Appx2653. This Court consolidated the appeals of the final written decisions. Dkt. 10.

### A. Subject Matter of the '710 and '122 Patents

As explained during prosecution, the claimed inventions are directed to

> a digital video recorder ("DVR") that stores a video program and plays at least a portion of the video program back at a later time (e.g., a time more convenient to the user of the DVR, etc.). Video programs generally include multiple types of data. For example, a video program may include program data (e.g., a movie, a sitcom, etc.) and auxiliary

> data (e.g., a news ticker, a commercial, etc.), where the auxiliary data is either superimposed over the program data and/or placed between portions of the program data. While the program data may have a relatively long shelf life, the auxiliary data may not. For example, a news ticker or a commercial concerning the evening news may be of no (or limited) value after the evening news has been transmitted.

Appx0613. The claimed inventions address that disparity by "allowing a user to program the DVR to skip (or omit) at least a portion of the auxiliary data after its value has diminished." Appx0613.

At the time of the invention (e.g., November 2010), a user could generally fast forward through (or skip) commercial portions of a program stored on a DVR (e.g., pressing the fast forward button, a 30-second skip button, etc.). But "[t]his creates a problem … in that it … can decrease the value of the program to the content owner, the content provider and the advertisers." Appx0180 (1:45-49). The patents-in-suit similarly discuss that precluding fast forwarding (or skipping) "creates another problem in that the information that's included in the program may be outdated." Appx0180 (1:50-51). Specifically:

> a program may include an advertisement for a movie that is currently being shown at a local theater. If, however, the user does not watch the program for several weeks, that movie may no longer be playing at the local theater.

Appx0180 (1:52-55).

The claimed inventions strike a balance between these two competing interests via a <u>state machine</u> that precludes viewers from skipping auxiliary data

(e.g., commercials) when that data is at its most value, then later permits viewers to skip the auxiliary data (e.g., commercials) when its value has diminished. In particular:

> The claimed invention achieves the above advantages by allowing a user of the DVR to set (or program) the DVR into one of two states. In a first state, the DVR is configured to play the program as it was originally recorded (e.g., with both the program and auxiliary data). In a second state, the DVR is configured to play the program data without the auxiliary data (or a portion thereof). In the claimed inventions, the DVR can only be programmed to skip (or omit) auxiliary data once the auxiliary data is no longer of value or is of limited value. To this end, the claimed invention provides that if the video program is being watched within a first period of time (e.g., within a day or two of the video program being transmitted to the DVR, etc.), then the video program will be played back in its entirety (e.g., including both program and auxiliary data). However, if the video program is being watched within a second period of time (e.g., a week after the video program has been transmitted to the DVR, etc.), then the video program will be played back in its entirety (e.g., including both program and auxiliary data, etc.) if the DVR has been programmed to operate in its first playback state, or in portions (e.g., without at least a portion of the auxiliary data, etc.) if the DVR has been programmed to operate in its second playback state. At any time during the second period of time, the user could also watch the video program with and without auxiliary data (or portions thereof) by watching the video program while the DVR is in a first playback state, and then watching the video program while the DVR is in a second playback state.

Appx0613-Appx0614.

These features are recited in the claimed inventions through commands and periods of time that control functionality of the claimed DVR. For example, the DVR of the ’710 Patent receives and stores a “transmitted video program” that includes “at least first, second and third portions.” Appx0185 (11:46-12:16). A

command can then be used to playback the video program from memory where (i) the video program is played back during a first period of time "in its entirety . . . regardless of a playback state" of the DVR, (ii) the video program is played back during a second period of time "in its entirety . . . [if] said DVR is in said first playback state," and (iii) the video program minus the second (e.g., commercial) portion is played back during the second period of time if "said DVR is in said second playback state," where another "[user-initiated] command" controls the playback state. Appx0185 (11:62-12:14).

It is notable that (i) the entire video program (including first, second, and third portions) is received and stored in memory before playback is commenced and (ii) it is the transmitted commercial (i.e., "second portion") that cannot be skipped during the first period of time (regardless of playback state) and can be skipped during the second period of time only if the DVR is in a second playback state. Thus, the DVR precludes users from skipping the transmitted commercial during the first period of time and allows them to skip the same transmitted commercial during the second period of time.

The '122 Patent is directed to subject matter similar to that of the '710 Patent, but further limits how the "plurality of video programs" are received and stored, as well as the commands for doing so. Specifically, the DVR tuner must receive a "plurality of video programs" that "are transmitted at the same time on a single

channel within said data distribution system." Appx0198 (11:63-66) (emphasis added). Moreover, a "third command" causes the DVR to both "receive and store said plurality of video programs." Appx0198 (12:16-17).

In other words, not only does a single (third) command trigger both the reception [e.g., "said tuner can be tuned to said single channel to receive said plurality of video programs"] [Appx0198 (11:66-12:1)] and storage of said plurality of video programs, but the DVR must store "said plurality of video programs," which may include both wanted and unwanted programs.

### B. The Final Written Decisions

Petitioner/Cross-Appellants asserted three grounds of unpatentability for the '710 Patent, using three prior-art references:

**B. Identification of Challenge**

Petitioner requests review on the grounds that (1) claims 1-19 of the '710 Patent are obvious over Casagrande in view of Russ under 35 U.S.C. §103; (2) claims 1-5, 7-13, and 16-19 are anticipated by Dow under 35 U.S.C. §102; and (3) claims 1-19 are obvious over Dow in view of Russ under §103.

Appx0214. The Board found all claims, besides claim 17 of the '710 Patent, unpatentable:

| Claim(s) | 35 U.S.C. § | Reference(s) /Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–19 | 103(a) | Casagrande, Russ | 1, 2, 3–11, 13–16, 18, 19 | 3, 12, 17 |
| 1–5, 7–13, 16–19 | 102 | Dow | | 1–5, 7–13, 16–19 |
| 1–19 | 103(a) | Dow, Russ | 1–16, 18, 19 | 17 |
| **Overall Outcome** | | | 1–16, 18, 19 | 17 |

Appx0077.

Petitioner/Cross-Appellants asserted three grounds of unpatentability for the ’122 Patent, using four prior-art references:

> **B. Identification of Challenge**
>
> Petitioner requests review on the grounds that (1) claims 1-20 are obvious over Casagrande in view of Russ and Miller under 35 U.S.C. §103; (2) claims 1, 3-5, 7-11, 13-16, and 18-19 are anticipated by Dow under 35 U.S.C. §102; and (3) claims 1-20 are obvious over Dow in view of Russ and Miller under §103.

Appx1772. The Board found all claims of the ’122 Patent unpatentable:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–20 | 103(a) | Casagrande, Russ, Miller | 1–20 | |
| 1, 3–5, 7–11, 13–16, 18, 19 | 102(b) | Dow | | |
| 1–20 | 103(a) | Dow, Russ, Miller | | |
| **Overall Outcome** | | | 1–20 | |

Appx0173.

It is noteworthy that the Board made findings regarding the second and third grounds of patentability in the '976 Decision (anticipation by *Dow* and obviousness in view of *Dow* and *Russ*), whereas the Board made no findings regarding similar grounds in the '977 Decision. *Compare* Appx0051-Appx0076 *with* Appx0172. Because the claims of the '122 Patent are narrower than the '710 Patent, a reversal as to grounds 1 and 3 of the '976 Decision warrants a reversal with respect to similar grounds in the '977 Decision.

## V. SUMMARY OF THE ARGUMENT

The patents-in-suit strictly define the functionality of a DVR through claimed commands and periods of time. Unfortunately, however, the Board repeatedly disregarded or misconstrued claim terms, including the "third command [that] instructs said DVR to receive and store said plurality of video programs," "first command," and "first period of time" limitations.

Putting aside those legal errors, which this Court reviews *de novo*, the Board's decisions are not supported by substantial evidence. For example, the '122 Patent requires a "third command" that causes the DVR to receive and store two or more video programs that are (i) "transmitted at the same time," (ii) "transmitted on the same single channel," and (iii) received on the same "tuner." But the Board's sole

evidence to support its finding is a box labeled "storage unit 1516" in a figure, which falls short of a scintilla of evidence, let alone substantial evidence.

Accordingly, Appellant respectfully requests that the Court (i) vacate or reverse the Board's determinations that claims 1-16, 18, and 19 of the '710 Patent are rendered obvious by the cited art, and (ii) vacate or reverse the Board's determinations that claims 1-20 of the '122 Patent are rendered obvious by the cited art.

## VI. STANDARD OF REVIEW

The Board's legal determinations are reviewed *de novo*. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). "Claim construction is ultimately a question of law, decided *de novo* on review, as are the intrinsic-evidence aspects of a claim-construction analysis." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021) (cleaned up). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (cleaned up).

"Obviousness is a mixed question of law and fact, and we review the Board's ultimate obviousness determination *de novo* and underlying fact-findings for substantial evidence." *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th

147, 152 (Fed. Cir. 2022) (cleaned up). A Final Written Decision may be vacated and remanded to the Board to reconsider obviousness under the proper claim construction. *See Google LLC v. Ecofactor, Inc.*, 92 F.4th 1049, 1059 (Fed. Cir. 2024). Reversal is required when, after correcting the Board's analysis, "there is only one permissible factual finding." *Corning v. Fast Felt Corp.*, 873 F.3d 896, 903 (Fed. Cir. 2017).

## VII. ARGUMENT

### A. '122 Patent: The Board Erred In Determining That The Combination Of *Casagrande*, *Russ*, And *Miller* Renders Obvious The "Third Command" Limitation.

The independent claims of the '122 Patent require a "third command" that causes a DVR to both receive and store "said plurality of video programs." Independent claim 1, reproduced below in pertinent part, is representative of the independent claims:[1]

> a controller configured to receive commands from a user of said DVR, wherein . . . a third command instructs said DVR to receive and store said plurality of video programs

Appx0198 (12:10-16); *see also* Appx0199-Appx0200 (claim 11, claim 18). The antecedent basis for "said plurality of video programs" is recited earlier in the claim:

[1] The Petition relied on the same evidence and arguments for independent claims 1, 11, and 18. *See* Appx1787-Appx1789. The '977 Decision also relies on the same analysis for the independent claims. *See* Appx0159-Appx0160, Appx0169-Appx0170.

> a tuner for receiving a plurality of video programs, wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system, (ii) said tuner can be tuned to said single channel to receive said plurality of video programs,

Appx0198 (11:63-12:1); *see also* Appx0199-Appx0200 (claim 11, claim 18). As a result, a DVR that merely receives and stores two or more video programs,[2] received at different times, does not meet the claimed "third command." Nor does a DVR that merely causes the receipt and storage of two or more video programs received at the same time. Rather, a single instance of the "third command" must trigger two functions—reception (by "tun[ing] to said single channel") (Appx0198 (claim 1)) <u>and</u> storage of two or more video programs—where the video programs are:

(i) "transmitted at the same time;"

(ii) "transmitted on the same single channel;" and

(iii) received on the same "tuner."

Appx0198 (11:64-12:1). The Board's finding that the combination of *Casagrande*, *Russ*, and *Miller* renders obvious the "third command" limitation in claims 1-20 should be reversed because, at best, the record evidence merely supports a finding that the proposed combination could record two or more video programs received at different times.

---

[2] *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1382 (Fed. Cir. 2003) (a "plurality" means "at least two").

### 1. Petitioner/Cross-Appellants Failed to Meet Their Burden Regarding the "Third Command" Limitation.

"In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). Petitioner/Cross-Appellants wholly failed to meet their burden—their whole analysis of the "third command" limitation is a single sentence:

> Regarding the claimed "third command," Casagrande's discloses "user input 1523 directing the operation of the receiving device 1510" (Ex[1006], 18:54-60; Ex[1002] ¶126) the operations including "receiving device 1510, by way of the control logic 1520, [] configured to receive the first A/V stream 1504…and store the A/V stream 1504 in the storage unit 1516." Ex[1006], 18:64-67; Ex[1002] ¶126.

Appx1789. In fact, outside of headings and claim listings, the term "third command" occurs only twice in the entire Petition. *See* Appx1789, Appx1813.

The evidence in the Petition for the "third command" limitation is limited to two citations to *Casagrande* and one citation to Petitioner/Cross-Appellants' expert witness. *See* Appx1789. The Board agreed that Petitioner/Cross-Appellants "relie[d] only upon Casagrande for teaching the storage of a plurality of video programs under limitations 1[b] and 1[c]" and that Petitioner/Cross-Appellants

"d[id] <u>not</u> rely on Miller for the teaching of storage of a plurality of video programs under limitation 1[b] and 1[c]." Appx0123 (emphasis added); *see also* Appx1789.

The first citation merely states that the DVR of *Casagrande* can a command from a remote control. Appx0740 (18:54-60). The second citation to *Casagrande* merely states that the DVR can receive and store a "first A/V stream:"

> The receiving device **1510**, by way of the control logic **1520**, is configured to receive the first A/V stream **1504** by way of the communication interface **1502**, and store the A/V stream **1504** in the storage unit **1516**.

Appx0740 (18:64-67). Neither citation refers to two or more video programs, let alone two or more video programs that are (i) "transmitted at the same time," (ii) "transmitted on the same single channel," (iii) received on the same "tuner," and (iv) both received and stored in response to a single command.

The Petition's citation to Petitioner/Cross-Appellants' expert witness fares no better because his opinion merely paraphrases the single sentence in the Petition, while citing to the same two portions of *Casagrande*:

> 126. Casagrande also discloses wherein "a third command instructs said DVR to receive and store said plurality of video programs." Casagrande discloses "the control logic 1520 may communicate with a user interface 1522 configured to receive user input 1523 directing the operation of the receiving device 1510." Casagrande at 18:54–60. Casagrande explains that "[t]he receiving device 1510, by way of the control logic 1520, is configured to receive the first A/V stream 1504 by way of the communication interface 1502, and store the A/V stream 1504 in the storage unit 1516." *Id.* at 18:64-67. Thus, this limitation of claim element 1[c] is disclosed by Casagrande.

Appx1920-1921. At best, the Petition showed that the DVR of *Casagrande*—the only reference relied upon for the "third command"—could record two or more video programs received at different times, presumably in response to different commands (e.g., a first set of commands for receiving, a second set of commands for storing, etc.).

Patent Owner/Appellant raised this glaring deficiency in both the Patent Owner's Preliminary Response and the Patent Owner's Response after the Board instituted review. Appx2298-Appx2299; Appx2447-2448. Petitioner/Cross-Appellants filed a Reply, but they were silent on the issue. *See generally* Appx2567-Appx2600. The Board agreed:

> In Reply, we note Petitioner does not further address the third command with respect to Ground 1 over Casagrande, Russ, and Miller. Petitioner only addresses the third command with respect to Ground 2 over Dow (anticipation). Reply 20.

Appx0122.

#### 2. Oral Argument Highlighted Petitioner/Cross-Appellants' Failure of Proof.

During its opening argument, Petitioner/Cross-Appellants mischaracterized the "third command" as requiring only that the DVR store a single program, ostensibly because the asserted grounds are deficient:

> The other claim in '122 Patent that's not here, has <u>a third command that just basically says that the user wants to record a particular program</u>. Now, that command is obviously inherent in any DVR, including the ones in Casagrande and Dow.[3]

Appx1615 (5:23-26) (emphasis added).

> I'll mention the, I think I already mentioned the '122 Patent has a third command that is reflected here on slide 23. <u>And this command is, as you see on the top of the slide, is the one that tells the DVR to store the program in the first place</u>. And again, that's definitely in Casagrande as it would be inherent in any DVR system, you know, as we said, the DVRs have to record somehow and the user needs to tell the program to record. So, that command is also in our combination.

Appx1627 (17:3-9) (emphasis added).

---

[3] Counsel's reference to only *Casagrande* and *Dow* further demonstrates that Petitioner/Cross-Appellants did not rely on additional references for the "third command" limitation.

In response, Patent Owner/Appellant raised the mischaracterization to the Board. Appx1642-Appx1643 (32:22-33:4). Counsel also identified why the "third command" would not have been obvious:

> And we have to recall that at the time of this invention, it would have been highly unconventional [due] to the limited storage space of DVRs to have one command that is now going to start saving multiple programs ensuing substantial place or space, excuse me.

Appx1643 (33:4-9). In rebuttal, Petitioner/Cross-Appellants was not able to identify any support in the Petition for the "third command." *See* Appx1657-Appx1658 (47:26-48:19). Instead, counsel directed the Board to page 20 of the Petition, which concerns a different claim limitation. *See id.*; *see also* Appx1784. And even if counsel's reference to that page were proper, the discussion therein concerns only the receipt of "said plurality of video programs," with no reference to the storage of "said plurality of video programs," or a DVR that performs both functions in response to the "third command." Appx1784.

#### 3. The Board Committed Legal Error by Incorrectly Construing the "Third Command" Limitation.

A fundamental principal of claim construction is that the "[s]ubsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). Here, the "third command instructs said DVR to receive and store said plurality of video programs." Appx0198 (12:10-16); *see also* Appx0199-

Appx0200 (claims 11, 18[4]). The antecedent basis for "said plurality of video programs" is earlier in the claim:

> a tuner for receiving a plurality of video programs, wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system, (ii) said tuner can be tuned to said single channel to receive said plurality of video programs,

Appx0198 (11:63-12:1); *see also* Appx0199-Appx0200 (claims 11, 18). Thus, setting aside the fact that a single (third) command must instruct the DVR to both receive and store a "plurality of video programs," the "plurality of video programs" must be (i) "transmitted at the same time," (ii) "transmitted on the same single channel," and received on the same "tuner." *See id.*

The Board erred in concluding that the "third command" requires only "a memory device . . . for storing a plurality of video programs," not a single command for receiving and storing a plurality of video programs, and not "said plurality of video programs" as required by the claims:

[4] Claim 18 recites "data on said plurality of video programs." Appx0200 (15:13-15).

> Regarding Patent Owner's arguments pertaining to the 1[c] third command, as discussed above (for limitation 1[b]), we find Petitioner has persuasively shown that Casagrande teaches or suggests the use of a memory device (Fig 15, storage unit 1516) for storing a plurality of video programs because the language of claim 1[c] does not place any limits regarding *how* the plurality of video programs are stored.

Appx0122. The Board ignored the requirements of "said plurality of video programs" recited earlier in the claim and the fact that a single command instructs the DVR to both receive and store a plurality of video programs. The Board's bare citation to *Casagrande* Figure 15 that supposedly "teaches or suggests the use of a memory device . . . for storing a plurality of video programs," without any reference to the specific requirements of the "third command," further establishes the Board's legal error.

This Court has discussed the fine line between whether the Board has construed a claim or compared the claim to prior art. *See Google LLC v. Ecofactor, Inc.*, 92 F.4th 1049, 1055 (Fed. Cir. 2024) ("While the line between these two inquiries can be fine, the answer could be critical given the different standard of review applicable to each issue on appeal."). The determination hinges on the outcome of the analysis, and whether the analysis determines the boundaries of the claim. *See id.* The Board construed the claims to disregard the antecedent requirements of "said video programs." *See* Appx0122. That error resulted in the

Board's finding that the "third command" is disclosed in the *Casagrande* DVR by the mere presence of a memory device, without any reference to commands:

> Regarding Patent Owner's arguments pertaining to the 1[c] third command, as discussed above (for limitation 1[b]), we find Petitioner has persuasively shown that Casagrande teaches or suggests the use of a memory device (Fig 15, storage unit 1516) for storing a plurality of video programs because the language of claim 1[c] does not place any limits regarding *how* the plurality of video programs are stored.

Appx0122.

It is unclear whether the Board (i) simply ignored the requirement that the "third command instructs said DVR to receive and store said plurality of video programs" or (ii) construed the limitation to remove the reference to the antecedent for "said plurality of video signals." The same is true for the use of a single command to both receive and store a plurality of programs. Regardless, *de novo* review of the Board's decision is appropriate because both alternatives are legal error.

#### 4. The Final Written Decision Is Not Supported By Substantial Evidence.

The only evidence the Board cited to support its decision is *Casagrande* Figure 15 for its disclosure of "storage unit 1516:"

> Regarding Patent Owner's arguments pertaining to the 1[c] third command, as discussed above (for limitation 1[b]), we find Petitioner has persuasively shown that Casagrande teaches or suggests the use of a memory device (Fig 15, storage unit 1516) for storing a plurality of video programs because the language of claim 1[c] does not place any limits regarding *how* the plurality of video programs are stored.

Appx0122. This is Figure 15 of *Casagrande*:




Appx0725 (rotated). It is a block diagram of *Casagrande's* DVR (receiving device 1510). *See id.* "Storage unit 1516" is just a box interconnected to other blocks. *See id.* Even if "User Input 1523" in Figure 15 is a command, *Casagrande* does not

contain any disclosure that "User Input 1523" has the specific requirements of the "third command," including the specific requirements of "receiv[ing] and stor[ing]" and "said plurality of video programs."

The Board did not rely on the scant evidence in the Petition to support its finding. *See* Appx0121-Appx0123. But even if it had considered that evidence, it would not constitute substantial evidence for the reasons discussed in Section VII.A.1. Accordingly, the Board's determination that *Casagrande*, *Russ*, and *Miller* render obvious the "third command" limitation of the '122 Patent is not supported by substantial evidence.

### B. '122 Patent: The Board Erred In Determining That The Combination Of *Casagrande*, *Russ*, And *Miller* Renders Obvious The "First Command" Limitation.

Independent claim 1[c], which is representative of the other independent claims,[5] recites two commands: "a first command changes said DVR from a first playback state to a second playback state" and "a second command initiates playback of said one of said plurality of video programs from said memory device." Appx0198 (12:12-16); *see also* Appx0199-Appx0200 (claims 11 and 18).

[5] The Petition relied on the same evidence and arguments for independent claims 1, 11, and 18. *See* Appx1787-Appx1789. The '977 Decision also relies on the same analysis for independent claims 1, 11, and 18. *See* Appx0159-Appx0160, Appx0169-Appx0170.

### 1. The Board Committed Legal Error by Incorrectly Construing the "First Command" Limitation.

Appellant asserts that the ordinary and customary meaning of the term "first command" is a user command that changes the DVR "from a first playback state to a second playback state" but does <u>not</u> initiate playback of a video program because the claims expressly require that the "second command" initiate playback. The Board improperly rejected that interpretation for allegedly narrowing the claim term by importing a negative limitation. *See* Appx0096-Appx0101. The Board erroneously construed the claim term "first command" to mean a user command that changes the DVR "from a first playback state to a second playback state" and can also initiate playback of a video program. *See id*.

As explained by this Court,

> the words of a claim are generally given their ordinary and customary meaning. . . . [T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. . . .

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (cleaned up); *see also Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017) ("The context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of terms in a claim") (cleaned up). "[T]his court does not interpret claim terms in a vacuum, devoid of the context

of the claim as a whole." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008).

It is undisputed that independent claim 1 requires two distinct commands: a "first command" and a "second command." *See* Appx0198 (12:12-16). A skilled artisan would not interpret the "first command" as being capable of initiating playback of the video program because the "first command" alone never initiates playback of the video program. *See* Appx0198 (12:17-37); Appx2507 (¶51). Instead, throughout independent claim 1, the "first command" and the "second command" are used together to control operation of the DVR: the "first command" is used to set the playback state of the DVR, while the "second command" is used to initiate playback of the video program after the playback state of the DVR has been set by the "first command." *See id*. If the "first command" also initiated playback of the video program, that would improperly render the "second command" superfluous or redundant because both the "first command" and "second command" initiate playback, which would undermine the notice function of the claims. *See Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) ("This notice function would be undermined, however, if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous.").

While that is the commonsense interpretation of the "first command," the Board improperly rejected it for supposedly narrowing the claim term beyond its plain and ordinary meaning, likening it to importing an additional unclaimed negative limitation. *See* Appx0096-Appx0101. Responding to Patent Owner-Appellant's argument regarding the "second command" being superfluous or redundant if the "first command" also initiated playback, the Board argued that "the 'first command' would also have to change playback states, so the 'first command' and 'second command' terms would still have different meanings." Appx0097. But under that reasoning, the Board is necessarily interpreting the "second command" as <u>not</u> changing the DVR "from a first playback state to a second playback state." In other words, <u>the Board's position</u> requires importing an additional unclaimed negative limitation (i.e., the "second command initiates playback of said one of said plurality of video programs from said memory device [*but does not change said DVR from the first playback state to the second playback state*]"). That is exactly what the Board criticized Patent Owner for allegedly doing in the first place. *See* Appx0096-Appx0101.

Responding to Patent Owner-Appellant's argument regarding claim 1 becoming illogical if the "first command" also initiates playback, the Board takes the baseless position that "there is <u>no indication</u> in claim 1 that the 'first command' and 'second command' are <u>related or linked</u>." Appx0098 (emphasis added). The

plain language of the claim—the fact that they are named "first" and "second" commands—shows otherwise. The Board concedes that the "first command" in claim 1 changes the playback state of the DVR. Appx0097; *see also* Appx0198 (12:11-13). In fact, claim 1 does not recite any other mechanism that can change the playback state of the DVR. Further, claim 1 recites "provide [the video program] . . . in its <u>entirety</u> . . . in response to receiving said second command . . . if said DVR is in said <u>first playback state</u>" and "provide <u>only a portion</u> of [the video program] . . . in response to receiving said second command . . . if said DVR is in said <u>second playback state</u>." Appx0198 (12:20-28). In other words, how the DVR responds to the "second command" depends on the playback state of the DVR when the "second command" is received. But as discussed above, the "first command" sets/changes the playback state of the DVR. Accordingly, the "first command" controls how the DVR responds to the later received "second command." Contrary to the Board's findings, the "first command" and the "second command" are very much "linked or related."

Additionally, the Board argues:

> even if the "first command" changed the playback state and initiated playback, we discern nothing in the claim precluding that there could be intervening events—like playback being paused—wherein the "second command" would nonetheless be used to initiate playback in accordance with claim limitations 1[d][i]-[iii].

Appx0098. As a threshold matter, that scenario is a fabrication by the Board that is not disclosed in the intrinsic record. Further, that fabricated scenario raises questions that the Board wholly ignores: Would the "first command" playback the entire video program or only a portion of it? Would playback initiated by the "first command" be subject to the same time restrictions (e.g., the "first period of time" and the "second period of time") as the "second command"? Would the "first command" change the playback state of the DVR before or after initiating playback? Following the intervening event—like playback being paused—can the "first command" be used to resume playback of the video program? Unsurprisingly, the intrinsic record provides no answers to those questions because, contrary to the Board's fabricated scenario, the claimed "first command" <u>does not</u> initiate playback of the video program.

According to the Board, the specification provides no "supporting description of the negative limitation argued by Patent Owner (that playback is not initiated by the first command)." Appx0100. That is false. This Court has held that "the specification satisfies the written description requirement when the essence of the original disclosure conveys the necessary information—regardless of how it conveys such information, and regardless of whether the disclosure's words are open to different interpretations." *Inphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1354 (Fed. Cir. 2015) (cleaned up). Further, this Court did "<u>not</u> [] create a heightened standard

for negative claim limitations. Just as disclosure is the hallmark of written description for positive limitations, [] so too for negative limitations. That disclosure need not rise to the level of disclaimer. Nor must it use the same words as the claims . . . Rather, as with positive limitations, the disclosure must only reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1020 (Fed. Cir. 2022) (cleaned up) (emphasis added). As disclosed by the '122 Patent,

> in response to the user pressing the "play" button on the remote control 770, the processor 740 would not only function to play the time-shifted data, but also to automatically acquire auxiliary data . . . and to automatically display (at an appropriate time) the auxiliary data on the display 750 . . . That being said, a user may be able to program the receiver/DVR (e.g., during set-up) to enable/disable the receiving and/or displaying of auxiliary data (or a portion thereof) . . . Thus, a user may be able to program the processor 740 to display only program data, and not auxiliary data, or filter the auxiliary data so that only certain information is displayed, or certain information is not displayed.

Appx0197 (9:61-10:14) (emphasis added). The claimed "first command" corresponds to "program[ming] the receiver/DVR" to "enable/disable the [] displaying of auxiliary data" (e.g., a commercial), while the claimed "second command" corresponds to "pressing the 'play' button . . . to play the time-shifted data" (i.e., the stored video program). The '122 Patent does not disclose that programming the DVR to enable/disable display of auxiliary data (i.e., the "first command") initiates playback. *See id.* But the same paragraph discloses that

pressing the "play" button (i.e., the "second command") initiates playback. *See id*. That paragraph also discloses that programming the DVR to enable/disable the displaying of auxiliary data (i.e., the "first command") takes place "during set-up." *See id*. It would be illogical to initiate playback "during set-up" because the user is in the process of "program[ming] the [DVR's] processor" to control what will and what will not be displayed. *Id*. Instead, playback is only initiated later, after the user is finished "program[ming] the [DVR's] processor" (i.e., after "set-up"), by "pressing the 'play' button" (i.e., the "second command"). *See id.* At bottom, that paragraph of the '122 Patent conveys to a skilled artisan that the inventor possessed a DVR in which the "second command" initiates playback but the "first command" does not, which is exactly what is being captured by independent claim 1. Thus, contrary to the Board's finding, the specification supports that playback is not initiated by the claimed "first command."

The Board also found that "[g]iven that the preambles of independent claims 1, 11, and 18 each use the open-ended transitional term 'comprising' . . . we decline Patent Owner's invitation to read an unclaimed negative limitation into the claim." Appx0101. The Board's position is flawed. While "the term 'comprising' raises a presumption that the list of [claim] elements is nonexclusive," that presumption "does not reach into each [claim element] to render every word and phrase therein open-ended." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007).

In other words, the use of "comprising" in the preamble of claim 1 does not give the Board a license to expand the "first command" to also initiate playback. But that is exactly what the Board has attempted to do.

For the aforementioned reasons, the Board's improper construction of the claim term "first command" should be vacated.

### 2. The Final Written Decision is Not Supported By Substantial Evidence.

The "first command," when properly construed, does not initiate playback of a video program; it is the "second command" that initiates playback of the video program. The Board found,

> As Petitioner persuasively shows, Casagrande teaches that "a user may *select* by way of the *user input 1523* whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514," corresponding to the selection by the user of the second playback state, which we find is sufficient to teach or suggest the claimed change of the DVR from a first playback state to a second playback state, as performed by the "first command" of claim 1[c].

Appx0119 (emphasis added). The fact that one of the streams is being "outputted to the display device" means that the command that precipitated that output (i.e., *Casagrande's* selection of "the first A/V stream 1504 or the second A/V stream 1512") initiated playback. In fact, a few lines earlier, *Casagrande* discloses its "user input 1523" "command[s] the receiving device 1510 to output the first A/V stream

1504 to the display device 1514 for presentation" (Appx0741 (19:15-18)), which only reinforces that *Casagrande's* selection of "the first A/V stream 1504 or the second A/V stream 1512" (the Board-identified "first command") initiates playback. That is contrary to the ordinary and customary meaning of the "first command" in claim element 1[c]. Further still, *Casagrande* is silent on any additional step the user must take to initiate playback after selecting "the first A/V stream 1504 or the second A/V stream 1514." *See* App0741 (19:63-20:2). That too reinforces that *Casagrande's* selection of "the first A/V stream 1504 or the second A/V stream 1514" (the Board-identified "first command") initiates playback, which again is contrary to the ordinary and customary meaning of the "first command" in claim element 1[c]. Accordingly, *Casagrande's* selection of "the first A/V stream 1504 or the second A/V stream 1514" cannot be the claimed "first command."

The Board does not rely on *Russ* or *Miller* to teach the "first command." *See* Appx0117-Appx0119. For the aforementioned reasons, the Board's determination that *Casagrande*, *Russ*, and *Miller* render obvious the "first command" of claim element 1[c] is not supported by substantial evidence.

### C. '122 Patent: The Board Erred In Determining That The Combination Of *Casagrande*, *Russ*, And *Miller* Renders Obvious The "At Least One Processor Configured To . . ." Limitation.

Limitation 1[d] recites "at least one processor configured to" provide different portions of "one of said plurality of video programs" based on the "playback state"

of the DVR and when playback is taking place (i.e., whether playback is taking place during the claimed "first period of time" or "second period of time"). Appx0198 (12:17-36). The claim recites three scenarios that define the required configuration of the "at least one processor." *Id*.

First, the "at least one processor" must

> (i) provide said one of said plurality of video programs in its entirety to a display device in response to receiving said second command during a first period of time

Appx0198 (12:17-20). The claimed "one of said plurality of video programs" contains at least three portions. *See* Appx0198 (12:1-3). As a result, under the first scenario, the "at least one processor" must be configured to provide the first, second, and third portions. *See* Appx0198 (12:1-3, 17-20).

Second, the "at least one processor" must

> (ii) provide said one of said plurality of video programs in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in said first playback state

Appx0198 (12:20-24). This second scenario occurs when (1) "said DVR is in said first playback state" and (2) "in response to receiving said second command during a second period of time." *See id*. Here again, the "one of said plurality of video programs" contains at least three portions, so under the second scenario, the "at least one processor" must be configured to provide the first, second, and third portions. *See* Appx0198 (12:20-24), Appx2515-Appx2516 (¶68).

Third, the "at least one processor" must

> (iii) provide only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said one of said plurality of video programs, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state

Appx0198 (12:25-36). This third scenario occurs when (1) "said DVR is in said second playback state" and (2) "receiving said second command during said second period of time." *See id*. The "first command" to set the DVR in the "second playback state" must be received at some point before the "second command" initiating playback is received. *See* Appx2516 (¶69). Under the third scenario, the "at least one processor" provides only a portion of the video program, not the entirety of the video program as under the first and second scenarios. *Compare* Appx0198 (12:25-36) *with* Appx0198 (12:17-20) (first scenario), Appx0198 (12:20-25) (second scenario). Specifically, the "at least one processor" will provide "at least said first and third portions of said plurality of video programs," but not the second portion, and "said third portion is provided to said display device immediately following said first portion." *See* Appx0198 (12:25-36), Appx2516 (¶69).

In summary, the "at least one processor" is configured such that the user of the DVR cannot skip the "second portion" of the "one of said plurality of video

programs" during the "first time period" (i.e., the first scenario). Appx0198 (12:17-20); *see also* Appx2517 (¶70). Subsequently, during the "second time period,"[6] the "at least one processor" is configured such that the user of the DVR can choose whether to skip the "second portion" of the "one of said plurality of video programs" based on selecting the "first playback state" or the "second playback state" (i.e., the second and third scenarios). Appx0198 (12:18-36), Appx2517 (¶70). As a result, the user cannot skip the "second portion," which can be a commercial more proximate to when the "video program" was received, whereas the skip functionality becomes available at a later point in time. *See id*.

**1. The cited art does not teach or suggest the relationship between the "first command" and the "second command."**

As discussed above, in the third scenario, the "first command" to set the DVR in the "second playback state" must have been received at some point before the "second command" initiating playback was received. *See* Appx2516 (¶69), Appx2523 (¶81). The Board found *Casagrande's* (i) selection of "the first A/V stream 1504 or the second A/V stream 1512" to be the claimed "first command" (ii) "selection of particular segments from the selection menu" for presentation to be the claimed "second command." Appx0119, Appx0121. But *Casagrande* fails to disclose that selection of "the first A/V stream 1504 or the second A/V stream 1512"

[6]Claim 1 of the '122 Patent recites that "said second period of time is a period of time after said first period of time." Appx0198 (12:37-38).

(the Board-identified "first command") is ever used in combination with "selection of particular segments from the selection menu" (the Board-identified "second command") to control the DVR, much less in the sequence that the third scenario requires.

The Board did not expressly address the relationship between the "first command" and "second command" in the section corresponding to claim element 1[d][iii] (i.e., the third scenario). *See* Appx0140-Appx0144. Instead, the Board references its reasoning in the section corresponding to claim element [d][ii] (i.e., the second scenario). *See* Appx0142 ("we do not find Patent Owner's arguments on Casagrande and Russ to be persuasive for the reasons discussed above for limitation 1[d][ii]"). In that section, the Board takes the incredible position that "there is no indication in claim 1 that the 'first command' and 'second command' are related or linked." Appx0135 (emphasis added). But the plain language of the claim indicates otherwise—the commands are named "first" and "second."

Claim 1 recites the "first command changes said DVR from a first playback state to a second playback state." Appx0198 (12:11-13). Claim 1 does not recite any other mechanism that could change the playback state of the DVR. *See* Appx0198 (11:60-12:40). The Board even concedes that the claimed "first command" in claim 1 changes the playback state of the DVR. Appx0097. Accordingly, if the DVR is in the "second playback state" when the "second

command" is received, as is the case in the third scenario, it is because the DVR received the "first command" at some point before it received the "second command."

Claim 1 also recites "provide [the video program] . . . in its entirety . . . in response to receiving said second command . . . if said DVR is in said first playback state" and "provide only a portion of [the video program] . . . in response to receiving said second command . . . if said DVR is in said second playback state." Appx0198 (12:20-28) (emphasis added). Accordingly, the "first command" controls how the DVR responds to the later received "second command." With respect to the third scenario, the "first command" places the DVR in the second playback state, which causes "only a portion" of the video program (instead of the "entirety" of the video program) to be played when the "second command" is later received. Thus, contrary to the Board's findings, the "first command" and the "second command" are very much "linked or related." And as discussed above, *Casagrande* does not teach or suggest that the combination of its selection of "the first A/V stream 1504 or the second A/V stream 1512" (the Board-identified "first command") and its "selection of particular segments from the selection menu" (the Board-identified "second command") control operation of the DVR, as the claimed third scenario requires.

### 2. The cited art does not teach or suggest that the "second portion" (e.g., a commercial) is both skippable and non-skippable depending on time.

Claim element 1[d] requires that during a first period of time the second portion (e.g., a commercial) of the video program cannot be skipped regardless of the user's desire to do so (as reflected in the user-controlled playback state of the DVR), but during a second period of time, the second portion (i.e., the same commercial) is skippable at the user's discretion (again, as reflected in the user-controlled playback state of the DVR). Thus, the second portion (i.e., the commercial) can be both skippable and non-skippable depending on time, i.e., there is a temporal element on when the second portion can be skipped.

*Casagrande* does not teach the required temporal element. Instead, the Board and Petitioner rely on *Russ* to cure the deficiencies of *Casagrande*. Appx0130. But *Russ*, like *Casagrande*, also does not teach the required temporal element. The Board's position hinges on Petitioner/Cross-Appellants' assertion that "Russ discloses its trick play functionality for skipping commercials could be restricted, particularly suggesting to preclude trick play for only a specified length of time, such as two weeks." Appx0128-Appx0129 (citing Appx1791) (cleaned up). But that assertion is a gross mischaracterization of *Russ*.

*Russ* discloses that an ad/commercial is inserted into a "commercial slot" and that different commercials may occupy a commercial slot at different times.

Appx0786 (¶[0035]). "The commercial slots could be persistent, meaning another product commercial would not be inserted over the specified commercial, but it could be updated by the company owning the commercial slot," and "[a] non-persistent commercial slot could display a particular ad for a company during a specified length of time before the commercial slot could then display a commercial for a different company." *Id*. (emphasis added).

A commercial is inserted into a commercial slot via a tag, and the tag specifies (1) an expiration for the commercial, and (2) whether the commercial can be skipped. *See* Appx0786 (¶[0035]). After the expiration, "the tag would become inactive or replaceable" and thus the commercial would no longer be viewable (because the tag is inactive) or the commercial would be replaced with a different commercial (because the tag is replaced). *Id*. *See also* Appx2544-Appx2545 (¶123). In other words, it is the commercial's tag that determines whether that commercial can be skipped—not the time at which the command to playback the video program is received. Accordingly, in *Russ*, trick-play (e.g., skipping) preclusion is commercial-based, not time-based. Thus, *Russ*, like *Casagrande*, also fails to teach a single commercial that is non-skippable during a first period of time and skippable during a second period of time.

Both Petitioner/Cross-Appellant and the Board focus on one sentence in *Russ*—"The commercial slot could also preclude trick play for only a specified

length of time, such as two weeks." *See* Appx0130 (quoting Appx0786 (¶[0035])), Appx1791 (citing Appx0786 (¶[0035])). But when properly read within the entire context of *Russ* paragraph [0035] (and leading paragraphs [0033] and [0034]), that sentence means either (1) the commercial slot is occupied by a single commercial, and the commercial's tag specifies that the commercial expires in two weeks and that trick play is precluded, or (2) the commercial slot will be occupied by different commercials over the next two weeks and each tag for each of those commercials specifies that trick play is precluded. Again, in either case, trick-play (e.g., skipping) preclusion is commercial based, not time based. The Board improperly read that one sentence from *Russ* in a vacuum without considering *Russ* as a whole. *See In re Enhanced Security Research, LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014) (Section 103 "does not permit a court to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole."); *Charles v. Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art.")

According to the Board, Petitioner/Cross-Appellant "relies on Russ's teaching of the desirability of having a first period of time where the user must watch the

entire program, so it is this known time-based limit in Russ that would have been implemented in Casagrande." Appx0127 (emphasis added). The Board's reasoning is fatally flawed: *Russ* does not disclose a generic "time-based limit" that can be implemented in *Casagrande* to meet the requirements of claim element 1[d]. To the extent that *Russ* discloses anything vaguely resembling time-based skipping restrictions, it does so via a tagging scheme. But as discussed above, in *Russ'* tagging scheme, trick-play (e.g., skipping) preclusion is commercial based, not time based. That contradicts what claim element 1[d] requires.

The Board also rejected Patent Owner/Appellant's argument regarding *Russ's* tags:

> We do not find persuasive Patent Owner's argument that Russ's teachings do not apply because it is its "tag" that determines whether the commercial can be skipped and not the time at which the video program is played back. PO Resp. 23. Again, Petitioner relies on Russ's teaching of restricting skipping commercials during playback for a certain time combined with Casagrande, wherein once the restriction expires the user may elect to skip the commercials or not.

Appx0134 (internal citations omitted). The Board's position is flawed because *Russ* does not teach a generic "first period of time" with skipping restrictions followed by a generic "second period of time" without restrictions that can be implemented in *Casagrande*. To the extent *Russ* does teach anything vaguely resembling a "first

period of time" followed by a "second period of time," it does so via its expiring tags. But implementing *Russ'* tagging scheme in *Casagrande* will <u>not</u> allow the user in *Casagrande's* modified system to view the "second portion" (e.g., the commercial) during the "second period of time" (if the user desires to do so)—the commercial corresponding to the expired tag would either be non-viewable or replaced by a new commercial. That contradicts what claim element 1[d] requires.

For the aforementioned reasons, the Board's determination that *Casagrande*, *Russ*, and *Miller* render obvious independent claim 1 of the '122 Patent is not supported by substantial evidence and should be vacated or reversed.

**3. Independent Claims 11 and 18**

The '977 Decision does not provide independent analysis for independent claims 11 or 18. *See* Appx0160, Appx0169-Appx0170. Instead, the '977 Decision contends that the testimony and other evidence of record related to claim 1 is relevant to each of the independent claims. *See id*. As a result, the Board's determinations that *Casagrande*, *Russ*, and *Miller* render obvious independent claims 11 and 18 of the '122 Patent are not supported by substantial evidence for the same reasons discussed above in reference to independent claim 1.

### D. ’710 Patent: The Board Erred In Determining That The Combination Of *Casagrande* And *Russ* Render Obvious Claims 1, 2, 3-11, 13-16, 18, And 19.

#### 1. 1[c] “a controller configured to receive commands from a user of said DVR . . .”

Both claim element 1[c] of the ’710 Patent and claim element 1[c] of the ’122 Patent require a “first command” that changes the playback state of the DVR but does not initiate playback, and a “second command” that initiates playback of the video program. *Compare* Appx0185 (11:57-61) *with* Appx0198 (12:10-15). The cited art fails to teach or suggest the “first command” for all the reasons discussed in Section VII.B.

#### 2. 1[d] “at least one processor configured to . . .”

Both claim element 1[d] of the ’710 Patent and claim element 1[d] of the ’122 Patent Claim capture three scenarios. *Compare* Appx0185 (11:62-12:14) *with* Appx0198 (12:17-35). Those three scenarios are discussed above in Section VII.C. The cited art fails to teach or suggest claim element 1[d] for all the reasons discussed above in Sections VII.C.1 and VII.C.2.

#### 3. Independent Claims 9 and 18

The ’976 Decision does not provide an independent analysis for independent claims 9 or 18. *See* Appx0040-Appx0041. Instead, the ’976 Decision relies on the same arguments for independent claim 1. See *id*. As a result, the Board’s determinations that *Casagrande* and *Russ* render obvious independent claims 9 and

18 of the ’710 Patent are not supported by substantial evidence for the same reasons discussed above in reference to independent claim 1.

### E. ’710 Patent: The Board Erred In Determining That *Dow* And *Russ* Render Obvious Claims 1-16, 18, And 19.

#### 1. 1[d][i] “at least one processor configured to (i) provide said video program in its entirety. . .”

Claim element 1[d][i] recites “at least one processor configured to (i) provide said video program in its entirety to a display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received <u>during a first period of time</u>.” Appx0185 (11:62-66) (emphasis added).

##### a. The Board erred by violating the Administrative Procedure Act with respect to claim element 1[d][i].

This Court “reviews the Board’s decisions under the Administrative Procedure Act (APA). Taking ‘due account . . . of the rule of prejudicial error,’ we must ‘hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,’ ‘without observance of procedure required by law,’ or ‘unsupported by substantial evidence.’” *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017) (quoting 5 U.S.C. § 706).

The ’976 Petition analyzed multiple claim elements of independent claim 1 in view of the combination of *Dow* and *Russ*. *See* Appx0268-0273. Although claim elements 1[d][ii] and 1[d][iii] were analyzed, the analysis of claim element 1[d][i]

was noticeably absent.[7] *See id.* Instead, the ’976 Petition expressly stated that claim "elements not discussed below are disclosed or rendered obvious <u>for the reasons stated above in Ground 2</u>." Appx0268 (emphasis added). Ground 2 is an anticipation analysis in view of *Dow* alone. *See* Appx0252-Appx0261. And the Board found that the ’976 Petition "does not identify any Dow disclosure that supports that there would be playback of the entire video program in a first period of time," as claim element 1[d][i] requires. Appx0074. Accordingly, the Board concluded that "Petitioner has not met its burden to demonstrate the disclosure of limitation 1[d][i] in Dow." *Id.*

Again, the ’976 Petition does not present any arguments, beyond those in Ground 2, why *Dow* alone teaches or suggests claim element 1[d][i] under 35 U.S.C. § 103. *See* Appx0268-Appx0272. Further, the ’976 Petition, by its own admission, does not rely on *Russ* to teach or suggest claim element 1[d][i]. *See* Appx0268 (claim "elements not discussed below are disclosed or rendered obvious for the reasons stated above in Ground 2"). The Board even acknowledged those facts: "For the teaching of limitation 1[d][i] under its obviousness assertions, Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow." Appx0055 (n.17). Accordingly, consistent with the Board's

---

[7] Appellant notes that the ’976 Petition expressly and distinctly analyzed claim element 1[d][i] under Ground 1 and Ground 2. *See* Appx0232-Appx0233, Appx0258-0259.

conclusion regarding claim element 1[d][i] in Ground 2, the Board should have also concluded that Petitioner did not meet its burden to demonstrate that *Dow* and *Russ* teach or suggest claim element 1[d][i]. In failing to do so, the Board acted arbitrarily and capriciously, violating the APA. Thus, the Board's conclusion regarding claim element 1[d][i] and the combination of *Dow* and *Russ* should be vacated or reversed.

**b. The Board erred by deviating from the arguments raised in the '976 Petition.**

An *inter partes* review must proceed "in accordance with or in conformance to the petition." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 365 (2018) (internal quotations omitted). "Nothing suggests the Director enjoys a license to depart from the petition and institute a <u>different</u> inter partes review of his own design." *Id.* (emphasis in original). The "statute tells us that the petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion." *Id.* at 367.

The '976 Petition relied solely on *Dow* to teach or suggest claim element 1[d][i]. *See* Appx0268 (claim "elements not discussed below are disclosed or rendered obvious for the reasons stated above in Ground 2"). Petitioner's expert also relied solely on *Dow* when discussing claim element 1[d][i]. *See* Appx0437-Appx0438 (¶¶339-341). In its Response, Patent Owner-Appellant noted that "Petitioner does not contend that it would have been obvious to combine *Dow* and *Russ* to address *Dow's* failure to disclose limitation 1[d][i]." Appx1103. In its

Reply, Petitioner/Cross-Appellant provided no additional analysis of claim element 1[d][i] in view of *Dow* and *Russ*, and thus did not assert that *Russ* is being used to teach or suggest claim element 1[d][i]. *See* Appx1234. The entirety of Petitioner/Cross-Appellant's arguments regarding Ground 3 (i.e., the combination of *Dow* and *Russ*) in the '976 Reply is reproduced below:

> **C. Ground 3: Claims 1-19 Are Obvious Over Dow and Russ.**
>
> PO rehashes similar arguments as it made with Grounds 1 and 2, which the Board should reject for the reasons stated above. PO also contests whether "it would have been obvious to combine Dow and Russ." *See* POR at 50-54. Petitioner notes that Ground 3 shows that Dow alone or, alternatively, in combination with Russ renders obvious all the limitations of the challenged claims. But PO's Response also fails because it ignores analysis from Petitioner and Dr. Jeffay that "[a] POSA viewing the teachings of…Dow…would have naturally looked to Russ for additional details regarding the implementation of such functionalities on DVRs." Paper 2, 20-21; Ex[1002]¶86. Thus, PO's arguments should be rejected, and the Board should determine that the challenged claims are rendered obvious by Dow alone or in combination with Russ.

Appx1234. The Board even acknowledged that the '976 Petition relied solely on *Dow* to teach or suggest claim element 1[d][i]: "For the teaching of limitation 1[d][i] under its obviousness assertions, Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow." Appx0055 (n.17). *See*

*also* Appx0056 ("the Petition states that it relies on the anticipation assertions for this limitation").

While it would seem undisputed that the '976 Petition relies solely on *Dow* to teach or suggest claim element 1[d][i], the Board found that the '976 Petition

> also states that, in the combination, Russ explains "[t]he commercial slot could also preclude trick play for only a specified length of time, such as two weeks" and that "Russ discloses the desirability of having a first time period wherein the user must watch the entire A/V stream, including commercials, such as when the operator or programmer has placed a two-week restriction on skipping commercials." <u>We find that this reference back to "the first period of time" shows that Petitioner relies on the combination of Dow and Russ for the teaching of limitation 1[d][i]</u>.

Appx0056-Appx0057 (internal citations omitted) (emphasis added). But the Board's position contradicts what is expressly stated in the '976 Petition: claim "elements not discussed below are disclosed or rendered obvious for the reasons stated above in Ground 2." Appx0268. And the Board's citations are to the discussion of claim element 1[d][ii] in the '976 Petition, <u>not</u> claim element 1[d][i]. *See* Appx0268-Appx0270. Further, when directly challenged by Patent Owner-Appellant, Petitioner/Cross-Appellant provided no substantive rebuttal arguments regarding the combination of *Dow* and *Russ* with respect to claim element 1[d][i]. *Compare* Appx1103 *with* Appx1234. Accordingly, the Board is adopting arguments on behalf of Petitioner/Cross-Appellant that could have been, but were not, raised by Petitioner/Cross-Appellant during the '976 IPR in violation of the Supreme

Court's and this Court's case law. Thus, the Board's conclusion regarding claim element 1[d][i] and the combination of *Dow* and *Russ* should be vacated or reversed.

#### c. The Board improperly construed the "first period of time" of claim element 1[d][i].

Appellant asserts that the ordinary and customary meaning of the term "a first period of time," as recited by claim element 1[d][i], is a period of time that starts at some point after transmission of the entire "video program" to the DVR. The Board improperly rejected that interpretation for allegedly narrowing the claim term beyond its plain and ordinary meaning. *See* Appx0008-Appx0012. Appellant disagrees.

A POSITA would interpret the "first period of time" to start after transmission of the entire "video program" to the DVR. *See* Appx1129 (¶47). That interpretation is based on the claim language itself. Specifically, claim 1 also recites "a memory device for storing said video program," "a second command initiates playback of said video program from said memory device" of the DVR, and "at least one processor configured to [] provide said video program in its entirety to a display device . . . if said second command is received during a first period of time." Appx0185 (11:60-66) (emphasis added). In order to "provide said video program in its entirety" from "said memory device," the entire "video program" must be stored in the "memory device," which is only possible after transmission of the entire

"video program" to the DVR. *See* Appx1129 (¶47). Accordingly, the "first period of time" must start after transmission of the entire "video program."

Further, that interpretation is also consistent with the dependent claims. For example, dependent claim 6 recites, in part, "wherein said first period of time is a period of time that is less than one week from said transmission of said video program." Appx0185 (claim 6) (emphasis added). As another example, dependent claim 14 recites, in part, "wherein said first period of time is a first day after said video program has been transmitted." Appx0186 (claim 14) (emphasis added). Accordingly, the dependent claims reinforce that the "first period of time" must start after transmission of the entire "video program." *See* Appx1129-Appx1130 (¶48).

Further still, that interpretation is also consistent with the prosecution history of the '710 Patent. As explained by patentee to the Examiner, the claimed invention is directed to

> a digital video recorder ("DVR") that stores a video program and plays at least a portion of the video program back at a later time (e.g., a time more convenient to the user of the DVR, etc.) . . . In a first state, the DVR is configured to play the program as it was originally recorded (e.g., with both the program and auxiliary data). In a second state, the DVR is configured to play the program data without the auxiliary data (or a portion thereof) . . . To this end, the claimed invention provides that if the video program is being watched within a first period of time (e.g., within a day or two of the video program being transmitted to the DVR, etc.), then the video program will be played back in its entirety (e.g., including both program and auxiliary data).

Appx0570-Appx0571 (emphasis added). Patentee's statement to the Examiner is unambiguous: the "first period of time" starts after the entire video program is transmitted. *See id*. Accordingly, based on the prosecution history of the '710 patent, the "first period of time" must start after transmission of the entire "video program." *See* Appx1130 (¶49).

The Board rejected Appellant's construction of the claim term "a first period of time" because it excludes a disclosed embodiment involving "buffering." *See* Appx0010-Appx0011 ("We do not agree. As Petitioner asserts, the Specification of the '710 patent discloses that DVRs with buffers . . ."). But this Court has held that "where the patent describes multiple embodiments, every claim <u>does not need to cover every embodiment</u> . . . This is particularly true where the plain language of a limitation of the claim does not appear to cover that embodiment." *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1026 (Fed. Cir. 2015) (emphasis added). That is the case here.

Historically, although a user could pause a pre-recorded video program during playback, the user could not, by definition, pause a video program being viewed in real-time (i.e., a live video program). The '710 Patent discloses

> It should be appreciated that the term "time-shifted data," as used herein is not limited to data that is recorded and watched hours or days later. For example, most DVRs include a buffer, which buffers data that is being viewed in real-time. The buffer is used so that live data can be paused for a predetermined period of time (determined by the size of

> the buffer). However, pausing a program and then pressing "play," results in a program that is time-shifted, if only by a couple of seconds.

Appx0182 (5:1-9). In other words, in the buffering embodiment of the '710 Patent, the DVR simulates the pause function for a live video program by buffering it (i.e., recording it) while it is being viewed in real-time. When the user pauses the live video program at a time point (e.g., 7 mins 4 seconds into the live video program), the DVR continues to record the live video program but does not display it (simulating that the live video program has been paused). When the user eventually presses "play" to resume viewing the video program, the DVR now displays the buffered (i.e., recorded) video program starting from the paused time point (e.g., 7 mins 4 seconds). Accordingly, pressing "play" in the cited buffering embodiment causes the video program to be played back from where it was paused; it does <u>not</u> cause the video program to be played back from the beginning (i.e., starting at 0 mins 0 seconds).

In contrast, the language of claim 1 is unequivocal: "(i) provide said video program <u>in its entirety</u> to a display device in response to receiving said second command . . . if said second command is received during <u>a first period of time</u>." Appx0185 (11:62-66) (emphases added). The phrase "in its entirety" necessarily includes <u>the beginning of the "video program</u>," which contradicts the buffering embodiment. Accordingly, the plain language of claim 1 excludes the cited

buffering embodiment and thus a proper construction of claim 1 does not encompass the buffering embodiment.

The Board also argued "[i]n light of the <u>disclosed buffering</u>, Patent Owner does not point us to any evidence or reasoning as to why an incoming program could not be buffered, <u>with playback then started upon receipt of a second command</u>, and where the remainder of the entire program subsequently would be received and displayed." Appx0010-Appx0011 (emphasis added). Again, the Board is mischaracterizing the buffering embodiment. That embodiment only buffers a video program "that is being viewed in real-time." Appx0182 (5:1-9). In other words, that embodiment does not buffer a video program which the user has not yet started to view. *See id.* Accordingly, the buffering embodiment does not disclose the scenario fabricated by the Board.

In its Decision, the Board rejected Patent Owner-Appellant's construction of the claim term "a first period of time" based on the doctrine of claim differentiation in view of dependent claims 6 and 14.[8] *See* Appx0011. According to the Board, the "presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."

---

[8] Both Patent Owner's Response and Petitioner's Reply discuss the "first period of time" with respect to dependent claims 6 and <u>14</u>. *See* Appx1057-Appx1058, Appx1212. The Board, however, mentions dependent claims 6 and <u>8</u>. *See* Appx0011. Appellant believes the Board's reference to dependent claim 8 is a typographical error.

*Id*. (quoting *Phillips*, 415 F.3d at 1315). But Appellant is not asserting that claim 6's limitation "wherein said first period of time is a period of time that is less than one week from said transmission of said video program" is present in independent claim 1. Appx0185 (12:37-39) (emphasis added). Appellant is also not asserting that claim 14's limitation "wherein said first period of time is a first day after said video program has been transmitted" is present in independent claim 1. Appx0186 (14:1-2) (emphasis added). Appellant is merely asserting that the term "a first period of time," as recited by independent claim 1, starts at some point after transmission of the entire "video program." Accordingly, Appellant's construction of claim 1 does not render any limitation of dependent claim 6 or dependent claim 14 superfluous or meaningless. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (this Court "strives to reach a claim construction that does not render claim language in dependent claims meaningless"). And to the extent that Appellant's construction of the term "a first period of time," as recited by independent claim 1, introduces some redundancy in view of dependent claim 6 or 14, this Court has held that "no canon of [claim] construction is absolute in its application," "[c]laim differentiation may be helpful in some cases, but it is just one of many tools used by courts in the analysis of claim terms," and "surplusage may exist in some claims." *ERBE Elektromedizin GmbH v. Canady Technology LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) (cleaned up). Accordingly,

even in view of the doctrine of claim differentiation, Appellant's claim construction of the term "a first period of time" is proper.

The Board also rejected Appellant's construction of the claim term "first period of time" because it did not consider patentee's statements during prosecution to meet the standard for disavowal of full claim scope. *See* Appx0011-Appx0012 ("We do not discern that the prosecution history reflects the disavowal that Patent Owner argues"). The Board is misguided: Appellant is not attempting to narrow the claim term "first period of time" beyond its plain and ordinary meaning; Appellant is arguing the plain and ordinary meaning of the claim term "first period of time." As explained by this Court, any "explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described, and patented." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F. 3d 1345, 1352-53 (Fed. Cir. 2019) (cleaned up). Again, Patentee's statement to the Examiner is unambiguous: the "first period of time" starts after the entire video program is transmitted. *See* Appx0570-Appx0571. Accordingly, based on the prosecution history, the ordinary and customary meaning of the claim term "a first period of time" is a time period that starts at some point after the entire "video program" is transmitted to the DVR.

Further, this Court has held that "[w]here there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning." *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014). It is undisputed that independent claim 1 will be broader under the Board's construction of the term "first period of time" and will be narrower under Appellant's construction of that term. It is also undisputed that, based on the intrinsic evidence, Appellant-Patent Owner is entitled to the narrower claim. Accordingly, even if it is an equal choice between the two constructions—it is not because the intrinsic evidence weighs in favor of Appellant's construction—Appellant's narrower meaning should be adopted to better serve the notice function of the claim.

For the aforementioned reasons, the Board's improper construction of the claim term "first period of time" should be vacated.

#### d. ***Dow* alone fails to teach or suggest claim element 1[d][i].**

Claim element 1[d][i] recites "at least one processor configured to (i) provide said video program in its entirety to a display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received <u>during a first period of time</u>." Appx0185 (11:62-66) (emphasis added).

As discussed above, the "first period of time," when properly construed, starts after transmission of the entire "video program" to the DVR.

As a threshold matter, the Board found that the '976 Petition "does not identify any Dow disclosure that supports that there would be playback of the entire video program in a first period of time," as claim element 1[d][i] requires. Appx0074. Accordingly, by the Board's own admission, *Dow* alone does not teach or suggest claim element 1[d][i].

Further, Petitioner/Cross-Appellant mapped a time interval including when *Dow's* DVR is operating in the "live view mode" or the "delayed view mode" to the claimed "first period of time." *See* Appx0268, Appx0259. Petitioner/Cross-Appellant expressly confirmed that mapping in the '976 Reply: "Dow's exemplary 'live view' and 'delayed view' modes, when the commercial skip feature may always be inactive, squarely fall within the claimed 'first period of time.'" Appx1229 (emphasis added). But that mapping is flawed because, as discussed above, the claimed "first period of time" must start after transmission of the entire "video program" to the DVR. In contrast, in *Dow's* "live view mode" or "delayed view mode," the entire "video program" has not been transmitted to the DVR. For example, in *Dow's* "live view mode," while the user is viewing the "first portion" of the program live, the "second portion" and "third portion" of the program have not been received yet. Appx0770 (24:23-27), Appx1161-Appx1162 (¶112). Similarly,

in *Dow's* "delayed view mode . . . where there is insufficient time to buffer and process events for identifying commercial groups (e.g., a time delay of less than two minutes)," while the user is viewing the "first portion" of the program, at best <u>only a portion</u> the second portion may have been received and <u>none</u> of the third portion has been received. Appx0770 (24:43-48), Appx1161-Appx1162 (¶112). Accordingly, *Dow* alone does not teach or suggest claim element 1[d][i].

### 2. *Dow* and *Russ* do not teach or suggest claim element 1[d].

Even assuming it is proper for the Board to deviate from the '976 Petition and analyze claim element 1[d][i] in view of the combination of *Dow* and *Russ*, that combination still does not teach or suggest claim element 1[d]. Claim element 1[d] requires that during a first period of time the second portion (e.g., a commercial) of the video program cannot be skipped regardless of the user's desire to do so (as reflected in the user-controlled playback state of the DVR), but during a second period of time, the second portion (i.e., the same commercial) is skippable at the user's discretion (again, as reflected in the user-controlled playback state of the DVR). Thus, the second portion (i.e., the commercial) can be both skippable and non-skippable depending on time, i.e., there is a temporal element on when the second portion (e.g., the commercial) can be skipped.

*Dow* does not teach the required temporal element. Instead, the Board and Petitioner rely on *Russ* to cure the deficiencies of *Dow*. *See* Appx0061 ("Petition

relies on the combination of Dow and Russ, not just Dow, for the teaching of this limitation"). But *Russ*, like *Dow*, also does not teach the required temporal element. The Board's position hinges on Petitioner/Cross-Appellants' assertion that "Russ discloses the desirability of having a first time period wherein the user must watch the entire A/V stream, including commercials, such as when the operator or programmer has placed a two-week restriction on skipping commercials." Appx0056-Appx0057 (citing Appx0269-Appx0270). But that assertion is a gross mischaracterization of *Russ*. As discussed above in Section VII.C.2, in *Russ* it is the commercial's tag that determines whether that commercial can be skipped—<u>not</u> the time at which the command to playback the video program is received. Accordingly, in *Russ*, trick-play (e.g., skipping) preclusion is commercial based, <u>not</u> time based. Thus, *Russ*, like *Dow*, also fails to teach a single commercial that is non-skippable during a first period of time and skippable during a second period of time.

Both Petitioner/Cross-Appellant and the Board focus on one sentence in *Russ*—"The commercial slot could also preclude trick play for only a specified length of time, such as two weeks." *See* Appx0056 (quoting Appx0786 (¶[0035])), Appx0269 (citing Appx0786 (¶[0035])). But when properly read within the entire context of *Russ'* paragraph [0035] (and leading paragraphs [0033] and [0034]), that sentence means either (1) the commercial slot is occupied by a single commercial, and the commercial's tag specifies that the commercial expires in two weeks and

that trick play is precluded, or (2) the commercial slot will be occupied by different commercials over the next two weeks and each tag for each of those commercials specifies that trick play is precluded. Again, in either case, trick-play (e.g., skipping) preclusion is commercial based, <u>not</u> time based. As discussed above in Section VII.C.2, the Board improperly read that sentence from *Russ* in a vacuum, without the full context of *Russ*.

According to the Board, Petitioner/Cross-Appellant "relies on Russ's teaching of the desirability of having a first period where the user must watch the <u>entire program</u>, so it is this known <u>time-based limit</u> in Russ that would be <u>implemented in Dow</u>." Appx0057 (emphasis added). The Board's reasoning is fatally flawed: *Russ* does not disclose a generic "time-based limit" that can be implemented in *Dow* to meet the requirements of claim element 1[d]. To the extent that *Russ* discloses anything vaguely resembling time-based skipping restrictions, it does so via a tagging scheme. But as discussed above, in *Russ'* tagging scheme, trick-play (e.g., skipping) preclusion is commercial based, <u>not</u> time based. That contradicts what claim element 1[d] requires.

Further, even if *Russ* discloses a generic "time-based limit" that can be implemented in *Dow*, that is still insufficient to render claim element 1[d] obvious. As a threshold matter, the Board does not expressly identify when the "first period of time" would start in *Dow's* modified system. *See* Appx0055-Appx0059. When

discussing claim element 1[d][ii] under Ground 3, both Petitioner/Cross-Appellant and its expert assert that the "first period of [time] begin[s] upon completion of transmission of the program." Appx0270 (emphasis added). *See also* Appx0441 (¶345). But that assertion contradicts Petitioner/Cross-Appellant's previous position that "Dow's exemplary 'live view' and 'delayed view' modes . . . squarely fall within the claimed 'first period of time.'" Appx1229 (emphasis added): *Dow's* "live view" and "delay view" modes undisputedly operate before completion of transmission of the program. Those inconsistencies only reinforce that the '976 Petition does not demonstrate that the combination of *Dow* and *Russ* renders claim 1 obvious.

Further, in *Dow's* pre-modified system, once an entire video program is recorded, the user may immediately playback the video program with or without commercials. *See* Appx0764 (11:42-12:4), Appx0770 (24:14-56), Appx0751 (Fig. 4). In other words, *Dow's* pre-modified system does not impose any time-based restrictions on the user's ability to play back a stored video program without commercials. *See id*. Following the Board's modifications, *Dow's* users will now need to wait for some non-trivial time period to expire before they can playback the stored video program without commercials. That contradicts *Dow's* explicit teaching that "consumers desire the ability to quickly and accurately avoid commercials in recorded programs." Appx0759 (1:31-32) (emphasis added). The new playback restrictions are a downgrade in the user experience and thus *Dow's*

users would, understandably, not react favorably to them. *See* Appx1173 (¶135). Accordingly, there is no motivation to combine *Dow* and *Russ*.

According to the Board,

> Russ states that when users fast-forward through commercials this "removes a potentially important source of information from the user and reduces the attractiveness of subscriber television systems as media for advertising." . . . Accordingly, the evidence of record supports that one of skill would look to Russ's techniques, including an initial period of playback time when commercial skipping would be restricted in order to maintain attractiveness for advertising.

Appx0058 (internal citations omitted). But there is no evidence in *Dow* of a decrease in "attractiveness for advertising" despite *Dow's* unrestricted commercial-skipping feature. To the contrary, *Dow* has an abundance of advertisements. *See* Appx0750 (Fig. 3) (showing "program 300" with multiple "commercial groups 351-354."). The Board's position hinges on one generic, partial sentence in *Russ* while ignoring the abundance of existing advertisements in *Dow*. Accordingly, there is no motivation to combine *Dow* and *Russ*.

Also according to the Board,

> Dr. Jeffay testifies that a person of ordinary skill in the art would have combined Russ's techniques with Dow to "allow the content provider to obtain additional revenue from advertisements shown to viewers who value watching the program during the initial release period while still appealing to viewers who are willing to delay watching the program in order to avoid commercials."

Appx0058 (internal citations omitted). But Petitioner's expert does not provide any evidence that content providers in *Dow* either (a) suffer from reduced ad revenues

because of *Dow's* unrestricted commercial-skipping feature, or (b) would experience an increase in ad revenues if *Dow's* system was modified to restrict its commercial-skipping feature as proposed by Petitioner/Cross-Appellant. *See* Appx0439-Appx0441 (¶¶343-345). Accordingly, there is no motivation to combine *Dow* and *Russ*.

According to the Board,

> after the first restriction period expires, Russ discloses a second period of time. Russ in combination with Dow would allow a user to enable or disable the commercial skip feature in a second period of time.

Appx0060-Appx0061 (internal citations omitted). Again, the Board's position is fatally flawed: *Russ* does not teach a generic "first period of time" with skipping restrictions followed by a generic "second period of time" without restrictions that can be implemented in *Dow*. To the extent *Russ* does teach anything vaguely resembling a "first period of time" followed by a "second period of time," it does so via its expiring tags. But implementing *Russ'* tagging scheme in *Dow* will <u>not</u> allow the user in *Dow's* modified system to view the "second portion" (e.g., the commercial) during the "second period of time" (if the user desires to do so)—the commercial corresponding to the expired tag would either be non-viewable or replaced by a new commercial. That contradicts what claim element 1[d] requires.

For the aforementioned reasons, the Board's determination that *Dow* and *Russ* teach or suggest claim element 1[d] is not supported by substantial evidence and should be vacated or reversed.

#### 3. Independent Claims 9 and 18

The '976 Decision does not provide independent analysis for independent claims 9 or 18. *See* Appx0065-Appx0066. Instead, the '976 Decision relies on the same arguments for independent claim 1. *See id*. As a result, the Board's determinations that *Dow* and *Russ* render obvious independent claims 9 and 18 of the '710 Patent are not supported by substantial evidence for the same reasons discussed above in reference to independent claim 1.

## VIII. CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully requests that the Court (i) vacate or reverse the Board's determinations that claims 1-16, 18, and 19 of the '710 Patent are rendered obvious by the cited art, and (ii) vacate or reverse the Board's determinations that claims 1-20 of the '122 Patent are rendered obvious by the cited art.

Dated: April 25, 2025

*<u>/s/ Fred I. Williams</u>*
Fred I. Williams

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on April 25, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 25, 2025

*/s/ Fred I. Williams*
Fred I. Williams

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1364

**Short Case Caption:** Digital Broadcasting Solutions, LLC v. DISH Networks L.L.C.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,758 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 04/25/2025

Signature: /s/ Fred I. Williams

Name: Fred I. Williams

Save for Filing

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper: 23
Date: December 9, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

DISH NETWORK L.L.C. AND DISH TECHNOLOGIES L.L.C.,
Petitioner,

v.

DIGITAL BROADCASTING SOLUTIONS, LLC,
Patent Owner.

---

IPR2023-00976
Patent 8,929,710 B2

---

Before ST. JOHN COURTENAY, III, SHEILA F. MCSHANE, and JOHN D. HAMANN, *Administrative Patent Judges*.

MCSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background*

DISH Network L.L.C. and DISH Technologies L.L.C. (collectively, "Petitioner") filed a Petition for *inter partes* review of claims 1–19 of U.S. Patent No. 8,929,710 B2 (Ex. 1001, "the '710 patent"), along with the Declaration of Dr. Kevin Jeffay. Paper 2 ("Pet."); Ex. 1002. Digital Broadcasting Solutions, LLC ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp.").

On December 11, 2023, the Board instituted an *inter partes* review of the challenged claims pursuant to 35 U.S.C. § 314. Paper 8 ("Dec.").

After institution, Patent Owner filed a Patent Owner Response (Paper 11, "PO Resp."), along with the Declaration of Dr. Immanuel Freedman (Ex. 2006). Petitioner filed a Reply (Paper 14, "Pet. Reply"), along with the Reply Declaration of Dr. Jeffay (Ex. 1014). Patent Owner filed a Sur-reply (Paper 15, "PO Sur-reply"). The parties presented oral arguments at a hearing on September 10, 2024, and a transcript of it has been entered into the record (Paper 22, "Tr.").

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–16, 18, and 19 of the '710 patent are unpatentable but has not demonstrated, by a preponderance of the evidence, that claim 17 is unpatentable.

## *B. Real Party in Interest*

DISH Network L.L.C. identifies itself as the real party in interest. Pet. 5. Petitioner states that DISH Network L.L.C. "is directly or indirectly owned" by DISH Network Corporation. *Id.* Patent Owner Digital

Broadcasting Solutions, LLC identifies itself as the sole real party in interest. Paper 6, 1.

*C. Related Matters*

The parties indicate this Petition is related to the district court litigation, *Digital Broadcasting Solutions, LLC v. DISH Network, L.L.C.,* 2:22-cv-00335-JRG (E.D. Tex.). Pet. 5; Paper 6, 1.

*D. The '710 Patent*

The '710 patent is titled "System and Method for Time Shifting at least a Portion of a Video Program," and issued on January 6, 2015, from an application filed October 24, 2011, claiming priority to Provisional Application No. 61/408,759, filed November 1, 2010. Ex. 1001, codes (22), (45), (60).

The '710 patent states that it "relates to the storage and play back of time-shifted data," which "allows the recorded data (in its original form) to be played back at a later time." Ex. 1001, 1:16–25. This "allows the user to skip commercials, or paid advertisements, which can decrease the value of the program to the content owner, the content provider, and advertisers." *Id.* at 1:43–49.

The '710 patent identifies a need for adding data which is current to time-shifted data at the time the data is being played. Ex. 1001, 2:5–11. The '710 patent thus "provides a system and method for adding auxiliary data (e.g., advertisements, news tickers, 'crawlers,' etc.) to data that has been time-shifted." *Id.* at 2:15–18. "[A]t the time the time-shifted data is being played, the receiver may be configured to acquire auxiliary data, and insert the auxiliary data into the time-shifted data, so that both the time-shifted data and the auxiliary data are displayed to the user on the display." *Id.* at 2:39–

44. Specifically, "time-shifted data is broken down into a plurality of segments, and auxiliary data is added between the individual segments." *Id.* at 2:58–60. "By receiving the auxiliary data when (or shortly after) the time-shifted data has been played, advertisements that are played between segments can be tailored to the date and/or time the time-shifted data is played." *Id.* at 6:54–57. Figure 6, reproduced below, depicts individual segments 610, 620, and 630, and commercial breaks 640 and 650, and, more specifically, illustrates time-shifted data that includes a plurality of commercial breaks, wherein auxiliary data is played during the commercial breaks. *Id*. at 3:49–52, 7:6–9.




Figure 6, above, shows a stored single program that includes three segments 610, 620, and 630 and two commercial breaks 640 and 650. Ex. 1001, 7:6–9.

The '710 patent also discloses that "the receiving device could be configured to disable at least the fast forwarding feature of the DVR while commercials are being played. This would allow a user to time-shift data without being able to skip commercials." *Id.* at 7:18–25. The patent also states that in an embodiment, "the auxiliary data is removed only after its value has diminished." *Id*. at code (57).

*E. Illustrative Claim*

Petitioner challenges claims 1–19 of the '710 patent. Claims 1, 9, and 18 are independent claims. Claim 1, which is illustrative, is reproduced below, with bracketed letters added to limitations for reference purposes.

1[pre]. A digital video recorder ("DVR") for time shifting at least a portion of a transmitted video program, comprising:

[a] a tuner for receiving said video program as transmitted, said video program including at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

[b] a memory device for storing said video program, allowing at least a portion of said video program to be played back at a later time;

[c] a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, and a second command initiates playback of said video program from said memory device; and

[d] at least one processor configured to (i) provide said video program in its entirety to a display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time, (ii) provide said video program in its entirety to said display device in response to receiving said second command if said second command is received during a second period of time and said DVR is in said first playback state, and (iii) provide only a portion of said video program to said display device in response to receiving said second command if said second command is received during said second period of time and said DVR is in said second playback state, said portion of said video program including at least said first and third portions of said video program, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state;

[e] wherein said second period of time is a period of time after said first period of time.

Ex. 1001, 11:46–12:16.

### *F. Asserted Grounds of Unpatentability*

Petitioner asserts that claims 1–19 are unpatentable based on the following grounds:

| **Claim(s) Challenged** | **35 U.S.C §** | **Reference(s)/Basis** |
|---|---|---|
| 1–19 | 103(a)[1] | Casagrande,[2] Russ [3] |
| 1–5, 7–13, 16–19 | 102[4] | Dow[5] |
| 1–19 | 103(a) | Dow, Russ |

Pet. 13.

## II. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Jeffay, Petitioner proposes that a person of ordinary skill in the art at the time of the ’710 patent would “have been someone with at least a bachelor of science in one of electrical

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”), amended 35 U.S.C. §§ 102, 103, and was effective on March 16, 2013. Because the ’710 patent has an effective filing date prior to the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of 35 U.S.C. §§ 102, 103.
[2] US 8,510,771 B2, filed May 4, 2009, issued August 13, 2013 (Ex. 1006, “Casagrande”).
[3] US 2006/0225105 A1, published October 5, 2006 (Ex. 1008, “Russ”).
[4] Petitioner asserts that Dow is prior art under §§ 102(a), (b), and (e). Pet. 18.
[5] US 7,251,413 B2, filed April 26, 2002, issued July 31, 2007 (Ex. 1007, “Dow”).

engineering, computer engineering, computer science, or a similar technology degree, as well as two years of relevant industry experience, including Internet networking architectures, digital programming delivery in broadcast, cable, or television networks, and set-top boxes [('STB')]." Pet. 14 (citing Ex. 1002 ¶ 42). Dr. Jeffay testifies that a "higher degree of education could compensate for less work experience and *vice versa*." Ex. 1002 ¶ 42.

Patent Owner states that "[f]or the purposes of the Response only, Patent Owner does not dispute the level of skill of a person of ordinary skill in the art ('POSITA') identified in the Petition." PO Resp. 4 (citing Pet. 14).

In determining the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc*., 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citation omitted). The level of ordinary skill in the art is also reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). We adopt the assessment offered by Petitioner, without the qualifier "at least" because its use introduces vagueness, for the purposes of this Final Written Decision because it is consistent with the '710 patent and the asserted prior art.

*B. Claim Construction*

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the principles set forth by our reviewing court, the "words of a claim 'are

generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

The parties present disputes related to two claim terms: "a first period of time" and "first command."

*1. "a first period of time"*

Patent Owner contends that the term "first period of time," recited in limitation 1[d][i], would be understood "to start <u>after</u> transmission of the entire 'video program' to the DVR." PO Resp. 5 (citing Ex. 2006 ¶ 47). Patent Owner refers to claim 1 and its recital that the video program is provided "in its entirety." *Id.* (citing limitation 1[d][ii]). Patent Owner argues that "[i]n order to 'provide said video program in its entirety' from 'said memory device,' the entire 'video program' must be stored in the 'memory device,' which is only possible <u>after</u> transmission of the entire 'video program' to the DVR." *Id.* (citing Ex. 2006 ¶ 47). Patent Owner contends that in light of dependent claims 6 and 14, the "first period of time" must start after the transmission of the entire video program. *Id.* at 5–6 (quoting claim 6 ("wherein said first period of time is a period of time that is less than one week from said transmission of said video program"); claim 14

("wherein said first period of time is a first day after said video program has been transmitted.")).

Additionally, Patent Owner refers to the prosecution history of the ’710 patent:

> a digital video recorder ("DVR") that stores a video program and plays at least a portion of the video program back at a later time (e.g., a time more convenient to the user of the DVR, etc.) . . . In a first state, the DVR is configured to play the program as it was originally recorded (e.g., with both the program and auxiliary data). In a second state, the DVR is configured to play the program data without the auxiliary data (or a portion thereof) . . . To this end, the claimed invention provides that if the video program is being watched within a first period of time (e.g., within a day or two of the video program being transmitted to the DVR, etc.), then the video program will be played back in its entirety (e.g., including both program and auxiliary data).

PO Resp. 6 (quoting Ex. 1003, 108–109). Based on this passage, Patent Owner asserts that the "first period of time" must start after transmission of the entire video program. *Id*. (citing Ex. 2006 ¶ 49). Patent Owner argues that the referenced statement in the prosecution history is "clear and unambiguous." PO Sur-reply 3.

Petitioner contends that Patent Owner's interpretation of the term "departs from the term's plain and ordinary meaning and is inconsistent with the specification and claims." Pet. Reply 3. Petitioner argues that Patent Owner's proposed construction improperly excludes embodiments of the ’710 patent. *Id*. at 3–4. Specifically, Petitioner refers to the ’710 patent Specification that refers to DVR buffering, stating:

> It should be appreciated that the term ***"time-shifted data," as used herein is not limited to data that is recorded and watched hour or days later***. For example, most DVRs include a buffer, which buffers data that is being viewed in real-time. The buffer is use so that ***live data can be paused*** for a predetermined period

> of time (determined by the size of the buffer). However, ***pausing a program and then pressing "play," results in a program that is time-shifted, if only by a couple of seconds.***

Pet. Reply 4 (quoting Ex. 1001, 5:1–9[6]). Petitioner further asserts that Patent Owner "has not presented any evidence that supports limiting the claims to only embodiments displaying videos that have been entirely transmitted." *Id*. Petitioner contends that dependent claims 6 and 14 do not support Patent Owner's proposed limitation to the term because the dependent claims include limitations that do not appear in independent claim 1. *Id*. In response, Patent Owner asserts that, in contrast to the Specification's "live" or buffered content, the independent claims require that "the 'first period of time' is *before* 'said second period of time'. . . and *after* 'receiving said video program' and 'storing said video program,'" and "the limitation cannot be met until 'said video program [is received and stored] in its entirety.'" PO Sur-reply 4 (citing Ex. 1001, 11:62–66).

Patent Owner's position is that in order to "provide said video program in its entirety" under the limitations of the independent claims, the "first period of time" cannot start until after the transmission of the entire video program to the DVR. We do not agree. As Petitioner asserts, the Specification of the '710 patent discloses that DVRs with buffers are used "so that live data can be paused for a predetermined period of time . . . [and] pausing a program and then pressing 'play,' results in a program that is time-shifted." *See* Ex. 1001, 5:3–8. In light of the disclosed buffering, Patent Owner does not point us to any evidence or reasoning as to why an incoming program could not be buffered, with playback then started upon receipt of a

---

[6] Petitioner cites to Exhibit 1001 at column 5 at lines 1 through 13 for the quotation, but this appears to be a typographical error.

second command, and where the remainder of the entire program subsequently would be received and displayed. That is, Patent Owner does not explain why playback of the entire program could not occur, even if the entire program had not been transmitted when playback was started.

Patent Owner's arguments that are based upon dependent claims 6 and 14 also do not support the adoption of limiting "a first period of time" to a start after the transmission of the entire video program. We agree with Petitioner that claims 6 and 8 have additional respective limitations to those in independent claim 1, so the dependent claims do not serve to limit the claim term interpretation. *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.").

Finally, the Federal Circuit has stated that the standard for disavowal of full claim scope through prosecution history disclaimer is "exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citations omitted); *see also Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("[W]hile the prosecution history can inform whether the inventor limited the claim scope in the course of prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO . . . Therefore, the doctrine of prosecution disclaimer only applies to unambiguous disavowals."). We do not discern that the prosecution history

reflects the disavowal that Patent Owner argues. Rather, the applicant's remarks that the DVR "stores a video program and plays at least a portion of the video program back at a later time" and to "play the program as it was originally recorded" is consistent with playback from a program that is being buffered, which would not require the entire program to have been stored before "a first period of time" starts. *See* Ex. 1003, 108–109. Additionally, although an example is cited in the prosecution history where a video program is watched within a day or two of the video program being transmitted, a mere example does not serve as a disclaimer of scope.

Accordingly, we do not adopt Patent Owner's proposed construction. We use the plain and ordinary meaning of the term here.

*2. "first command"*

Patent Owner proposes that the claim term "first command" should be interpreted to mean a command that changes a DVR from a first playback state to a second playback state, but "[t]he 'first command' alone never initiates playback of the video program in independent claim 1." PO Resp. 7 (citing Ex. 1001, 11:62–12:9). Patent Owner argues that in claim 1 "the 'first command' and the 'second command' are used <u>together</u> to control operation of the DVR," with the "first command" setting the playback state, "while the 'second command' is used to initiate playback of the video program after the playback state of the DVR has been set by the 'first command.'" *Id.* (citing Ex. 1001, 11:62–12:9). Patent Owner contends, with supporting testimony from Dr. Freedman, that if the "first command" also initiated playback of the video program, then the "'second command' [would be] redundant and [would] render claim 1 illogical." *Id.*; Ex. 2006 ¶ 51. In Sur-reply, Patent Owner similarly asserts that Petitioner is trying to conflate the meanings of "first command" and "second command" and

"Petitioner's proposed construction should be rejected because it would render superfluous the explicit differentiation" between the terms. PO Sur-reply 5.

Petitioner responds that Patent Owner is arguing that the "first command" excludes the initiation of playback. Pet. Reply 5. Petitioner asserts that under Patent Owner's proposed interpretation, "the first command must ***only*** change the playback state and do nothing more[,] [b]ut the challenged claims do not recite such restrictive terms." *Id*. Petitioner contends that the "first command" "must at least change the DVR from a first playback state to a second playback state," but Patent Owner's "proposed restrictions are unfounded, and the Board should reject [Patent Owner's] improperly narrow construction." *Id*.

Patent Owner advocates that we should import a limitation, albeit a negative limitation, into the construction of the term "first command." Patent Owner argues that the language of the independent claims requires this importation. We do not agree. "[I]t is important not to import into a claim limitations that are not part of the claim." *SuperGuide Corp. v. DirecTV Enter., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). Although Patent Owner argues that Petitioner is conflating the meaning of "first command" and "second command," thus rendering the terms redundant, claim 1 recites that a "first command changes said DVR from a first playback state to a second playback state" and a "second command initiates playback of said video program from said memory device." Even if the "first command" were to initiate playback, the "first command" would also have to change

playback states, so the "first command" and "second command" terms would still have different meanings.

Further, although Patent Owner and Dr. Freedman argue that if the "first command" also initiated playback of the video program, the "second command" would be redundant and claim 1 would be illogical, we do not agree. Patent Owner's arguments are premised on the contention that the "first command" and "second command" are exclusively tied together in claim 1, with the "first command" used to set the playback state and the "second command" used to initiate playback. PO Resp. 7. Dr. Freedman's testimony relies on the language of claim 1 only (Ex. 2006 ¶ 51), but there is no indication in claim 1 that the "first command" and "second command" are so related or linked. Additionally, even if the "first command" changed the playback state and initiated playback, we discern nothing in the claim precluding that there could be intervening events—like playback being paused—wherein the "second command" would nonetheless be used to initiate playback in accordance with limitations 1[d][i]–[iii]. Thus, we are not persuaded by Patent Owner's arguments.

Accordingly, we decline to include the limitation that the "first command" can never initiate playback of the video program and instead, we use the plain and ordinary meaning of the term.

*3. Other Terms*

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co*., 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary

to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999))).

### *C. Principles of Law*

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum,* 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate, a claim a prior art reference must disclose every limitation of the claimed invention . . .;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field); *In re Baxter Travenol Labs.,* 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and

(4) when in evidence, objective indicia of nonobviousness.[7] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*D. Asserted Obviousness of Claims 1–19 over Casagrande and Russ*

Petitioner contends that claims 1–19 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Casagrande and Russ. Pet. 22–51. In support, Petitioner also relies upon the Jeffay Declaration and the Reply Jeffay Declaration. Ex. 1002; Ex. 1014. Patent Owner argues that the combination of Casagrande and Russ does not teach all the limitations of the claims and that the rationale to combine the references is insufficient. PO Resp. 8–32. Patent Owner relies upon the Freedman Declaration. Ex. 2006.

We begin our discussion with brief summaries of Casagrande and Russ, and then address the evidence and arguments presented.

*1. Casagrande (Ex. 1006)*

Casagrande discloses "methods and apparatus for the identification of locations in a presentation stream based on metadata associated with the presentation stream." Ex. 1006, code (57). Casagrande uses "signature data" to identify various "locations" within a presentation stream. *Id.* Then, "identified locations within a presentation stream may be utilized to identify boundaries of segments within the presentation stream, such as segments of a show and interstitials (e.g., commercials) of the show." *Id.* The identified portions of a presentation stream may be utilized for filtering segments of content during presentation. *Id.*

---

[7] No evidence of objective indicia of nonobviousness has been presented by Patent Owner. *See generally* Prelim. Resp.

Casagrande describes that video recorded for later playback on digital video recorders may allow a viewer to skip over commercial breaks, but the viewer performs this function manually, such as with a fast-forward button. Ex. 1006,1:18–28. To improve upon this approach, Casagrande discloses:

> the identification of locations in a presentation stream based on metadata associated with the presentation stream. Identified locations within a presentation stream may be utilized to identify boundaries of segments within the presentation stream, such as segments of a show and interstitials (e.g., commercials) of the show. In various embodiments, identified portions of a presentation stream may be utilized for skipping segments of content during presentation, insertion of supplemental or substitute content within various locations of the presentation stream, selective presentation of specific segments of the presentation stream, presentation of segments of content in non-sequential order and the like.

*Id.* at 2:35–47. Figure 8, reproduced below, is a representation of a first stream received, and second stream outputted after filtering interstitials. *Id.* at 13:8–11.




Figure 8, above, shows a first audio/video stream 704A, comprising segment 802 and 806, separated by interstitial 804, which is filtered out to create a second audio/video stream 712A. Ex. 1006, 13:8–11.

Casagrande discloses that "a user may be restricted from temporally moving through particular identified segments of a presentation stream at a non-real time presentation rate of the A/V stream." Ex. 1006, 4:20–23. Thus, "a receiving device may automatically output particular segments of a presentation stream without skipping over or otherwise fast forwarding through the segments, regardless of whether a user provides input requesting fast forwarding or skipping through the segments." *Id.* at 4:23–32.

Casagrande discloses that a user may select whether the first (full) or second (filtered) audio/video stream is presented to the display device. Ex. 1006, 19:63–66. In some embodiments, this function is prevented by the content provider of the first audio/video stream. *Id.* at 19:66–20:2.

*2. Russ (Ex. 1008)*

Russ is directed "to the insertion of advertisements into presentations of networked multi-room systems." Ex. 1008 ¶ 2.

Russ describes that in newer networked multimedia systems, such as in satellite and cable television systems, users have the capability to record and replay broadcast content. Ex. 1008 ¶ 3. Users also have the ability to fast-forward through recorded advertisements, which "removes a potentially important source of information from the user and reduces the attractiveness of subscriber television systems as media for advertising." *Id.* ¶ 6.

Russ discloses that while watching a previously recorded presentation, a "program identifier" (PID) associated with the presentation can be altered, so that the presentation has a new advertisement inserted. Ex. 1008 ¶¶ 25, 28.

Russ also introduces the concept of "trick play functionality." Ex. 1008 ¶ 32. This involves a user's use of "pause, fast forward, rewind, skip ahead, or skip back" playback control functions "while watching a presentation 410 made up of a program 420 and a commercial 430." *Id.* However, "a user's trick play functionality could be restricted while viewing a portion of a presentation, such as commercials. The trick play functionality, such as fast forward, would not work for certain commercials as specified, for example, by the local cable operator or the presentation programmer." *Id.* ¶ 33. This could also apply to new commercials inserted into a presentation. *Id.* A tag inserted in the presentation could control "which commercials should preclude trick play." *Id.* ¶ 34. Russ discloses other options as well, such as that a "commercial slot could also preclude trick play for only a specified length of time, such as two weeks." *Id.* ¶ 35.

*3. Discussion*

*a. Claim 1*

The Petition asserts that the combination of Casagrande and Russ teaches all the limitations of claim 1 and that there is a rationale to combine the references. Pet. 20–39. Below we consider the claim 1 limitations and rationale to combine in turn.

*i. Limitation 1[pre]*

Petitioner asserts that Casagrande teaches the preamble of claim 1 by its disclosure of a digital video recorder (DVR), in a cable or satellite set-top box (STB), which allows viewers to record digital video for later playback, and perform time shifting and commercial skipping functions. Pet. 22 (citing Ex. 1006, 1:17–25).

Patent Owner presents no arguments specifically related to preamble 1[pre]. *See generally* PO Resp.

On this complete record, we agree with Petitioner that Casagrande teaches the preamble of claim 1.[8]

*ii. Limitation 1[a]*

Petitioner asserts that Casagrande's set-top box with communication interface receives a video stream that includes segments and "interstitials (e.g., commercials)," which the receiver identifies. Pet. 23–24 (citing Ex. 1006, 17:62–64, 3:1–5; Ex. 1002 ¶¶ 89–90, 94). Petitioner contends that Casagrande discloses that its receiving device receives a presentation stream with segments and interstitials in them, and with first, second, and third portions in the stream. *Id*. at 24–26 (citing, *inter alia*, Ex. 1006, Figs. 2, 8).

---

[8] We need not determine whether the preamble of claim 1 is limiting because Petitioner has shown that Casagrande teaches the preamble.

Petitioner argues that a person of ordinary skill in the art would have understood that Casagrande's set-top box uses a tuner to receive data from a satellite transponder via the antenna. *Id*. at 26–27 (citing Ex. 1002 ¶¶ 91, 93).

Petitioner also contends that Russ explains that "[b]roadband communications systems, such as satellite and cable television systems, are now capable of providing many services in addition to analog broadcast video." Pet. 27 (citing Ex. 1008 ¶ 3; Ex. 1002 ¶ 92). Petitioner asserts that Russ further explains that the set-top box is used for accessing various video services, and the set-top box "includes a processor, a tuner system, a storage device, a modulator, and a remote device communications receiver." *Id*. (citing Ex. 1008 ¶¶ 3, 20; Ex. 1002 ¶¶ 92–93).

Patent Owner presents no arguments specifically related to limitation 1[a]. *See generally* PO Resp.

On this complete record, we agree with Petitioner that Casagrande teaches limitation 1[a].

*iii. Limitation 1[b]*

Petitioner asserts that Casagrande teaches a storage unit 1516 to store audio/video streams. Pet. 28 (citing Ex. 1006, 18:18–29, 18:64–67, Fig. 15; Ex. 1002 ¶¶ 98–100). Petitioner contends that Casagrande's storage unit allows for playback of earlier-stored video programs. *Id*. at 29 (citing Ex. 1006, 18:26–29; Ex. 1002 ¶ 100).

Patent Owner presents no arguments specifically related to limitation 1[b]. *See generally* PO Resp.

On this complete record, we agree with Petitioner that Casagrande teaches limitation 1[b].

*iv. Limitation 1[c]*

Petitioner asserts that Casagrande teaches that users provide commands using a remote control through a user interface to "control logic 1520," which executes the commands. Pet. 29 (citing Ex. 1006, 18:45–60; Ex. 1002 ¶¶ 92, 101–102). Petitioner contends that Casagrande teaches the claimed "first command" in a user selection of a "first A/V stream 1504 or the second A/V stream 1512," which correspond to the claimed first and second playback states, where stream 1512 "has the interstitials (e.g., commercials) removed." *Id*. at 30 (citing Ex. 1006, 19:63–66; Ex. 1002 ¶¶ 104–105). Petitioner argues that Casagrande teaches the claimed "second command" where a user is presented a menu of available segments of a program, from which a particular segment is selected. *Id*. at 31 (citing Ex. 1006, 4:4–8; Ex. 1002 ¶¶ 106, 177).

In support, Dr. Jeffay testifies that for the teaching of the "first command," "Casagrande explains that 'a user may select by way of the user input 1523 whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514 by way of the A/V interface 1518.'" Ex. 1002 ¶ 105 (quoting Ex. 1006, 19:63–66). Dr. Jeffay testifies that by this disclosure, Casagrande "teaches a user selecting between a first playback state (i.e., selecting to play the first A/V stream) and a second playback state (i.e., selecting to play the second A/V stream)." *Id*.

In support of the teaching of a "second command," Dr. Jeffay testifies that "Casagrande discloses 'a menu of available segments of [a] television program, and [a user] may select one or more of the available segments for the presentation . . . . Based upon user selection of particular segments from the selection menu, the receiving device responsively outputs the selected

segments," which teaches a second command that initiates playback of said video program. Ex. 1002 ¶ 106 (quoting Ex. 1006, 4:1–8).

Patent Owner contends that the Petition asserts that "the 'first playback state' and 'second playback state' correspond to whether the first A/V stream or the second A/V stream is displayed to the user" and that Casagrande's "first command" "toggles between which stream is displayed," but it is the "second command" that initiates playback under the claim. PO Resp. 11 (citing Pet. 30; Ex. 1001, 11:62–12:14). Patent Owner asserts that the "first command," which places the DVR in the respective first or second playback states, is "associated with time-based limitations on navigation through a program." *Id*. at 12. Patent Owner argues that the combination of Casagrande and Russ does not teach limitation 1[c] because Casagrande's selection of the first A/V stream or second A/V steam "<u>does</u> initiate playback." *Id*. Patent Owner argues that "*Casagrande* is silent on any additional step the user must take to initiate playback after selecting 'the first A/V stream 1504 or the second A/V stream 1514.'" *Id*. (citing Ex. 1006, 19:63–7:2; Ex. 2006 ¶ 61).

There is evidentiary support that Petitioner has demonstrated that Casagrande teaches the "first command." Dr. Jeffay testifies that "Casagrande explains that the 'first A/V stream include[es] at least one segment of a show, at least one interstitial of the show and text data, e.g., closed captioning data (operation 1802)'" and there is a "second A/V stream" that is filtered, so a person of ordinary skill in the art would understand that the "'second A/V stream' that has the interstitials (e.g., commercials) removed from the first A/V stream." Ex. 1002 ¶ 104 (citing Ex. 1006, 15:30–34, 19:10–14, 21:28–32). Dr. Jeffay's testimony is supported by the cited disclosures of Casagrande, and Casagrande depicts

and describes the first A/V stream with interstitials (commercials) and a second A/V stream with the interstitials removed. Ex. 1006, 13:5–11, Fig. 8. Casagrande also discloses that the respective A/V streams may be stored. *Id*. at 19:44–45.

Additionally, Petitioner asserts that in Casagrande, a user is presented with a menu of available segments and "upon user selection of particular segments from the selection menu, the receiving device *responsively outputs* the selected segments . . . ." Pet. Reply 7; Ex. 1006, 4:1–7 (emphasis added). As an example, Casagrande explains that "a user may select particular news stories that they desire to view, and the recording device may output the selected news stories back-to-back, skipping *presentation* of undesignated segments." Ex. 1006, 4:8–12 (emphasis added). Thus, Dr. Jeffay's testimony is supported by Casagrande, which discloses that, with the selection of selected segments, there is presentation of the selected segments, i.e., playback is initiated. *See* Pet. 31; Ex. 1002 ¶ 61; Ex. 1006, 4:1–12.

Thus, we agree with Petitioner that Casagrande discloses that users may designate whether they want to watch a complete stream or a stream with portions removed, which is the claimed "first command" that changes playback states. *See* Ex. 1006, 19:63–66; Pet. 30–31; Ex. 1002 ¶ 105. We also agree that Casagrande discloses that a user may pick program segments and begin playback, which is the claimed "second command" that initiates playback of a video program. Ex. 1006, 4:1–8; Pet. 31; Ex. 1002 ¶ 106.

As discussed above, we decline to import a limitation, as Patent Owner proposes, wherein the "first command" would exclude the initiation of playback, so most of Patent Owner's arguments fail on that basis. Patent Owner also contends that the respective first or second playback states are

associated with time-based limitations on navigation through a program. This issue does not relate to limitation 1[c], which recites no temporal limitations. We address temporal issues below in the discussion of limitations 1[d][i]–[iii].

On this complete record, we agree with Petitioner that Casagrande teaches limitation 1[c].

*v. Limitation 1[d][i]*

Petitioner asserts that Casagrande teaches that control logic 1520 (which includes a processor) executes the software to perform the claimed functions to control the output of A/V streams from its receiving device 1510 to a display device 1514 for viewing. Pet. 31 (citing Ex. 1006, 18:26–29, 18:42–49; Ex. 1002 ¶¶ 108–109). Petitioner argues "that Casagrande teaches that the entirety of the A/V presentation (e.g., the first A/V stream) may be presented in some cases, even when the user requests the shortened version without commercials (the second A/V stream)." *Id*. at 32 (citing Ex. 1002 ¶ 110). Petitioner contends that Casagrande teaches that "a content provider of the first A/V stream 1504 *may prevent the user from maintaining such control*," where "commercials within a television program may be associated with *restrictions against fast forwarding or skipping,* and a recording device *may automatically present the commercial segments regardless of the receipt of user input requesting non-presentation of the segments*." *Id*. (citing Ex. 1006, 19:66–20:2, 5:66–6:3, 4:28–32; Ex. 1002 ¶ 110). Petitioner also asserts that the combination of Casagrande in combination with Russ "would entail [Casagrande's] restrictions on skipping/etc. being limited to a particular time period." *Id*.

Patent Owner contends that Petitioner cites to portions of Casagrande that "show that the first A/V stream may be shown in its entirety even if the

user desires to see the second A/V stream 'by way of additional information delivered to the receiving device' by the 'content provider.'" PO Resp. 16 (citing Ex. 1006, 19:66–20:2, 5:66–6:3). Patent Owner argues that "that limitation by the 'content provider' remains the same—there is no determination [that] 'said second command is received during the first period of time' as is required by the claim." *Id*. (citing Ex. 2006 ¶ 68). Dr. Freedman further testifies that the Petition cites only to Casagrande for the disclosure of the first scenario of limitation 1[d][i], and there is no argument that it would have been obvious to modify Casagrande to satisfy this claim limitation. Ex. 2006 ¶ 68.

In Sur-reply, Patent Owner asserts that the "shortcoming" of Casagrande is that the "'identified restrictions' are not based on time, but the claims require specific timing (i.e., 'if said second command is received during a first period of time')." PO Sur-Reply 9–10. Patent Owner contends that the Petition for this limitation "contains <u>no reference to *Russ* (EX1008).</u>" *Id*. at 10 (citing Pet. 31–32). Patent Owner also argues that "*Russ* uses 'ad-insertion tags' to 'differentiate between the program and commercials.'" *Id*. (citing Ex. 1008 ¶ 26). Patent Owner contends that the tags can specify an expiration date, and upon expiry the commercial would be no longer viewable or would be replaced with a different commercial. *Id*. (citing Ex. 1008 ¶ 35). Patent Owner asserts that "*Russ* does not disclose providing 'said video program in its entirety . . . during a first period of time'" because "it is the 'tag' that determines whether the commercial can be skipped—not the time at which the video program is played back." *Id*. at 11.

In the discussion of this limitation, the Petition specifically cites Russ, stating that "as discussed below," Russ is relied upon in combination for the

teaching of "restrictions on skipping/etc. being limited to a particular time period" in the discussion of limitation 1[d][i]. *See* Pet. 32. In other words, Petitioner specifically incorporates its Russ arguments—which are discussed in detail for the following limitation—for this limitation. This refutes Patent Owner's contention that Russ is never referenced, and, as Petitioner states, Russ's disclosures on restricting commercial skipping (trick play) in the first period of time are further discussed in the Petition. *Id*. at 32–36. For instance, the Petition explains that Russ teaches the restriction of skipping commercials during playback, such as "for only a specified length of time, such as two weeks." *Id*. at 32–33 (citing Ex. 1008 ¶¶ 34–35; Ex. 1002 ¶ 114). Petitioner asserts that, thus, "Russ discloses the desirability of having a *first period of time* wherein the user must watch the entire A/V stream, including commercials, regardless of whether the user requested playback of a commercial-free stream." *Id*. at 33 (citing Ex. 1002 ¶ 114) (emphasis added).

Petitioner contends that a person of ordinary skill in the art "would have found it obvious to apply the time-based nature of the restrictions on trick-play taught in Russ as a way to implement the various 'playback restrictions' found in Casagrande, including the restriction on skipping commercials entirely." Pet. 34 (citing Ex. 1002 ¶¶ 114–118). Petitioner further asserts that Casagrande and Russ disclose restrictions on removing interstitials which are linked to the first and second periods of time. *Id*. (citing Ex. 1002 ¶ 117). Petitioner argues that a person of ordinary skill in the art would have been motivated to use Russ's time-based restrictions in Casagrande "to obtain the predictable result of restricting automatically skipping of interstitials for a finite period of time," which would increase the broadcaster's financial value of the interstitial content. *Id*. at 35 (citing

Ex. 1002 ¶ 116). Petitioner contends that a person of ordinary skill in the art considering Casagrande's teachings would have looked to Russ for additional details regarding implementations in functionality. *Id*. at 20–21 (citing Ex. 1002 ¶ 86). Petitioner also asserts that one of skill in the art would have had a reasonable expectation of success in the combination—that is, incorporating Russ's techniques into Casagrande—because the incorporation would have required "simple software/user interface modifications" that were known to those of skill in the art and because similar techniques worked in similar systems in Russ. *Id*. at 35.

In support, Dr. Jeffay testifies that a person of ordinary skill in the art would be motivated to combine Casagrande and Russ in order to restrict "temporally moving through particular identified segments," as discussed in Casagrande. Ex. 1002 ¶ 115 (citing Ex. 1006, 4:20–21). Dr. Jeffay testifies that a person of ordinary skill in the art "would have found it obvious . . . to apply the time-based nature of the restrictions on trick-play found in Russ to the various 'playback restrictions' found in Casagrande, including the restriction on skipping commercials entirely." *Id*. Dr. Jeffay testifies that both Casagrande and Russ disclose restrictions on removing interstitials that are directly linked to periods of time, with Casagrande disclosing that "a user may be restricted from temporally moving through particular identified segments of a presentation stream," with Russ disclosing trick-play preclusion for a specified length of time. *Id*. (citing Ex. 1006, 4:20–27; Ex. 1008 ¶ 35). Dr. Jeffay refers to Casagrande's disclosure concerning replacing commercials with timelier ones, and testifies that because Casagrande acknowledges a concern with the decreasing value of interstitial content over time, a person of ordinary skill in the art would have been motivated to implement Russ's time-based limits on restrictions in

Casagrande. *Id*. ¶ 117 (citing Ex. 1006, 10:5–13). Dr. Jeffay further testifies that a person of skill would understand "that some users would be willing to accept restrictions on commercial skipping soon after distribution of content" and "would understand that combining Russ's techniques with Casagrande would successfully allow the content provider to obtain additional revenue from advertisements shown to viewers who value watching the program during the initial release period while still appealing to viewers who are willing to delay watching the program in order to avoid commercials." *Id*. ¶ 118.

Patent Owner argues that, although Petitioner asserts that Casagrande and Russ discuss the general concept of restricting the ability to skip commercials, "the Petition does not identify any specific reasoning to combine or modify the references according to the claimed invention." PO Resp. 23–24 (citing Pet. 33–36). Patent Owner contends that the only support is from the declaration of Dr. Jeffay, and that restates Petitioner's argument, and the majority of his opinions cite no supporting evidence. *Id*. at 24 (citing Pet. 33–34; Ex. 1002 ¶¶ 114–118; Ex. 2006 ¶ 83). Patent Owner asserts that Petitioner's obviousness rationale is driven by hindsight. *Id*. (citing Ex. 2006 ¶ 84).

We find that Petitioner has demonstrated that the combination of Casagrande and Russ teaches limitation 1[d][i] and that there is rationale to combine the references. We agree with Petitioner that Casagrande teaches playing a video program in its entirety for display, that is, where a user is restricted from fast-forwarding through commercials, for instance. As identified by Petitioner, Casagrande discloses:

> In some embodiments, a user may be restricted from temporally moving through particular identified segments of a

> presentation stream at a non-real time presentation rate of the A/V stream. In other words, a receiving device may automatically output particular segments of a presentation stream without skipping over or otherwise fast forwarding through the segments, regardless of whether a user provides input requesting fast forwarding or skipping through the segments. For example, commercials within a television program may be associated with restrictions against fast forwarding or skipping, and a recording device may automatically present the commercial segments regardless of the receipt of user input requesting non-presentation of the segments.

Ex. 1006, 4:20–32; *see* Pet. 32. Additionally, we agree with Petitioner, and find persuasive Dr. Jeffay's testimony, that there is motivation to combine Russ with Casagrande in view of Casagrande's recognition of the decreasing value of interstitial content over time, and the implementation of Russ's time-based limits on restrictions in Casagrande would offer the benefit of increasing a broadcaster's financial value of the interstitial content. *See* Ex. 1002 ¶¶ 86, 113–118; Ex. 1006, 10:5–13; Ex. 1008 ¶ 35. We further credit Dr. Jeffay's testimony that there would be success in the combination of Casagrande and Russ because a person of skill would understand, based on Russ's disclosures, that users would be willing to accept restrictions on commercial skipping. Ex. 1002 ¶ 118. Further, in view of the similarities of Casagrande and Russ, as Petitioner discusses, there would have been a reasonable expectation of success of the combination. *See* Pet. 34–35; Ex. 1002 ¶¶ 115–118.

We do not find persuasive Patent Owner's contention that there is no determination that "said second command is received during the first period of time" because Casagrande only teaches that the restriction on full playback is by way of information sent by the content provider. PO Resp. 16; PO Sur-reply 9–10. This argument attacks Casagrande individually, but,

as discussed above, the Petition relies on the combination of Casagrande and Russ, not just Casagrande, for teaching this limitation. *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981). Further, the evidence of record supports that Russ teaches restricting skipping commercials during playback for a certain initial time, so in combination with Casagrande, we find that this teaches providing a video program in its entirety for a first period of time. *See* Pet. 32–34; Ex. 1008 ¶¶ 34–35. We also do not find persuasive Patent Owner's argument that Russ uses tags that determine whether a commercial can be skipped, and that it is the tag that determines whether the commercial can be skipped and not the time at which the video program is played back. PO Sur-reply 11. Again, Patent Owner attacks Russ individually. Petitioner relies on Russ's teaching of the desirability of having a first period of time where the user must watch the entire program, so it is this known time-based limit in Russ that would have been implemented in Casagrande. *See* Pet. 33–36.

We also do not find Patent Owner's arguments on the alleged lack of specific reasoning to combine Casagrande and Russ to be persuasive. *See* PO Resp. 23–24. Dr. Jeffay testifies that "Casagrande acknowledges that one concern expressed by content providers is the decreasing value of interstitial content over time, particularly because commercials may become less relevant to the user or may expire." Ex. 1002 ¶ 117 (citing Ex. 1006, 10:5–13 ("[T]he supplemental content 602 may also be selected to replace a commercial with a timelier commercial from the same advertiser. For example, a department store may have originally advertised a sale during the original broadcast of the show, but that particular sale may have since ended.")). Accordingly, the evidence supports that Casagrande identifies that the earlier playback of commercials has value, which provides support

that there would be additional revenues from commercials that are watched during the initial release period, which supports that a person of skill in the art would have been motivated to implement Russ's time-based restrictions on playback in the first period of time. *Id.* ¶¶ 117, 118.

Accordingly, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][i] by the combination of Casagrande and Russ or Petitioner's asserted rationale to combine the references.

On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches limitation 1[d][i] and we find a rationale to combine the references has been demonstrated.

*vi. Limitation 1[d][ii]*

As noted above, Petitioner asserts that Russ teaches the restriction of skipping commercials during playback, such as "for only a specified length of time, such as two weeks." Pet. 32–33 (citing Ex. 1008 ¶¶ 34–35; Ex. 1002 ¶ 114). Petitioner further contends "Russ discloses the desirability of having a first period of time wherein the user must watch the entire A/V stream, including commercials, regardless of whether the user requested playback of a commercial-free stream," and "the desirability of having a second period of time (i.e., once the restriction expires) in which the user may elect to skip the commercials or not." *Id.* at 33 (citing Ex. 1002 ¶ 114). Thus, Petitioner contends "Casagrande and Russ both disclose restrictions on removing interstitials that are directly linked to first and second periods of time." *Id.* at 34 (citing Ex. 1002 ¶ 117). Petitioner asserts that a person of skill in the art would have appreciated that a user would select playback of the first A/V stream (the entire video program), even after the period of restriction on commercial skipping had ended, with an example that a user

may opt to watch the Super Bowl with commercials. *Id*. at 36 (citing Ex. 1002 ¶ 104).

Patent Owner contends that, similar to its arguments for limitation 1[d][i], Casagrande does not disclose the second scenario because it does not make a determination based upon whether "said second command is received during a second period of time"; rather, it is the "content provider" that determines whether a commercial can be skipped. PO Resp. 18 (citing Ex. 1006, 19:66–20:2, 5:66–6:3; Ex. 2006 ¶ 71). Patent Owner asserts that the DVR must determine whether the second command was received during the second period of time in order to determine whether the user can skip portions. *Id*. at 18–19 (citing Ex. 2006 ¶ 72). Patent Owner also argues that the "first command" must be received before the "second command" initiating playback is received. *Id*. at 19 (citing Ex. 2006 ¶ 73). Patent Owner further contends that Casagrande fails to disclose that its selection of A/V streams is used with the "selection of particular segments from a selection menu," "much less in the sequence required by the second scenario." *Id*. (citing Ex. 2006 ¶ 73).

Patent Owner additionally argues that, similar to its contentions for the first scenario, Russ also fails to teach the second scenario because its commercial-related functionality is "driven by 'tags.'" PO Resp. 19 (citing Ex. 1008 ¶ 26). Patent Owner asserts that the tags have an expiration date, and then the tags become inactive or replaceable, so at the time of the expiration of the tag, the commercial would no longer be viewable or it would be replaced. *Id*. at 20 (citing Ex. 1008 ¶ 35). Patent Owner contends that "it is the 'tag' that determines whether the commercial can be skipped—not the time at which the video program is played back." *Id*. at 20

As we discuss for limitation 1[d][i], and as Petitioner asserts, Russ discloses that trick play functionality is restricted for only a specified period of time. *See* Ex. 1008 ¶¶ 34–35. Accordingly, we find support for Dr. Jeffay's testimony that, in the view of one of ordinary skill in the art, Casagrande in combination with Russ teaches that after the expiry of the first period of time there is a second period of time in which commercials may be skipped or not, depending on the playback state. Ex. 1002 ¶ 114; *see also* Pet. 32–33. We also agree that Casagrande teaches that a playback state, which may include commercials, could have been selected. Ex. 1006, 19:63–66, 21:28–32; Ex. 1002 ¶¶ 104, 114; Pet. 36. Additionally, we agree that Petitioner has demonstrated a rationale to combine Casagrande and Russ with a reasonable expectation of success of the combination. *See* Ex. 1002 ¶¶ 115–118.

For similar reasons to those discussed above for limitation 1[d][i], we do not find persuasive Patent Owner's argument that there is no determination that "said second command is received during the second period of time" because in Casagrande it is the "content provider" that determines whether a commercial can be skipped. This argument attacks Casagrande individually, but the Petition relies on the combination of Casagrande and Russ, not just Casagrande, for the teaching of this limitation. Petitioner relies on Russ's teaching of restricting skipping commercials during playback for a certain time and this teaching is combined with Casagrande, wherein once the restriction expires the user may elect to skip the commercials or not. *See* Pet. 33. Thus, in combination, upon the expiry of the first period of time, there is a second period of time, and the playback state determines whether commercials are played (or not). Similarly, we do not find persuasive Patent Owner's

argument that Russ's teachings do not apply because it is its "tag" that determines whether the commercial can be skipped and not the time at which the video program is played back. PO Resp. 18–19. Again, Petitioner relies on Russ's teaching of restricting skipping commercials during playback for a certain time combined with Casagrande, wherein once the restriction expires the user may elect to skip the commercials or not. Pet. 33. Thus, Patent Owner argues Russ individually, where, in combination, it is the time of restriction expiry, and the status of the playback state, that determines whether a commercial can be skipped or not.

Patent Owner also argues that the "first command" must be received before the "second command" initiating playback is received, that is, that a certain sequence is required. PO Resp. 19. Patent Owner asks too much. As discussed *supra* in the discussion on claim construction for the term "first command," there is no indication in the claim that the "first command" and "second command" are exclusively linked or related. Limitation 1[c] requires that there be a controller configured to receive a "first command" that changes a DVR from a first playback state to a second playback state; limitation 1[d][ii] requires that the DVR be in a first playback state. Under limitation 1[c], the "first command" may, for instance, be set by a switch that is set to the respective playback states. Under limition1[c], the switch could be used to set the playback state, which is received by the controller of the DVR, and under limitation 1[d][ii], the system would only make a determination of whether the DVR is set in a first playback state. Accordingly, the switch could be set to certain playback state and it could remain at that setting through repeated intervening playback events under limitations 1[c] and 1[d][ii], which would not require the specific timing sequence that Patent Owner argues is required.

Further, Patent Owner argues that Casagrande fails to disclose that its selection of A/V streams is used with the selection of particular segments from a selection menu, and does not disclose the sequence required by the second scenario. PO Resp. 19. As discussed for limitation 1[c] above, Casagrande discloses that a user may select a certain playback stream, that is, a certain playback that may or may not contain commercials, and the user may choose and playback specific video segments. Ex. 1006, 4:1–8, 19:63–66. We determine that these disclosures are sufficient, in combination with Russ and its disclosure of the expiry of trick play restrictions, to teach that there is a certain playback state that is set, which would include a first playback state, and that there is a teaching of a command from a user to play back a video program in a second period of time, which is all that the claim requires.

Accordingly, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][ii] by the combination of Casagrande and Russ. Further, we find that Petitioner has provided sufficient rationale to combine the references.

On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches limitation 1[d][ii] and a rationale to combine the references has been demonstrated.

*vii. Limitation 1[d][iii]*

Petitioner asserts that Casagrande's "second A/V stream" includes a subset of segments in the original temporal order of the first A/V stream without the identified interstitial content. Pet. 36. Petitioner contends that "Casagrande teaches that a user 'may effectively view a subset of the segments of an A/V stream in the original temporal order of the segments, skipping output of undesignated segments of the A/V stream.'" *Id*. at 37

(citing Ex. 1006, 24:23–26; Ex. 1002 ¶ 121). Thus, according to Petitioner, "in the combination with Russ, once the commercial skipping inhibition period (i.e., the claimed first period of time) expires, the combination would permit the user to request playback of the 'second A/V stream' where the commercial is removed." *Id*. at 38 (citing Ex. 1002 ¶¶ 122–123). Figure 8 of Casagrande, reproduced below, is a graphical representation of a first A/V stream that is received and a second output stream that is outputted. Ex. 1006, 1:59–61.




Pet. 37. Consistent with Petitioner-annotated Figure 8 of Casagrande, above, Petitioner asserts that "the boundary 808 (e.g., the ending boundary of segment 802) is the starting point at which the interstitial 804 is to be filtered from the first A/V stream 704A" and that "the boundary 810 (e.g., the beginning boundary of segment 806) is the ending point at which the interstitial 804 is to be filtered from the first A/V Stream 704A," and "[a]s a result of the filtering . . . the second segment 806 [third portion] is outputted

immediately following the first segment 802 [first portion].” Pet. 37–38 (citing Ex. 1006, 13:29–31; Ex. 1002 ¶ 121).

Patent Owner contends that in Casagrande, it is the content provider that determines whether the transmitted commercial can be skipped, and there is no determination based on a second command in a second period of time. PO Resp. 21 (citing Ex. 2006 ¶ 77). Patent Owner further argues that in Russ, because the tag for a commercial can become inactive, “the preclusion of trick play in *Russ* is commercial-dependent, not time-dependent.” *Id*. at 22–23 (citing Ex. 2006 ¶ 80). Patent Owner asserts that Casagrande fails to disclose that its selection of A/V streams is used with the selection of segments from a selection menu, and fails to disclose the sequence required by the limitation. *Id*. at 23 (citing Ex. 2006 ¶ 81).

As discussed for limitation 1[d][i], and as Petitioner asserts and we agree, Russ discloses that trick play functionality is restricted for only a specified period of time. *See* Ex. 1008 ¶¶ 34–35. Accordingly, we find support for Dr. Jeffay’s testimony that, in the view of one of ordinary skill in the art, Casagrande in combination with Russ teaches that after the expiry of the first period of time there is a second period of time in which commercials may be skipped. Ex. 1002 ¶ 122; *see also* Pet. 37. Additionally, we agree that Petitioner has demonstrated a rationale to combine Casagrande and Russ with a reasonable expectation of success of the combination. *See* Ex. 1002 ¶¶ 115–118.

We do not find Patent Owner’s arguments on Casagrande and Russ to be persuasive for the reasons discussed above for limitation 1[d][ii]. Accordingly, we do not find that Patent Owner’s arguments undermine Petitioner’s showing of the teaching of limitation 1[d][iii] by the

combination of Casagrande and Russ. Further, we find that Petitioner has provided sufficient rationale to combine the references.

On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches limitation 1[d][iii] and a rationale to combine the references has been demonstrated.

*viii. Limitation 1[e]*

Petitioner asserts that in the combination of Casagrande and Russ "the second period of time wherein skipping of commercials is allowed begins once the restriction expires." Pet. 39 (citing Ex. 1002 ¶ 126). Dr. Jeffay testifies that "Russ clearly defines a first period of time where trick play is 'preclude[d],'" where "during the first period of time, the combination of Casagrande and Russ teaches that only the 'first A/V stream' of Casagrande . . . containing the first portion (e.g., segment 802) followed by the second portion (e.g., interstitial 804) followed by the third portion (e.g., segment 806)" and "[t]he second period of time wherein skipping of commercials is allowed begins once the restriction expires." Ex. 1002 ¶ 125.

Patent Owner presents no arguments specifically related to limitation 1[e]. *See generally* PO Resp.

We agree with Petitioner that the combination of Casagrande and Russ teaches a second period of time following a first period of time where trick play has been precluded.

On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches limitation 1[e] and a rationale to combine the references has been demonstrated.

*ix. Conclusion*

Patent Owner presents no evidence of objective indicia of nonobviousness. *See generally* PO Resp. Weighing the record as a whole in

view of the findings and analysis above, we conclude that Petitioner has met its burden to show, by a preponderance of the evidence, that independent claim 1 would have been obvious over Casagrande and Russ.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable.

*b. Independent Claims 9 and 18*

Claim 9 is an independent method claim and claim 18 is an independent apparatus claim. Ex. 1001, 12:52–13:26, 14:18–46. Petitioner relies on the same arguments and evidence in support of obviousness for these claims as that relied upon for claim 1. Pet. 22–39. We are persuaded by Petitioner's arguments as to claims 9 and 18 and find they are supported by the cited evidence. *Id*. Accordingly, we adopt Petitioner's analysis as our own. Petitioner has shown sufficiently that the combination of Casagrande and Russ teaches or suggest each limitation of independent claims 9 and 18, and sufficient reasoning with rational underpinning has been provided for the motivation to combine the references.

Patent Owner asserts that Petitioner fails to show that the combination of Casagrande and Russ renders claims 9 and 18 unpatentable. PO Resp. 26–27, 29–32. For the issues of the teaching of the "first command" and "second command," Patent Owner relies on its arguments presented for limitation 1[c]. *Id*. at 26–27, 31. We do not find these arguments persuasive for the reasons explained for limitation 1[c] above. Patent Owner also contends that Petitioner fails to demonstrate that limitations 9[f] and 18[d] are met by the prior art, and relies on its arguments directed to limitation 1[d]. *Id*. at 27, 31–32. We do not find these arguments persuasive for the reasons discussed above for limitations 1[d][i]–[iii]. Accordingly, we do not

find that Patent Owner's arguments undermine Petitioner's showing of the teaching of the limitations of claims 9 and 18 by the combination of Casagrande and Russ.

We conclude that Petitioner has met its burden to show, by a preponderance of the evidence, that independent claims 9 and 18 would have been obvious over Casagrande and Russ. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 9 and 18 are unpatentable.

*c. Dependent Claims 3 and 12*

Claim 3 depends from claim 1 and further recites:

> wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said (*sic*) to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes said primary video content and *only a portion of said secondary video content*.

Ex. 1001, 12:20–26 (emphasis added). Claim 12 depends from claim 9 and recites additional limitations that are essentially the same as claim 3. *Id*. at 13:38–44.

Petitioner asserts that Casagrande teaches the additional limitations of claims 3 and 12. Pet. 40–42. Petitioner states explicitly that it is the multiple segments of the video frames that correspond to the "primary content" of claims 3 and 12, and it is the interstitials that correspond to the claimed "secondary content." *Id*. at 40 (citing Ex. 1002 ¶ 133). Petitioner contends that Casagrande discloses that the interstitials can be skipped during output of an A/V stream. *Id*. at 40–41 (citing Ex. 1006, 16:4–12; Ex. 1002 ¶ 134). Petitioner refers to Casagrande's teachings of user selection of certain segments for presentation, and its disclosure that presentation of

undesignated segments is skipped. *Id*. at 41 (citing Ex. 1006, 4:4–8; Ex. 1002 ¶ 135). Petitioner also relies on Casagrande's teaching of restrictions against fast forwarding and or skipping through commercials segments, "regardless of the receipt of user input requesting non-presentation of the segments." *Id*. at 41–42 (citing Ex. 1006, 24:34–43; Ex. 1002 ¶ 135).

In Reply, Petitioner additionally asserts that Casagrande does not suggest the restrictions against skipping apply to all commercials, as confirmed by Russ, which discloses commercial segments organized by slot, with time-based restriction specific to the slot. Pet. Reply 15 (citing Ex. 1008 ¶ 35). Petitioner contends that some commercials may be skipped and others may not. *Id*. at 15–16 (citing Ex. 1002 ¶ 85). Petitioner argues that "the limitations may change based on the commercial slot, with some commercials having longer time restrictions on skipping than others (i.e., commercials in some slots can be skipped after two weeks, while others only after a month from first broadcast)." *Id*. at 16 (citing Ex. 1015 ¶¶ 10–11).

Patent Owner argues that claim 3 falls within limitation 1[d][iii]. PO Resp. 25. Patent Owner asserts that Petitioner mapped Casagrande's interstitials (commercials) to the "secondary video content." *Id*. (citing Pet. 40). Patent Owner contends that in Petitioner's assertions for limitation 1[d][iii], the Petitioner relied upon a Casagrande embodiment where commercials are skipped in their entirety. *Id*. (citing Pet. 37). Patent Owner argues that for claim 3, Petitioner cites to Casagrande's embodiment where the DVR "automatically present[s] the commercial segments regardless of the receipt of user input requesting non-presentation of the segments." *Id*. at 25–26 (citing Pet. 41–42). Patent Owner contends that Petitioner's mapping is flawed because the two embodiments (commercials entirely skipped, commercials presented) are mutually exclusive and there is also a failure to

teach presenting "only a portion" of the commercials. *Id*. at 26 (citing Ex. 1006, 24:34–43).

Additionally, Patent Owner asserts that Casagrande states that "commercials within a television program may be associated with restrictions against fast forwarding or skipping," and does not teach or suggest that a subset of the commercials can be associated with restrictions. PO Sur-reply 14 (citing Ex. 1006, 24:38–40). Patent Owner further asserts that Petitioner's arguments in Reply regarding Russ are improper because the Petition does not contain any reference to Russ for claims 3 and 12. *Id*. (citing Pet. 40–42). Patent Owner also contends that Petitioner fails to provide any support in Russ other than the unsupported opinions of Dr. Jeffay. *Id*. at 14–15 (citing Pet. Reply 15–16).

We agree with Patent Owner that Petitioner fails to demonstrate the prior art teaching claims 3 and 12. The claims require that "the portion of said video program that is provided to said [] display device" "includes said primary video content and only a portion of said secondary video content." In other words, the claim requires that the entire primary video content is provided, but only portions of the secondary video content be provided. In the Petition, Petitioner relies only upon Casagrande for the limitations specific to claims 3 and 12. *See* Pet. 40–42; Ex. 1002 ¶¶ 133–135. Petitioner asserts that the multiple segments of the video frames correspond to the "primary content" and *the interstitials correspond to the claimed "secondary content.*" Pet. 40 (emphasis added). In its assertions for limitation 1[d][iii], Petitioner identifies that the "second A/V stream," that is the stream selected for a "second playback state," is "a subset of segments in the original temporal order of the first A/V stream *without the identified interstitial content*." Pet. 30–31, 36 (emphasis added). However, as Patent

Owner points out, Petitioner's mapping of limitation 1[d][ii] with removal of all interstitial content conflicts with that asserted for claims 3 and 12, wherein Petitioner contends that certain undesignated interstitial portions are not presented. That is, Petitioner relies on Casagrande's teaching that there are no interstitials in playback under limitation 1[d][iii], but for claim 3, which depends from claim 1 and includes all its limitations, Petitioner relies upon Casagrande's playing undesignated segments of the secondary content, where Petitioner asserts the second content is the interstitials only. The reliance on teachings of skipping all the interstitials and also skipping only some of the interstitials are inconsistent and mutually exclusive, and given the interdependencies of claim 1 and claim 3, this represents Petitioner taking inconsistent positions on the respective claims. Further, Petitioner points to Casagrande's disclosure that a user can select certain segments for presentation, and not others (*see* Pet. 41 (citing Ex. 1006, 4:4–8)), but as discussed for limitation 1[c] above, as Petitioner maps the "first command" and the "second command," it is the "first command" that determines whether the interstitials will be presented. Petitioner asserts that it is the "second command" that initiates playback, and Petitioner maps this to Casagrande's selection of segments, not to choosing an A/V stream with or without interstitials. Petitioner also refers to Casagrande's teaching that there can be restrictions against skipping through commercials segments, "regardless of the receipt of user input requesting non-presentation of the segments," but this does not address why Casagrande teaches "only a portion of said secondary video content" (interstitials). *See* Pet. 41. That is, Casagrande discloses restrictions on skipping all commercials, but does not disclose that this would be applied to only some commercials. Ex. 1006, 24:34–43.

In Reply, Petitioner asserts that "Casagrande does not suggest that the restrictions against fast forwarding or skipping apply equally to all commercial segments, and Russ confirms that not every commercial would be subject to the same restrictions as others." Pet. Reply 15. Casagrande does disclose that there can be restrictions on skipping commercials, but does not indicate or suggest that restrictions would be applied to some commercials and not others. *See* Ex. 1006, 24:34–43. Although Petitioner suggests that Russ provides "confirm[ation]" of an alleged teaching of Casagrande, we do not agree with this characterization, because, as stated, Casagrande does not indicate or suggest application of a restriction to some commercials and not others.

Petitioner then turns to Russ's disclosures, alleged to "confirm[] that not every commercial would be subject to the same restrictions or not." Pet. Reply 15–16 (citing Ex. 1008 ¶ 35). We decline to consider Russ's disclosures for the teaching of these claims. Specifically, Petitioner's newly-raised reliance on Russ's teachings is directed to a new theory of unpatentability, that is, Russ's disclosure of commercial segments organized by slot, with time-based restriction specific to the slot, and that different time restrictions would be used for the respective slots. *Id*. at 15. The Petition does not contain any reference to Russ for teachings related to claims 3 and 12. *See* Pet. 40–42. "The 'newness' restriction prohibits the petitioner from raising, in reply, 'an entirely new theory of *prima facie* obviousness absent from the petition,' even if the new theory is responsive to the patent owner's response or the Board's institution decision." *Corephotonics, Ltd. v. Apple Inc*., 84 F.4th 990, 1008 (Fed. Cir. 2023) (quoting *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.,* 853 F.3d 1272, 1286 (Fed. Cir. 2017)). As discussed above, we do not find that the evidence of

record demonstrates that Casagrande teaches the limitations of these claims, so Petitioner appears to be relying on the new arguments and evidence related to Russ to demonstrate *prima facie* obviousness that are not in the Petition.[9] Nor is there an explanation as to why this is a fair extension of a previously-raised argument, and we do not discern that the new arguments are related to those previously made in the Petition. *See Corephotonics*, 84 F. 4th at 1009. In our view, Petitioner's Reply "contention crosses the line from the responsive to the new." *Ariosa Diagnostics v. Verinata Health, Inc*., 805 F.3d 1359, 1386 (Fed. Cir. 2015). Therefore, we disregard Petitioner's arguments based on Russ for claims 3 and 12 made in reply.

Petitioner also refers to another new reference (Ex. 1015) for the teaching of this element of the claims, but this is also not referred to in the Petition, so we disregard this argument. Pet. Reply 16; Ex. 1015 ¶¶ 10–11; *see* Consolidated Trial Practice Guide,[10] 74 (A contention in reply "that raises a new issue or belatedly presents evidence may not be considered.").

Accordingly, we determine that Petitioner has not shown by a preponderance of the evidence that claims 3 and 12 are unpatentable based on the combination of Casagrande and Russ.

---

[9] We do not discern that the situation here is due to circumstances like a new claim construction Board ruling arising in a Final Written Decision that Petitioner did not have the opportunity to address, nor does it relate to the same prior art identified in the Petition. *See*, e.g, *Axonics, Inc. v. Medtronic, Inc*., 75 F.4th 1374, 1380–84 (Fed. Cir. 2023); *Corephotonic*s, 84 F. 4th at 1010.

[10] Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019), available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf.

*d. Dependent Claim 17*

Claim 17 depends from claim 11 (which depends from claim 9) and further recites:

> wherein said step of receiving said video program further comprises receiving said video program, said at least one time of when said second portion of said video program begins, and said at least one time of when said second portion of said video program ends from a satellite, wherein each one of said at least one times is received by said DVR after said video program is stored on said memory device.

Ex. 1001, 14:10–17.

Petitioner asserts that Casagrande discloses that "[t]he location information 706 may be transmitted to the receiving device 710 together or separately from the first A/V stream 704." Pet. 49 (citing Ex. 1006, 12:52–56; Ex. 1002 ¶ 203). Petitioner contends that a person of ordinary skill in the art "would have understood that the location information that includes 'each one of said at least one times' may be received after storage of the video stream and/or that receiving the location information after storage of the video stream would be obvious." *Id*. (citing Ex. 1002 ¶ 204).

Patent Owner argues that a person of ordinary skill in the art would understand Casagrande's disclosure that "[t]he location information 706 may be transmitted to the receiving device 710 together or separately from the first A/V stream 704" means that "separately" is "on a different channel," not "at a different time." PO Resp. 29 (citing Ex. 2006 ¶ 94). In support of its contention, Patent Owner refers to annotated Figure 7 of Casagrande, reproduced below.




Annotated Figure 7 of Casagrande depicts some components of a system, with Patent Owner identifying signal lines as "Different Channels." PO Resp. 29.

In Reply, Petitioner asserts that Patent Owner's reading of "location information 706 may be transmitted to the receiving device 710 together or separately from the first A/V stream 704" to mean "at a different time" is strained and narrow. Pet. Reply 16 (citing PO Resp. 29; Ex. 1006, 12:52–54). Petitioner contends that Casagrande teaches "the communication interface 1502 may receive the supplemental content 1506 and the location information 1508 ***by employing the same technology used to receive the first A/V stream***" and this information can be separate from the first A/V stream. *Id.*

We find that Petitioner has not met its burden to demonstrate unpatentability of claim 17. In claim 17 there are times recited in the claim: "at least one time of when said second portion of said video program begins" and "at least one time of when said second portion of said video program

ends." Ex. 1001, 14:10–17. The claim further requires "wherein each one of said at least one times is received by said DVR *after said video program is stored on said memory device*." *Id*. at 14:15–17 (emphasis added). Petitioner has not demonstrated that the evidence of record provides support that the video program storage is at an earlier time relative to the receiving of the times relating to the second portion of a video stream. Rather, as Patent Owner asserts, the evidence suggests that Casagrande instead transmits the location information in a separate signal than the A/V stream. Ex. 1006, Fig. 7.

At oral hearing, Petitioner argued that whether Casagrande discloses that the location information is sent with the program or is transmitted later could go "either way." Tr. 22:24–26. Petitioner asserted that Dr. Jeffay testified that "a person of ordinary skill in the art reading that, you know, separately language would understand that could be separate in time" and "separate in time certainly includes the possibility of sending it later." *Id*. at 23:5–9. Petitioner first newly raised evidence at oral hearing as to why one of ordinary skill in the art would view Casagrande to support a separate in time teaching. Specifically, Petitioner identified a portion of Casagrande (Ex. 1006, 20:18) that was not previously identified or discussed in the Petition or Petitioner's Reply in association with this claim.[11] *Id*. at 23:12–17. The issue of Petitioner's failure to show the teaching of the temporal aspect of this claim was raised in Patent Owner's Response (PO Resp. 29) and the proper time to respond to this issue was in Petitioner's Reply, not at

[11] We note that the demonstrative slides that Petitioner referred to for claim 17 during the hearing (Ex. 1021, slides 36, 40) do not show the citation to Casagrande referenced at oral hearing or the specific reference to a portion of Dr. Jeffay's declaration. Tr. at 23:12–17.

the hearing. We therefore do not consider Petitioner's newly-raised argument made at the oral hearing.

Petitioner bears the burden to demonstrate unpatentability, and we do not find that Petitioner has carried its burden. Petitioner was required to demonstrate by a preponderance of the evidence that Casagrande teaches that the location information it relies upon was sent after the storage of the video stream. The evidence relied upon by Petitioner, even if it were to arguably demonstrate that location information could be sent after the video stream, is insufficient. As discussed above, the evidence of record shows only that Casagrande transmits the location information in a separate signal than the A/V stream (Ex. 1006, Fig. 7), and Dr. Jeffay's testimony on claim 17 is conclusory (Ex. 1002 ¶¶ 201–205).

Accordingly, we determine that Petitioner has not shown by a preponderance of the evidence that claim 17 is unpatentable.

*e. Dependent Claims 2, 4–8, 10, 11, 13–16, and 19*

Petitioner asserts that the combination of Casagrande and Russ teaches all the limitations of dependent claims 2, 4–8, 10, 11, 13–16, and 19 and that there is a rationale to combine the references. Pet. 39–40, 42–50.

Patent Owner presents no arguments specific to these claims, except that they depend from independent claims 1, 9, and 18, which Patent Owner asserts have not been demonstrated to be unpatentable. PO Resp. 32. As discussed above, we disagree with Patent Owner and find that Petitioner has demonstrated by a preponderance of the evidence that independent claims 1, 9, and 18 are unpatentable.

We are persuaded by Petitioner's arguments as to claims 2, 4–8, 10, 11, 13–16, and 19 and find they are supported by the cited evidence. Pet. 39–40, 42–50. Accordingly, we adopt Petitioner's analysis as our own.

Petitioner has shown sufficiently that the combination of Casagrande and Russ teaches or suggests each limitation of dependent claims 2, 4–8, 10, 11, 13–16, and 19 and sufficient reasoning with rational underpinning has been provided for the motivation to combine the references.

Accordingly, Petitioner has shown by a preponderance of the evidence that claims 2, 4–8, 10, 11, 13–16, and 19 are unpatentable as obvious over Casagrande and Russ.

### *E. Asserted Obviousness of Claims 1–19 Over Dow and Russ*

Petitioner contends that claims 1–19 are rendered obvious by Dow in combination with Russ. Pet. 67–74. In support, Petitioner relies upon the Jeffay Declaration and the Reply Jeffay Declaration. Ex. 1002; Ex. 1014. Patent Owner argues that the combination of Dow and Russ does not teach all the limitations of the claims and Petitioner has provided insufficient rationale to combine the references. PO Resp. 50–58. Patent Owner relies upon the Freedman Declaration. Ex. 2006.

We begin our discussion with brief summary of Dow, and then address the evidence and arguments presented.

#### *1. Dow (Ex. 1007)*

Dow describes "a digital video recorder that detects and stores black field and silent frame events for use in locating commercial groups. The commercial groups may be skipped or otherwise navigated based upon data pointers linking the stored events to corresponding locations in the video data file." Ex. 1007, code (57). Dow discloses "improved methods of detecting commercials and automatically skipping them." *Id.* at 3:47–48.

Specifically, Dow discloses its system "may identify transitions between program content and commercials or commercial groups and

provide a navigation function for automatically skipping the commercials or commercial groups during playback." *Id.* at 22:37–41. Dow's "navigation function module 814 may provide the logic for a commercial skipping feature." *Id.* at 23:29–30. Dow discloses:

> The control interface module 818 may provide menu options for selecting whether or not the commercial skip function is active when playback is selected from a playback menu. The control interface module 818 may define that the commercial skip is always inactive in live view mode or delayed view mode (a form of playback) where there is insufficient time to buffer and process events for identifying commercial groups (e.g., a time delay of less than two minutes).

*Id.* at 24:40–48.

*2. Discussion*

*a. Claim 1*

*i. Limitation 1[pre]*

For the teaching of the preamble, Petitioner asserts that "Dow teaches a DVR that 'provide[s] a large number of enhancements for receiving, storing, and viewing video content,' including 'enhanced navigation options, such as slow motion, fast-forwarding, and rewinding," as well as "methods for skipping entire portions of a presentation." Pet. 51 (citing Ex. 1007, 3:2–26, 6:53–7:6).[12]

Patent Owner presents no arguments specifically related to limitation 1[pre]. *See generally* PO Resp.

---

[12] For the teaching of the preamble, Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow. Pet. 67.

On this complete record, we agree with Petitioner that Dow teaches the preamble of claim 1.[13]

*ii. Limitation 1[a]*

For the teaching of limitation 1[a], Petitioner asserts that Dow discloses an "A/V input module," with tuner, that receives sequential portions of presentation content. Pet. 52–53 (citing Ex. 1007, 9:49–52, 12:28–32).[14]

Patent Owner presents no arguments specifically related to limitation 1[a]. *See generally* PO Resp.

On this complete record, we agree with Petitioner that Dow teaches limitation 1[a].

*iii. Limitation 1[b]*

For the teaching of limitation 1[b], Petitioner asserts that Dow teaches data storage 550 stores content files and other data used in the operation of the DVR. Pet. 54 (citing Ex. 1007, 12:11–17, Fig. 5).[15]

Patent Owner presents no arguments specifically related to limitation 1[b]. *See generally* PO Resp.

On this complete record, we agree with Petitioner that Dow teaches limitation 1[b].

---

[13] We need not determine whether the preamble of claim 1 is limiting because Petitioner has shown that Dow teaches the preamble.
[14] For the teaching of limitation 1[a], Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow. Pet. 67.
[15] For the teaching of limitation 1[b], Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow. Pet. 67.

*iv. Limitation 1[c]*

For the teaching of limitation 1[c], Petitioner asserts that Dow teaches the use of a remote control receiving user commands for controlling the DVR system, where the commands are passed to and executed by processor.[16] Pet. 55–56. Petitioner further asserts that Dow teaches that the "control interface module 'define[s] one or more control signals for toggling the commercial skip function between active and inactive modes, such as a button on (and corresponding control signal from) a remote control,' thereby defining a first command for changing from disabled commercial skipping (first playback state) to enable commercial skipping (second playback state)." *Id*. at 56 (citing Ex. 1007, 24:29–32). Petitioner further asserts that Dow teaches "a second command to initiate playback of the program stored in memory," using its "play button." *Id*. at 56–57 (citing Ex. 1007, 24:37–40 ("The control interface module 818 may provide a global default through a menu system for defining whether the commercial skip function is active or inactive at the start of playback (e.g., when the play button is pressed."))).

Patent Owner argues that, although Petitioner asserts that Dow's toggle button setting corresponds to a functionality where the commercial skip is either active or inactive, the "first playback state" and "second playback state" require more than this functionality. PO Resp. 35–36 (citing Pet. 56). Patent Owner asserts that the playback states also place time-based limitations on navigation through a program. *Id*. at 36 (citing Ex. 2006 ¶ 105); *see also* PO Sur-reply 17.

---

[16] For the teaching of limitation 1[c], Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow. Pet. 67.

We agree with Petitioner that the evidence supports that Dow teaches the "first command" which sets different playback states (commercial skipping or no commercial skipping), as well as "second command" that initiates playback. *See* Ex. 1007, 24:29–40. We are not persuaded by Patent Owner's argument concerning a time-based limitation because limitation 1[c] does not have such a requirement.

On this complete record, we agree with Petitioner that Dow teaches limitation 1[c].

*v. Limitation 1[d][i]*

For the teaching of limitation 1[d][i], Petitioner refers to Dow's description of a control interface module that defines "variables governing the activation of the navigation function when the DVR is in a particular state, such as playback mode, playback menu mode, live view mode, program guide menu mode, etc."[17] Pet. 58 (citing Ex. 1007, 24:24–27). Petitioner asserts that Dow discloses that the "control user interface defines 'control signals for toggling the commercial skip function between active,' when the user may skip commercials, 'and inactive modes,' when the user may not skip any commercials." *Id*. (citing Ex. 1007, 24:30–31). Petitioner contends that "Dow teaches that '[t]he control interface module 818 may define that commercial skip is always inactive in live view mode or in delayed view mode (a form of playback) where there is insufficient time to buffer and process events for identifying commercial groups (e.g., a time delay of less than two minutes).'" *Id*. (citing Ex. 1007, 24:43–48).

[17] For the teaching of limitation 1[d][i] under its obviousness assertions, Petitioner relies upon the argument and evidence provided under its anticipation challenge based on Dow. Pet. 67.

Patent Owner argues that, although Petitioner's citations to Dow "disclose that different operational modes of *Dow's* DVR affect whether the user can skip commercials," they "do not disclose any of those modes being affected by time." PO Resp. 39 (citing Ex. 1007, 24:24–27). Patent Owner asserts that Petitioner's reference to Dow's commercial skip inactive state in live or delayed view mode indicates that "the 'commercial skip' is disabled based on what mode the DVR is in, not by time." *Id*. (citing Ex. 1007, 24:43–48; Ex. 2006 ¶¶ 111). Patent Owner further argues that "*Dow* does not determine whether a 'second command' was received during a 'first period of time,'" as the claim limitation requires. *Id*. at 39–40. Patent Owner also contends that Dow cannot "provide said video in its entirety," as claimed, in a "live view mode" because the "'second portion' has not been fully received and the third portion has not yet been received, let alone stored in a memory device." *Id*. at 40–41 (citing Ex. 1007, 24:43–48; Ex. 2006 ¶ 112). Patent Owner asserts that Petitioner's mapping is "flawed" because "the 'second portion' has not been fully transmitted and the 'third portion' has not yet been transmitted." *Id*. at 41 (citing Ex. 2006 ¶ 113).

In Sur-Reply, Patent Owner asserts that in the Petition there is no reference to Russ in the discussion of limitation 1[d][i]. PO Sur-reply 10. Patent Owner also argues that Russ's tags expire and, therefore, that commercials would no longer be viewable. *Id*. at 10–11.

Petitioner's obviousness challenge relies upon the combination of Dow and Russ. Pet. 67–74. Although the Petition states that it relies on the anticipation assertions for this limitation (Pet. 67), the Petition also states that, in the combination, Russ explains "[t]he commercial slot could also preclude trick play for only a specified length of time, such as two weeks" and that "Russ discloses the desirability of having a *first time period* wherein

the user must watch the entire A/V stream, including commercials, such as when the operator or programmer has placed a two-week restriction on skipping commercials." *Id*. at 68–69 (citing Ex. 1002 ¶ 343–344; Ex. 1008 ¶ 35) (emphasis added). We find that this reference back to "the first period of time" shows that Petitioner relies on the combination of Dow and Russ for the teaching of limitation 1[d][i]. We find also find that this assertion, with the reliance on Russ to teach a restriction on commercial skipping in a first period of time, teaches the limitation that a video program would be played in its entirety in a first period of time. Thus, contrary to Patent Owner's arguments, we find that the Petition's arguments and evidence provide support of the teaching that the "commercial skip" is disabled based on time, not on the mode set in the combination Dow with Russ. We also do not find persuasive Patent Owner's argument that Russ uses tags which determine whether a commercial can be skipped, and that it is the tag that determines whether the commercial can be skipped and not the time at which the video program is played back. PO Sur-reply 11. As to this argument, Patent Owner attacks Russ individually and not the combination of references. Petitioner relies on Russ's teaching of the desirability of having a first period where the user must watch the entire program, so it is this known time-based limit in Russ that would be implemented in Dow. *See* Pet. 68–69.

Additionally, we do not find persuasive Patent Owner's arguments that the claim is not taught in Dow because the transmission of a program may be incomplete. As discussed in the claim construction section, *supra*, we have not adopted Patent Owner's proposed construction that the "a first period of time" has "to start after transmission of the entire 'video program' to the DVR."

Additionally, we agree with Petitioner, and we find persuasive Dr. Jeffay's testimony, that a person of ordinary skill "would have been motivated to combine Dow and Russ in order to effectuate the desired result of restricting navigation in order to avoid 'reduc[ing] the attractiveness of subscriber television systems as media for advertising.'" Ex. 1002 ¶ 344 (quoting Ex. 1008 ¶ 6); *see also* Ex. 1002 ¶ 345. More specifically, Russ states that when users fast-forward through commercials this "removes a potentially important source of information from the user and reduces the attractiveness of subscriber television systems as media for advertising." Ex. 1008 ¶ 6. Accordingly, the evidence of record supports that one of skill would look to Russ's techniques, including an initial period of playback time when commercial skipping would be restricted in order to maintain attractiveness for advertising. Dr. Jeffay testifies that a person of ordinary skill in the art would have combined Russ's techniques with Dow to "allow the content provider to obtain additional revenue from advertisements shown to viewers who value watching the program during the initial release period while still appealing to viewers who are willing to delay watching the program in order to avoid commercials." Ex. 1002 ¶ 345. Further, we agree with Petitioner that Dow and Russ relate to utilizing DVRs to view audio-video content and to time-shifting functionality when viewing content on DVRs, and the references teach the use of restrictions to prevent users from performing trick-play or skipping over content such as advertisements, which supports that one of ordinary skill of art viewing the teachings of Dow would have looked to Russ. Pet. 20–21 (citing Ex. 1007, Abstract, 9:37–39, 24:44–48; Ex. 1008 ¶¶ 3, 32, 33; Ex. 1002 ¶ 86). Further, in view of the similarities of Dow and Russ, we find that there would have been a reasonable expectation of success of the combination.

Patent Owner argues that neither Petitioner nor Petitioner's expert provide evidence that Dow suffers from reduced ad revenues because of Dow's ad-skipping feature or would experience an increase in ad revenues if Dow's system was modified. PO Resp. 52 (citing Ex. 2006 ¶ 136). We do not find Petitioner's arguments persuasive because Dow discloses that a user can set a toggle switch to skip commercials. Ex. 1007, 24:29–32. Because Dow discloses that a user could skip commercials, this provides support for Petitioner's assertions that there was a need for in Dow to restrict the commercial skipping by the combination with Russ. Further, Russ discloses that commercial skipping reduces the attractiveness of subscriber television systems as media for advertising, indicating the desirability to restrict commercial skipping. *See* Ex. 1008 ¶ 6. Thus, we do not find Patent Owner's arguments persuasive.

Accordingly, on this complete record, we agree with Petitioner that the combination of Dow and Russ teaches limitation 1[d][i] and there is rationale to combine the references.

*vi. Limitation 1[d][ii]*

Petitioner asserts "a user of Dow's DVR may disable the commercial skip feature in a second period of time," such as using "control signals for toggling the commercial skip function between active and inactive modes, such as a button on (and corresponding control signal from) a remote control." Pet. 58 (citing Ex. 1007, 24:29–32). Petitioner refers to Russ's disclosure of restrictions on commercial skipping in a first period of time and argues that "Russ discloses the desirability of having a second time period (i.e., once the restriction expires) in which the user may elect to skip the commercials or not." *Id*. at 68–69 (citing Ex. 1002 ¶¶ 344–345). Dr. Jeffay testifies that "Russ discloses a second period of time (i.e., once the

restriction expires) in which the user may elect to skip the commercials or not." Ex. 1002 ¶ 343. Petitioner asserts that a person of ordinary skill in the art "would have found it obvious to implement the time-based restrictions of Russ in Dow's DVR." Pet. 69 (citing Ex. 1002 ¶ 345). Petitioner also asserts, with supporting testimony from Dr. Jeffay, that some users are willing to accept restrictions on commercial skipping soon after distribution of content during a first period time, while other users are willing to wait weeks to watch the program to allow for availability of commercial skipping. *Id*. (citing Ex. 1002 ¶ 345). Petitioner also asserts that a person of ordinary skill in the would have understood that the combination would "allow[] the content provider to obtain additional revenue from showing advertisements to users who value watching the program during the initial release period while still appealing to viewers who are willing to delay watching the program until commercial skipping becomes available." *Id*. (citing Ex. 1002 ¶ 343).

Patent Owner argues that "*Russ* does not disclose 'providing said video program in its entirety' (i.e., including commercials under Petitioner's argument) 'during a second period of time.'" PO Resp. 53 (citing Ex. 2006 ¶ 137). Patent Owner asserts that Russ's tags expire and so it does not teach providing a video program in its entirety. *Id*. at 53–54. Patent Owner also contends that Petitioner's obviousness rationale is only supported by Dr. Jeffay's declaration, which should be afforded no weight, because it only restates Petitioner's argument without additional supporting evidence or reasoning. *Id*. at 54.

We find that Petitioner has demonstrated that the combination of Dow and Russ teaches limitation 1[d][ii]. We credit Dr. Jeffay's testimony that after the first restriction period expires, Russ discloses a second period of

time. Ex. 1002 ¶ 343. Russ in combination with Dow would allow a user to enable or disable the commercial skip feature in a second period of time. Ex. 1007, 24:29–32. As Dr. Jeffay testifies, and we agree, some users may opt to not skip commercials for longer periods of time. Ex. 1002 ¶ 345.

We do not find persuasive Patent Owner's argument concerning Russ's tags for the reasons discussed, *supra*, for limitation 1[d][i]. We also do not find persuasive Patent Owner's argument that Russ does not teach the playback of the entire video program in the second period of time; the Petition relies on the combination of Dow and Russ, not just Dow, for the teaching of this limitation. Finally, as to Patent Owner's arguments that Dr. Jeffay's declaration is unsupported, we do not agree. Dr. Jeffay provides references to the prior art, with explanations as to how the art teaches the claims, and also provides rationale for the combination, as supported by the prior art disclosures. *See* Ex. 1002 ¶¶ 324–351.

Thus, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][ii] by the combination of Dow and Russ or Petitioner's asserted rationale to combine the references.

Accordingly, on this complete record, we agree with Petitioner that the combination of Dow and Russ teaches limitation 1[d][ii] and there is rationale to combine the references.

*vii. Limitation 1[d][iii]*

Petitioner asserts that "Dow discloses the use of the DVR's 'enhanced navigation features to view recorded content with substantially reduced commercials.'" Pet. 70 (citing Ex. 1007, 9:37–39). Petitioner refers to Dow's Figure 3, reproduced below, to show where the commercial skip feature is enabled. *Id*. (citing Ex. 1007, 9:45–47, Fig. 3).



Fig. 3

Figure 3 of Dow, reproduced above, depicts first timeline 310 that corresponds to how a video program was originally presented and stored and second timeline 312 is the program viewed with the commercial skipping feature enabled. Ex. 1007, 9:39–45. Petitioner asserts that "Dow explains that '[p]rogram segments 383–385 would be presented sequentially without any interruption or other indication that commercials had been skipped.'" Pet. 70 (citing Ex. 1007, 10:45–47). Dr. Jeffay testifies that a person of ordinary skill in the art POSA "would have understood based on Dow that a shortened presentation disclosed in the second timeline of Figure 3 would include the sequential presentation of program content segments, leading to the presentation of the third segment of claim element 1[d][iii] being presented immediately following the claimed first segment." Ex. 1002 ¶ 347. Dr. Jeffay further testifies that a person of ordinary skill "would have understood that Dow and Russ disclose all limitations of claim element 1[d]." *Id.* ¶ 348.

Patent Owner asserts that for limitation 1[d][iii], "Petitioner merely restates its anticipation arguments for *Dow*, and its previous arguments for *Russ* (where trick play is precluded)" and these features of the limitation are not disclosed in the prior art. PO Resp. 55. Patent Owner argues that "[i]n *Dow*, there are no time-based restrictions on commercial skipping after the video program has been received and stored on a memory device" and "[i]n *Russ*, the commercial skipping restrictions are commercial based, not time-based." *Id*. Patent Owner contends that "[t]he transmitted commercial can either be skipped or it cannot (based on its 'tag'.)." *Id*. (citing Ex. 2006 ¶ 141).

We find that Petitioner has demonstrated that the combination of Dow and Russ teaches limitation 1[d][iii]. We agree with Petitioner that Russ in combination with Dow would allow for a user to enable or disable the commercial skip feature in a second period of time, and with commercial skip enabled, the presentation of the third segment of a video program would be presented immediately following the claimed first segment. *See* Pet. 58–59; Ex. 1007, 24:29–32.

We do not find persuasive Patent Owner's argument that Dow does not teach time-based restrictions on commercial skipping because Petitioner relies on Russ in combination with Dow. As to this argument, as well as the arguments that Russ's commercial skipping restrictions are commercial-based with tagging, Petitioner relies on Russ's teaching of the desirability of having a first period where the user must watch the entire program, so it is this known time-based limit in Russ that would be implemented in Dow. *See* Pet. 68–69. Thus, we are not persuaded by Patent Owner's arguments.

Thus, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][iii] by the combination of Dow and Russ or Petitioner's asserted rationale to combine the references.

Accordingly, on this complete record, we agree with Petitioner that the combination of Dow and Russ teaches limitation 1[d][iii] and there is rationale to combine the references.

*viii. Limitation 1[e]*

Petitioner asserts that "Russ clearly defines a first period of time where trick play is 'preclude[d]'" where "during the first time period, the Dow-Russ combination would have resulted in the ability to play only the first timeline of Dow's Figure 3" and "[d]uring the second time period, after the commercial skip or trick play restrictions are lifted, the Dow-Russ combination would have result[ed] in a user being permitted to view the program according to the second timeline of Dow's Figure 3, with abbreviated or no commercials." Pet. 71 (citing Ex. 1007, Fig. 3; Ex. 1002 ¶ 348).

Patent Owner presents no arguments specifically related to limitation 1[e]. *See generally* PO Resp.

We agree with Petitioner that the combination of Dow and Russ teaches a second period of time following a first period of time where trick play has been precluded.

On this complete record, we agree with Petitioner that the combination of Dow and Russ teaches limitation 1[e] and a rationale to combine the references has been demonstrated.

*ix. Conclusion*

Patent Owner presents no evidence of objective indicia of nonobviousness. *See generally* PO Resp. Weighing the record as a whole in view of the findings and analysis above, we conclude that Petitioner has met its burden to show, by a preponderance of the evidence, that independent claim 1 would have been obvious over Dow and Russ.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable.

*b. Independent Claims 9 and 18*

Claim 9 is an independent method claim and claim 18 is an independent apparatus claim. Ex. 1001, 12:52–13:26, 14:18–46. Petitioner relies on the same arguments and evidence in support of obviousness for these claims as that relied upon for claim 1. Pet. 67–72. We are persuaded by Petitioner's arguments as to claims 9 and 18 and find they are supported by the cited evidence. *Id*. Accordingly, we adopt Petitioner's analysis as our own. Petitioner has shown sufficiently that the combination of Dow and Russ teaches or suggest each limitation of independent claims 9 and 18, and sufficient reasoning with rational underpinning has been provided for the motivation to combine the references.

Patent Owner alleges that Petitioner does not provide independent analysis for claims 9 and 18 and that Petitioner "contends that the same disclosures in *Dow* and *Russ* are relevant to each of the independent claims," so "the Petition fails to show that the combination" of references renders the claims obvious. PO Resp. 56. Patent Owner does not identify any deficiencies of Petitioner's evidence and arguments specific to claims 9 and 18 and our review of the evidence indicates that Petitioner's argument and

evidence is applicable to claims 9 and 18, as well as to claim 1. Further, we do not find Patent Owner's arguments for claim 1 persuasive for the reasons explained above. Accordingly, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of the limitations of claims 9 and 18 by the combination of Dow and Russ.

We conclude that Petitioner has met its burden to show, by a preponderance of the evidence, that independent claims 9 and 18 would have been obvious over Dow and Russ.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 9 and 18 are unpatentable.

*c. Dependent Claims 3 and 12*

Claim 3 depends from claim 1 and further recites:

> wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes said primary video content and only a portion of said secondary video content.

Ex. 1001, 12:20–26. Claim 12 depends from claim 9 and recites additional limitations that are essentially the same as claim 3. *Id*. at 13:38–44.

Petitioner relies upon Dow for teaching the limitations of claims 3 and 12. Pet. 60–61, 72. Petitioner asserts that Dow discloses that a video program contains varying content, "for example, program segments and commercials." *Id*. at 60 (citing Ex. 1007, 9:48–49). Petitioner contends that Dow teaches that content portions "are viewed sequentially in a normal presentation, such as during a television broadcast or standard replay from a recorded source" and are viewed without commercials in presentations using Dow's commercial skip function. *Id*. (citing Ex. 1007, 9:49–52). Petitioner

refers to Dow's disclosures that users may utilize the DVR's "enhanced navigation features to view recorded content with substantially reduced commercials" and its DVR "may provide an indicator in order to notify the user that the commercial skip function has skipped commercial content" where "the content navigation module 540 may play a small portion of one or more commercials in a skipped commercial group." *Id*. at 60–61 (citing Ex. 1007, 9:37–39,16:5–9; Ex. 1002 ¶ 250). In support, Dr. Jeffay testifies that the limitations of claim 3 are disclosed in Dow. Ex. 1002 ¶ 250.

Patent Owner presents the argument that to meet the requirements of limitation 1[d][iii] Petitioner relied on the embodiment in Dow where commercials are skipped in their entirety. PO Resp. 44–45 (citing Pet. 59, Ex. 1007, 10:45–47). For claim 3, Patent Owner argues, Petitioner cites to Dow's disclosure "where the DVR still plays 'a small portion of one of more commercials,'" and Petitioner relies upon mutually exclusive embodiments. *Id*. at 45 (citing Pet. 61, Ex. 1007, 16:5–9; Ex. 2006 ¶ 118); *see also* PO Sur-reply 20–21 (asserting that the combination of the embodiments would not have been immediately apparent). Patent Owner contends that Petitioner fails to explain how a commercial can be skipped in its entirety, but a small portion of the commercial is still played. PO Resp. 45.

In Reply, Petitioner contends that "[d]uring a second time period, when the commercial skip feature is enabled, Dow discloses users utilizing the DVR's 'enhanced navigation features to view recorded content with substantially reduced commercials.'" Pet. Reply 24 (citing Ex. 1007, 9:37–39; Ex. 1002 ¶ 250). Further, Petitioner notes that Dow discloses that "the content navigation module 540 may play a small portion of one or more commercials in a skipped commercial group." *Id*. (citing Ex. 1007, 16:5–9; Ex. 1002 ¶ 250) (emphasis omitted).

We find that Petitioner has provided sufficient evidence that Dow teaches the limitations of claim 3. Petitioner relies upon the commercial skipping in Dow for the teaching of both limitation 1[d][iii] (Pet. 59) and for claim 3 (*id*. at 60–61). We do not agree with Patent Owner's arguments alleging inconsistencies in Petitioner's assertions. For limitation 1[d][iii] Petitioner relies upon Dow's teaching of "commercial skipping" with automatic commercial skipping enabled. Pet 59 (citing Ex. 1007, 9:40–45, 10:47– 50,[18] Fig. 3). Although Figure 3 of Dow shows all the commercials skipped in its second timeline, Petitioner does not assert that it is relying on all commercials being skipped for the teaching of limitation 1[d][iii], nor does the limitation require this (providing a "portion of said video program"). *See* Pet. 59. For the teaching of claim 3, Petitioner refers to Dow's disclosure that the "content navigation module 540 may play a *small portion of one or more commercials in a skipped commercial group*." Ex. 1007, 16:5–9 (emphasis added). This supports Petitioner's position that Dow discloses that commercial skipping may include playing a portion of a commercial in a skipped commercial group, and we discern no inconsistency of this with Petitioner's limitation 1[d][iii] contentions. *Id*.

We also do not find persuasive Patent Owner's argument that Petitioner relies upon mutually exclusive embodiments with no apparent reason. As discussed, Petitioner relies upon commercial skipping for the teaching of limitation 1[d][iii], and the teaching of content navigation module 540 for playing a small portion of commercials for claim 3.

---

[18] The quoted portion of Dow in the Petition (Pet. 59) is in this citation, rather than the citation of "10:45–47" in the Petition, so the citation in the Petition appears to be a typographical error.

Ex. 1007, 16:5–9. Dow describes that "the content navigation module 540 may include a commercial skip function that operates during playback" (*id*. at 15:43–45), and goes on to explain that the content navigation module may play a small portion of commercials. *Id*. at 16:5–9. Given that Petitioner relies on commercial skipping for the teaching of limitation 1[d][iii], Dow discloses that the content navigation module 540 may have a commercial skip function, and Dow discloses that the play of portions of commercials is by operation of the content navigation module 540, we discern that the embodiments are related. Thus, we are not persuaded by Patent Owner's arguments.

Therefore, we conclude that Petitioner has met its burden to show, by a preponderance of the evidence, that dependent claims 3 and 12 would have been obvious over Dow and Russ.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 3 and 12 are unpatentable.

*d. Dependent Claim 17*

Claim 17 depends from claim 11 (which depends from claim 9) and further recites:

> wherein said step of receiving said video program further comprises receiving said video program, said at least one time of when said second portion of said video program begins, and said at least one time of when said second portion of said video program ends from a satellite, wherein each one of said at least one times is received by said DVR after said video program is stored on said memory device.

Ex. 1001, 14:10–17.

Petitioner asserts that Dow discloses that "video programs may be broadcast with metadata indicating video events" so a person of ordinary skill in the art "would have understood that the metadata affiliated with

video events could be transmitted to the DVR separately, or after the video program has been transmitted." Pet. 74. Petitioner contends that Dow's commercial skip feature "is always inactive in live view mode or delayed view mode (a form of playback) where there is insufficient time to buffer and process events for identifying commercial groups" and a person of ordinary skill "would have found it obvious to have Dow's DVR store the video program in memory separately or before receiving the times when the second portion begins and ends." *Id*. (citing Ex. 1002 ¶¶ 424, 425; Ex. 1007, 24:44–48).

Patent Owner argues that claim 17 requires that "the start time and the end time of the second portion are received from the satellite after the video program is stored on the memory device of the DVR." PO Resp. 56 (citing Ex. 2006 ¶ 144). Patent Owner asserts that Petitioner maps Dow's metadata to "one of said at least one times," but even if that were proper, "*Dow* still fails to disclose the specific timing required by claim 17." *Id*. at 57 (citing Ex. 2006 ¶ 145). Patent Owner contends that neither the Petition nor the Petitioner's expert provide any evidence or reasoning for its conclusions. *Id*. (citing Pet. 74; Ex. 1002 ¶¶ 423–425).

In Reply, Petitioner asserts that Patent Owner's Response "is conclusory and fails to articulate why Dow's 'event data or other metadata' would not include the times recited in claim 17." Pet. Reply 25 (citing Ex. 1007, 14:17–19; Ex. 2006 ¶ 125). Petitioner refers to Dow's metadata table that can include "program name, one or more categories, program description, rating information, running time, recording quality, source, data/time of recording, etc." *Id*. (citing Ex. 1007, 17:9–11). Petitioner also refers to the disclosure that the metadata table includes "the location of a corresponding content file, corresponding index file (time-based index file

and/or commercial index file), a data pointer for where the last viewing left off, etc." *Id*. (citing Ex. 1007, 17:14–17). Petitioner argues that Dow discloses that "in ***some*** embodiments, some or all of the index data ***may*** be received with a broadcast or transfer of a video program," so "Dow describes other embodiments in which some or all of the index data may be communicated at other times, such as after the broadcast or transfer of a video program." *Id*. at 25–26 (citing Ex. 1007, 17:64–65).

We find that Petitioner has not met its burden to demonstrate unpatentability of claim 17. In claim 17 there are times recited in the claim: "at least one time of when said second portion of said video program begins" and "at least one time of when said second portion of said video program ends." Ex. 1001, 14:10–17. The claim further requires "wherein each one of said at least one times is received by said DVR *after said video program is stored on said memory device*." *Id*. at 14:15–17 (emphasis added). Here, Petitioner relies upon Dow's disclosure of metadata as the claimed "second portion." Pet. 74. Although Petitioner's refers to Dow's disclosure of time-related data being included in a metadata table (Ex. 1007, 17:9–11, 17:14–17), this does not teach or suggest that metadata is sent after the video program is stored. Further, while Petitioner refers to Dow's storage of index files being received with the video program in *some* embodiments (Ex. 1007, 17:64–65), we agree with Patent Owner (PO Sur-reply 22) that Dow's disclosure is taken out of context. In the fuller context, Dow discloses that the index data may be generated by the indexing logic and the event indexer module, and in some embodiments the index data may be received with the video program—but this disclosure does not teach or suggest that index data may be sent at different times than the video program or that the index data is sent after the video program is stored. *See* Ex. 1007, 17:61–65.

Additionally, the Petition and Dr. Jeffay's testimony for the teaching of this limitation is conclusory and does not provide any explanation of why one of skill in the art would interpret Dow as teaching that metadata is received after the video program is stored. *See* Pet. 74, Ex. 1002 ¶¶ 423–426. Thus, Petitioner has not demonstrated by a preponderance of the evidence that Dow teaches the limitations of claim 17.

Accordingly, we determine that Petitioner has not shown by a preponderance of the evidence that claim 17 is unpatentable.

*e. Dependent Claims 2, 4–8, 10, 11, 13–16, and 19*

Petitioner asserts that the combination of Dow and Russ teaches all the limitations of dependent claims 2, 4–8, 10, 11, 13–16, and 19 and that there is a rationale to combine the references. Pet. 60–67, 72–73.

Patent Owner presents no arguments specific to these claims, except that they depend from independent claims 1, 9, and 18, which Patent Owner asserts have not been demonstrated to be unpatentable. PO Resp. 58. As discussed above, we disagree with Patent Owner and find that Petitioner has demonstrated by a preponderance of the evidence that independent claims 1, 9, and 18 are unpatentable.

We are persuaded by Petitioner's arguments as to claims 2, 4–8, 10, 11, 13–16, and 19 and find they are supported by the cited evidence. Pet. 60–67, 72–73. Accordingly, we adopt Petitioner's analysis as our own. Petitioner has shown sufficiently that the combination of Dow and Russ teaches or suggests each limitation of dependent claims 2, 4–8, 10, 11, 13–16, and 19, and sufficient reasoning with rational underpinning has been provided for the motivation to combine the references.

Accordingly, Petitioner has shown by a preponderance of the evidence that claims 2, 4–8, 10, 11, 13–16, and 19 are unpatentable as obvious over Dow and Russ.

*F. Asserted Anticipation of Claims 1–5, 7–13, and 16–19 By Dow*

Petitioner contends that claims 1–5, 7–13, and 16–19 are anticipated by Dow. Pet. 51–67. Patent Owner argues that Dow does not disclose all the limitations of the claims. PO Resp. 32–49.

*a. Claim 1*

We focus on limitations 1[d][i]and 1[d][iii]. Petitioner asserts for limitation 1[d][i] that Dow discloses that "[t]he control interface module 818 may define that commercial skip is always inactive in live view mode or in delayed view mode (a form of playback) where there is insufficient time to buffer and process events for identifying commercial groups (e.g., a time delay of less than two minutes)." Pet. 58 (citing Ex. 1007, 24:43–48). Neither the Petition nor Dr. Jeffay identifies why Dow discloses providing the entirety of a video program in a first period of time. Pet. 58; Ex. 1002 ¶¶ 237–239.

Patent Owner argues that commercial skipping is disabled based on what mode the DVR is in, but not by time. PO Resp. 39–40 (citing Ex. 2006 ¶ 111). In Reply, Petitioner asserts that "Dow's commercial skipping toggle is made possible by a commercial indexer and an already-known companion index file containing the ***time index*** of the video file." Pet. Reply 20 (citing Ex. 1007, 6:45–51). Petitioner also contends that "'DVRs may use the data from the index file to enable ***time-based manipulation of the video stream during playback***,' which Dow says includes commercial skipping." *Id.* (citing Ex. 1007, 3:20–22, 6:64–67).

In Sur-Reply, Patent Owner argues that in Dow "[t]he time index is a file that cross-references portions of an MPEG video stream to the elapsed time of the video." PO Sur-reply 17–18. In support, Patent Owner cites to Dow, which discloses:

> Most DVRs store video content as compressed video files using a digital compression standard, such as MPEG. In order to provide time-based access to and navigation of the video files, DVRs may generate a companion index file containing a time index of the video file. For example, the index file may correlate GOPs (Group of Pictures, a unit of MPEG compressed data) to elapsed time. DVRs may use the data from the index file to enable time-based manipulation of the video data stream during play back.

Ex. 1007, 3:14–22 (quoted at PO Sur-Reply 18). Patent Owner further contends that the use of the time index "does nothing more than allow the DVR to skip to specific times within the video stream," and "does not provide any time-based limitations on navigation through a program." PO Sur-reply 18 (citing Ex. 1007, 3:14–22, 6:64–67).

Petitioner has not sufficiently demonstrated that Dow discloses limitation 1[d][i]. The Petition does not identify any Dow disclosure that supports that there would be playback of the entire video program in a first period of time. In Reply, Petitioner points to the use of an index file but does not identify why the index file specifically discloses the time-based limitation, and we do not discern a sufficient disclosure of that limitation in Dow. Further, there is no supporting expert testimony on this issue. *See generally* Ex. 1002; Ex. 1014. Accordingly, we find that Petitioner has not met its burden to demonstrate the disclosure of limitation 1[d][i] in Dow.

For limitation 1[d][iii], Petitioner asserts that Figure 3 of Dow shows two timelines, with the second timeline showing the commercial skipping

feature enabled. Pet. 59. Dr. Jeffay similarly refers to the two timelines shown in Figure 3 in Dow. Ex. 1002 ¶¶ 241–242.

Patent Owner asserts that Figure 3 of Dow "depicts the program as originally presented, whereas timeline 312 depicts how the program will be displayed with the commercial-skip feature active." PO Resp. 42–43 (citing Ex. 1007, 9:37–47). Patent Owner argues that Figure 3 and associated disclosure "are silent about the commercial-skip feature becoming available during a 'second period of time' when it was not available during 'a first period of time,' and where the 'first period of time' started after transmission of the entire video program." *Id*. at 43 (citing Ex. 2006 ¶ 115).

In Reply, Petitioner refers to an index file that contains the time index of the video file. Pet. Reply 22 (citing Ex. 1007, 6:61–64). Petitioner further refers to Figure 3 of Dow and related disclosures. *Id*. at 23 (citing Ex. 1007, 9:40–45, 10:45–47, Fig. 3). In Sur-reply, Patent Owner asserts that the time index of the video file "does nothing more than allow the DVR to skip to specific times within the video stream." PO Sur-reply 19–20 (citing Ex. 1007, 3:14–22).

Dow explains Figure 3 as follows:

> FIG. 3 shows a timeline of a program 300 that has been recorded on a DVR, such as the DVR 100. The first timeline 310 is the program 300 as it may be viewed in correspondence with how it was originally presented and stored on DVR 100. The second timeline 312 is the program 300 viewed with one embodiment of an automated commercial skipping feature enabled. The second timeline 312 provides a substantially different viewing experience, including a shortened total running time for the presentation.

Ex. 1007, 9:39–47. According to this disclosure, and as Patent Owner asserts, Figure 3 depicts the program as originally presented in the first

timeline, and in the second timeline it shows how the program will be displayed with the commercial-skip feature active. We discern nothing in Dow that discloses that commercial-skip feature would be employed in a "second period of time." In Reply, Petitioner points to the use of an index file, but does not identify why the index file discloses this time-based limitation, and we do not discern a sufficient disclosure for this limitation in Dow. Further, there is no supporting expert testimony on this issue. *See generally* Ex. 1002; Ex. 1014. Thus, we find that Petitioner has not met its burden to demonstrate that Dow discloses limitation 1[d][iii].

Accordingly, Petitioner has not shown by a preponderance of the evidence that claim 1 is unpatentable as anticipated by Dow.

*b. Claims 2–5, 7–13, and 16–19*

Petitioner relies upon the same evidence and argument for its anticipation challenges to independent claims 9 and 18. Pet. 51–60. We do not find that the arguments and evidence are sufficient to demonstrate the disclosure of the limitations of claims 9 and 18 for the reasons discussed for claim 1 above. Thus, we find that Petitioner has not met its burden to demonstrate the disclosure of the limitations of claims 9 and 18 in Dow.

Petitioner asserts that dependent claims 2–5, 7, 8, 10–13, 16, 17, and 19 are anticipated by Dow. *Id*. at 60–67. The argument and evidence for these claims do not cure the deficiencies discussed above for the independent claims. Thus, the anticipation challenge to the dependent claims also fails.

Accordingly, Petitioner has not shown by a preponderance of the evidence that claims 2–5, 7, 8, 10–13, 16, 17, and 19 are unpatentable as anticipated by Dow.

## IV. CONCLUSION[19]

The outcome for the challenged claims of this Final Written Decision follows. In summary:

| Claim(s) | 35 U.S.C. § | Reference(s) /Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–19 | 103(a) | Casagrande, Russ | 1, 2, 3–11, 13–16, 18, 19 | 3, 12, 17 |
| 1–5, 7–13, 16–19 | 102 | Dow | | 1–5, 7–13, 16–19 |
| 1–19 | 103(a) | Dow, Russ | 1–16, 18, 19 | 17 |
| **Overall Outcome** | | | 1–16, 18, 19 | 17 |

## V. ORDER

It is, therefore,

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–16, 18, and 19 of the ’710 patent are unpatentable

[19] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*, 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

and Petitioner has not demonstrated by a preponderance of the evidence that claim 17 of the '710 patent is unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Eliot D. Williams
G. Hopkins Guy III
Ali Dhanani
Thomas Carter
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
hop.guy@bakerbotts.com
ali.dhanani@bakerbotts.com
thomas.carter@bakerbotts.com

PATENT OWNER:

Todd E. Landis
John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com

Trials@uspto.gov
571-272-7822

Paper: 23
Date: December 9, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

DISH NETWORK L.L.C. and DISH TECHNOLOGIES L.L.C.,
Petitioner,

v.

DIGITAL BROADCASTING SOLUTIONS, LLC,
Patent Owner.

---

IPR2023-00977
Patent 9,538,122 B2

---

Before ST. JOHN COURTENAY III, SHEILA F. McSHANE, and JOHN D. HAMANN, *Administrative Patent Judges*.

COURTENAY, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, DISH Network L.L.C. and DISH Technologies L.L.C. (collectively, "Petitioner") challenge the patentability of claims 1–20 of U.S. Patent No. 9,538,122 B2 (Ex. 1001, "the '122 patent"), owned by Digital Broadcasting Solutions, LLC ("Patent Owner"). We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Petitioner has shown by a preponderance of the evidence that claims 1–20 of the '122 patent are unpatentable.

## *A. Procedural History*

Petitioner filed a petition for *inter partes* review of claims 1–20 of the '122 patent. Paper 1 ("Pet."). Petitioner also filed the supporting Declaration of Dr. Kevin Jeffay. Ex. 1002. Patent Owner filed a Preliminary Response. Paper 7 ("Prelim. Resp.").

On December 11, 2023, we instituted an *inter partes* review of claims 1–20 of the '122 patent on the following grounds:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–20 | 103(a)[1] | Casagrande,[2] Russ,[3] Miller[4] |

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102, 103, and was effective on March 16, 2013. The '122 patent claims the benefit of a filing date prior to the effective date of the applicable AIA amendments. *See* Ex. 1001, (code 63). Therefore, we refer to the pre-AIA versions of 35 U.S.C. §§ 102, 103.
[2] Casagrande, US 8,510,771 B2 (issued Aug. 13, 2013); Ex. 1006.
[3] Russ, US 2006/0225105 A1 (published Oct. 5, 2006); Ex. 1008.
[4] Miller, US 2009/0165057 A1 (published June 25, 2009); Ex. 1009.

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 3–5, 7–11, 13–16, 18, 19 | 102(b)[5] | Dow |
| 1–20 | 103(a) | Dow, Russ, Miller |

Paper 8 ("Inst. Dec."), 9.

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 11, "PO Resp."), Petitioner filed a Reply (Paper 14, "Reply"), and Patent Owner filed a Sur-reply (Paper 15, "Sur-reply"). Petitioner relies upon the declaration of Dr. Kevin Jeffay in Support of Petitioner's Reply. Ex. 1014. Patent Owner relies upon the declaration of Dr. Immanuel Freeman in support of its Response and Sur-reply. Ex. 2008.

We held an oral argument on September 10, 2024. A copy of the transcript of that argument was entered into the record. Paper 22 ("Tr.").

### *B. Real Parties in Interest*

Petitioner (DISH Network L.L.C. and DISH Technologies L.L.C.) identifies itself as the real party in interest. Pet. vi. Petitioner states that DISH Network L.L.C. "is directly or indirectly owned" by DISH Network Corporation. *Id.* Patent Owner Digital Broadcasting Solutions, LLC identifies itself as the sole real party in interest. Paper 6, 1.

### *C. Related Matters*

The parties identify the following judicial proceeding in which the '122 patent is asserted and which may affect, or be affected by, a decision in

[5] Dow issued as US Pat. 7,251,413 B2 on July 31, 2007 (code 45), more than one year prior to the effective filing date of the '122 patent (Oct. 24, 2011) (code 63). Ex. 1007.

this proceeding: *Digital Broadcasting Solutions, LLC v. DISH Network L.L.C.*, Case No. 2:22-cv-00335 (E.D. Tex.). Pet. vi; Paper 6, 1; *see* 37 C.F.R. § 42.8(b)(2). Patent Owner additionally identifies IPR2023-00976 as a related proceeding before the Board. Paper 6, 1.

*D. The '122 Patent*

The '122 patent is entitled "System and Method for Time Shifting at Least a Portion of a Program," and relates to "storage and play back of time-shifted data." Ex. 1001, code (54), 1:18–19. The '122 patent observes that digital video recorders (DVRs) allow a user to record data such as audio and video for play back at a later time, referred to as time-shifting, which provides the advantage of "allow[ing] a user to pause, rewind or fast forward a television program," including "skip[ping] a portion of the program." *Id.* at 1:23–27, 1:44–47. The features, however, present "a problem for the content owner and/or the content provider in that it allows the user to skip commercials, or paid advertisements, which can decrease the value of the program." *Id.* at 1:47–50. The '122 patent proposes "a system and method for adding auxiliary data (e.g., advertisements, news tickers, 'crawlers,' etc.) to data that has been time-shifted." *Id.* at 2:17–19.

In particular, the '122 patent describes a receiving device that may function as a standard receiver or a DVR, but when time-shifted data is being played, the receiving device "may be configured to acquire auxiliary data, and insert the auxiliary data into the time-shifted data, so that both the time-shifted data and the auxiliary data are displayed to the user." *Id.* at 2:33–44. For example, in an embodiment, time-shifted data may be broken into three segments, and a receiving device may play a first segment in response to a user command to play the data, whereafter the receiving device

may play auxiliary data. *Id.* at 6:43–55. Then, the receiving device may play the second segment, followed by more auxiliary data, followed by the third segment. *Id.* at 6:55–57. However, in an embodiment, a "processor . . . is configured to display auxiliary data only when the time-shifted data is being played, and not when the time-shifted data is in rewind or fast forward"; rather, auxiliary data "is only displayed when the time-shifted data is being played, in a forward direction, and at a normal (or original) speed." *Id.* at 10:15–27.

More directly related to the claims, the Abstract (code 57) describes one embodiment of the '122 patent in which

> a receiver, which may be configured to function as both a receiver and a DVR, is configured to receive a video program having both primary and secondary portions. The receiving device is further configured to play both portions of the video program if the program is being watched (a) during a first period of time or (b) during a second period of time and a user desires to watch both portions, and to play only the primary portions if the program is being watched during the second period of time and the user desires to watch only the primary portions. By doing this, the user can avoid the secondary portions when those portions have a diminished value to the user, the content owner, the content provider and/or advertisers.

### *E. Illustrative Claim*

Petitioner challenges claims 1–20 of the '122 patent. Pet. 8. Of the challenged claims, claims 1, 11, and 18 are independent. Claim 1, reproduced below, is illustrative of the challenged claims, and recites the following (bracketing and identifiers added):

> 1[Pre] A digital video recorder (DVR) for time shifting at least one video program, said video program being transmitted over a data distribution system, comprising:
>
> 1[a][i] a tuner for receiving a plurality of video programs,

wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system,

1[a][ii] (ii) said tuner can be tuned to said single channel to receive said plurality of video programs, and

[1a][iii] (iii) at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

1[b] a memory device for storing said plurality of video programs, allowing said one of said plurality of video programs to be played back at a later time;

1[c] a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, a second command initiates playback of said one of said plurality of video programs from said memory device, and a third command instructs said DVR to receive and store said plurality of video programs; and

1[d][i] at least one processor configured to (i) provide said one of said plurality of video programs in its entirety to a display device in response to receiving said second command during a first period of time,

1[d][ii] (ii) provide said one of said plurality of video programs in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in said first playback state, and

1[d][iii] (iii) provide only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of

> said one of said plurality of video programs including at least said first and third portions of said one of said plurality of video programs, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state;
>
> [1e] wherein said second period of time is a period of time after said first period of time.

Ex. 1001, 11:60–12:39; Pet. 1–2.

## II. ANALYSIS

### *A. Principles of Law*

To prevail in its challenge to Patent Owner's patent claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art. *KSR Int'l Co. v. Teleflex, Inc.*, 550

U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including the following: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.[6] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). "A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors, and it is error to reach a conclusion of obviousness until all those factors are considered." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc) (citations omitted). "This requirement is in recognition of the fact that each of the *Graham* factors helps inform the ultimate obviousness determination." *Id.*

### *B. Level of Ordinary Skill*

We consider the asserted grounds of unpatentability in view of the understanding of a person of ordinary skill in the art (POSITA).[7] In assessing the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)). "[O]ne or more factors may predominate." *Id.*

---

[6] The parties do not address objective indicia of nonobviousness, which accordingly do not form part of our analysis.

[7] We note the acronyms "POSITA" and "POSA" are used interchangeably by the parties and the Board as referring to a person having ordinary skill in the art.

Relying on the declaration of Dr. Jeffay, Petitioner contends that an ordinarily skilled artisan for the ’122 patent “would have been someone with at least a bachelor of science in electrical engineering, computer engineering, computer science or a similar technology degree, as well as two years of relevant industry experience, including Internet networking architectures, digital programming delivery, and STBs.” Pet. 9 (citing Ex. 1002 ¶ 41).

Patent Owner does not dispute Petitioner’s level of skill of a person of ordinary skill in the art: “For the purposes of this Response only, Patent Owner does not dispute the level of skill of a person of ordinary skill in the art (‘POSITA’) identified in the Petition.” PO Resp. 5 (citing Pet. 9).

We determine that the level of ordinary skill proposed by Petitioner is consistent with the challenged patent and the asserted prior art, and we therefore adopt that level for purposes of our analysis below. On the present record, we are satisfied that this definition comports with the level of skill necessary to understand and implement the teachings of the ’122 patent and the asserted prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that the prior art itself can reflect appropriate level of ordinary skill in art).

### *C. Claim Construction*

We apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2022). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art, at the time of the invention and in the

context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). "There are only two exceptions to this general rule: (1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

We find two of the claim terms are in dispute between the parties: "a first period of time" and "a first command," as articulated by the Patent Owner in the Response, and by Petitioner in the Reply. PO Resp. 6–9; Reply 3–5. We address these claim terms below.

*1. a first period of time*

We note claim 1[e] expressly requires the second period of time to occur after the first period of time. However, the parties' proposed constructions of "a first period of time" are in dispute. Petitioner proposes that the first period of time, as recited in independent claim 1, is not limited

to occurring after the entire program has been transmitted, or else dependent claims 6 and 13 would be superfluous. Reply 3–4. Patent Owner disagrees, and contends the first period of time begins after the entire video program has been transmitted to the DVR. PO Resp. 6 (citing Ex. 2008 ¶ 47).

Patent Owner states: "It is important to note that (A) the entire video program (including first, second, and third portions) are received and stored in memory before playback is commenced." PO Resp. 4. Patent Owner further explains the intended distinction between the first period of time and the second period of time:

> Specifically, the claimed digital video recorder (DVR) places specific, time-based restrictions on when the user can skip a transmitted commercial: the DVR must preclude the user from skipping the *transmitted commercial* during a first period of time and allow the user to skip the <u>*same*</u> *transmitted commercial* during a second period of time.

PO Resp. 1.

We understand Patent Owner's position is that in order for the DVR to "receive and store said plurality of video programs" (claim 1[c]) under the limitations of the independent claims, the "first period of time" cannot start until after the transmission of the entire video program(s) to the DVR where it is stored. We do not agree.

We emphasize that claim 1 is silent regarding when the "first period of time" begins. Because the '122 patent describes a buffered streaming embodiment in which a program may be played and then paused for a time period depending on the size of the buffer, and then resumed, we find support for Petitioner's argument in the claim itself and within the '122 patent. Ex. 1001, 5:5–25.

In light of the disclosed buffering (*id.*), Patent Owner does not point us to any evidence or reasoning as to why an incoming program could not be buffered, with playback then started upon receipt of a second command, and where the entire program would be displayed—even if the "first period of time" did not start until after the transmission of the entire video program to the DVR. That is, Patent Owner does not explain why playback of the entire program could not occur, even if the entire program had not been transmitted (but was being buffered).

Further, regarding dependent claims 6 and 13, our reviewing court guides that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) (en banc) (citation omitted). Thus, under the doctrine of claim differentiation "[i]t is established in patent law that '[w]here some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement.'" *Uniroyal, Inc.* v. *Rudkin-Wiley Corp.*, 837 F.2d 1044, 1054-55 (Fed. Cir. 1988) (citations omitted); *Accord RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003) ("An independent claim usually covers a scope broader than the preferred embodiment, especially if the dependent claims recite the precise scope of the preferred embodiment."); *Phillips*, 415 F.3d at 1324 ("[A]n independent claim should be given broader scope than a dependent claim.").

In particular, we note claim 6 of the '122 patent expressly defines when the first period of time in claim 1 begins and ends:

> 6. The DVR of claim 1, wherein said first period of time is a period of time that begins when said one of said plurality of video

> programs is stored on said memory device and available to be viewed and ends within a predetermined time thereafter, said predetermined time being less than one week.

Claim 13 of the ’122 patent further requires storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends:

> 13. The method of claim 11, wherein said step of storing said plurality of video programs on said at least one memory device in said DVR further comprises storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends.

Under the doctrine of claim differentiation, “where the limitation that is sought to be ‘read into’ an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.” *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

Therefore, Patent Owner’s arguments that are based upon dependent claims 6 and 13 do not support the adoption of limiting “a first period of time” to a start after the transmission of the *entire* video program for claim 1. We agree with Petitioner that claims 6 and 13 have additional respective limitations to those in independent claim 1 and 11, so dependent claim 6 does not serve to limit the claim 1 term interpretation, when claim 1 is considered alone. Reply 4. Similarly, dependent claim 13 (which depends upon independent claim 11) does not serve to limit the claim 11 term interpretation, when claim 11 is considered alone.

We turn next to the prosecution history to inform our claim construction of the “first period of time,” as recited in claim 1. Patent Owner cites to the prosecution history (PO Resp. 2–3) found in the parent

application of the ’122 patent, now U.S. Patent No. 8,929,710 B2 (*see* related IPR2023-00976):[8]

> a digital video recorder (‘DVR’) that stores a video program and plays at least a portion of the video program back at a later time (e.g., a time more convenient to the user of the DVR, etc.) . . . In a first state, the DVR is configured to play the program as it was originally recorded (e.g., with both the program and auxiliary data). In a second state, the DVR is configured to play the program data without the auxiliary data (or a portion thereof) . . . To this end, the claimed invention provides that if the video program is being watched within a first period of time (e.g., within a day or two of the video program being transmitted to the DVR, etc.), then the video program will be played back in its entirety (e.g., including both program and auxiliary data).

PO Resp. 7–8 (quoting Ex. 2007, 10).

Patent Owner argues that “[t]hese foregoing features are recited in the claimed inventions.” *Id.* at 4. Based on this, Patent Owner contends that a “POSITA would interpret the ‘first period of time’ to start after transmission of the entire ‘video program’ to the DVR.” *Id.* at 6 (citing Ex. 2008 ¶ 47). Patent Owner argues that its “interpretation is also consistent with the prosecution history of the parent case (i.e., U.S. Patent No. 8,929,710).” PO Resp. 7. Patent Owner asserts that the referenced statement in the prosecution history is “clear and unambiguous.” PO Sur-reply 3.

The Federal Circuit has stated that the standard for disavowal of full claim scope through prosecution history disclaimer is “exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature.” *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citations omitted); *see also Grober v.*

---

[8] The ’122 patent is a “[c]ontinuation of application No. 13/279,943, filed on Oct. 24, 2011, now Pat. No. 8,929,710.” Ex. 1001, code (63).

*Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("[W]hile the prosecution history can inform whether the inventor limited the claim scope in the course of prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO. . . . Therefore, the doctrine of prosecution disclaimer only applies to unambiguous disavowals.").

Here, we do not discern that the prosecution history argued by Patent Owner reflects an unambiguous disavowal. *See* PO Resp. 7–8 (quoting Ex. 2007, 10). Rather, the Applicant's remarks that the DVR: (1) "stores a video program and plays at least a portion of the video program back at a later time," so as to (2) "play the program as it was originally recorded" are also consistent with playback of a streaming program that is buffered, which would not require the entire program to have been stored before "a first period of time" starts. *See* Ex. 2007, 10. Additionally, an example is cited in the prosecution history in which a video program is watched within a day or two of the video program being transmitted, but a mere example does not serve as an unambiguous disclaimer of scope. *See id.*

The '122 patent's disclosed streaming embodiment (Ex. 1001, 5:5–25), and the doctrine of claim differentiation, support Petitioner's arguments (Reply 3–4) regarding the "first period of time." Accordingly, we do not adopt Patent Owner's proposed construction. We use the plain and ordinary meaning of the term here.

*2. a first command*

The proposed construction of "a first command," as recited in claim 1[c], is also in dispute between the parties. Petitioner proposes that the "first command," as claimed, requires only that the playback state of the DVR be

changed from a first playback state to a second playback state. Reply 5. Patent Owner disagrees and proposes that the first command changes the DVR playback state from a first playback state to a second playback state but never initiates playback of the video program in independent claim 1. PO Resp. 8–9. Patent Owner argues that if the "first command" also initiated playback of the video program, that would render the "second command" redundant and render claim 1 illogical. *Id.*

Patent Owner further contends: "[i]ndependent claim 1 requires two distinct commands (i.e., a first command and a second command). A POSITA would not interpret the 'first command' as being capable of initiating playback of the video program. That is because the 'first command' alone never initiates playback of the video program in independent claim 1." PO Resp. 8 (emphasis omitted) (citing Ex. 1001, 12:17–37; Ex. 2008 ¶ 51).

Dr. Freedman testifies in support of Patent Owner:

> throughout independent claim 1, the 'first command' and the 'second command' are used together to control operation of the DVR: the 'first command' is used to set the playback state of the DVR, while the 'second command' is used to initiate playback of the video program after the playback state of the DVR has been set by the 'first command.' Ex. 1001, 12:11–17. In my opinion, if the 'first command' also initiated playback of the video program, that would render the 'second command' redundant and render claim 1 illogical.

Ex. 2008 ¶ 51 (emphasis omitted).

Petitioner argues that the Board should reject Patent Owner's improperly narrowed construction. Reply 5 (citing Ex. 1001, 12:17–37).

Patent Owner responds in the Sur-reply:

> Petitioner seeks to improperly conflate the meanings of the 'first command' and 'second command' such that either command can initiate playback to support its defective invalidity grounds. The plain language of the claim requires that the 'first command changes said DVR from a first playback state to a second playback state' (EX1001,12:11–13) whereas the 'second command initiates playback of said video program from said memory device (EX1001,12:13–15). Petitioner's proposed construction should be rejected because it would render superfluous the explicit differentiation between the 'first command' and 'second command' recited in the claims.

Sur-reply 4.

Patent Owner thus contends we should adopt a narrowed claim 1 construction by importing an additional *unclaimed* negative limitation (shown in brackets, *infra*) into the first command, as follows:

> a first command changes said DVR from a first playback state to a second playback state, [*and does not initiate playback of said one of said plurality of video programs from said memory device*], a second command initiates playback of said one of said plurality of video programs from said memory device.

PO Resp. 8–9; Sur-reply 4.

"In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine*, 469 F.3d at 1014 (citing *Phillips*, 415 F.3d at 1312–17); *see also Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014).

Regarding Patent Owner's proposed narrowed construction (in which the first command does not initiate playback) the Federal Circuit has found "[i]t is axiomatic that [it] will not narrow a claim term beyond its plain and

ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history." *Wasica Finance GmbH v. Continental Automotive Sys., Inc.*, 853 F.3d 1272, 1281 (Fed. Cir. 2021).

In reviewing the intrinsic evidence, we turn first to the '122 patent claim language. Patent Owner's statement confirms that claim 1 is silent regarding any mention of the first command not initiating playback. Sur-reply 4 ("The plain language of the claim requires that the "first command changes said DVR from a first playback state to a second playback state.") (citing Ex. 1001, 12:11–13). Patent Owner contends Petitioner is conflating the meaning of "first command" and "second command," thus rendering these claim terms superfluous or redundant. PO Resp. 17; Sur-reply 4.

However, claim 1[c] recites that a "first command changes said DVR from a first playback state to a second playback state" and a "second command initiates playback of said video program from said memory device." Even if the "first command" initiates playback, the "first command" would also have to change playback states, so the "first command" and "second command" terms would still have different meanings.

Further, although Patent Owner (PO Resp. 17) and Dr. Freedman (Ex. 2008 ¶ 51) argue that if the "first command" also initiated playback of the video program, the "'second command" would be redundant and claim 1 would be illogical, we do not agree. Patent Owner's arguments are premised on the assumption that the "first command" and "second command" are tied together in claim 1, with the "first command" used to set the playback state and the "second command" used to initiate playback. PO Resp. 17; Sur-

reply 4. Dr. Freedman's testimony relies on the language of claim 1 only (Ex. 2008 ¶ 51), but there is no indication in claim 1 that the "first command" and "second command" are related or linked. Additionally, even if the "first command" changed the playback state and initiated playback, we discern nothing in the claim precluding that there could be intervening events—like playback being paused—wherein the "second command" would nonetheless be used to initiate playback in accordance with claim limitations 1[d][i]–[iii]. Thus, we are not persuaded by Patent Owner's arguments.

Turning next to the written description, we note that both Patent Owner and Dr. Freedman cite to column 12 of the '122 patent as purported written description support of the argued negative limitation that the "first command" of claim 1 does not initiate playback. PO Resp. 8 (citing Ex. 1001, 12:17–37; Ex. 2008 ¶ 51). But column 12 of the '122 patent is the *claims section* — it merely includes claim 1, and in particular, the literal claim 1[c] language in dispute. Thus, aside from the literal language of claim 1, both Patent Owner and Dr. Freedman cite no written description support for the argued (but unclaimed) negative limitation that the "first command" of claim 1 does not initiate playback. PO Resp. 8–9; Sur-reply 4; Ex. 2008 ¶ 51.

Our reviewing court guides there is adequate written description for a claimed negative limitation when, for example, "the specification describes a reason to exclude the relevant [element]." *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012); *accord Inphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1355 (Fed. Cir. 2015); *accord Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1348 (Fed. Cir. 2016) (overruled on other grounds by *Aqua*

*Prods., Inc. v. Matal*, 872 F.3d 1290, 1301 (Fed. Cir. 2017) (en banc)); *see also Novartis Pharm. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016–17 (Fed. Cir. 2022).[9]

A reason to exclude an element could be found in "statements in the specification expressly listing the disadvantages of using" that element. *Santarus*, 694 F.3d at 1351. "Another reason could be that the specification 'distinguishes among' the element and alternatives to it." *Novartis* 38 F.4th at 1016 (citations omitted).

But here, the argued negative limitation (the first command does not initiate playback) is not claimed. And neither Patent Owner nor Dr. Freedman identify any portions of the '122 patent specification that provide a reason to exclude using the first command to initiate playback. *See* PO Resp. 8–9; Sur-reply 4; Ex. 2008 ¶ 51.[10] The Federal Circuit provides guidance that silence in the patent specification is insufficient to support a negative limitation. *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1288 (Fed. Cir. 2021) (declining to read a negative limitation into the claim as found by the Board, because "silence does not support reading the claims to exclude gimbaled geophones" (citations omitted)), *see also Novartis*, 38 F.4th at 1017 ("The common denominator

---

[9] On rehearing, the Federal Circuit held that the specification of the patent at issue did not satisfy the written description requirement for the no-loading-dose negative limitation.

[10] We note Dr. Freedman's declaration in support of Patent Owner is extrinsic evidence. *See* Ex. 2008 ¶ 51. *See Phillips*, 415 F.3d at 1318 ("[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history.'" (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998))).

of these examples is disclosure of [a reason to exclude] the element. That makes sense because 'the hallmark of written description is disclosure.'") (citations omitted).

Similar to our discussion above regarding the term "first time period," we do not discern that the prosecution history reflects any unambiguous disavowal by the Applicant (now Patent Owner) regarding the first command excluding playback, even if there were written description support for such a negative limitation. PO Resp. 8–9; Sur-reply 4, *see Grober*, 686 F.3d at 1341 (Fed. Cir. 2012) ("[T]he doctrine of prosecution disclaimer only applies to unambiguous disavowals.").

Therefore, we find the intrinsic evidence (including the claims, written description, and the prosecution history of the '122 patent) is silent regarding any supporting description of the negative limitation argued by Patent Owner (that playback is not initiated by the first command). The plain language of claim 1[c] merely requires that "a first command changes said DVR from a first playback state to a second playback state." On this record, we find Patent Owner has not provided "a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim*, 358 F.3d at 913, 915.

We further note that the preamble of claim 1 recites "[a] digital video recorder (DVR) . . . comprising:" *inter alia*, 1[c] "a first command changes said DVR from a first playback state to a second playback state." Our reviewing court guides that "[t]he transitional term 'comprising' . . . is inclusive or open-ended and does not exclude additional, unrecited elements or method steps." *Georgia-Pacific Corp. v. U.S. Gypsum Co.,* 195 F.3d 1322, 1327 (Fed. Cir. 1999) (citing MPEP § 2111.03 (6th ed. 1997)). "A

drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'" *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1383 (Fed. Cir. 2000); *see also Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Moreover, "claims may embrace 'different subject matter than is illustrated in the specific embodiments in the specification.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) (citations and internal quotation marks omitted).

These controlling legal authorities are applicable here. Given that the preambles of independent claims 1, 11, and 18 each use the open-ended transitional term "comprising" and following the guidance of *Phillips* (*id.*), we find Petitioner's plain language construction for the claim 1 term "a first command" is the correct claim construction, and we decline Patent Owner's invitation to read an unclaimed negative limitation into the claim.

Accordingly, we decline to include the negative limitation that the "first command" can never initiate playback of the video program. We use the plain and ordinary meaning of the term: "a first command changes said DVR from a first playback state to a second playback state," as set forth under claim 1[c].

### *D. Ground 1 – Asserted Obviousness Over Casagrande, Russ, and Miller*

Petitioner contends that claims 1–20 of the '122 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Casagrande, Russ, and Miller. Pet. 14–44. Relying upon the declaration of Dr. Jeffay, Petitioner explains how the references allegedly teach or suggest the claim

limitations and provides reasoning for combining the teachings of the references. *Id.* at 13–44 (citing Ex. 1002 ¶¶ 93, 105, 110). Patent Owner provides a substantive response to Petitioner's arguments under Ground 1 only for independent claims 1, 11, and 18, relying in part of the declaration of Dr. Freedman. PO Resp. 12–29 (citing Ex. 2008). Patent Owner does not advance separate, substantive arguments for dependent claims 2–10, 12–17, 19, and 20 under Ground 1. PO Resp. 28–29.

*3. Summary of Casagrande (Ex. 1006)*

Casagrande is titled "Methods and Apparatus for Filtering Content from a Presentation Stream Using Signature Data," and relates to identifying locations within a presentation stream of segment boundaries, "such as segments of a show and interstitials (e.g., commercials) of the show," in order to filter segments during presentation. Ex. 1006, codes (54), (57). More specifically, Casagrande involves using identified portions of content in a presentation for: (1) "skipping segments of content during presentation," (2) the "insertion of supplemental or substitute content within various locations of the presentation stream," (3) the "selective presentation of specific segments of the presentation stream," and (4) the "presentation of segments of content in non-sequential order and the like." *Id.* at 2:41–47. Casagrande teaches the insertion or replacement of video content. *Id.* at 2:41–47. Casagrande describes "audio and video data that may be transmitted to, and received by, an electronic device, such as a terrestrial ('over the-air') television receiver, a cable television receiver, [and] a satellite television receiver." *Id.* at 4:41–45.

*4. Summary of Russ (Ex. 1008)*

Russ is titled "Networked Multi-Room System Ad Insertion," and relates to inserting "[r]eplacement material, such as new commercials," in a presentation based on ad-insertion tags corresponding to commercial breaks in the presentation. Ex. 1008, codes (54), (57). Russ describes that a user's control of a viewing experience may be enhanced through trick mode functionality "(e.g., pause, fast forward, rewind, skip ahead, or skip back functionality)." *Id.* ¶ 32. In one embodiment, however, "trick play functionality, such as fast forward, would not work for certain commercials as specified, for example, by the local cable operator or the presentation programmer." *Id.* ¶ 33. Further, an alternative commercial may be inserted into the presentation upon use of a fast forward function to replace an original commercial, and "added or replaced material, such as new commercials, would also be unskippable." *Id.* ¶¶ 32–33.

*5. Summary of Miller (Ex. 1009)*

Miller is titled "Concurrent Program Content Processing Apparatus, Systems, and Methods." Ex. 1009, code (54). Miller relates to "systems and methods for concurrently presenting and recording program content received via a single carrier signal." *Id.* ¶ 1. In particular, a system may include a receiving device with a tuner that can receive a multiplexed signal including multiple program content portions, and may also include a program content transporter for concurrently presenting a first program on a display device and recording a second program. *Id.* ¶ 2. Miller teaches a "receiving device 118 [that] may include at least two tuners" (*id.* ¶ 31), and "a receiving device 118 having a single tuner." *Id.* ¶ 32. Miller also teaches the storage and

selected viewing of video content using a DVR system. *Id*. ¶¶ 15–16, 35–37.

*6. Analysis of Ground 1*

*a. Independent claim 1*

Petitioner relies on Casagrande for teaching a set top box with digital video recorder (DVR) functionality that enables skipping of interstitials (e.g., commercials), in addition to teaching a storage unit 1516 (Fig. 15) and a receiving device 110 (Fig. 1), and first (802), second (804), and third (806) segments (or portions) of a video program in which the second portion 804 is the interstitial 804, as depicted in Figure 8. Pet. 14–33 (citing Ex. 1006). Petitioner relies on Russ for additional details regarding the implementation of "time-limited restrictions on trick-play/commercial skipping" on DVRs. Pet. 13 (citing Ex. 1002 ¶ 93). Petitioner relies on Miller for additional details "surrounding the processing of signals delivered to a DVR over a satellite network." Pet. 14 (citing Ex. 1002 ¶ 105).

In the Response, Patent Owner substantively addresses only claim 1 limitations 1[a][i], 1[b], 1[c], 1[d][i], 1[d][ii], and 1[d][iii] under Ground 1 over Casagrande, Russ, and Miller. PO Resp. 12–28.

*1. Preamble 1 [Pre]*

The preamble of claim 1 recites: "A digital video recorder (DVR) for time shifting at least one video program, said video program being transmitted over a data distribution system, comprising." Ex. 1001, 11:60–62.

To the extent that the preamble may be limiting, Petitioner persuasively shows that Casagrande teaches the preamble of claim 1,

because Casagrande discloses a DVR to "allow viewers to record video in a digital format to a disk drive." Pet. 15 (quoting Ex. 1006, 1:17–22). Petitioner notes that Casagrande describes that DVRs are often incorporated in set-top boxes (STB) for "satellite and cable television services" and that "[a] television program stored on a STB allows a viewer to perform time shifting functions, and may additionally allow a viewer to skip over commercial breaks." Pet. 15 (quoting Ex. 1006, 1:21–26).

We credit Dr. Jeffay's testimony that "DVRs with time-shifting capabilities were well-known in the art as of the priority date of the '122 Patent," and such DVRs "included functions [(i.e., commands)] such as pausing, fast forwarding, rewinding, skipping ahead, skipping back, and buffering." Ex. 1002 ¶ 94. Regarding the claim 1 preamble recitation "said video program being transmitted over a data distribution system," we credit Dr. Jeffay's testimony that Casagrande explains "the A/V stream may be supplied by any source, such as an over-the-air broadcast, a satellite or cable television distribution system." Ex. 1002 ¶ 95 (citing Ex. 1006, 4:36–40).

Patent Owner acknowledged in the Preliminary Response that "*Casagrande* is generally directed to a set top box with digital video recorder (DVR) functionality." Prelim. Resp. 9. However, Patent Owner does not specifically address the preamble of claim 1 in the Response, or in the Sur-reply. *See generally* PO Resp.; Sur-reply.

Based on the entire record, we find Petitioner shows that at least Casagrande teaches or suggests the preamble of claim 1.[11]

---

[11] We need not determine whether the preamble of claim 1 is limiting because we find Petitioner has shown that Casagrande teaches the preamble.

*2. Limitation 1[a][i]*

Limitation 1[a][i] of claim 1 recites: "a tuner for receiving a plurality of video programs, wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system." Ex. 1001, 11:63–66.

Even though Casagrande does not use the term "tuner," Petitioner argues that a POSA would have understood that Casagrande's set-top box (STB) would have used a "tuner to receive the data from a satellite transponder via the antenna." Pet. 16 (citing Ex. 1002 ¶ 99). Petitioner argues that "a POSA would have been motivated and found it obvious to implement Casagrande's STB with a tuner to isolate and extract the desired programming from the received signal." Pet. 16–17 (citing Ex. 1002 ¶ 101). We credit Dr. Jeffay's testimony that a POSA would have understood that Casagrande's DVR includes "one or more tuners for receiving a plurality of video segments or would have found it an obvious implementation choice." Ex. 1002 ¶ 101.

Turning to Russ, Petitioner notes that "Russ explains that 'primary device 140' is a STB that 'includes a processor, a tuner system,' 'which may be a simplified processor and only one tuner, may be included to extract channels from the received downstream broadband signals.'" Pet. 17 (citing Ex. 1008 ¶¶ 20, 33) (emphasis omitted).

Turning to Miller, Petitioner notes that Miller discloses "a system that concurrently processes multiple distinct programs communicated via a single carrier signal." Pet. 17 (quoting Ex. 1009 ¶ 2). Miller "includes a receiving device comprising *a tuner operable to receive a multiplexed signal* via a satellite network that communicates digital video programming, the

*multiplexed signal* comprising a plurality of program content portions, each program content portion corresponding to one of a plurality of programs, and a program content transporter that is communicatively coupled to the *tuner*." *Id.* (quoting Ex. 1009 ¶ 2) (emphasis added).

Patent Owner responds: "the Petition fails to identify in either reference [(Casagrande or Russ)] any disclosure of a 'tuner' that receives a 'plurality of video programs' that are 'transmitted at the same time'—mere generic reference to 'multiple tuners' or extracting and decoding signals are not sufficient." PO Resp. 12. Turning to Miller, Patent Owner argues that "*Miller* discloses recording only one program, not a plurality (i.e., more than one) of video programs as is required by this limitation." *Id*. at 13 (citing Ex. 1009, Fig. 5 (the "first program" is presented while the "second program" is recorded)). Patent Owner also argues that Petitioner asserts that it would have been obvious to modify Casagrande's tuner for the teaching of this limitation, but Petitioner "only cites to disclosures in Miller that allegedly disclose this limitation, with the benefit of impermissible hindsight from claim 1," and the citations to Dr. Jeffay's declaration do not cure the deficiencies of the Petition. PO Resp. 13. Patent Owner also contends that the Declaration of Dr. Jeffay should not be afforded weight because it only restates Petitioner's arguments without providing additional supporting evidence or reasoning. *Id*.

Petitioner replies that "PO's Response does not address Casagrande's receiving device,[12] Russ's set-top box, and Miller's "receiving device *comprising a tuner*," which disclose, or render obvious, at least one tuner consistent with the tuner recited in claim 1." Reply 6 (citing Ex. 1009 ¶ 2; Ex. 1008 ¶¶ 20, 33; Ex. 1006, 17:62–18:2.).

Petitioner refers back to the Petition in the Reply: "[T]he Petition explains that 'Miller [provides] 'various techniques to facilitate the concurrent utilization of program content communicated via a single carrier signal' such as 'receiving via a single content stream selector a multiplexed signal containing multiple distinct programs.'" Reply 7 (citing Pet. 18 (quoting Ex. 1009 ¶ 32, citing Ex. 1002 ¶ 104)). Petitioner thus relies upon the collective teachings and suggestions of Casagrande, Russ, and Miller for teaching the claimed "tuner" limitation.

In the Sur-reply, Patent Owner notes that "[t]he Reply focuses on the tuner disclosed in *Miller*." Sur-reply 6 (citing Reply 7). Patent Owner contends: "The sole disclosure in *Miller* is of a tuner that can receive multiple programs 'from a <u>single carrier signal</u>.'" Sur-reply 6 (citing Ex. 1009 ¶ 32). But Patent Owner contends "that is not sufficient." Sur-reply 6. Patent Owner argues: "The claims require that the 'plurality of video programs are transmitted at the same time on a single channel.'" *Id*. at 6–7 (emphasis omitted).

---

[12] Although Casagrande teaches a receiving device 1510 (as depicted in Fig. 15) and does not use the term "tuner," we note there is no requirement in an obviousness analysis for the prior art to "contain a description of the subject matter of the appealed claim in *ipsissimis verbis*." *In re May*, 574 F.2d 1082, 1090 (CCPA 1978).

In support, Patent Owner relies upon the deposition testimony of Dr. Freedman (Ex. 1020) that: "The term 'single channel' in the claims 'means the selection of a specific frequency from the carrier signal and a specific element of the multi-plex constellation of signals."' Sur-reply 7 (citing Ex. 1020, 83:17–23). Patent Owner argues: "By contrast, *Miller* merely discloses receiving multiple programs from a single carrier signal . . . which does not mean that the programs are on the same channel as required by the claims." Sur-reply 7 (citing Ex. 1009 ¶ 32).

We find that Petitioner demonstrates the teaching of this limitation based on the combination of Casagrande, Russ, and Miller. In particular, Miller discloses "a system that *concurrently processes multiple distinct programs communicated via a single carrier signal*" and explains that the

> system includes a receiving device comprising *a tuner operable to receive a multiplexed signal via a satellite network* that communicates digital video programming, *the multiplexed signal comprising a plurality of program content portions, each program content portion corresponding to one of a plurality of programs*, and a program content transporter that is communicatively coupled to the tuner.

Ex. 1009 ¶ 2 (emphasis added). Dr. Jeffay provides testimony that Miller provides "various techniques to facilitate the concurrent utilization of program content communicated via a single carrier signal" such as "receiving via a single content stream selector a multiplexed signal containing multiple distinct program," and a person of ordinary skill in the art would have added the multiplexing feature of Miller to Casagrande/Russ. Ex. 1002 ¶ 104. Dr. Jeffay therefore testifies that a person of skill would have found it obvious to have implemented Casagrande's A/V stream as multiple video programs communicated at the same time on a single

channel. *Id*. That is, Petitioner is using Miller's teachings in Casagrande's tuner to be capable of tuning to a single channel to receive a plurality of multiplexed video programs. *See* Pet. 20.

Dr. Jeffay provides testimony in support of motivation to use Miller's tuners in the combined system of Casagrande and Russ. Ex. 1002 ¶¶ 103–105. Dr. Jeffay points to Miller's disclosures that having multiple tuners, each capable of accessing a single program on a single program, is "subject to several disadvantages, such as higher manufacturing costs for receiving devices 118, increased power consumption by receiving devices 118, and the like." Ex. 1002 ¶ 104 (citing Ex. 1009 ¶ 31). Dr. Jeffay, and Miller's disclosures, support that in order to avoid these disadvantages Miller provides techniques to "facilitate the concurrent utilization of program content" such as "receiving via a single content stream selector a multiplexed signal containing multiple distinct programs." Ex. 1002 ¶ 104; Ex. 1009 ¶ 32. Dr. Jeffay further testifies that "adding the multiplexing feature of Miller to the combined system of Casagrande and Russ would have avoided" the disadvantages discussed in Miller. Ex. 1002 ¶ 104. Dr. Jeffay testifies that a satellite set-top box has a finite number of tuners and "it would have been advantageous to deliver multiple video programs at the same time using a single tuner." *Id*.

Dr. Jeffay also testifies that each of the references discloses the use of satellite systems for video content delivery, referring to Casagrande's disclosure of the transmittal of an A/V stream to a satellite television receiver. Ex. 1002 ¶ 105 (citing Ex. 1006, 4:41–46). Dr. Jeffay also points to Miller's disclosure of a tuner operable to receive a multiplexed signal via a satellite network. Ex. 1005 ¶ 105 (citing Ex. 1009 ¶ 2). Dr. Jeffay testifies

that each of these references describes a system for receiving content from a satellite system via tuner, and a person of ordinary skill in the art would have a reasonable expectation of success in the combination. Ex. 1005 ¶¶ 105–106.

In view of the sufficiency of the disclosures of the prior art and the supporting testimony of Dr. Jeffay, which we find persuasive because it is supported by the disclosures of the prior art, we find that Petitioner demonstrates the teaching of this limitation by the combination of the prior art, as well as the rationale to combine the prior art and the reasonable expectation of success of the combination.

We do not find that Patent Owner's arguments undermine Petitioner's showing that the prior art teaches this limitation with a rationale to combine the references with the reasonable expectation of success of the combination. Turning to Patent Owner's arguments, we do not agree with Patent Owner that Petitioner "only cites to disclosures in Miller that allegedly disclose this limitation, with the benefit of impermissible hindsight from claim 1" because, as discussed above, Petitioner relies on the art in combination.

Further, although Patent Owner argues that Miller only discloses recording one video program (PO Resp. 13; Sur-reply 6–7), we disagree, because Miller discloses receiving a "multiplexed signal containing multiple distinct programs." Ex. 1009 ¶ 32.

We also do not agree with Patent Owner's contention that the Jeffay Declaration should not be afforded weight because it only restates Petitioner's arguments without providing additional supporting evidence or reasoning; as discussed above Dr. Jeffay provides additional discussion of

the issues related to this limitation and his analysis in his declaration, as well as identifying prior art disclosures in support.

Patent Owner also asserts that the Petition fails to identify disclosures in Casagrande and Russ of a tuner that receives a plurality of programs that are transmitted at the same time. PO Rep. 12. As discussed above, Petitioner's contentions are that this limitation is taught by the combination of Casagrande, Russ, and Miller, and Patent Owner impermissibly argues the references separately. As to the issue of whether the plurality of the programs are transmitted at the same time, Dr. Jeffay (Ex. 1002 ¶ 102) refers to Miller's statement that it is directed to "a system that *concurrently* processes multiple distinct programs communicated via a single carrier signal" (Ex. 1009 ¶ 2) (emphasis added). Thus, we are not persuaded by Patent Owner's arguments on this issue.

In the Sur-reply, Patent Owner argues that "[t]he Reply focuses on the tuner disclosed in *Miller*" but "that is not sufficient." Sur-reply 6. Patent Owner further argues: "The claims require that the 'plurality of video programs are transmitted at the same time on a single channel.'" *Id*. at 6–7 (emphasis omitted). For support of this allegation, Patent Owner relies upon the deposition testimony of Dr. Freedman that: "The term 'single channel' in the claims 'means the selection of a specific frequency from the carrier signal and a specific element of the multi-plex constellation of signals.'" Sur-reply 7; Ex. 1020, 83:17–23. Patent Owner adds that "[b]y contrast, *Miller* merely discloses receiving multiple programs from a single carrier signal . . . which does not mean that the programs are on the same channel as required by the claims." Sur-reply 7 (citing Ex. 1009 ¶ 32).

These arguments, and this cited testimony, are contrary to Miller's teachings. In particular, Dr. Freedman's testimony assumes that Miller's carrier signal comprises multiple specific frequencies that are selectable by a single tuner for receiving the multiple programs. *See* Ex. 1020, 83:17–23. Miller, however, teaches that the carrier signal comprises a specific frequency that can be selected for receiving the multiplexed programs. *See* Ex. 1009 ¶¶ 31–32 ("receiving via a single content stream selector a multiplexed signal containing multiple distinct programs"), 35, 39 ("content stream selector 306 includes a tuner that is configured to tune to a particular frequency that is used to carry programming"), 41 ("if the content stream selector 306 includes only a single tuner, it may only be capable of continuously receiving programming from a single carrier signal during a given time period, such that the program content transporter 200 may only be capable of concurrently processing programming carried on that carrier signal during the time period"), 43, Fig. 3 (showing multiple carrier signals each carrying portions of multiple programs). In other words, Miller uses the term carrier signal as corresponding to a single channel, rather than multiple channels as Patent Owner alleges. *Id.*

In addition, Dr. Freedman's testimony that "single channel" also means the selection of "a specific element of the multi-plex constellation of signals" is ambiguous, conclusory, and untethered to the intrinsic evidence and claim language. Ex. 1020, 83:17–23. Again, as we discuss above, Miller teaches a single channel via its teachings of having a single carrier signal.

Based upon the entire record, we find Petitioner shows that the combination of Casagrande, Russ, and Miller collectively teach or suggest

claim limitation 1[a][i] with a rationale to combine the references.

*3. Limitation 1[a][ii]*

Limitation 1[a][ii] of claim 1 recites: "(ii) said tuner can be tuned to said single channel to receive said plurality of video programs." Ex. 1001, 11:66–12:1.

Petitioner persuasively argues that "Miller renders obvious element 1[a][ii] by teaching 'a system that concurrently processes multiple distinct programs communicated via a single carrier signal' including 'a tuner operable to receive a multiplexed signal via a satellite network . . . and a program content transporter that is communicatively coupled to the tuner.'" Pet. 20 (citing Ex. 1009 ¶ 2).

Petitioner further persuasively contends that "[a] POSA would have been motivated to have Casagrande's tuner be capable of tuning to a single channel to receive a plurality of video programs because, as Miller teaches, this provides the benefits of saving resources, improving operation efficiencies of satellite-based networks, and to provide a STB capable of decoding existing multiplexed satellite signals." Pet. 20 (citing 1009 ¶ 2; Ex. 1002 ¶ 110).

Patent Owner does not separately and substantively argue limitation 1[a][ii] of claim 1, aside from the similar arguments previously advanced for limitation 1[a][i], discussed above. *See generally* PO Resp., Sur-reply.

Based upon our review of Miller's description of "a tuner operable to receive a multiplexed signal via a satellite network" at paragraph 2, and in light of our analysis above for limitation 1[a][i], we find Petitioner has shown the collective teachings and suggestions of Casagrande, Russ, and Miller render obvious limitation 1[a][ii] under Ground 1.

#### 4. *Limitation 1[a][iii]*

Limitation 1[a][iii] of claim 1 recites: "(iii) at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion." Ex. 1001, 12:1–6.

Regarding the respective first, second, and third portions of the video program, Petitioner initially argues that Figures 2 and 8 of Casagrande show contiguous segments corresponding to the claimed "first, second, and third portions." Pet. 22 (citing Ex. 1002 ¶ 114).

Petitioner argues that "Casagrande explains '[t]he receiving device 710A is operable to receive a first A/V stream 704' that 'includ[es] at least one segment of a show, [and] at least one interstitial of the show.'" Pet. 24 (citing Ex. 1006, 15:21–24, 21:28–32). We note Casagrande describes one embodiment of an "interstitial" as being a "commercial" i.e., an advertisement. Ex. 1006, 2:40–41.

Patent Owner does not separately and substantively argue limitation 1[a][iii] of claim 1, aside from the similar arguments previously advanced for limitation 1[a][i], as discussed above. *See generally* PO Resp., Sur-reply. Based upon our review of the record, we find Petitioner has persuasively shown that Casagrande's first (802), second (804), and third (806) segments (or portions) of a video program, in which the second portion is the interstitial 804 (i.e., commercial), teach or suggest limitation 1[a][iii], as depicted in Figure 8. Pet. 22 (citing Ex. 1006, Fig. 8; Ex. 1002 ¶ 114).

Accordingly, we find Petitioner has shown the collective teachings and suggestions of Casagrande, Russ, and Miller render obvious limitation 1[a][iii] under Ground 1.

*5. Limitation 1[b]*

Limitation 1[b] of claim 1 recites: "a memory device for storing said plurality of video programs, allowing said one of said plurality of video programs to be played back at a later time." Ex. 1001, 12:7–9.

Petitioner argues that Casagrande's Figure 15 includes a storage unit (i.e., a memory device), the first A/V stream 1504, and the supplemental content 1506. Pet. 22 (citing Ex. 1006, 18:18–25, Fig. 15). Petitioner notes that "Casagrande explains that 'the receiving device 1510, by way of the control logic 1520,' stores 'the A/V stream 1504 in the storage unit 1516.'" *Id.* (citing Ex. 1006, 18:64–67).

Patent Owner contends that Miller discloses recording only one program, not a plurality of (i.e., two or more) video programs. PO Resp. 14 (citing Ex. 1009 at Fig. 5 (the "first program" is presented while the "second program" is recorded)).

Petitioner relies, however, upon the combination of Casagrande, Russ, and Miller in its obviousness ground and relies specifically on Casagrande for the teaching of this claim limitation. We credit Dr. Jeffay's testimony that a person of ordinary skill in the art "would have understood that a storage unit in the context of the Casagrande patent includes a memory device for storing a plurality of video programs" (Ex. 1002 ¶ 117), because Casagrande is directed to the use of DVRs and storage for content therein, which would include storage for more than one video program (*see* Ex. 1006, code (57)).

Patent Owner further contends "[t]he Petition fails to allege that it would have been obvious to modify *Casagrande* with *Miller* to render obvious this limitation, so the combination of *Casagrande*, *Russ*, and *Miller* does not teach or suggest this limitation." PO Resp. 14 (citing Pet. 22–23).

However, as noted above, Petitioner relies in part upon the declaration of Dr. Jeffay in explaining how the references teach or suggest the claim limitations and provides reasoning for combining the teachings of the references, which we find sufficient as rationale to combine the references. Pet. 13–14 (citing Ex. 1002 ¶¶ 93, 104–106, 110).

Patent Owner has not rebutted Dr. Jeffay's testimony regarding motivation that explains how "a POSA would generally have been motivated to combine the teachings of Casagrande, Miller, and Russ for several reasons with a reasonable expectation of success." Ex. 1002 ¶ 93.

Based upon our review of Casagrande's storage unit 1516, as depicted in Figure 15, we find Petitioner has shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render obvious limitation 1[b].

*6. Limitation 1[c]*

Limitation 1[c] of claim 1 recites: "a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, a second command initiates playback of said one of said plurality of video programs from said memory device, and a third command instructs said DVR to receive and store said plurality of video programs." Ex. 1001, 12:10–16.

Regarding the claimed "first command," Petitioner argues that "Casagrande teaches that 'a user may select by way of the user input 1523 whether the first A/V stream 1504 or the second A/V stream 1512 is

outputted to the display device 1514,' corresponding to the claimed first and second playback states." Pet. 24 (quoting Ex. 1006, 19:63–66). Given this description (*id.*), Petitioner argues that "Casagrande teaches a user selecting between a first playback state (i.e., playback of the entire first A/V stream) and a second playback state (i.e., playback of the second A/V stream, excluding commercials)." Pet. 25.

Patent Owner responds: "The claimed 'first command,' which places the DVR in a 'first playback state' or a 'second playback state,' is associated with time-based limitations on navigation through a program, as discussed in further detail below for limitation 1[d]." PO Resp. 15.

Petitioner replies: "Even if the claimed 'first command' must not initiate playback, Casagrande teaches changing the DVR's playback state to a second playback state because it teaches that the user "may select . . . whether the first A/V stream . . . or the second A/V stream . . . is outputted to the display device." Reply 8 (citing Ex. 1006, 19:63-66). Petitioner further argues: "Notably, this selection may be overwritten by the system, so this user selection does not guarantee that playback of the requested stream is initiated." Reply 8 (citing Ex. 1006, 19:64–10:2; 19:15–19).

In the Sur-reply, Patent Owner contends: "Petitioner's second citation [to Casagrande] (19:15-19) reinforces the fact that Petitioner's 'first command' initiates playback because it 'command[s] the receiving device 1510 to output the first A/V stream 1504 to the display device 1514 for presentation.'" Sur-reply 9 (quoting Ex. 1006, 19:15–19) (emphasis omitted).

Responsive to Patent Owner's first argument (PO Resp. 15), we find limitation 1[c] is silent regarding any mention of a first or second period of

time, or any other temporal limitations. Moreover, time-based limitations 1[d][i], 1[d][ii], and 1[d][iii] are likewise silent regarding any mention of the claimed "first command," and instead refer to the second command. Therefore, we find Patent Owner's arguments to the contrary are unsupported by the plain language of claim 1. *See* PO Resp. 15.

Moreover, given the transitional term "comprising" recited in the preamble of claim 1, and our claim construction *supra* for the "first command," we are not persuaded by Patent Owner's argument that Casagrande does not teach the "first command" because Petitioner's mapping to Casagrande (19:15–19) also initiates playback. *See* Sur-reply 9 (citing Ex. 1006, 19:15–19).

As Petitioner persuasively shows, Casagrande teaches that "a user may *select* by way of the *user input 1523* whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514," corresponding to the selection by the user of the second playback state, which we find is sufficient to teach or suggest the claimed change of the DVR from a first playback state to a second playback state, as performed by the "first command" of claim 1[c]. Pet. 24 (citing Ex. 1006, 19:63–66; Ex. 1002 ¶ 123) (emphasis added).

For at least the aforementioned reasons, we find Petitioner has shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render the claim 1[c] "first command" obvious under Ground 1.

Regarding the claim 1[c] "second command," Petitioner notes that "Casagrande explains that 'a user may be presented with a menu of available segments of the television program, and may select one or more of the available segments for presentation.'" Pet. 25 (quoting Ex. 1006, 4:1–4).

Petitioner further notes that Casagrande explains: "[b]ased upon user selection of particular segments from the selection menu, the receiving device responsively outputs the selected segments." Pet. 25 (quoting Ex. 1006, 4:4–8).

Patent Owner responds "it is the [claimed] 'second command' that initiates playback of a particular program or stream." PO Resp. 15 (citing Ex. 1001, 12:10–16; Ex. 2008 ¶ 63).

In reply, Petitioner contends that even under

> PO's narrow view of the claims, the user interaction described in Casagrande renders obvious the claims because it would be obvious to allow the user to first designate a desired program, or program variant to watch (i.e., to select whether a complete first stream, or a shortened second stream is desired, corresponding to the first command) followed by a second command to indicate that selection is complete and playback should begin.

Reply 9 (citing Ex. 1014 ¶ 9).

In the Sur-reply, Patent Owner disagrees:

> The fact remains that *Casagrande* does nothing more than allow the user to select to play one of two audio/visual streams: (1) a "first audio/visual stream" that includes "segments" and "interstitials" (*e.g.*, commercials) or (2) a "second audio visual stream" that the DVR generates by removing the "interstitials" from the "first audio/visual stream" and, in some cases, replacing the removed "interstitials" with "substitute content." EX1006, 2:23–47, 8:63–9:5, 13:13–31, 19:63–66. This is distinguishable from the claimed invention where a "second command" initiates playback of a *single* video program and a controller determines *automatically* which portions of the video program are provided to the display device based (in part) on a selected playback state of the DVR—a state that is selected via a "first command".

Sur-Reply 9.

We note the argued *automatic* function of the 1[c] "controller" is not claimed. *Id.* Moreover, "it is well settled that it is not 'invention' to broadly provide a mechanical or automatic means to replace manual activity which has accomplished the same result." *In re Venner*, 262 F.2d 91, 95 (CCPA 1958) (citation omitted).

Given the plain language of claim 1, we agree with Patent Owner (Sur-Reply 9) that claim 1[c] requires a "second command [that] initiates playback." However, the claim does not recite that *only* the second command initiates playback, so as to preclude the "first command" from initiating playback under the claim limitations, as discussed *supra* in our claim construction section.

Petitioner has mapped the claimed "second command" that initiates playback to Casagrande. Pet. 25 (quoting Ex. 1006, 4:1–4 ("In at least one embodiment, a user may be presented with a menu of available segments of the television program, and may select one or more of the available segments for presentation.")). In reviewing the record, we find Patent Owner has not substantively addressed Petitioner's mapping of the claimed "second command" to this disclosure of Casagrande.

On this record, we find Petitioner has shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render the claim 1[c] "second command" obvious under Ground 1.

Regarding the claimed 1[c] "third command," Petitioner notes that "Casagrande's discloses 'user input 1523 directing the operation of the receiving device 1510'" (Pet. 25 (quoting Ex. 1006, 18:54–60)) and "the operations including 'receiving device 1510, by way of the control logic 1520, [] configured to receive the first A/V stream 1504 . . . and store the

A/V stream 1504 in the storage unit 1516.'" Pet. 25 (quoting Ex. 1006, 18:64–67).

Patent Owner responds that the claimed "'third command instructs said DVR to receive and store said plurality of video programs,' not only a single program." PO Resp. 16 (underline omitted).

In Reply, we note Petitioner does not further address the third command with respect to Ground 1 over Casagrande, Russ, and Miller. Petitioner only addresses the third command with respect to Ground 2 over Dow (anticipation). Reply 20.

In the Sur-reply, Patent Owner argues that "the claimed invention does not merely requir[e] storing video programs but a single 'third command [that] instructs said DVR to receive and store the plurality of video programs.'" Sur-reply 10–11 (citing Ex. 1001, 12:15–17). Patent Owner contends "[i]n other words, a *single* command that results in the reception and storage of a *plurality* of video programs. Not only is this feature not disclosed in *Casagrande*, but it is not disclosed in *Russ* or *Miller*." Sur-reply 11.

Regarding Patent Owner's arguments pertaining to the 1[c] third command, as discussed above (for limitation 1[b]), we find Petitioner has persuasively shown that Casagrande teaches or suggests the use of a memory device (Fig 15, storage unit 1516) for storing a plurality of video programs because the language of claim 1[c] does not place any limits regarding *how* the plurality of video programs are stored. For example, plural video programs could be stored in respective separate portions of storage in any order, or they could be stored in sequential order in a single portion of storage (e.g., memory or disk). *See* Pet. 23. The record reflects that

Petitioner relies only upon Casagrande for teaching the storage of a plurality of video programs under limitations 1[b] and 1[c]. *See id*. at 22–23.

Patent Owner further argues:

> Miller actually teaches away from this feature by requiring *a plurality of user input* in order to receive and record a plurality of programs (e.g., one for each program to view or record). *See* EX1009, ¶[0054] ("[A] user may direct, such as by selecting the appropriate input elements [plural] of an interface to the receiving device 118, the concurrently presenting and recording of two distinct programs."); see also *id*.,¶[0037] (describing how programs that are not selected are ignored) and ¶[0042] (describing different scenarios where different programs are selected for viewing or recording). As such, *Miller* does not make up for this deficiency in *Casagrande* with respect to claim limitations 1[c] *et al*.

Sur-reply 11.

But Petitioner does not rely on Miller for the teaching of storage of a plurality of video programs under limitations 1[b] and 1[c] under Ground 1 over Casagrande, Russ, and Miller. Moreover, the "mere disclosure of alternative designs does not teach away." *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) (quoting *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004)). A reference does not teach away if it merely expresses a general preference for an alternative invention but does not "criticize, discredit, or otherwise discourage" investigation into the invention claimed. *Fulton*, 391 F.3d at 1201. When combining references to establish obviousness, the appropriate consideration is whether the proposed combination would work for its intended purpose, not whether the proposed combination is inconsistent with the stated goal of one of the references (here, Miller), as Patent Owner argues. Sur-reply 11. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009).

Here, Patent Owner provides no support for its allegation of "teaching away" by showing how Miller criticizes, discredits, or otherwise discourages investigation into the invention claimed. *Fulton*, 391 F.3d at 1201. For at least the aforementioned reasons, we find Petitioner has shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render the claim 1[c] "third command" obvious under Ground 1.

*7. Limitation 1[d][i]*

Limitation 1[d][i] of claim 1 recites: "at least one processor configured to (i) provide said one of said plurality of video programs in its entirety to a display device in response to receiving said second command during a first period of time." Ex. 1001, 12:17–20.

Petitioner argues that "Casagrande teaches the use of 'control logic 1520 [that] includes a processor,' for 'execution of software configured to perform the various control functions described herein.'" Pet. 25–26 (quoting Ex. 1006, 18:46–49; citing Ex. 1002 ¶ 128) (emphasis omitted).

In support, Petitioner contends the control logic "'control[s] the operation of' the 'communication interface 1502, the storage unit 1516, and the A/V interface 1518.'" Pet. 26 (quoting Ex. 1006, 18:42–45; citing Ex. 1002 ¶ 129). Petitioner notes that Casagrande further explains that "A/V interface 1518 . . . is configured to output A/V streams from the receiving device 1510 to a display device 1514 for presentation to a user." Pet. 26 (quoting Ex. 1006, 18:27–29; citing Ex. 1002 ¶ 129). Petitioner thus argues that a "POSA would have understood that 'control logic' is 'configured' to control 'A/V interface 1518' to 'output A/V streams from the receiving device 1510 to the display device.'" Pet. 26 (citing Ex.1002 ¶ 129).

Petitioner asserts that a person of ordinary skill in the art "would have understood that Casagrande presents the entirety of the A/V presentation (e.g., the first A/V stream) even when the user requests the shortened version without commercials (the second A/V stream)." Pet. 26 (citing Ex. 1002 ¶ 130). Petitioner also points to Casagrande's disclosure that "commercials within a television program may be associated with restrictions against fast forwarding or skipping, and a recording *device may automatically present the commercial segments regardless of the receipt of user input requesting non-presentation of the segments*." *Id*. (citing Ex. 1006, 4:23–27; Ex. 1002 ¶ 130).

Dr. Jeffay testifies that a person of ordinary skill in the art "would have understood that processing a user request for changing between the first playback state (the first A/V stream) and the second playback state (the second A/V stream) will still lead to the depiction of the first A/V stream (*i.e.*, the stream in its entirety) on the display device during a first period of time where the content provider has placed restrictions on removing interstitial content." Ex. 1002 ¶ 131. Thus, according to Petitioner, "Casagrande teaches playback of the entire first A/V stream during a first period of time (i.e., while restrictions are active), 'regardless of' whether the first or second playback state had been requested by the user." Pet. 26 (citing Ex. 1002 ¶ 111). Petitioner also argues that Casagrande "when combined with Russ," teaches that the "restriction on skipping may be lifted after a time period." Pet. 27 (citing Ex. 1002 ¶ 131).

Patent Owner disagrees and contends the "combination of *Casagrande*, *Russ*, and *Miller* as pled in the Petition, does not disclose the first scenario (i.e., limitation 1[d][i])." PO Resp. 20 (citing Pet. 25–27).

Patent Owner notes the "Petition cites to only *Casagrande* for alleged disclosure of the first scenario (i.e., limitation 1[d][i])." *Id.* Patent Owner argues "there is no determination on whether 'said second command' is received 'during a first period of time.'" PO Resp. 21 (citing Ex. 2008 ¶ 71). Patent Owner asserts the "Petition does not argue that it would have been obvious to modify *Casagrande* to satisfy this claim limitation, alone or in combination with *Russ* or *Miller*, so the combination of *Casagrande* and *Russ* does not disclose the first scenario (i.e., limitation 1[d][i])." PO Resp. 21.

Regarding Patent Owner's argument that "there is no determination [in Casagrande] on whether 'said second command' is received 'during a first period of time" (PO Resp. 21 (citing Ex. 2008 ¶ 71)), Petitioner replies that "Casagrande specifically teaches that 'commercials within a television program may be associated with restrictions against fast forwarding or skipping, and a recording device may automatically present the commercial segments regardless of the receipt of user input requesting non-presentation of the segments.'" Reply 10–11 (citing Ex. 1006, 4:29–32). Petitioner notes that Casagrande explains: "a content provider of the first A/V stream 1504 *may prevent the user from maintaining such control*." Reply 11 (citing Ex. 1006, 19:66–20:2; 5:66–6:3; Ex. 1002 ¶ 110). Petitioner thus concludes that "Casagrande teaches playback of the entire first A/V stream during a first time period (i.e., while restrictions are active), 'regardless of' whether the first or second playback state had been requested by the user." Reply 11 (citing Ex.1002 ¶ 111). Petitioner additionally argues that Russ "expressly includes limitations on skipping commercials based on the passage of a

'specified length of time, such as two weeks.'" Reply 12 (citing Ex. 1008 ¶ 35).

We do not find persuasive Patent Owner's contention there is no determination that "said second command is received during the first period of time" because Casagrande only teaches that the restriction on full playback is by way of information sent by the content provider. PO Resp. 21. This argument attacks Casagrande individually, but, as discussed above, the Petition relies on the combination of Casagrande and Russ, not just Casagrande, for teaching this limitation. *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981).

Further, the evidence of record supports that Russ teaches restricting skipping commercials during playback for a certain initial time, so in combination with Casagrande, we find that this teaches providing a video program in its entirety for a first period of time. *See* Pet. 27 (citing Ex. 1002 ¶ 131); Russ ¶ 35 ("The commercial slot could also preclude trick play for only a specified length of time. Such as two weeks."). We also do not find persuasive Patent Owner's argument that Russ uses tags which determines whether a commercial can be skipped, and that it is the tag that determines whether the commercial can be skipped and not the time at which the video program is played back. PO Sur-reply 12–13. Again, Patent Owner attacks Russ individually. Petitioner relies on Russ's teaching of the desirability of having a first period of time where the user must watch the entire program, so it is this known time-based limit in Russ that would have been implemented in Casagrande. *See* Pet. 27.

Additionally, we agree with Petitioner, and credit Dr. Jeffay's testimony, that there would have been a motivation to combine Russ with

Casagrande in view of Casagrande's recognition of the decreasing value of interstitial content over time, and the implementation of Russ's time-based limits on restrictions in Casagrande would have offered the benefit of increasing a broadcaster's financial value of the interstitial content. *See* Ex. 1002 ¶¶ 93, 149–150; Ex. 1006, 10:5–13; Ex. 1008 ¶ 35.

We additionally credit Dr. Jeffay's testimony that there would have been success in the combination of Casagrande and Russ because a person of skill would have understood, based upon Russ's disclosures, that users would have been willing to accept restrictions on commercial skipping. Ex. 1002 ¶ 93. Further, in view of the similarities of Casagrande and Russ, as Petitioner discusses, we find there would have been a reasonable expectation of success of the combination. *See* Pet. 30 (citing Ex. 1002 ¶ 137).

Accordingly, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][i] by the combination of Casagrande and Russ or Petitioner's asserted rationale to combine the references. On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches or suggests limitation 1[d][i] and rationale to combine the references has been demonstrated.

*8. Limitation 1[d][ii]*

Limitation 1[d][ii] of claim 1 recites: "(ii) provide said one of said plurality of video programs in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in said first playback state." Ex. 1001, 12:20–24.

Petitioner notes that "[s]imilar to Casagrande, Russ discloses its 'trick play functionality' for skipping commercials 'could be restricted,'

particularly suggesting to '*preclude trick play for only a specified length of time, such as two weeks*.'" Pet. 27 (citing Ex. 1008 ¶ 35). Petitioner thus argues that "Russ discloses the desirability of having a first period of time wherein the user must watch the entire A/V stream, including commercials, regardless of whether the user requested playback of a commercial-free stream." *Id*. (citing Ex. 1002 ¶ 136). Petitioner notes that "Russ discloses the desirability of having a second period of time (i.e., once the restriction expires) in which the user may elect to skip the commercials or not." *Id.*

Petitioner asserts that a person of ordinary skill in the art "would have been motivated to combine the time-based restrictions of Russ with the ability to restrict the skipping of interstitials as illustrated by Casagrande's Figure 8." Pet. 28.

In support, Dr. Jeffay testifies that "Russ discloses the desirability of having a first period of time wherein the user must watch the entire A/V stream, including commercials, such as when the operator or programmer has placed a two-week restriction on skipping commercials" and "the desirability of having a second period of time (*i.e.*, once the restriction expires) in which the user may elect to skip the commercials or not." Ex. 1002 ¶ 136.

Patent Owner responds that the "combination of *Casagrande*, *Russ*, and *Miller* as pled in the Petition, does not disclose the second scenario (i.e., limitation 1[d][ii])." PO Resp. 21 (citing Pet. at 27–30). In support, Patent Owner contends that Casagrande does not disclose the "second scenario for the similar reason that the limitation by the 'content provider' remains the same—there is no determination based on 'receiving said second command during said second period of time' as is required by the claim." PO Resp. 21

(citing Ex. 1006, 19:66–20:2, 5:66–6:3). Patent Owner contends: "In other words, it is the 'content provider' that determines whether a commercial can be skipped—not the time period as claimed." PO Resp. 21 (citing Ex. 2008 ¶ 72).

We do not find persuasive Patent Owner's argument that "there is no determination based on 'receiving said second command during [a] second period of time'" because in Casagrande it is the "'content provider' that determines whether a commercial can be skipped — not the time period as claimed." PO Resp. 21 (citing Ex. 1006, 19:66–20:2, 5:66–6:3; Ex. 2008 ¶ 72). This argument attacks Casagrande individually, but the Petition relies on the combination of Casagrande and Russ, not just Casagrande, for teaching this limitation. Petitioner relies on Russ's teaching of restricting skipping commercials during playback for a certain time and this teaching is combined with Casagrande, wherein once the restriction expires the user may elect to skip the commercials or not. *See* Pet. 29–30.

Moreover, we credit Dr. Jeffay's testimony that "[t]o the extent it is suggested that Casagrande does not disclose lifting the restrictions on skipping interstitials, thereby creating a first period of time wherein skipping is restricted and a second period of time wherein skipping is allowed, Russ teaches such options." Ex. 1002 ¶ 134. We agree with Dr. Jeffay that "Russ discloses the desirability of having a second period of time (*i.e.*, once the restriction expires) in which the user may elect to skip the commercials or not." *Id.* ¶ 136 (citing Ex. 1008 ¶ 35); *see also* Russ ¶ 35 ("The commercial slot could also preclude trick play for only a specified length of time. Such as two weeks.").

Therefore, in the combination of Casagrande and Russ, upon the expiry of the first period of time, there is a second period of time, and the playback state determines whether commercials are played (or not).

Petitioner also notes that "Russ further explains that 'a tag corresponding with a commercial could expire after a period of time.'" Pet. 27 (quoting Ex. 1008 ¶ 35; citing Ex. 1002 ¶ 136).

Patent Owner responds that Russ does not disclose the second scenario because the "commercial-related functionality in *Russ* is driven by 'tags,'" which "differentiate between the program and commercials" and "can also specify an expiration date." PO Resp. 23 (citing Ex. 1008 ¶¶ 26–28, 35, 75). Patent Owner notes that the tags in Russ can "specify whether the user can fast forward through a commercial (so-called 'trick play' functionality)." PO Resp. 23. Patent Owner states that after a tag expiration date "the tag would become inactive or replaceable," and the commercial would be no longer be viewable (because the tag is inactive) or the commercial could be replaced with a different commercial (because the tag is replaced). PO Resp. 23 (citing Ex. 1008 ¶¶ 35, 75).

Patent Owner argues that Russ does not disclose the time limitation because in Russ "it is the 'tag' that determines whether the commercial can be skipped—not the time at which the video program is played back." PO Resp. 23. Further, Patent Owner asserts, after the tag expires, "the commercial would either be non-viewable or replaced by a new commercial," that is, it would not be the transmitted commercial that is displayed. PO Resp. 24 (citing Ex. 1008 ¶ 75). Patent Owner contends "[a] POSITA would understand an 'inactive tag' to mean the commercial is no longer to be inserted/included into the video program, and thus is not

viewable during playback of the video program because a tag 'signif[ies] where to insert an ad' in a video program." PO Resp. 24 (quoting Ex. 2008 ¶ 58) (emphasis omitted).

In Reply, Petitioner contends that Casagrande and Russ disclose, or otherwise render obvious, the second scenario in which a video program is provided in its entirety during a second period of time. Reply 12. In support, Petitioner notes that "Casagrande and Russ both disclose precluding "trick play for only a specified length of time, such as two weeks." *Id.* (citing Ex. 1008 ¶¶ 34–35; Ex. 1006, 5:67–6:1; Ex. 1002 ¶ 135) (emphasis omitted). Petitioner contends that "[o]nce the *first period of time* ends, either through the expiration of a tag or additional information, Casagrande and Russ teach *a second period of time* when a user may elect to skip the commercial segments (or not)." Reply 12 (citing Ex. 1002 ¶ 136) (emphasis added).

Petitioner additionally notes that "Casagrande expressly discloses menu selection by which a user "may select one or more of the available segments for presentation." Reply 13 (citing Ex. 1006, 4:1–8) (emphasis omitted). Petitioner argues that "Casagrande permits the user to select the full length first A/V stream, which in the combination with Russ would be available during the *second time period*." *Id.* (citing Ex. 1006, 19:63–65, 13:5–12) (emphasis added).

Petitioner notes that "Russ similarly discloses viewing a program in its entirety even though the viewer has the option of utilizing trick play functionalities like fast-forwarding or skipping." Reply 13. Petitioner notes that, in Russ, "a tag corresponding with a commercial could expire after a period of time, after which the tag would become inactive or replaceable."

Reply 13 (citing Ex. 1008 ¶ 35) (emphases omitted). Petitioner argues that "nothing in Russ prohibits viewing commercials once the tag expires, and, regardless, a POSA would not implement the combination this way because Casagrande states that users may prefer to watch commercials in certain instances." *Id.* (citing Ex. 1006, 14:49–51; Ex. 1015 ¶¶ 10–11).

Addressing Patent Owner's argument that "the preclusion of trick play in *Russ* is commercial-dependent, not time-dependent" and, thus, different than the commercial skipping claimed in the '122 patent (PO Resp. 26 (citing Ex. 2008 ¶ 80)), Petitioner replies that "[t]his argument assumes commercial tags expire after a specified time, after which commercials are never shown." Reply 13 (citing PO Resp. 10). Petitioner contends that "this interpretation of Russ is inconsistent with Russ's actual disclosures. Russ teaches using a multipurpose tag to command a primary device to 'preclude trick play for only a specified length of time, such as two weeks'" (i.e., a first period of time), after which a user may utilize trick play functionality during a second period of time. Reply 13–14 (citing Ex. 1008 ¶¶ 34–35) (emphasis omitted). Petitioner contends: "Regardless, the combination of Casagrande and Russ articulated in the petition expressly includes the ability to watch commercials, even after the first period of time." Reply 14 (citing Pet. 35–36).

Patent Owner disagrees in the Sur-reply:

> *Russ* unambiguously states that if a commercial tag will preclude trick play for a period of time, it does so by having an associated expiration date: "The commercial slot could also preclude trick play for only a specified length of time, such as two weeks. For example, a tag corresponding with a commercial could expire after a period of time after which the tag would become inactive or replaceable.

Sur-reply 14 (quoting Ex. 1008 ¶ 35).

Patent Owner contends "[t]here is no support in *Russ* for the transmitted commercial to be skippable only after a first period of time." Sur-reply 14. Patent Owner asserts: "In fact, *Russ* provides the opposite—that 'trick play functionality such as fast forward, would not work for certain commercials as specified.'" *Id.* (citing Ex. 1008 ¶ 33) (emphasis omitted). Patent Owner concludes: "[a]s such, 'trick play' preclusion is commercial based, not time based. Accordingly, neither *Casagrande* nor *Russ* discloses this limitation." Sur-reply 14.

We do not find persuasive Patent Owner's argument that Russ's teachings do not apply because it is its "tag" that determines whether the commercial can be skipped and not the time at which the video program is played back. PO Resp. 23. Again, Petitioner relies on Russ's teaching of restricting skipping commercials during playback for a certain time combined with Casagrande, wherein once the restriction expires the user may elect to skip the commercials or not. Pet. 27–30. Thus, Patent Owner argues Russ individually, where, in combination, it is the time of restriction expiry, and the status of the playback state, that determines whether a commercial can be skipped or not.

Patent Owner states that "[t]he plain language of the claim requires that the processor provide the video program in different forms (i.e., with or without the 'second portion') based on whether the 'second command' was received during the 'second period of time.'" PO Resp. 22. Patent Owner argues that "a POSITA would understand that the DVR must determine whether the 'second command' initiating playback was received during the 'second period of time' in order to determine whether the user is even

permitted to skip the claimed 'second portion' during playback." *Id.* (citing Ex. 2008 ¶ 73).

Again, this argument attacks Casagrande individually, but the Petition relies on the combination of Casagrande and Russ, not just Casagrande, for the teaching of this limitation. Petitioner relies on Russ's teaching of restricting skipping commercials during playback for a certain time and this teaching is combined with Casagrande, wherein once the restriction expires the user may elect to skip the commercials or not. *See* Pet. 29. Thus, in combination, upon the expiration of the first period of time, there is a second period of time, and the playback state determines whether commercials are played (or not).

Patent Owner contends "in the second scenario, the 'first command' to set the DVR in the 'first playback state' must be received before the 'second command' initiating playback is received." PO Resp. 22 (citing Ex. 2008 ¶ 74).

Patent Owner asks too much. As discussed *supra* in our discussion on claim construction for the term "first command," there is no indication in the claim that the "first command" and "second command" are linked or related. Limitation 1[c] requires that there be a controller configured to receive a "first command" that changes a DVR from a first playback state to a second playback state; limitation 1[d][ii] requires that the DVR be in a first playback state. Under limitation 1[c], the "first command" may, for instance, be set by a switch that is used to change playback states. Under limitation 1[c], the switch could be used to set the playback state, which is received by the controller of the DVR, and under limitation 1[d][ii], the system only makes a determination of whether the DVR is set in a first

playback state. Accordingly, the switch could be set to a certain playback state and it could remain at that setting through repeated intervening playback events under limitations 1[c] and 1[d][ii], which would not require the specific timing sequence that Patent Owner argues is required.

Patent Owner additionally argues that Petitioner mapped the selection of the first and second A/V streams to the "first command" and the "selection of particular segments" to the "second command," but "*Casagrande* fails to disclose that its selection of 'the first A/V stream 1504 or the second A/V stream 1512' . . . is ever used with *Casagrande's* 'selection of particular segments from the selection menu' . . . command"), much less in the sequence that the second scenario requires." PO Resp. 22–23 (citing Ex. 2008 ¶ 74).

As discussed for limitation 1[c] above, Casagrande discloses that a user may select a certain playback stream, that is, a certain playback that may or may not contain commercials, and the user may choose and playback specific video segments. Ex. 1006, 4:1–8, 19:63–66. We determine that these disclosures are sufficient, in combination with Russ and its disclosure of the expiry of trick play restrictions, to teach that there is a certain playback state that is set, which would include a first playback state, and that there is a command from a user to playback a video program in a second period of time, which is all that the claim requires.

Patent Owner additionally argues that the "Petition does not identify any specific reasoning to combine or modify the references according to the claimed invention." PO Resp. 27 (citing Pet. 27–30). Patent Owner contends that the "only support is from the declaration of Dr. Jeffay." *Id.* (citing Ex. 1002 ¶¶ 136–138). Patent Owner asserts that "his declaration

should be afforded no weight because it does nothing more than restate Petitioner's argument without any additional supporting evidence or reasoning." *Id.*

We disagree, because we do not find Dr. Jeffay's declaration at paragraphs 136–138 to be an exact restatement of the Petition's arguments without any additional supporting evidence or reasoning.

Dr. Jeffay persuasively explains that "Russ discloses the desirability of having a second period of time (*i.e.*, once the restriction expires) in which the user may elect to skip the commercials or not." Ex. 1002 ¶ 136 (citing Ex. 1008 ¶ 35). Dr. Jeffay persuasively explains that a "POSA would have been motivated to combine Casagrande and Russ in order to effectuate the desired result of restricting 'temporally moving through particular identified segments' that Casagrande discusses." *Id.* (citing Ex. 1006, 4:20–21).

Dr. Jeffay persuasively explains that a "POSA would have been motivated to implement the known time-based limits on restrictions found in Russ in Casagrande's DVR to obtain the predictable result of restricting the automatic skipping of interstitials for a finite period of time, thereby increasing the financial value of the interstitial content to the broadcaster." Ex. 1002 ¶ 137.

Dr. Jeffay persuasively explains that a "POSA would understand that applying Russ's technique would allow the content provider to obtain additional revenue from advertisements shown to viewers who value watching the program during the initial release period, while still appealing to viewers who are willing to delay watching the program to avoid commercials." Ex. 1002 ¶ 138.

Petitioner persuasively explains that in Russ "'primary device 140' is

a STB that 'includes a processor, a tuner system,' 'which may be a simplified processor and only one tuner, may be included to extract channels from the received downstream broadband signals.'" Pet. 17 (citing Ex. 1008 ¶¶ 20, 33) (emphasis omitted). Petitioner further explains that "[t]uners and related software had been shown in Russ to effectuate Casagrande's desired channel extraction in a STB." *Id.* (citing Ex. 1002 ¶ 101; Ex. 1006, 18:49–53).

In reviewing the record, we are not persuaded by Patent Owner's argument because we find Petitioner provides sufficient evidence of record (Ex. 1009 ¶ 2; Ex. 1002 ¶ 103) that shows combining the teachings of the cited Casagrande, Russ, and Miller references would not have been "uniquely challenging or difficult for one of ordinary skill in the art," nor would have "represented an unobvious step over the prior art." *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at 418). Further, we find that Petitioner has provided sufficient rationale for the combination. *See KSR*, 550 U.S. at 415 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

Here, we find each of the Casagrande, Russ, and Miller references addresses the *function* of providing a commercial skipping capability (i.e., a "trick play" feature), or at least the processing of commercials (Miller paragraph 44) using *similar structures* such as a set top box, tuner, and/or a digital video recorder (DVR). *See, e.g.*, Casagrande (Ex. 1006, 1:18–34 (discussing DVRs and skipping over commercial breaks), and 9:64–67 (discussing "trick mode functions"); *see* Russ (Ex. 1008), ¶¶ 20–22 (discussing a "tuner"), and ¶ 33 (discussing a "trick play" feature); and

Miller (Ex. 1009) ¶ 2 (discussing a "tuner operable to receive a multiplexed signal"), and ¶ 16 (discussing a DVR). Therefore, we find a POSA would reasonably have consulted these references in solving the relevant problem faced by the inventor of the '122 patent.

On this record, we are also persuaded that Petitioner's rationale to modify Casagrande with Russ would offer an improvement, as evidenced by Dr. Jeffay's unrebutted testimony that the modification would result in a *financial value* for the broadcaster, which we find is sufficient. Ex. 1002 ¶ 138. Further, we credit Dr. Jeffay's testimony that a person of ordinary skill in the art would have been motivated to look to Miller in combination with Casagrande and Russ for details on processing of signals delivered to a DVR and for its multiplexing features. *Id.* ¶¶ 93, 104–106, 110. Nor do we find Dr. Jeffay's declaration at paragraph 138 to be an exact restatement of the Petition's arguments without any additional supporting evidence or reasoning, as discussed above.

Accordingly, we do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][ii] by the combination of Casagrande and Russ. Further, we find that Petitioner has provided sufficient rationale to combine the references.

On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches or suggests limitation 1[d][ii] and a rationale to combine the references has been demonstrated.

*9. Limitation 1[d][iii]*

Limitation 1[d][iii] of claim 1 recites:

> (iii) provide only a portion of said one of said plurality of video programs to said display device in response to receiving said

> second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said one of said plurality of video programs, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state.
>
> Ex. 1001, 12:24–36.

We note at the outset that the functional limitations of 1[d][iii] are performed when the second command is received during the second period of time and when the DVR is in a second playback state.

Petitioner argues that a "POSA would have understood that Casagrande's 'second A/V stream' includes segments in the original temporal order, excluding one or more interstitial segments." Pet. 31 (citing Ex. 1002 ¶ 145). Petitioner relies upon Casagrande's Figure 21 as teaching a "process for processing an audio/video stream." *Id.* (citing Ex. 1006, 23:45–46; Ex. 1002 ¶ 145). Petitioner contends that by using the steps depicted in Casagrande's Figure 21, a user "effectively view[s] a subset of the segments of an A/V stream in the original temporal order of the segments, skipping output of undesignated segments of the A/V stream." Pet. 31 (citing Ex. 1006, 24:23–26; Ex. 1002 ¶ 145). Thus, according to Petitioner, "in the combination with Russ, once the commercial skipping inhibition period (i.e., the claimed 'first period of time') expires, the combination would permit the user to request playback" with the commercial removed. Pet. 32 (citing Ex. 1002 ¶¶ 148–151).

Petitioner contends this is also shown in Casagrande's Figure 8, as annotated by Petitioner below. Pet. 31 (citing Ex. 1006, 13:5–8; Ex. 1002 ¶ 146).




*Shown above is Casagrande's Figure 8, as annotated by Petitioner, depicting a first A/V stream including first, second, and third portions of video segments, in which the second portion is an interstitial (e.g., a commercial), and a second A/V stream in which the interstitial is excluded.*

Consistent with Petitioner-annotated Figure 8 of Casagrande, above, Petitioner asserts that the "boundary 808 (e.g., the ending boundary of segment 802) is the starting point at which the interstitial 804 is to be filtered from the first A/V stream 704A" and that the "boundary 810 (e.g., the beginning boundary of segment 806) is the ending point at which the interstitial 804 is to be filtered from the first A/V Stream 704A," and "[a]s a result of the filtering . . . the second segment 806 [third portion] is outputted immediately following the first segment 802 [first portion]." Pet. 32 (quoting Ex. 1006, 13:23–31 (alterations to Casagrande's Fig. 8 added by Petitioner); Ex. 1002 ¶ 146).

Patent Owner contends that in Casagrande, it is the content provider that determines whether the transmitted commercial can be skipped, and there is no determination based on a second command in a second period of time. PO Resp. 25 (citing Ex. 2008 ¶ 77). Patent Owner further argues that in Russ, because the tag for a commercial can become inactive, "the preclusion of trick play in *Russ* is commercial-dependent, not time-dependent." *Id*. at 26 (citing Ex. 2008 ¶ 80). Patent Owner asserts that Casagrande fails to disclose that its selection of A/V streams is used with the selection of segments from a selection menu, and fails to disclose the sequence required by the limitation. *Id*. at 27 (citing Ex. 2008 ¶ 81). Patent Owner also asserts that the rationale to combine the references is insufficient. PO Resp. 27–28.

As discussed for limitation 1[d][i], and as Petitioner asserts and we agree, Russ discloses that trick play functionality is restricted for only a specified period of time. *See* Ex. 1008 ¶¶ 34–35. Accordingly, we find support for Dr. Jeffay's testimony that, in the view of one of ordinary skill in the art, Casagrande in combination with Russ teaches that after the expiry of the first period of time there is a second period of time in which commercials may be skipped. Ex. 1002 ¶¶ 148–151; *see also* Pet. 32. Additionally, we agree that Petitioner has demonstrated a rationale to combine Casagrande and Russ with a reasonable expectation of success of the combination, as discussed above in the discussion of limitation 1[a][i].

Accordingly, we do not find Patent Owner's arguments on Casagrande and Russ to be persuasive for the reasons discussed above for limitation 1[d][ii]. We do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 1[d][iii] by the

combination of Casagrande and Russ. Further, we find that Petitioner has provided sufficient rationale to combine the references.

On this complete record, we agree with Petitioner that the combination of Casagrande and Russ teaches or suggests limitation 1[d][iii] and a rationale to combine the references has been demonstrated.

*10. Limitation 1[e]*

Limitation 1[e] of claim 1 recites: "wherein said second period of time is a period of time after said first period of time." Ex. 1001, 12:38–39.

Dr. Jeffay testifies that "Russ clearly defines a first period of time where trick play is 'preclude[d]'" so "during the first period of time, the combination of Casagrande and Russ would have resulted in the ability to play only the first A/V stream." Ex. 1002 ¶ 155. Dr. Jeffay goes on to testify that, referencing Figure 8 of Casagrande, that "the second period of time wherein skipping of commercials is allowed begins once the restriction expires." *Id.* ¶ 156.

We find Dr. Jeffay's testimony persuasive because it is supported by the disclosures of the prior art. *Id.*

Patent Owner advances no arguments specific to temporal limitation 1[e]. *See generally* Response; Sur-reply.

We find Petitioner has shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render limitation claim 1[e] obvious under Ground 1.

*11. Conclusion for Claim 1 under Ground 1*

Patent Owner presents no evidence of objective indicia of nonobviousness. *See generally* PO Resp. Weighing the record as a whole in

view of the findings and analysis above, we conclude that Petitioner has met its burden to show, by a preponderance of the evidence, that independent claim 1 would have been obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable.

### *b. Dependent Claim 2*

Claim 2 recites:

> The DVR of claim 1, further comprising a wireless transmitter in communication with said at least one processor and said memory device, said wireless transmitter being configured to transmit said one of said plurality of video programs in its entirety or said portion of said one of said plurality of programs at least indirectly to said display device, said display device being remotely located from said DVR.

Ex. 1001, 12:40–47.

Petitioner argues dependent claims 2 and 12 together under Ground 1.

Petitioner notes that "Casagrande discloses wirelessly transmitting programs to the display device. Casagrande explains that its DVR receiving device 1510 includes 'A/V interface 1518, and control logic 1520.'" Pet. 34 (citing Ex. 1006, 17:53–55; Ex 1002 ¶ 159). In further support, Petitioner notes that "Casagrande teaches that its DVR receiving device is 'communicatively coupled to the presentation device 114 through any type of . . . wireless connection.'" Pet. 34 (citing Ex. 1006, 6:54–56; Ex. 1002 ¶ 161).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore,

that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Notably, Patent Owner's expert, Dr. Freedman, does not add anything further regarding all dependent claims 2–10, 12–17, 19, and 20, as considered under Ground 1:

> Dependent claims 2–10 depend from and add limitations to independent claim 1. Dependent claims 12–17 depend from and add limitations to independent claim 11. Dependent claims 19 and 20 depend from and add limitations to independent claim 18. The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons.

Ex. 2008 ¶ 85.

In Reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 2, we credit Dr. Jeffay's testimony that Casagrande's "receiving device 1510 includes a communication interface 1502, a storage unit 1516, an A/V interface 1518, and control logic 1520." Ex. 1002 ¶ 159 (quoting Ex. 1006, 17:53–55). Dr. Jeffay further notes "[i]n one implementation, the control logic 1520 includes a processor, such as a microprocessor, microcontroller, digital signal processor (DSP), or the like for execution of software configured to perform the various control functions described [t]herein." Ex. 1002 ¶ 159 (quoting Ex. 1006, 18:45–49). Moreover, we credit Dr. Jeffay's testimony that Casagrande explains

that "[t]he A/V interface 1518 may incorporate circuitry to output the A/V streams in any format recognizable by the display device 1514 . . . including WiFi." Ex. 1002 ¶ 159 (quoting Ex. 1006, 18:29–35).

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 2 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*c. Dependent Claim 3*

Claim 3 recites:

> The DVR of claim 1, further comprising at least one other tuner, wherein said at least one other tuner allows said DVR to receive at least one other video program while said tuner is being used to receive said plurality of video programs, said at least one other video program being selected by said user.

Ex. 1001, 12:48–53.

Petitioner argues that Miller discloses the "desirab[ility] to access multiple program content streams concurrently . . . [A] user may desire to view a first program and record a second program that are being communicated concurrently by a program distributor 106 to a receiving device 118." Pet. 34–35 (citing Ex. 1009 ¶ 31; Ex. 1002 ¶ 169).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply regarding all the claims dependent from either independent

claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 3, we credit Dr. Jeffay's testimony that Casagrande teaches the use of a tuner by way of a receiving device comprising, in one embodiment, a DVR. Ex. 1002 ¶ 165 (quoting Ex. 1006, 6:26–30 ("The receiving device 110 of Fig. 1 may be any device capable of receiving a presentation stream from the communication network 102.")). We also credit Dr. Jeffay's testimony that Russ similarly teaches the use of tuners in DVR systems, explaining that "[a] processor and a tuner system, which may be a simplified processor and only one tuner, may be included to extract channels from the received downstream broadband signals." Ex. 1002 ¶ 167 (quoting Ex. 1008 ¶ 20). We additionally credit Dr. Jeffay's testimony that Miller discloses this limitation at paragraph 31. Ex. 1002 ¶ 168 (citing Ex. 1009 ¶ 31).

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 3 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*d. Dependent Claim 4*

Claim 4 recites: "The DVR of claim 1, wherein said one of said plurality of video programs includes at least primary and secondary video content, and said first and third portions of said one of said plurality of video programs consists of said primary video content." Ex. 1001, 12:54–58.

Petitioner argues that "a POSA would have understood the multiple segments of Casagrande's video frames correspond to 'primary content' while the interstitials correspond to 'secondary content.'" Pet. 35 (citing Ex. 1002 ¶ 173).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In Reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 4, we credit Dr. Jeffay's testimony that "Casagrande discloses a television program comprised of multiple segments of video frames, which are interspersed with interstitials (*e.g.*, commercials, promotions, alerts, and other shows)." Ex. 1002 ¶ 173 (citing Ex. 1006, 4:57–59). We further credit Dr. Jeffay's testimony that a "POSA would have understood that the multiple segments of video frames in Casagrande correspond to the 'primary content' or 'time-shifted' data in the ['122] Patent. Similarly, the interstitials of Casagrande correspond to the 'secondary content' or 'auxiliary data' of the '122 Patent." Ex. 1002 ¶ 173.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 4 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*e. Dependent Claim 5*

Claim 5 recites:

> The DVR of claim 4, wherein said second portion of said one of said plurality of video programs consists of said secondary video content and said memory device is further configured to store at least one time when said second portion begins and at least one time when said second portion ends.

Ex. 1001, 12:59–64.

Petitioner argues dependent claims 5 and 13 together. Pet. 26.

Petitioner argues that "[f]or Casagrande's location information corresponding to 'presentation times,' a POSA would have found it obvious to implement that information as a time stamp of the stored video." Pet. 36 (citing Ex. 1002 ¶ 182).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or

Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 5, we credit Dr. Jeffay's testimony that "Casagrande explains how location information which may consist of boundaries within the A/V stream, and offsets from those boundaries, correspond to 'presentation times' of the content." Ex. 1002 ¶ 181 (citing Ex. 1006, 14:34–35). We also credit Dr. Jeffay's testimony that it would have been obvious to "a POSA that the location information corresponding to 'presentation times' could be implemented as a time stamp of the stored video. This could simplify implementation as MPEG files, which Casagrande explains was a common format for video presentation that was also widely known to include time stamp information." Ex. 1002 ¶ 182 (citing Ex. 1006, 7:12–16).

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 5 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*f. Dependent Claim 6*

Claim 6 recites:

> The DVR of claim 1, wherein said first period of time is a period of time that begins when said one of said plurality of video programs is stored on said memory device and available to be viewed and ends within a predetermined time thereafter, said predetermined time being less than one week.

Ex. 1001, 12:65–13:3.

Petitioner notes that "Russ teaches 'trick play functionality' to skip commercials. Pet. 37 (citing Ex. 1008 ¶ 33); *see also supra* Claim Element 1[d][iii]. Petitioner notes that Russ explains "[t]he commercial slot could

also preclude trick play for only a specified length of time, such as two weeks." Pet. 37 (citing Ex. 1008 ¶ 35; Ex. 1002 ¶ 187).

Petitioner argues: "A POSA would have understood that Russ's disclosure of a two-week period is exemplary in nature and other time periods are useable." Pet. 37 (citing Ex. 1002 ¶¶ 188). Petitioner further argues: "A POSA would have understood that a day or a weekend are also examples of 'specified length[s]' of time that would be an obvious implementation choice." Pet. 37.

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 6, we credit Dr. Jeffay's testimony that Russ discloses "[t]he commercial slot could also preclude trick play for only a specified length of time, such as two weeks." Ex. 1002 ¶ 187 (quoting Ex. 1008 ¶ 35). We find Dr. Jeffay's testimony is persuasive that "a POSA would have understood that Russ's disclosure of a two week period is exemplary in nature," and a "'local cable operator' or 'presentation

programmer' would have found it obvious to specify a shorter period of time, such as a day or less than a week, if a particular commercial were only relevant for said time period." Ex. 1002 ¶ 188.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 6 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*g. Dependent Claim 7*

Claim 7 recites: "The DVR of claim 1, wherein said single channel is stored in said memory and said at least one processor is configured to tune said tuner to said single channel in response to said controller receiving said third command." Ex. 1001, 13:4–7.

Petitioner argues dependent claims 7 and 16 together. Pet. 37–38.

Petitioner argues that claims 7 and 16 would have been obvious for the same reasons as claims 1 and 11. Petitioner notes that Casagrande's control logic "receive[s] user input 1523 directing the operation of the receiving device 1510." Pet. 38 (quoting Ex. 1006, 18:54–60; citing Ex. 1002 ¶ 191). Petitioner notes that Casagrande's receiving device "receive[s] the first A/V stream 1504 by way of the communication interface 1502, and store[s] the A/V stream 1504 in the storage unit 1516." *Id.* (quoting Ex. 1006, 18:64–67; citing Ex. 1002 ¶ 191).

Petitioner further notes that Miller likewise discloses a "content stream selector" "compris[ing] a single tuner" for "tun[ing] to a frequency of a carrier signal that carries multiple program content streams multiplexed." Pet. 38 (quoting Ex. 1009 ¶ 63; Ex. 1002 ¶ 194). Petitioner additionally notes that "[t]he content stream selector may then begin and continue to

receive and forward, such as by storing in a buffer 412, program content portions from each of the multiple program content streams, as they arrive over the carrier signal." *Id.* (quoting Ex. 1009 ¶ 63; citing Ex. 1002 ¶ 194).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 7, we credit Dr. Jeffay's testimony that Casagrande discloses a third command that instructs the DVR to receive and store a plurality of video programs and that Casagrande's DVR uses control logic 1520 to communicate with a user interface 1522 that is "configured to receive user input 1523 directing the operation of the receiving device 1510." Ex. 1002 ¶ 191 (quoting Ex. 1006, 18:54–60). We also credit Dr. Jeffay's testimony that Casagrande discloses the storage of supplemental content within the storage unit of the DVR. Ex. 1002 ¶ 192 (quoting Ex. 1006, 18:18–20 ("Coupled to the communication interface 1502 is a storage unit 1516, which is configured to store both the first A/V stream 1504 and the supplemental content 1506.")). We further credit Dr. Jeffay's testimony

that the disclosures of Miller renders this limitation obvious. Ex. 1002 ¶ 193 (citing Ex. 1009 ¶ 2).

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 7 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*h. Dependent Claim 8*

Claim 8 recites:

> The DVR of claim 1, wherein data communicated via said single channel is compressed prior to transmission and said at least one processor is configured to decompress said data after its have [sic] been received so that said one of said plurality of video programs or said portion of said one of said plurality of video programs can be displayed, depending on when said second command is received and said playback state of said DVR.

Ex. 1001, 13:8–15.

Petitioner argues that claims 8 and 15 would have been obvious for the same reasons as claims 1 and 11. Pet. 39. Petitioner notes that Casagrande's "A/V data may be formatted according to one of the MPEG encoding standards, such as MPEG-2 or MPEG-4." Pet. 39 (quoting Ex. 1006, 7:12–14; citing Ex. 1002 ¶ 197). Petitioner persuasively shows that a "POSA would have understood that such standards, including MPEG-2 and MPEG-4, involved compressing video data." Pet. 39 (citing Ex. 1002 ¶ 197). Petitioner notes Casagrande's signature data "comprises compressed data, e.g., compressed audio or video data. The compressed data may then be expanded and compared with the audio or video data of the first presentation stream 104 which has also been uncompressed." Pet. 39 (quoting Ex. 1006, 8:55–60; citing Ex. 1002 ¶ 198) (emphasis omitted).

Petitioner additionally notes that Miller discloses content portions

"comprise MPEG . . . packets that contain compressed . . . video . . . data." Pet. 40 (quoting Ex. 1009 ¶ 29; citing Ex. 1002 ¶ 200). Petitioner notes that Miller explains that "[t]he video processing system 404 and/or the presenter 408 may perform additional processing on program content portions, such as decompression . . . prior to communicating the program content to the presentation device 120." Pet. 40 (quoting Ex. 1009 ¶ 52; citing Ex. 1002 ¶ 200).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 8, we credit Dr. Jeffay's testimony that Casagrande teaches that "the A/V data may be formatted according to one of the MPEG encoding standards, such as MPEG-2 or MPEG-4." Ex. 1002 ¶ 197 (quoting Ex. 1006, 7:12–14). We credit Dr. Jeffay's testimony that a "POSA would have understood that MPEG encoding standards, including MPEG-2 and MPEG-4 both involved compressing video data." Ex. 1002 ¶ 197.

Turning to Miller, we credit Dr. Jeffay's testimony that Miller further

explains that "[t]he video processing system 404 and/or the presenter 408 may perform additional processing on program content portions, such as decompressions, decryption, encryption, scaling, and the like, prior to communicating the program content to the presentation device 120." Ex. 1002 ¶ 200 (quoting Ex. 1009 ¶ 52).

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 8 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*i. Dependent Claim 9*

Claim 9 recites: "The DVR of claim 5, wherein said secondary video content comprises at least one advertisement." Ex. 1001, 13:16–17.

Petitioner notes that Casagrande discloses an A/V stream that is "comprised of multiple segments of video frames, which are interspersed with interstitials (e.g., commercials)." Pet. 40 (quoting Ex. 1006, 4:57–62; citing Ex. 1002 ¶ 203).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this

proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 9, we credit Dr. Jeffay's testimony noting that Casagrande discloses interstitials, which include commercials. Ex. 1002 ¶ 203 (citing Ex. 1006, 4:57–63).

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 9 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*j. Dependent Claim 10*

Claim 10 depends from claim 1 and adds:

10[a] "The DVR of claim 1, wherein said at least one processor is further configured to (i) retrieve said portion of said one of said plurality of video programs from said memory if said second command is received during said second period of time and said DVR is in said second playback state, and"

10[b] "(ii) retrieve said one of said plurality of video programs in its entirety from said memory device if another second command is received at a time thereafter and said DVR is switched to said first playback state at or before said time thereafter."

Ex. 1001, 13:18–27.

Regarding limitation 10[a], Petitioner notes that Casagrande discloses "a processor . . . to perform the various control functions." Pet. 40 (quoting Ex. 1006, 18:45–49; citing Ex. 1002 ¶ 206); *see supra* Claim Element 1[d][i]. Petitioner further notes that Casagrande teaches that "[b]oth the first A/V stream 1504 and the second A/V stream 1512 may reside within the

storage unit 1516." Pet. 41 (quoting Ex. 1006, 19:43–44; citing Ex. 1002 ¶ 207). Petitioner notes that Casagrande discloses users select[ing] . . . whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514 by way of the A/V interface." Pet. 41 (quoting Ex. 1006, 19:63–66; citing Ex. 1002 ¶ 207). Petitioner further notes Casagrande explains that "[a]t some point after the location information 1508 is processed, the control logic 1520 generates and transmits a second A/V stream 1512 over the A/V interface 1518 to the display device 1514." Pet. 41 (quoting Ex. 1006, 19:10–13; Ex. 1002 ¶ 208).

Regarding limitation 10[b], Petitioner argues: "[a] POSA would have understood that changing the 'playback state' of Casagrande is not temporally limited to before the first request to view an A/V stream is received and processed." Pet. 41 (citing Ex. 1002 ¶ 213). Petitioner thus concludes that "a subsequent request to view the 'first A/V stream' comprising the entire content stream may be received after a request to view the 'second A/V stream' has been processed, such as when commercials are of interest to a user." *Id.* Petitioner additionally notes Casagrande explains that users "may select . . . whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514 by way of the A/V interface 1518." Pet. 41 (quoting Ex. 1006, 19:63–66; citing Ex. 1002 ¶ 213). Petitioner notes that Casagrande discloses that both A/V streams 1504 and 1512 "may reside within storage unit 1516." Pet. 42 (quoting Ex. 1006, 19:44–45; citing Ex. 1002 ¶ 214).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore,

that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 10(a), we credit Dr. Jeffay's testimony for the same reasons articulated in paragraphs 206–210 of the declaration. Ex. 1002 ¶¶ 206–210.

Regarding claim 10(b), we credit Dr. Jeffay's testimony for the same reasons articulated in paragraphs 211–216 of the declaration. Ex. 1002 ¶¶ 211–216.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 10 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*k. Independent Claim 11*

Petitioner advances essentially the same evidence and arguments for independent claims 1, 11, and 18. Pet. 14. *See* Claim 11, Ex. 1001, 13:28–14:14.

Patent Owner responds:

> The Petition does not provide independent analysis for independent claims 11 or 18. *See* Pet., pp. 14-33. Instead, it

> contends that the same disclosures in *Casagrande*, *Russ*, and *Miller* are relevant to each of the independent claims. *See id.* As a result, the Petition fails to show that the combination of *Casagrande*, *Russ*, and *Miller* renders obvious claims 11 and 18 for the same reasons as claim 1. *See supra* Section IV.A.1; Ex. 2008, ¶84.

PO Resp. 28.

Regarding claim 11, we credit Dr. Jeffay's testimony and the other evidence or record for the same reasons discussed above regarding independent claim 1.

Accordingly, we find Petitioner has shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render independent claim 11 obvious under Ground 1.

*l. Dependent Claim 12*

Claim 12 recites:

> The method of claim 11, wherein said step of providing said at least a portion of said one of said plurality of video programs to a display device further comprises transmitting said at least a portion of said one of said plurality of video programs to said display device via a transmission path that includes at least one wireless connection, said display device being remotely located from said DVR.

Ex. 1001, 14:15–21.

Petitioner argues dependent claims 2 and 12 together under Ground 1.

Petitioner notes that "Casagrande discloses wirelessly transmitting programs to the display device. Casagrande explains that its DVR receiving device 1510 includes 'A/V interface 1518, and control logic 1520.'" Pet. 34 (citing Ex. 1006, 17:53–55; Ex 1002 ¶ 159). In further support, Petitioner notes that "Casagrande teaches that its DVR receiving device is communicatively coupled to the presentation device 114 through any type

of . . . wireless connection.'" Pet. 34 (citing Ex. 1006, 6:54–56; Ex. 1002 ¶ 161).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 12, we credit Dr. Jeffay's testimony and the other evidence of record for the same reasons discussed above regarding claim 2.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that claim 12 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*m. Dependent Claim 13*

Claim 13 recites:

> The method of claim 11, wherein said step of storing said plurality of video programs on said at least one memory device in said DVR further comprises storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends.

Ex. 1001, 14:22–27.

Petitioner argues dependent claims 5 and 13 together. Pet. 26.

Petitioner argues that "[f]or Casagrande's location information corresponding to 'presentation times,' a POSA would have found it obvious to implement that information as a time stamp of the stored video." Pet. 36 (citing Ex. 1002 ¶ 182).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 13, we credit Dr. Jeffay's testimony for the same reasons discussed above regarding claim 5.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 13 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*n. Dependent Claim 14*

Claim 14 recites:

> The method of claim 11, wherein said one of said plurality of video programs includes at least primary and secondary video

> content, said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state consists of said primary video content, and said secondary video content includes at least one advertisement.

Ex. 1001, 14:28–35.

Petitioner argues that "[c]laim 14 is obvious for the same reasons as claims 4–5 and 9." Pet. 42 (citing Ex. 1002 ¶¶ 243-44).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 12, we credit Dr. Jeffay's testimony for the same reasons discussed above regarding claims 4, 5, and 9.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 14 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*o. Dependent Claim 15*

Claim 15 recites:

> The method of claim 11, further comprising the steps of: compressing said plurality of video programs prior to said plurality of video programs being transmitted over said data distribution system, and decompressing said plurality of video programs after said plurality of video programs have been received by said DVR[] and before said one of said plurality of video programs or portion thereof is provided to said display device.

Ex. 1001, 14:36–45.

Petitioner argues that claims 8 and 15 would have been obvious for the same reasons as claims 1 and 11. Pet. 39. Petitioner notes that Casagrande's "A/V data may be formatted according to one of the MPEG encoding standards, such as MPEG-2 or MPEG-4." Pet. 39 (quoting Ex. 1006, 7:12–14; citing Ex.1002 ¶ 197). Petitioner persuasively shows that a "POSA would have understood that such standards, including MPEG-2 and MPEG-4, involved compressing video data." Pet. 39 (citing Ex. 1002 ¶ 197). Petitioner notes Casagrande's signature data "comprises compressed data, e.g., compressed audio or video data. The compressed data may then be expanded and compared with the audio or video data of the first presentation stream 104 which has also been uncompressed." Pet. 39 (quoting Ex. 1006, 8:55–60; citing Ex. 1002 ¶ 198) (emphasis omitted).

Petitioner additionally notes that Miller discloses content portions "comprise MPEG . . . packets that contain compressed . . .video . . . data." Pet. 40 (quoting Ex. 1009 ¶ 29; citing Ex. 1002 ¶ 200). Petitioner notes that Miller explains that "[t]he video processing system 404 and/or the presenter 408 may perform additional processing on program content portions, such as decompression…prior to communicating the program content to the

presentation device 120." Pet. 40 (quoting Ex. 1009 ¶ 52; citing Ex. 1002 ¶ 200).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 15, we credit Dr. Jeffay's testimony for the reasons discussed above regarding claim 8, and independent claims 1 and 11.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 15 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*p. Dependent Claim 16*

Claim 16 recites:

> The method of claim 11, further comprising the step of tuning said single tuner to a particular channel at a particular time in response to receiving said third command, said particular channel and said particular time being stored in said at least one memory device in said DVR.

Ex. 1001, 14:46–50.

Petitioner argues dependent claims 7 and 16 together. Pet. 37–38.

Petitioner argues that claims 7 and 16 would have been obvious for the same reasons as claims 1 and 11. Petitioner notes that Casagrande's control logic "receive[s] user input 1523 directing the operation of the receiving device 1510." Pet. 38 (quoting Ex. 1006, 18:54–60; citing Ex. 1002 ¶ 191). Petitioner notes that Casagrande's receiving device "receive[s] the first A/V stream 1504 by way of the communication interface 1502, and store[s] the A/V stream 1504 in the storage unit 1516." *Id.*

Petitioner further notes that Miller likewise discloses a "content stream selector" "compris[ing] a single tuner" for "tun[ing] to a frequency of a carrier signal that carries multiple program content streams multiplexed." Pet. 38 (quoting Ex. 1009 ¶ 63; Ex. 1002 ¶ 194). Petitioner additionally notes that "[t]he content stream selector may then begin and continue to receive and forward, such as by storing in a buffer 412, program content portions from each of the multiple program content streams, as they arrive over the carrier signal." *Id.* (quoting Ex. 1009 ¶ 63; citing Ex. 1002 ¶ 194).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this

proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 16, we credit Dr. Jeffay's testimony for the same reasons discussed above regarding claim 7.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 16 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*q. Dependent Claim 17*

Claim 17 recites:

> The method of claim 16, further comprising the step of receiving a fourth command from said at least one user of said DVR, said fourth command indicating a desire to record a second video program, which is accomplished using another tuner if said second video program is being transmitted to said DVR while said plurality of video programs are being transmitted to said DVR.

Ex. 1001, 14:51–57.

Petitioner explains that Casagrande teaches its DVR "perform[s] further processing using the identified portions of the presentation stream, such as filtering of segments of the presentation stream." Pet. 42 (quoting Ex.1006, 3:5–7; citing Ex. 1002 ¶ 250). Petitioner notes Casagrande discloses that "communication interface 1502" further includes "circuitry to receive a first A/V stream 1504 and location information 1508." Pet. 42 (quoting Ex. 1006, 17:62–64; citing Ex. 1002 ¶ 250). Petitioner further notes Casagrande's storage unit "is configured to store both the first A/V stream 1504 and the supplemental content 1506." Pet. 42 (quoting Ex. 1006, 18:18–20; citing Ex. 1002 ¶ 251).

Petitioner notes Russ similarly teaches "[a] processor and a tuner system . . . may be included to extract channels from the received downstream broadband signals." Pet. 42–43 (quoting Ex. 1008 ¶ 20; citing Ex. 1002 ¶ 252). Petitioner argues that a "POSA would have understood that recording multiple video programs airing on various channels was a well-known practice and this limitation is inherently present in Casagrande or rendered obvious by Russ." Pet. 43 (citing Ex. 1002 ¶ 253).

Petitioner notes that Miller explains it was "desirable to access multiple program content streams concurrently." Pet. 43 (quoting Ex. 1009 ¶ 31; citing Ex. 1002 ¶ 254). Petitioner notes Miller explains that "a user may desire to view a first program and record a second program that are being communicated concurrently by a program distributor 106 to a receiving device 118." Pet. 43 (quoting Ex. 1009 ¶ 31; citing Ex. 1002 ¶ 254). Petitioner notes Miller discloses "the receiving device 118 may include at least two tuners, such that the first tuner can . . . receive a first carrier signal . . . and the second tuner can . . . receive a second carrier signal that carries a program content stream corresponding to the second program." Pet. 43 (quoting Ex. 1009 ¶ 31; citing Ex .1002 ¶ 254). Petitioner thus concludes: "a POSA would understand that the STB's memory could store and/or output at least two programs simultaneously." Pet. 43 (citing Ex.1002 ¶ 254).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further

regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply, regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 17, we credit Dr. Jeffay's testimony for the same reasons articulated in paragraphs 249–255 of the declaration. Ex. 1002 ¶¶ 249–255.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 17 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*r. Independent Claim 18*

Petitioner advances essentially the same evidence and arguments for independent claims 1, 11, and 18. Pet. 14. *See* Claim 11, Ex. 1001, 14:58–16:10.

Patent Owner responds:

> The Petition does not provide independent analysis for independent claims 11 or 18. *See* Pet., pp. 14-33. Instead, it contends that the same disclosures in *Casagrande*, *Russ*, and *Miller* are relevant to each of the independent claims. *See id.* As a result, the Petition fails to show that the combination of *Casagrande*, *Russ*, and *Miller* renders obvious claims 11 and 18 for the same reasons as claim 1. *See supra* Section IV.A.1; Ex. 2008, ¶84.

PO Resp. 28.

Regarding claim 18, we credit Dr. Jeffay's testimony and the other

evidence of record for the same reasons discussed above regarding independent claims 1 and 11.

Accordingly, we find Petitioner has persuasively shown that the collective teachings and suggestions of Casagrande, Russ, and Miller render independent claim 18 obvious under Ground 1.

*s. Dependent Claim 19*

Claim 19 recites: "The system of claim 18, wherein said third command further results in said first tuner being tuned to a particular frequency to receive said data on said plurality of video programs, said particular frequency being provided by a content provider and stored on said DVR." Ex. 1001, 16:11–16.

Petitioner concludes that "[c]laim 19 is obvious for the same reasons as claims 1 and 7." Pet. 43 (citing Ex. 1002 ¶¶ 270–71).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2–10, 12–17, and 19–20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends: "PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 19, we credit Dr. Jeffay's testimony for the same

reasons discussed above regarding claims 1 and 7.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 19 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

*t. Dependent Claim 20*

Claim 20 recites:

> The system of claim 18, wherein said second portion comprises at least one commercial and said data on said plurality of video programs is packetized, with individual packets being linked at least indirectly to individual ones of said plurality of video programs and to individual channels associated with content owners thereof.

Ex. 1001, 16:17–22.

Petitioner contends that claim 20 would have been obvious for the same reasons as claim 18. Pet. 44 (citing Ex. 1002 ¶ 273). Petitioner notes Miller also discloses that "[p]rogram content portions . . . comprise . . . packets that contain compressed and/or encrypted video, audio, and/or other data." Pet. 44 (quoting Ex. 1009 ¶ 29; citing Ex. 1002 ¶ 278).

Patent Owner responds: "The combination of *Casagrande*, *Russ*, and *Miller* fails to render obvious independent claims 1, 11, and 18, therefore, that combination fails to render obvious dependent claims 2-10, 12-17, and 19-20 for at least the same reasons." PO Resp. 29 (citing Ex. 2008 ¶ 85).

Patent Owner's expert, Dr. Freedman, does not add anything further regarding the dependent claims, as considered under Ground 1, as noted above. Ex. 2008 ¶¶ 36–37.

In reply regarding all the claims dependent from either independent claim 1, independent claim 11, or independent claim 18, Petitioner contends:

"PO's Response provides no support from the '122 Patent for this proposition and fails to explain any deficiencies in Petitioner's or Dr. Jeffay's analyses of the remaining challenged claims." Reply 16.

Regarding claim 20, we credit Dr. Jeffay's testimony and the other evidence of record for the same reasons discussed above regarding claim 18.

For the reasons explained by Petitioner above, we find Petitioner shows by a preponderance of the evidence that dependent claim 20 is unpatentable as obvious over the collective teachings and suggestions of Casagrande, Russ, and Miller.

### *E. Ground 2 – Asserted Obviousness over Dow*

We need not reach Ground 2 over Dow, because we have determined that claims 1, 3–5, 7–11, 13–16, 18, and 19 are unpatentable on the basis of Ground 1 for the reasons discussed *supra*. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018); *see also Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020).

### *F. Ground 3, Asserted Obviousness over Dow, Russ, and Miller*

We need not reach Ground 3, because we have determined that claims 1–20 are unpatentable on the basis of Ground 1 for the reasons discussed *supra*. *See SAS*, 138 S. Ct. at 1359; *see also Boston Sci.*, 809 F. App'x at 990.

## III. CONCLUSION[13]

The table below summarizes our conclusions as to the challenged claims:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–20 | 103(a) | Casagrande, Russ, Miller | 1–20 | |
| 1, 3–5, 7–11, 13–16, 18, 19 | 102(b) | Dow[14] | | |
| 1–20 | 103(a) | Dow, Russ, Miller[15] | | |
| **Overall Outcome** | | | 1–20 | |

## IV. ORDER

Accordingly, it is

ORDERED that, based on a preponderance of the evidence, claims 1–20 of U.S. Patent No. 9,538,122 B2 have been shown to be unpatentable; and

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[14] Ground 2 over Dow was not reached.

[15] Ground 3 over Dow, Russ, and Miller was not reached.

FURTHER ORDERED that that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Eliot Williams
George Guy
Ali Dhanani
Thomas Carter
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
hop.guy@bakerbotts.com
ali.dhanani@bakerbotts.com
thomas.carter@bakerbotts.com

FOR PATENT OWNER:

John Wittenzellner
Mark McCarthy
WILLIAMS SIMONS & LANDIS PLLC
johnw@wsltrial.com
mmccarthy@wsltrial.com

US008929710B2

(12) **United States Patent**
**Fitzsimmons**

(10) **Patent No.: US 8,929,710 B2**
(45) **Date of Patent: Jan. 6, 2015**

(54) **SYSTEM AND METHOD FOR TIME SHIFTING AT LEAST A PORTION OF A VIDEO PROGRAM**

(76) Inventor: **Todd E. Fitzsimmons**, Long Beach, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 364 days.

(21) Appl. No.: **13/279,943**

(22) Filed: **Oct. 24, 2011**

(65) **Prior Publication Data**

US 2012/0106920 A1 May 3, 2012

**Related U.S. Application Data**

(60) Provisional application No. 61/408,759, filed on Nov. 1, 2010.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 5/775*** | (2006.01) |
| ***H04N 5/783*** | (2006.01) |
| ***H04N 21/4147*** | (2011.01) |
| ***G11B 27/10*** | (2006.01) |
| ***H04N 21/426*** | (2011.01) |
| ***H04N 21/431*** | (2011.01) |
| ***H04N 21/432*** | (2011.01) |
| ***H04N 21/443*** | (2011.01) |
| ***H04N 21/462*** | (2011.01) |
| ***H04N 21/81*** | (2011.01) |
| ***H04N 21/845*** | (2011.01) |

(52) **U.S. Cl.**

CPC ............... ***H04N 5/775*** (2013.01); ***H04N 5/783*** (2013.01); ***H04N 21/4147*** (2013.01); ***G11B 27/105*** (2013.01); ***H04N 21/4263*** (2013.01); ***H04N 21/4316*** (2013.01); ***H04N 21/4325*** (2013.01); ***H04N 21/4438*** (2013.01); ***H04N 21/4622*** (2013.01); ***H04N 21/812*** (2013.01); ***H04N 21/8126*** (2013.01); ***H04N 21/8456*** (2013.01)

USPC .......................................................... **386/230**

(58) **Field of Classification Search**

CPC ....... H04N 5/775; H04N 5/85; H04N 9/8042; G11B 27/34; G11B 27/105

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,634,785 B2 * | 12/2009 | Smith | ............................ | 725/34 |
| 2008/0319852 A1 * | 12/2008 | Gardner et al. | ................. | 705/14 |
| 2009/0238536 A1 * | 9/2009 | Gratton | .......................... | 386/54 |
| 2011/0221964 A1 * | 9/2011 | Harris | .......................... | 348/569 |

* cited by examiner

*Primary Examiner* — William C Vaughn, Jr.
*Assistant Examiner* — Daniel Tekle
(74) *Attorney, Agent, or Firm* — Todd E. Fitzsimmons

(57) **ABSTRACT**

A system and method is provided for time shifting a video program. In one embodiment, a receiver, which may be configured to function as both a receiver and a DVR, is configured to add auxiliary data to time-shifted data. The receiving device is configured to acquire auxiliary data at the time the time-shifted data is being played, and to add the auxiliary data to the time-shifted data so that both the time-shifted data and the auxiliary data are displayed to a user on a display. By acquiring data at (or around) the time the time-shifted data is being played, it is more likely that the auxiliary data has value to the user, thereby increasing the value of the time-shifted data to the content owner, the content provider and advertiser. In an alternate embodiment, the auxiliary data is removed only after its value has diminished.

**19 Claims, 4 Drawing Sheets**






Figure 1




Figure 2




Figure 3




Figure 4




Figure 5




Figure 6




Figure 7


Start
810
Record Program
820
Play Program
830
Retrieve Auxiliary Data In Response To Playing Program
840
Insert Auxiliary Data Into Program During Play
850
Stop
860

Figure 8

# SYSTEM AND METHOD FOR TIME SHIFTING AT LEAST A PORTION OF A VIDEO PROGRAM

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit pursuant to 35 U.S.C. §119(e) of U.S. Provisional Patent Application No. 61/408,759 filed Nov. 1, 2010, which application is specifically incorporated herein, in its entirety, by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the storage and play back of time-shifted data, and more particularly to a system and method for adding auxiliary data to data that has been time-shifted.

2. Description of Related Art

Digital video recorders ("DVRs"), like TIVO™, are commonly used to record data (e.g., video, audio, etc.), allowing it to be played back at a later time. This concept is referred to as time-shifting, in that it allows the recorded data (in its original form) to be played back at a later time. For example, a television program that airs at 2:05 in the morning can be recorded and played back at a more convenient time (e.g., the following day at 1:00 in the afternoon).

The concept of time-shifting is advantageous to the user in that it allows the user to watch a television program at a more convenient time. Such a concept is also advantageous to an owner and a distributor of the program (i.e., content owner and content provider, respectively) in that it increases (or has the potential to increase) viewership, or the number of viewers of the program. In other words, by allowing a person to watch a television program at a time that is convenient to them, it increases the likelihood that the person will watch the program, especially if the program is being broadcasted at an inconvenient time (e.g., while other popular programs are being broadcasted, while the person is working, while the person is sleeping, etc.).

DVRs are also popular in that they allow a user to pause, rewind or fast forward a television program. Thus, the user can re-watch the program (or a portion thereof), or skip a portion of the program. This creates a problem for the content owner and/or the content provider in that it allows the user to skip commercials, or paid advertisements, which can decrease the value of the program to the content owner, the content provider and advertisers.

It also creates another problem in that the information that's included in the program may be outdated. For example, a program may include an advertisement for a movie that is currently being shown at a local theater. If, however, the user does not watch the program for several weeks, that movie may no longer be playing at the local theater. By way of another example, the program may include information at the bottom of the screen (e.g., news ticker or "crawler"), identifying upcoming programs, late-breaking news, scores of daily sporting events, etc. Obviously, if the user does not watch the program for several weeks, this information is outdated, and of little value.

This problem originates from the fact that this type of information (e.g., advertisements, news tickers, "crawlers," etc.) is selected based on when the program is being broadcasted, and not on when the program is being viewed. For example, if a program is being broadcasted on a Monday afternoon, then it may include commercials directed toward



mothers, or individuals who are home on Monday afternoon. Similarly, if a program is being broadcasted on a sports channel on Sunday night, then it may include a news ticker on scores for sporting events that took place earlier that day.

With more and more data being time-shifted, it would be advantageous to develop a system and method of adding data (e.g., auxiliary data) to time-shifted data at the time the data is being played. By doing this, data can be added that is current, and therefore more likely to be of value to the user, which can increase the value of the program to the content owner, the content provider and advertisers.

## SUMMARY OF THE INVENTION

The present invention provides a system and method for adding auxiliary data (e.g., advertisements, news tickers, "crawlers," etc.) to data that has been time-shifted. Preferred embodiments of the present invention operate in accordance with a data transmission system, wherein data (e.g., movies and television programs, including sitcoms, sporting events, news programs, etc.) is being transmitted from at least one data source (e.g., content owner, content provider, etc.) to at least one receiving device (e.g., set-top box, television, etc.) via at least one data distribution means (e.g., satellite, cable, fiber-optics, telephone line, etc.). Data is provided to the receiving device via a first transmission path, where it is processed and provided to a display via a second transmission path, which may include, for example, a coaxial cable, an HDMI cable, RCA cables, an Ethernet cable or other wireless means (e.g., WiFi, Bluetooth, etc.).

In a preferred embodiment of the present invention, the receiving device is configured to function as a DVR. In other words, the receiving device is configured to perform both standard receiver functions and standard DVR functions. In this embodiment, the receiving device is also configured to add auxiliary data to data that is being time-shifted, or data that has been recorded and is being played back. In other words, at the time the time-shifted data is being played, the receiver may be configured to acquire auxiliary data, and insert the auxiliary data into the time-shifted data, so that both the time-shifted data and the auxiliary data are displayed to the user on the display. By acquiring auxiliary data at (or around) the time the time-shifted data is being played, it is more likely that the auxiliary data has value to the user, thereby increasing the value of the time-shifted data to the content owner, the content provider and advertisers.

In one embodiment of the present invention, the time-shifted data may be displayed in a main portion of the display, and the auxiliary data may be displayed in a secondary (or auxiliary) portion of the display. For example, in the case of a sitcom, the sitcom may be shown in the main portion, and auxiliary information, such as information on upcoming programs, late-breaking news, the content owner, the content provider or an advertiser, may be shown in the secondary portion.

In another embodiment of the present invention, the time-shifted data is broken down into a plurality of segments, and auxiliary data is added between the individual segments. For example, time-shifted data, which may be a sitcom, may be broken down into three segments. The receiving device may be configured to store the segments separately, and play the first segment in response to a corresponding command. The receiving device may further be configured to receive auxiliary data when the first segment is played (or is substantially over) and to play the auxiliary data when the first segment is

over. The receiving device would then play the second segment, followed by a second set of auxiliary data, followed by the third segment, etc.

In another embodiment of the present invention, a system for adding auxiliary data to time-shifted data includes a controller in communication with a remote control, a processor and at least one tuner, wherein the tuner is configured to receive data on at least one channel from an antenna, and to access data on a particular channel, as selected by either the controller or the processor. Data received by the tuner is then provided to a decoder, where the data is processed and provided to the processor. The processed data can then either be displayed on the display or stored in memory, so that it can be displayed at a future time.

In another embodiment of the present invention, a method for adding auxiliary data to time-shifted data includes the recording of program data. When the program data is played, auxiliary data is retrieved. This can be, for example, in response to a request to play the program data, in response to accessing program data from memory, in response to playing program data. etc. Both auxiliary data and program data are then played at the same time on the display (e.g., as PIP, POP, etc.). In an alternate embodiment, the program data is split into a plurality of segments, and auxiliary data is played between segments. The playing of both program data and auxiliary data (either consecutively or concurrently) continues until the program data is over.

A more complete understanding of the system and method for inserting auxiliary data into time-shifted data will be afforded to those skilled in the art, as well as a realization of additional advantages and objects thereof, by a consideration of the following detailed description of the preferred embodiment. Reference will be made to the appended sheets of drawings which will first be described briefly.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a data transmission system in accordance with a preferred embodiment of the present invention;

FIG. **2** illustrates a receiving device and a display in accordance with one embodiment of the present invention, wherein the receiving device is configured to display both auxiliary data and time-shifted data on the display;

FIGS. **3** and **4** illustrate exemplary methods of displaying time-shifted and auxiliary data on the display;

FIG. **5** illustrates time-shifted data that is divided into a plurality of segments, wherein auxiliary data is played between individual segments';

FIG. **6** illustrates time-shifted data that includes a plurality of commercial breaks, wherein auxiliary data is played during the commercial breaks;

FIG. **7** illustrates a system for inserting auxiliary data into time-shifted data in accordance with one embodiment of the present invention; and

FIG. **8** illustrates a method for inserting auxiliary data into time-shifted data in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides a system and method for adding auxiliary data (e.g., advertisements, news tickers, "crawlers," etc.) to data that is being time-shifted. As shown in FIG. **1**, preferred embodiments of the present invention operate in accordance with a data transmission system, wherein data (e.g., movies and television programs, including sitcoms, sporting events, news programs, etc.) is being transmitted from at least one data source **110***a*, **110***b* (e.g., content owner, content provider, etc.) to at least one receiving device **120***a*, **120***b* and **120***c* (e.g., set-top box, television, etc.) via at least one data distribution means **100** (e.g., satellite, cable, fiber-optics, telephone line, etc.). Thus, for example, the transmission of data from DIRECTV™ or DISH™ to a satellite receiver via at least one satellite is within the spirit and scope of the present invention. By way of another example, the transmission of data from Time Warner™ or Charter™ to a cable box via a cable, fiber-optic or wide area network is also within the spirit and scope of the present invention.

As shown in FIG. **2**, data is provided to the receiving device **120** via a first transmission path **222**, where it is processed and provided to a display **220** via a second transmission path **220**, which may include, for example, a coaxial cable, an HDMI cable, RCA cables, an Ethernet cable or other wireless means (e.g., WiFi, Bluetooth, etc.). It should be appreciated that the receiving device **120** is not limited to any particular type of receiving device, and includes all reception devices generally known to those skilled in the art (e.g., set-top boxes, satellite receivers, analog or digital cable boxes, etc.). It should also be appreciated that the first transmission path **222** is not limited to any particular type of transmission path, and includes all communication paths generally known to those skilled in the art (e.g., satellites, cables, fiber-optics, telephone lines, wide area networks, local area networks, wireless communication paths, etc.). It should further be appreciated that the display **220** is not limited to any particular type of display, and includes all display devices generally known to those skilled in the art (e.g., CRTs, LCDs, plasmas, projection devices, etc.). It should further be appreciated that the present invention is not limited a receiving device that is separate from a display. Thus, for example, a display that includes a receiving device is within the spirit and scope of the present invention.

In a preferred embodiment of the present invention, the receiving device **120** is configured to function as a DVR. In other words, the receiving device **120** is configured to perform both standard receiver functions (e.g., receiving data on a plurality of channels, processing data on a channel selected by a user (e.g., via a remote control), and providing the processed data to a display) and standard DVR functions (e.g., allowing a user to record, pause, rewind, fast forward and play processed data). It should be appreciated, however, that the present invention is not limited to a receiving device that incorporates a DVR, and that a receiving device that is in communication with an external (or remote) DVR (or other time-shifting device) is within the spirit and scope of the present invention.

The receiving device **120** may also be configured to add auxiliary data (e.g., advertisements, new tickers, "crawlers," etc.) to data that is being time-shifted, or data that has been recorded and is being played back (hereafter referred to as "time-shifted data"). In other words, at the time the time-shifted data is being played (e.g., in response to a request to play the time-shifted data, in response to the time-shifted data being played, in response to the time-shifted data being accessed from memory, etc.), the receiver is configured to acquire auxiliary data, and (at that time or a time thereafter) insert the auxiliary data into the time-shifted data, so that both the time-shifted data (or a portion thereof) and the auxiliary data (or a portion thereof) are displayed to the user on the display **220**. By acquiring auxiliary data at (or around) the time the time-shifted data is being played, it is more likely that the auxiliary data has value to the user, thereby increasing the value of the time-shifted data to the content owner, the content provider and advertisers.

It should be appreciated that the term "time-shifted data," as used herein is not limited to data that is recorded and watched hours or days later. For example, most DVRs include a buffer, which buffers data that is being viewed in real-time. The buffer is used so that live data can be paused for a predetermined period of time (determined by the size of the buffer). However, pausing a program and then pressing "play," results in a program that is time-shifted, if only by a couple of seconds. Thus, depending on how the receiving device is programmed, it can treat all time-shifted data as "time-shifted data," or it can treat data that is shifted by a predetermined period of time (e.g., an hour, a day, a week, etc.) as "time-shifted data." It should also be appreciated that while "auxiliary data" is preferably current video data (e.g., "crawlers," news tickers, etc.) the present invention is not so limited. Thus, for example, inserting an auxiliary still image over time-shifted data (e.g., an advertiser's or content provider's logo (solid or semi-transparent), etc.), or playing auxiliary audio along with (or instead of) audio included in the time-shifted data is within the spirit and scope of the present invention.

It should further be appreciated that in different embodiments of the present invention, auxiliary data is displayed during either (a) the entire time the time-shifted data is displayed, or (b) a portion of the time the time-shifted data is displayed. For example, auxiliary data may be displayed shortly after the time-shifted data is displayed (e.g., giving the receiving device time to receive, process and/or store the auxiliary data). By way of another example, auxiliary data (e.g., a first set of auxiliary data) may be displayed while a first portion of the time-shifted data is displayed. Furthermore, a second set of auxiliary data may be displayed while a second portion of the time-shifted data is displayed, a third set of auxiliary data may be displayed while a third portion of the time-shifted data is displayed, etc. Alternatively, the first set of auxiliary data may be repeated (e.g., displayed while a third portion of the time-shifted data is displayed, etc.). It should further be appreciated that the auxiliary data can either be received in real-time (i.e., at or immediately before it is displayed), or received and stored, allowing it to be displayed at a later time (e.g., a minute later, a hour later, a day later, etc.).

FIG. **3** illustrates one way in which time-shifted data (or a portion thereof) and auxiliary data (or a portion thereof) can be displayed on the display **220**. Specifically, the time-shifted data (e.g., a sporting event, a news program, a sitcom, a movie, etc.) may be displayed in a main portion **322** of the display **220**, and the auxiliary data (e.g., an advertisement, a new ticker, a "crawler," etc.) may be displayed in an auxiliary portion **324** of the display. For example, in the case of a sitcom, the sitcom may be shown in the main portion **322**, and auxiliary information, such as information on upcoming programs, late-breaking news, the content owner, the content provider or an advertiser, may be shown in the secondary portion **324**. By way of another example, in the case of a sporting event, the sporting event may be shown in the main portion **322**, and auxiliary information, such as information on other sporting events (e.g., scores, game updates, etc.) and an advertiser (or sponsor) of this information, may be shown in the secondary portion **324**.

FIG. **4** illustrates another way in which time-shifted data (or a portion thereof) and auxiliary data (or a portion thereof) can be displayed on the display **220**. Specifically, the time-shifted data may be displayed in a main portion **422** of the display **220**, and auxiliary data may be displayed in an auxiliary portion **424** of the display **220**. It should be appreciated that the present invention is not limited to displaying time-shifted data and auxiliary data as shown in FIGS. **3** and **4**. Thus, for example, a method that displays auxiliary data on multiple portions of a display (regardless of each portion's size, location, etc.) is within the spirit and scope of the present invention. Further, as discussed below, a method that displays auxiliary data on the entire display is also within the spirit and scope of the present invention.

It should be appreciated that auxiliary data can be displayed inside the time-shifted data (e.g., similar to picture-in-picture, or PIP) or outside the time-shifted data (e.g., similar to picture-out-of-picture, or POP). In the case of the prior, the time-shifted data may be sized to fill the entire display, and the auxiliary data may be sized to fill only a portion of the display and either (a) blocks out time-shifted data in the auxiliary portion (e.g., similar to PIP, where you can only see the auxiliary data, and you cannot see the underlying time-shifted data), or (b) is semi-transparent, and does not block out all time-shifted data in the auxiliary portion (e.g., allows some of the underlying time-shifted data to be seen). In the case of the latter, the time-shifted data may be sized to fill a first portion of the display, and the auxiliary data may be sized to fill a second portion of the display. In one embodiment of the present invention, the time-shifted data and the auxiliary data can be combined to fill the entire display. For example, the time-shifted data may be sized for a 16:7 display, and the auxiliary data may be sized for a 16:2 display, thereby allowing the combined data to be sized for a 16:9 display. It should be appreciated, however, that it may be more convenient for time-shifted data to be sized for a 16:9 display, so that it can be easily displayed for those who are not time-shifting. For those who are time-shifting, auxiliary data can be added as a PIP, or the time-shifted data can be reformatted so that the auxiliary data can be added as a POP.

In another embodiment of the present invention, the time-shifted data is broken down into a plurality of segments, and auxiliary data is added between the individual segments. For example, as shown in FIG. **5**, time-shifted data **500**, which may be a sitcom, is broken down into three segments **510**. **520** and **530**. The receiving device may be configured to store the segments separately, and play the first segment in response to a user (e.g., via a remote control) transmitting a command to play the time-shifted data. The receiving device may also be configured to receive auxiliary data when the first segment is played (e.g., in response to receiving the command to play the time-shifted data, in response to the first segment being played, in response to the first segment being over (or substantially over), in response to the first segment being accessed from memory, etc.), and to play the auxiliary data (e.g., a commercial, etc.) when the first segment is over. The receiving device would then play the second segment, followed by a second set of auxiliary data, followed by the third segment, etc.

By receiving the auxiliary data when (or shortly after) the time-shifted data has been played, advertisements that are played between segments can be tailored to the date and/or time the time-shifted data is played. As discussed further below, the advertisements can also be tailored to the user (e.g., using data kept by the content provider, data gathered by the receiving device, etc.). It should be appreciated that while it may be advantageous to receive auxiliary data as soon as time-shifted data is played (e.g., so that the data can be buffered and ready to be played), such a feature is not a limitation of the present invention. Thus, for example, receiving auxiliary data before the time-shifted data is played, or after portions of the time-shifted data are played, is within the spirit and scope of the present invention. By way of example only,

the receiving device may be configured to receive auxiliary data in real-time, or when it is to be played (e.g., when the first segment is over, etc.).

In another embodiment of the present invention, the time-shifted data includes data on when commercials should be played. For example, as shown in FIG. **6**, time-shifted data **600** may be stored as a single program that includes three segments **610**, **620** and **630** and two commercial breaks **640**, **650**. In this embodiment, the time-shifted data comprises a plurality of data packets that includes (in part) information on the two commercial breaks **640**, **650**. This information may include, for example, when the commercial break begins, when the commercial break ends, the duration of the commercial break, etc. By doing this, the program can be aired (or broadcasted) with commercials, so that it can be watched (in its original form) by those who do not time-shift, and different commercial can be added to the program if the program is time-shifted. It should be appreciated that if the receiving device knows when commercials are to be played, or can differentiate between program data (or segments) and auxiliary data (or commercial breaks), then the receiving device could be configured to disable at least the fast forwarding feature of the DVR while commercials are being played. This would allow a user to time-shift data without being able to skip commercials. It should be appreciated that this embodiment of the present invention is not limited to time-shifted data that includes commercial breaks. For example, time-shifted data that includes at least one other break (e.g., an end (or remainder) of program data, updated information on program data, a sequel to program data, etc.).

FIG. **7** illustrates a system for adding auxiliary data to time-shifted data in accordance with one embodiment of the present invention. Specifically, the system **70** includes a controller **710** in communication with a remote control **770** (e.g., as operated by a user of the system), a processor **740** and a plurality of tuners **722**, **724**, wherein the tuners **722**, **744** are configured to receive data on a plurality of channels from antenna **780**, and to access data on a particular channel (or a particular frequency), as selected by either the controller **710** or the processor **740**. For example, a user (via the remote control **770** and the controller **710**) may select a particular channel to watch or record. By way of another example, the processor **740** may select a particular channel if it needs to acquire auxiliary data or program data that needs to be recorded (discussed in greater detail below).

Data received by the tuners **722**, **724** is then provided to the decoders **732**, **734**, respectively, where the data is processed (e.g., amplified, decoded, de-packetized. etc.) and provided to the processor **740**. The processed data can then either be displayed on the display **750** or stored in memory **760**, so that it can be displayed at a future time. It should be appreciated that the present invention is not limited to the system shown in FIG. **7**. First of all, FIG. **7** does not show every component included in a receiver/DVR. Those skilled in the art will understand that FIG. **7** shows key components, and that other (common) components are not shown for the sake of simplicity. For example, a receiver/DVR that further includes video amplifiers, audio amplifiers, analog-to-digital converters, multiplexors, additional processors (e.g., video processor, audio processor, PIP processor, etc.), fewer processors (e.g., combining the controller **710** and the processor **740**, etc.), additional/fewer tuners, and additional/fewer memory devices is within the spirit and scope of the present invention.

It should also be appreciated that the memory shown in FIG. **7** is not limited to any particular type of memory, and all memory devices general known to those skilled in the art (e.g., hard drives, disk drives, RAM, ROM, etc.) are within the spirit and scope of the present invention. Further, the memory **760** may exist as a single memory, or as multiple memories locally and/or remotely located. For example, a first memory may be located inside the processor **740**, a second memory may be external to the receiver/DVR, etc. It should further be appreciated that while FIG. **7** illustrates that data is received via antenna **780**, the present invention is no so limited. As discussed above with respect to FIG. **1**, data can be provided over any uni-directional or bi-directional data path, including, but not limited to satellites, cables, fiber-optics, telephone lines, wide area networks, local area networks and/or wireless data paths.

By way of example only, a user (via the remote control **770**) may decide to record a sitcom that starts at 8:00 on channel **247** on Monday evening. The request would be provided to the processor **740** via the controller **710**. At 8:00 on Monday evening, the processor **740** would set the tuner **722** to channel **247**. The sitcom would then be retrieved, processed and stored in memory **760**. A week later, the user (via the remote control **770**) may decide to watch the sitcom, or time-shifted data. The request would be provided to the processor **740** via the controller **710**. The processor **740** would then stream the time-shifted data to the display **750**, so that it could be watched by the user. In the response to the request (or the like, as discussed above), the processor **740** would also acquire auxiliary data. The auxiliary data could be acquired from either the memory **760** (if previously received) or from the content owner or content provider (e.g., via antenna **780** or the like (e.g., satellite, cable, etc.)).

In one embodiment of the present invention, the processor **740** uses information included in the time-shifted data and/or linked to the time-shifted data (e.g., in memory) to acquire the auxiliary data. For example, the time-shifted data (or data linked thereto) may identify the channel that carried the time-shifted data. The processor **740** could then set the tuner **722** to this channel (e.g., **247**) to receive the auxiliary data. In this embodiment, channel **247** is used to not only broadcast program data (e.g., sitcoms, sports, movies, etc.), but also to broadcast auxiliary data. However, if there is not enough bandwidth on channel **247** to broadcast both program and auxiliary data, then a different channel (e.g., channel **1247**) could be used to broadcast auxiliary data for channel **247**. The different channel could either be identified in the time-shifted data or in a look-up table, linking channel **247** to channel **1247**. The look-up table, which could also link a program ID number or a time slot to a particular channel, could be stored in RAM or ROM in processor **740**, or in memory **760**.

Because auxiliary data may require less bandwidth, different types of auxiliary data could be carried on the same channel. For example, channel **1247** could carry auxiliary data for channel **247** and channel **248**, auxiliary data for first program data and for second program data, auxiliary data for a first segment and for a second segment, etc., wherein each type of auxiliary data includes data that identify the channel, program or segment for which it pertains. For example, if the auxiliary data is provided in a plurality of packets, channel data (or data that could be used to determine channel data) (e.g., via a look-up table) could be include in at least one packet (e.g., in a packet's header, payload, etc.).

It should be appreciated that the processor **740** may be configured to set the secondary tuner **724** to the channel that includes the auxiliary data. This is done so that the primary tuner **722**, which may be in use by the user (e.g., to buffer live television, to record another program, etc.), is left unchanged. In fact, in a preferred embodiment, the system would include a dedicated tuner that is not accessible to the user and used solely (or at least primarily) to acquire auxiliary data. It

should also be appreciated that the processor may further be configured to add auxiliary data to program data, regardless of whether the program data is time-shifted. In other words, if program data is being viewed in real-time (i.e., not time-shifted), then the processor could be used to add auxiliary data (retrieved in real-time) to the program data (retrieved in real-time). Such an embodiment could be used to display, for example, a sitcom and a news ticker, both of which are broadcasted at substantially the same time. Such an embodiment could also be used to display, for example, first and second program data, both of which are broadcasted at substantially the same time, and can be displayed together to create (together with proper glasses) a 3D affect. If, however, the program data is time-shifted, then the processor could be used to add auxiliary data (retrieved in response to playing the previously recorded program data) to the program data (previously recorded).

The foregoing embodiment is well suited for a uni-directional network, such as satellite. However, in a bi-directional network, such as cable, fiber-optics, wide area network, local area network, or satellite with a return system (e.g., phone line, satellite transmitter, etc.), the auxiliary data could be requested from a content provider or a content owner. For example, the time-shifted data could include self-identifying information (e.g., ID number), which could be provided (e.g., together with date and/or time) to the content provider or content owner, requesting the auxiliary data. This would allow the auxiliary data (which could be provided in a response to the request, over a channel identified in a response to the request, over a channel identified in a look-up table, etc.) to be tailored to not only the time and/or date of playback of the time-shifted data, but to the time-shifted data itself. For example, auxiliary data for a soap opera may be different than auxiliary data for a sporting event, even if both are being played back at the same time. In such a system, additional data could also be used to tailor the auxiliary data to the user. For example, the content provider may have demographic data on the user, and the processor **740** may have information on his/her viewing habits (e.g., programs that have been recorded, programs that have been viewed, etc.). This information, together with the type of time-shifted data, and the time and/or day it is being played, could be used to tailor auxiliary data specifically for the user.

Regardless of the particular method used to acquire auxiliary data (e.g., acquiring it from the same channel that carried the program data, acquiring it from a different channel, sending a request for auxiliary data, etc.), a program may be stored on the receiver (e.g., in memory in the processor **740**, in the memory **760**, etc.) to perform the functions of acquiring and displaying auxiliary data without any intervention from the user. For example, in response to the user pressing the "play" button on the remote control **770**, the processor **740** would not only function to play the time-shifted data, but also to automatically acquire auxiliary data (which may require changing the channel of the primary tuner **722**, changing the channel of the secondary tuner **724**, sending a request to the content provider, etc.) and to automatically display (at an appropriate time) the auxiliary data on the display **750**. Preferably, this should be done without any user intervention, so that the process is seamless to the user. That being said, a user may be able to program the receiver/DVR (e.g., during set-up) to enable/disable the receiving and/or displaying of auxiliary data (or a portion thereof). For example, a user who is recording a first sporting event and watching a second sporting event, either in real-time or time-shifted, may not want to receive updates (e.g., in the form of a news ticker) on the first sporting event. Thus, a user may be able to program the processor **740** to display only program data, and not auxiliary data, or filter the auxiliary data so that only certain information is displayed, or certain information is not displayed.

In one embodiment of the present invention, the processor **740** is configured to display auxiliary data only when the time-shifted data is being played, and not when the time-shifted data is in rewind or fast forward. In other words, if the user enters a command (via the remote control **770**) to rewind the time-shifted data, so that the time-shifted data is shown on the display **750** going backwards, or enters a command to fast forward the time-shifted data, so that the time-shifted data is shown on the display **750** going forwards, the auxiliary data is not displayed during these times. It is only displayed when the time-shifted data is being played, in a forward direction, and at a normal (or original) speed.

In another embodiment of the present invention, the processor **740** is further configured to display auxiliary data when the time-shifted data is in rewind. In other words, if the user enters a command to rewind the time-shifted data, so that the time-shifted data is shown on the display **750** going backwards, the processor **740** displays the auxiliary data during this time. In accordance with this embodiment, the processor **740** may be configured to buffer the time-shifted data and the auxiliary data (together) so that the rewind command can be used to play both the time-shifted data and the auxiliary data (together) in reverse. For example, if the time-shifted data is a sitcom, and the auxiliary data is a transparent logo for Pepsi™, and the user enters a command to play the sitcom, then the processor **740** may be configured to display (or play) the sitcom on the display **750** along with the Pepsi™ logo. The processor **740** may then buffer (or store) (e.g., in memory **760**) the played portions of the sitcom with the Pepsi™ logo, allowing the processor **740** to play (from the buffer) the sitcom in reverse together with the Pepsi™ logo if the user enters a rewind command. This would also allow the processor **740** to pause the data (together), and then play the data (together). Preferably, the buffered data should be stored separate from the time-shifted data, so that the time-shifted data (or a portion thereof) can be played at a later time with different auxiliary data.

In another embodiment of the present invention, the processor **740** is further configured to display auxiliary data when the time-shifted data is in fast forward. In other words, if the user enters a command to fast forward the time-shifted data, so that the time-shifted data is shown on the display **750** going forward, the processor **740** displays the auxiliary data during this time. It should be appreciated that in order to do this, the auxiliary data needs to be received, or stored, prior to (or immediately after) the time-shifted data is played. For example, in the prior instance of a sitcom and a Pepsi™ logo, because the logo does not change during playback, the processor **740** can add the logo to the time-shifted data regardless of whether the data is being played in reverse, or fast forward. By way of another example, if the auxiliary data is received before the time-shifted data is played, then the processor **740**, in response to a fast forward command, could display the time-shifted data going forward together with the auxiliary data going forward. In other words, both sets of data could be displayed (together) while they are being fast forwarded. In this example, the processor **740** could be configured to receive and store auxiliary data for the time-shifted data stored in the memory **760** (e.g., once a week, once a day, once an hour, etc.) in anticipation that the time-shifted data may be played. By way of another example, the processor could be configured to download auxiliary data (e.g., as a chunk of data) at the time the time-shifted data is being played. The

downloaded data can then be processed (e.g., unzipped, decompressed, etc.) and played together with the time-shifted data (or a portion thereof).

It should be appreciated that in one embodiment of the present invention, the memory **760**, or a portion thereof, may be remotely located from the processor **740** (e.g., at the content provider, etc.). In such a system, program data could be stored remotely from the processor **740**, and requested by the user (e.g., like an on-demand video system). As with other embodiments of the present invention, the program data (as stored) could be accessed by the processor **740** and played on the display **750**. During play, the processor **740** could also be configured to access auxiliary data, and display the auxiliary data together with the program data on the display **750**.

FIG. **8** illustrates a method of adding auxiliary data to time-shifted data. Specifically, the method, which starts at step **810**, involves recording program data at step **820**. When the program data is played at step **830**, auxiliary data is retrieved at step **840**. This can be, for example, in response to a request to play the program data, in response to accessing program data from memory, in response to playing program data, in response to the program data being substantially over, etc. At step **850**, both auxiliary data and program data are played at the same time on the display (e.g., as PIP, POP, etc.). In an alternate embodiment, the program data is split into a plurality of segments, and auxiliary data is played between segments. The playing of both program data and auxiliary data (either consecutively or concurrently) continues until the program data is over, ending the method at step **860**.

Having thus described multiple embodiments of a system and method for inserting auxiliary data into time-shifted data, it should be apparent to those skilled in the art that certain advantages of the system have been achieved. It should also be appreciated that various modifications, adaptations, and alternative embodiments thereof may be made within the scope and spirit of the present invention. For example, in certain embodiments of the invention, it is described that a processor is used to display both auxiliary and time-shifted data. It should be appreciated that the processor may also (or instead) initiate the display of auxiliary and/or time-shifted data by controlling (or providing data to) another device (e.g., a multiplexor, a mixer, an adder, a multiplier, another processor (e.g., PIP processor, video processor, etc.), video memory, etc.). The invention is further defined by the following claims.

What is claimed is:

**1**. A digital video recorder ("DVR") for time shifting at least a portion of a transmitted video program, comprising:

a tuner for receiving said video program as transmitted, said video program including at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

a memory device for storing said video program, allowing at least a portion of said video program to be played back at a later time;

a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, and a second command initiates playback of said video program from said memory device; and

at least one processor configured to (i) provide said video program in its entirety to a display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time, (ii) provide said video program in its entirety to said display device in response to receiving said second command if said second command is received during a second period of time and said DVR is in said first playback state, and (iii) provide only a portion of said video program to said display device in response to receiving said second command if said second command is received during said second period of time and said DVR is in said second playback state, said portion of said video program including at least said first and third portions of said video program, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

**2**. The DVR of claim **1**, wherein said controller is configured to receive said commands from a remote control operated by said user of said DVR.

**3**. The DVR of claim **1**, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes said primary video content and only a portion of said secondary video content.

**4**. The DVR of claim **1**, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes only said primary video content.

**5**. The DVR of claim **4**, wherein said memory device is further configured to store at least one time when said secondary video content begins and at least one time when said secondary video content ends.

**6**. The DVR of claim **1**, wherein said first period of time is a period of time that is less than one week from said transmission of said video program, and said second period of time is any time after said first period of time.

**7**. The DVR of claim **4**, wherein said secondary video content comprises at least one advertisement.

**8**. The DVR of claim **1**, wherein said at least one processor is further configured to (i) retrieve said portion of said video program from said memory device if said second command is received during said second period of time and said DVR is in said second playback state, and (ii) retrieve said video program in its entirety from said memory device if another second command is received at a time thereafter and said DVR is switched to said first playback state at or before said time thereafter.

**9**. A method for time shifting at least a portion of a video program transmitted to a digital video recorder ("DVR"), comprising:

receiving said video program, said video program including at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

storing said video program on a memory device in said DVR;

receiving a first command from at least one user of said DVR, said first command indicating a playback state of said DVR;

receiving a second command from said at least one user of said DVR, said second command indicating a desire to playback at least a portion of said video program; and

providing said at least a portion of said video program to a display device in response to receiving said second command;

wherein said step of providing said at least a portion of said video program to said display device further comprises (i) providing said video program to said display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time, (ii) providing said video program to said display device in response to receiving said second command if said second command is received during a second period of time and said DVR is in said first playback state, and (iii) providing only a portion of said video program to said display device in response to receiving said second command if said second command is received during said second period of time and said DVR is in said second playback state, said portion of said video program including at least said first and second portions of said video program, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

**10**. The method of claim **9**, wherein said step of receiving said video program further comprises receiving said video program from a satellite via an antenna.

**11**. The method of claim **9**, wherein said step of storing said video program on said memory device in said DVR further comprises storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends, wherein said portion of said video program provided during said second time and when said DVR is in said second playback state does not include at least said second portion.

**12**. The method of claim **9**, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes said primary video content and only a portion of said secondary video content.

**13**. The method of claim **9**, wherein said video program includes at least primary and secondary video content, and said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state includes only said primary video content.

**14**. The method of claim **9**, wherein said first period of time is a first day after said video program has been transmitted, and said second period of time is a time period thereafter.

**15**. The method of claim **9**, wherein said first period of time is a period of time that is less than one week from said transmission of said video program, and said second period of time is a time period after said first period of time.

**16**. The method of claim **13**, wherein said secondary video content is at least one advertisement.

**17**. The method of claim **11**, wherein said step of receiving said video program further comprises receiving said video program, said at least one time of when said second portion of said video program begins, and said at least one time of when said second portion of said video program ends from a satellite, wherein each one of said at least one times is received by said DVR after said video program is stored on said memory device.

**18**. A digital video recorder ("DVR") for time shifting at least a first portion of a video program, said first portion of said video program consists of first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion, comprising:

a tuner for receiving said video program;

a memory device for storing said video program;

a controller for receiving commands including at least a first command for setting a playback state of said DVR and a second command for initiating a playback of said video program from said memory device; and

at least one processor for (i) providing said first portion of said video program in its entirety to a display device in response to receiving said second command during a first period of time, (ii) providing said first portion of said video program in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in a first playback state, and (iii) providing only said first and third portions of said video program to said display device in response to receiving said second command during said second period of time if said DVR is in a second playback state, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state.

**19**. The method of claim **18**, wherein said first and third portions of said video program include primary content and said second portion includes secondary content.

* * * * *

US009538122B2

(12) **United States Patent**
**Fitzsimmons**

(10) **Patent No.: US 9,538,122 B2**
(45) **Date of Patent: *Jan. 3, 2017**

(54) **SYSTEM AND METHOD FOR TIME SHIFTING AT LEAST A PORTION OF A PROGRAM**


(71) Applicant: **Todd Fitzsimmons**, Gardena, CA (US)

(72) Inventor: **Todd Fitzsimmons**, Gardena, CA (US)


( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 28 days.

This patent is subject to a terminal disclaimer.


(21) Appl. No.: **14/543,753**

(22) Filed: **Nov. 17, 2014**

(65) **Prior Publication Data**

US 2015/0071602 A1 Mar. 12, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/279,943, filed on Oct. 24, 2011, now Pat. No. 8,929,710.

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 5/77* | (2006.01) |
| *H04N 5/775* | (2006.01) |
| *H04N 5/783* | (2006.01) |
| *H04N 21/4147* | (2011.01) |
| *G11B 27/10* | (2006.01) |
| *H04N 21/426* | (2011.01) |
| *H04N 21/431* | (2011.01) |
| *H04N 21/432* | (2011.01) |
| *H04N 21/443* | (2011.01) |
| *H04N 21/462* | (2011.01) |
| *H04N 21/81* | (2011.01) |
| *H04N 21/845* | (2011.01) |

(52) **U.S. Cl.**

CPC ............. ***H04N 5/775*** (2013.01); ***G11B 27/105*** (2013.01); ***H04N 5/783*** (2013.01); ***H04N 21/4147*** (2013.01); ***H04N 21/4263*** (2013.01); ***H04N 21/4316*** (2013.01); ***H04N 21/4325*** (2013.01); ***H04N 21/4438*** (2013.01); ***H04N 21/4622*** (2013.01); ***H04N 21/812*** (2013.01); ***H04N 21/8126*** (2013.01); ***H04N 21/8456*** (2013.01)

(58) **Field of Classification Search**

CPC ........ H04N 5/775; H04N 5/85; H04N 9/8042; G11B 27/34; G11B 27/105

USPC ........................................................ 386/230

See application file for complete search history.


(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,750,213 | A | 6/1988 | Novak |
| 5,175,631 | A | 12/1992 | Juri et al. |


(Continued)

*Primary Examiner* — William C Vaughn, Jr.
*Assistant Examiner* — Daniel Tekle
(74) *Attorney, Agent, or Firm* — Fitzsimmons IP Law

(57) **ABSTRACT**


A system and method is provided for time shifting a video program. In one embodiment of the present invention, a receiver, which may be configured to function as both a receiver and a DVR, is configured to receive a video program having both primary and secondary portions. The receiving device is further configured to play both portions of the video program if the program is being watched (a) during a first period of time or (b) during a second period of time and a user desires to watch both portions, and to play only the primary portions if the program is being watched during the second period of time and the user desires to watch only the primary portions. By doing this, the user can avoid the secondary portions when those portions have a diminished value to the user, the content owner, the content provider and/or advertisers.


**20 Claims, 4 Drawing Sheets**



**Related U.S. Application Data**

(60) Provisional application No. 61/408,759, filed on Nov. 1, 2010.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 5,333,091 | A | 7/1994 | Iggulden et al. |
| 5,724,472 | A | 3/1998 | Abecassis |
| 6,181,364 | B1 | 1/2001 | Ford |
| 6,317,795 | B1 | 11/2001 | Malkin et al. |
| 6,360,053 | B1 | 3/2002 | Wood et al. |
| 6,408,128 | B1 | 6/2002 | Abecassis |
| 6,756,997 | B1 | 6/2004 | Ward et al. |
| 6,889,383 | B1 | 5/2005 | Jarman |
| 6,898,799 | B1 | 5/2005 | Jarman |
| 6,971,119 | B1 | 11/2005 | Arsenault et al. |
| 7,376,159 | B1 | 5/2008 | Stanger et al. |
| 7,509,020 | B2 | 3/2009 | Wood et al. |
| 7,552,458 | B1 | 6/2009 | Fenseth et al. |
| 7,634,785 | B2 * | 12/2009 | Smith .................. G11B 27/036 725/102 |
| 7,801,303 | B2 | 9/2010 | Dulac |
| 7,848,364 | B2 | 12/2010 | Stranger et al. |
| 7,877,290 | B1 | 1/2011 | Arsenault et al. |
| 7,882,518 | B2 | 2/2011 | Finseth et al. |
| 7,934,228 | B2 | 4/2011 | Miner |
| 7,992,175 | B2 | 8/2011 | Kahn et al. |
| 8,051,442 | B2 | 11/2011 | Ergen et al. |
| 8,117,282 | B2 | 2/2012 | Jarman et al. |
| 8,136,140 | B2 | 3/2012 | Hodge |
| 8,155,498 | B2 | 4/2012 | Dow et al. |
| 8,209,713 | B1 | 6/2012 | Lai et al. |
| 8,239,913 | B2 | 8/2012 | Munsell et al. |
| 8,245,253 | B2 | 8/2012 | Gratton et al. |
| 8,312,490 | B2 | 11/2012 | Yap et al. |
| 8,428,438 | B2 | 4/2013 | Wolfe et al. |
| 8,571,933 | B2 | 10/2013 | Rosenberg |
| 8,571,934 | B2 | 10/2013 | Rosenberg et al. |
| 8,572,639 | B2 | 10/2013 | Ficco |
| 8,606,085 | B2 | 12/2013 | Gratton |
| 8,677,408 | B2 | 3/2014 | Green et al. |
| 8,752,084 | B1 | 6/2014 | Lai et al. |
| 8,752,115 | B2 | 6/2014 | Dow et al. |
| 8,775,256 | B2 | 7/2014 | Rosenberg et al. |
| 8,776,151 | B2 | 7/2014 | Major et al. |
| 8,779,941 | B2 | 7/2014 | Amir |
| 8,782,691 | B1 | 7/2014 | Noble et al. |
| 8,819,723 | B1 | 8/2014 | Weir |
| 8,819,743 | B2 | 8/2014 | Kirchner |
| 8,938,751 | B2 | 1/2015 | Jacobs |
| 9,027,060 | B1 | 5/2015 | Yap et al. |
| 9,066,131 | B1 | 6/2015 | Arsenault |
| 9,154,721 | B2 | 10/2015 | Gratton |
| 2002/0002562 | A1 | 1/2002 | Moran et al. |
| 2009/0238536 | A1 * | 9/2009 | Gratton ................ G11B 27/034 386/285 |
| 2011/0221964 | A1 * | 9/2011 | Harris ................. G06F 3/04817 348/569 |


* cited by examiner




Figure 1




Figure 2




Figure 3




Figure 4




Figure 5




Figure 6




Figure 7



DISH, Exh. 1001, Page 5 of 14


Start
810
Record Program
820
Play Program
830
Retrieve Auxiliary Data In Response To Playing Program
840
Insert Auxiliary Data Into Program During Play
850
Stop
860

Figure 8

# SYSTEM AND METHOD FOR TIME SHIFTING AT LEAST A PORTION OF A PROGRAM

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of Ser. No. 13/279,943, which was filed on Oct. 24, 2011, which claims the benefit pursuant to 35 U.S.C. §119(e) of U.S. Provisional Patent Application No. 61/408,759 filed Nov. 1, 2010, which applications are specifically incorporated herein, in their entirety, by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the storage and play back of time-shifted data, and more particularly to a system and method for adding auxiliary data to data that has been time-shifted.

2. Description of Related Art

Digital video recorders ("DVRs"), like TIVO™, are commonly used to record data (e.g., video, audio, etc.), allowing it to be played back at a later time. This concept is referred to as time-shifting, in that it allows the recorded data (in its original form) to be played back at a later time. For example, a television program that airs at 2:05 in the morning can be recorded and played back at a more convenient time (e.g., the following day at 1:00 in the afternoon).

The concept of time-shifting is advantageous to the user in that it allows the user to watch a television program at a more convenient time. Such a concept is also advantageous to an owner and a distributor of the program (i.e., content owner and content provider, respectively) in that it increases (or has the potential to increase) viewership, or the number of viewers of the program. In other words, by allowing a person to watch a television program at a time that is convenient to them, it increases the likelihood that the person will watch the program, especially if the program is being broadcasted at an inconvenient time (e.g., while other popular programs are being broadcasted, while the person is working, while the person is sleeping, etc.).

DVRs are also popular in that they allow a user to pause, rewind or fast forward a television program. Thus, the user can re-watch the program (or a portion thereof), or skip a portion of the program. This creates a problem for the content owner and/or the content provider in that it allows the user to skip commercials, or paid advertisements, which can decrease the value of the program to the content owner, the content provider and advertisers.

It also creates another problem in that the information that's included in the program may be outdated. For example, a program may include an advertisement for a movie that is currently being shown at a local theater. If, however, the user does not watch the program for several weeks, that movie may no longer be playing at the local theater. By way of another example, the program may include information at the bottom of the screen (e.g., news ticker or "crawler"), identifying upcoming programs, late-breaking news, scores of daily sporting events, etc. Obviously, if the user does not watch the program for several weeks, this information is outdated, and of little value.

This problem originates from the fact that this type of information (e.g., advertisements, news tickers, "crawlers," etc.) is selected based on when the program is being broadcasted, and not on when the program is being viewed. For example, if a program is being broadcasted on a Monday afternoon, then it may include commercials directed toward mothers, or individuals who are home on Monday afternoon. Similarly, if a program is being broadcasted on a sports channel on Sunday night, then it may include a news ticker on scores for sporting events that took place earlier that day.

With more and more data being time-shifted, it would be advantageous to develop a system and method of adding data (e.g., auxiliary data) to time-shifted data at the time the data is being played. By doing this, data can be added that is current, and therefore more likely to be of value to the user, which can increase the value of the program to the content owner, the content provider and advertisers.



## SUMMARY OF THE INVENTION

The present invention provides a system and method for adding auxiliary data (e.g., advertisements, news tickers, "crawlers," etc.) to data that has been time-shifted. Preferred embodiments of the present invention operate in accordance with a data transmission system, wherein data (e.g., movies and television programs, including sitcoms, sporting events, news programs, etc.) is being transmitted from at least one data source (e.g., content owner, content provider, etc.) to at least one receiving device (e.g., set-top box, television, etc.) via at least one data distribution means (e.g., satellite, cable, fiber-optics, telephone line, etc.). Data is provided to the receiving device via a first transmission path, where it is processed and provided to a display via a second transmission path, which may include, for example, a coaxial cable, an HDMI cable, RCA cables, an Ethernet cable or other wireless means (e.g., WiFi, Bluetooth, etc.).

In a preferred embodiment of the present invention, the receiving device is configured to function as a DVR. In other words, the receiving device is configured to perform both standard receiver functions and standard DVR functions. In this embodiment, the receiving device is also configured to add auxiliary data to data that is being time-shifted, or data that has been recorded and is being played back. In other words, at the time the time-shifted data is being played, the receiver may be configured to acquire auxiliary data, and insert the auxiliary data into the time-shifted data, so that both the time-shifted data and the auxiliary data are displayed to the user on the display. By acquiring auxiliary data at (or around) the time the time-shifted data is being played, it is more likely that the auxiliary data has value to the user, thereby increasing the value of the time-shifted data to the content owner, the content provider and advertisers.

In one embodiment of the present invention, the time-shifted data may be displayed in a main portion of the display, and the auxiliary data may be displayed in a secondary (or auxiliary) portion of the display. For example, in the case of a sitcom, the sitcom may be shown in the main portion, and auxiliary information, such as information on upcoming programs, late-breaking news, the content owner, the content provider or an advertiser, may be shown in the secondary portion.

In another embodiment of the present invention, the time-shifted data is broken down into a plurality of segments, and auxiliary data is added between the individual segments. For example, time-shifted data, which may be a sitcom, may be broken down into three segments. The receiving device may be configured to store the segments separately, and play the first segment in response to a corresponding command. The receiving device may further be configured to receive auxiliary data when the first segment is played (or is substantially over) and to play the

auxiliary data when the first segment is over. The receiving device would then play the second segment, followed by a second set of auxiliary data, followed by the third segment, etc.

In another embodiment of the present invention, a system for adding auxiliary data to time-shifted data includes a controller in communication with a remote control, a processor and at least one tuner, wherein the tuner is configured to receive data on at least one channel from an antenna, and to access data on a particular channel, as selected by either the controller or the processor. Data received by the tuner is then provided to a decoder, where the data is processed and provided to the processor. The processed data can then either be displayed on the display or stored in memory, so that it can be displayed at a future time.

In another embodiment of the present invention, a method for adding auxiliary data to time-shifted data includes the recording of program data. When the program data is played, auxiliary data is retrieved. This can be, for example, in response to a request to play the program data, in response to accessing program data from memory, in response to playing program data, etc. Both auxiliary data and program data are then played at the same time on the display (e.g., as PIP, POP, etc.). In an alternate embodiment, the program data is split into a plurality of segments, and auxiliary data is played between segments. The playing of both program data and auxiliary data (either consecutively or concurrently) continues until the program data is over.

A more complete understanding of the system and method for inserting auxiliary data into time-shifted data will be afforded to those skilled in the art, as well as a realization of additional advantages and objects thereof, by a consideration of the following detailed description of the preferred embodiment. Reference will be made to the appended sheets of drawings which will first be described briefly.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a data transmission system in accordance with a preferred embodiment of the present invention;

FIG. **2** illustrates a receiving device and a display in accordance with one embodiment of the present invention, wherein the receiving device is configured to display both auxiliary data and time-shifted data on the display;

FIGS. **3** and **4** illustrate exemplary methods of displaying time-shifted and auxiliary data on the display;

FIG. **5** illustrates time-shifted data that is divided into a plurality of segments, wherein auxiliary data is played between individual segments';

FIG. **6** illustrates time-shifted data that includes a plurality of commercial breaks, wherein auxiliary data is played during the commercial breaks;

FIG. **7** illustrates a system for inserting auxiliary data into time-shifted data in accordance with one embodiment of the present invention; and

FIG. **8** illustrates a method for inserting auxiliary data into time-shifted data in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides a system and method for adding auxiliary data (e.g., advertisements, news tickers, "crawlers," etc.) to data that is being time-shifted. As shown in FIG. **1**, preferred embodiments of the present invention operate in accordance with a data transmission system, wherein data (e.g., movies and television programs, including sitcoms, sporting events, news programs, etc.) is being transmitted from at least one data source **110***a*, **110***b* (e.g., content owner, content provider, etc.) to at least one receiving device **120***a*, **120***b* and **120***c* (e.g., set-top box, television, etc.) via at least one data distribution means **100** (e.g., satellite, cable, fiber-optics, telephone line, etc.). Thus, for example, the transmission of data from DIRECTV™ or DISH™ to a satellite receiver via at least one satellite is within the spirit and scope of the present invention. By way of another example, the transmission of data from Time Warner™ or Charter™ to a cable box via a cable, fiber-optic or wide area network is also within the spirit and scope of the present invention.

As shown in FIG. **2**, data is provided to the receiving device **120** via a first transmission path **222**, where it is processed and provided to a display **220** via a second transmission path **220**, which may include, for example, a coaxial cable, an HDMI cable, RCA cables, an Ethernet cable or other wireless means (e.g., WiFi, Bluetooth, etc.). It should be appreciated that the receiving device **120** is not limited to any particular type of receiving device, and includes all reception devices generally known to those skilled in the art (e.g., set-top boxes, satellite receivers, analog or digital cable boxes, etc.). It should also be appreciated that the first transmission path **222** is not limited to any particular type of transmission path, and includes all communication paths generally known to those skilled in the art (e.g., satellites, cables, fiber-optics, telephone lines, wide area networks, local area networks, wireless communication paths, etc.). It should further be appreciated that the display **220** is not limited to any particular type of display, and includes all display devices generally known to those skilled in the art (e.g., CRTs, LCDs, plasmas, projection devices, etc.). It should further be appreciated that the present invention is not limited a receiving device that is separate from a display. Thus, for example, a display that includes a receiving device is within the spirit and scope of the present invention.

In a preferred embodiment of the present invention, the receiving device **120** is configured to function as a DVR. In other words, the receiving device **120** is configured to perform both standard receiver functions (e.g., receiving data on a plurality of channels, processing data on a channel selected by a user (e.g., via a remote control), and providing the processed data to a display) and standard DVR functions (e.g., allowing a user to record, pause, rewind, fast forward and play processed data). It should be appreciated, however, that the present invention is not limited to a receiving device that incorporates a DVR, and that a receiving device that is in communication with an external (or remote) DVR (or other time-shifting device) is within the spirit and scope of the present invention.

The receiving device **120** may also be configured to add auxiliary data (e.g., advertisements, new tickers, "crawlers," etc.) to data that is being time-shifted, or data that has been recorded and is being played back (hereafter referred to as "time-shifted data"). In other words, at the time the time-shifted data is being played (e.g., in response to a request to play the time-shifted data, in response to the time-shifted data being played, in response to the time-shifted data being accessed from memory, etc.), the receiver is configured to acquire auxiliary data, and (at that time or a time thereafter) insert the auxiliary data into the time-shifted data, so that both the time-shifted data (or a portion thereof) and the auxiliary data (or a portion thereof) are displayed to the user on the display **220**. By acquiring auxiliary data at (or

around) the time the time-shifted data is being played, it is more likely that the auxiliary data has value to the user, thereby increasing the value of the time-shifted data to the content owner, the content provider and advertisers.

It should be appreciated that the term "time-shifted data," as used herein is not limited to data that is recorded and watched hours or days later. For example, most DVRs include a buffer, which buffers data that is being viewed in real-time. The buffer is used so that live data can be paused for a predetermined period of time (determined by the size of the buffer). However, pausing a program and then pressing "play," results in a program that is time-shifted, if only by a couple of seconds. Thus, depending on how the receiving device is programmed, it can treat all time-shifted data as "time-shifted data," or it can treat data that is shifted by a predetermined period of time (e.g., an hour, a day, a week, etc.) as "time-shifted data." It should also be appreciated that while "auxiliary data" is preferably current video data (e.g., "crawlers," news tickers, etc.) the present invention is not so limited. Thus, for example, inserting an auxiliary still image over time-shifted data (e.g., an advertiser's or content provider's logo (solid or semi-transparent), etc.), or playing auxiliary audio along with audio included in the time-shifted data is within the spirit and scope of the present invention.

It should further be appreciated that in different embodiments of the present invention, auxiliary data is displayed during either (a) the entire time the time-shifted data is displayed, or (b) a portion of the time the time-shifted data is displayed. For example, auxiliary data may be displayed shortly after the time-shifted data is displayed (e.g., giving the receiving device time to receive, process and/or store the auxiliary data). By way of another example, auxiliary data (e.g., a first set of auxiliary data) may be displayed while a first portion of the time-shifted data is displayed. Furthermore, a second set of auxiliary data may be displayed while a second portion of the time-shifted data is displayed, a third set of auxiliary data may be displayed while a third portion of the time-shifted data is displayed, etc. Alternatively, the first set of auxiliary data may be repeated (e.g., displayed while a third portion of the time-shifted data is displayed, etc.). It should further be appreciated that the auxiliary data can either be received in real-time (i.e., at or immediately before it is displayed), or received and stored, allowing it to be displayed at a later time (e.g., a minute later, a hour later, a day later, etc.).

FIG. **3** illustrates one way in which time-shifted data (or a portion thereof) and auxiliary data (or a portion thereof) can be displayed on the display **220**. Specifically, the time-shifted data (e.g., a sporting event, a news program, a sitcom, a movie, etc.) may be displayed in a main portion **322** of the display **220**, and the auxiliary data (e.g., an advertisement, a new ticker, a "crawler," etc.) may be displayed in an auxiliary portion **324** of the display. For example, in the case of a sitcom, the sitcom may be shown in the main portion **322**, and auxiliary information, such as information on upcoming programs, late-breaking news, the content owner, the content provider or an advertiser, may be shown in the secondary portion **324**. By way of another example, in the case of a sporting event, the sporting event may be shown in the main portion **322**, and auxiliary information, such as information on other sporting events (e.g., scores, game updates, etc.) and an advertiser (or sponsor) of this information, may be shown in the secondary portion **324**.

FIG. **4** illustrates another way in which time-shifted data (or a portion thereof) and auxiliary data (or a portion thereof) can be displayed on the display **220**. Specifically, the time-shifted data may be displayed in a main portion **422** of the display **220**, and auxiliary data may be displayed in an auxiliary portion **424** of the display **220**. It should be appreciated that the present invention is not limited to displaying time-shifted data and auxiliary data as shown in FIGS. **3** and **4**. Thus, for example, a method that displays auxiliary data on multiple portions of a display (regardless of each portion's size, location, etc.) is within the spirit and scope of the present invention. Further, as discussed below, a method that displays auxiliary data on the entire display is also within the spirit and scope of the present invention.

It should be appreciated that auxiliary data can be displayed inside the time-shifted data (e.g., similar to picture-in-picture, or PIP) or outside the time-shifted data (e.g., similar to picture-out-of-picture, or POP). In the case of the prior, the time-shifted data may be sized to fill the entire display, and the auxiliary data may be sized to fill only a portion of the display and either (a) blocks out time-shifted data in the auxiliary portion (e.g., similar to PIP, where you can only see the auxiliary data, and you cannot see the underlying time-shifted data), or (b) is semi-transparent, and does not block out all time-shifted data in the auxiliary portion (e.g., allows some of the underlying time-shifted data to be seen). In the case of the latter, the time-shifted data may be sized to fill a first portion of the display, and the auxiliary data may be sized to fill a second portion of the display. In one embodiment of the present invention, the time-shifted data and the auxiliary data can be combined to fill the entire display. For example, the time-shifted data may be sized for a 16:7 display, and the auxiliary data may be sized for a 16:2 display, thereby allowing the combined data to be sized for a 16:9 display. It should be appreciated, however, that it may be more convenient for time-shifted data to be sized for a 16:9 display, so that it can be easily displayed for those who are not time-shifting. For those who are time-shifting, auxiliary data can be added as a PIP, or the time-shifted data can be reformatted so that the auxiliary data can be added as a POP.

In another embodiment of the present invention, the time-shifted data is broken down into a plurality of segments, and auxiliary data is added between the individual segments. For example, as shown in FIG. **5**, time-shifted data **500**, which may be a sitcom, is broken down into three segments **510**, **520** and **530**. The receiving device may be configured to store the segments separately, and play the first segment in response to a user (e.g., via a remote control) transmitting a command to play the time-shifted data. The receiving device may also be configured to receive auxiliary data when the first segment is played (e.g., in response to receiving the command to play the time-shifted data, in response to the first segment being played, in response to the first segment being accessed from memory, etc.), and to play the auxiliary data (e.g., a commercial, etc.) when the first segment is over. The receiving device would then play the second segment, followed by a second set of auxiliary data, followed by the third segment, etc.

By receiving the auxiliary data when (or shortly after) the time-shifted data has been played, advertisements that are played between segments can be tailored to the date and/or time the time-shifted data is played. As discussed further below, the advertisements can also be tailored to the user (e.g., using data kept by the content provider, data gathered by the receiving device, etc.). It should be appreciated that while it may be advantageous to receive auxiliary data as soon as time-shifted data is played (e.g., so that the data can be buffered and ready to be played), such a feature is not a

limitation of the present invention. Thus, for example, receiving auxiliary data before the time-shifted data is played, or after portions of the time-shifted data are played, is within the spirit and scope of the present invention. By way of example only, the receiving device may be configured to receive auxiliary data in real-time, or when it is to be played (e.g., when the first segment is over, etc.).

In another embodiment of the present invention, the time-shifted data includes data on when commercials should be played. For example, as shown in FIG. **6**, time-shifted data **600** may be stored as a single program that includes three segments **610**, **620** and **630** and two commercial breaks **640**, **650**. In this embodiment, the time-shifted data comprises a plurality of data packets that includes (in part) information on the two commercial breaks **640**, **650**. This information may include, for example, when the commercial break begins, when the commercial break ends, the duration of the commercial break, etc. By doing this, the program can be aired (or broadcasted) with commercials, so that it can be watched (in its original form) by those who do not time-shift, and different commercial can be added to the program if the program is time-shifted. It should be appreciated that if the receiving device knows when commercials are to be played, or can differentiate between program data (or segments) and auxiliary data (or commercial breaks), then the receiving device could be configured to disable at least the fast forwarding feature of the DVR while commercials are being played. This would allow a user to time-shift data without being able to skip commercials. It should be appreciated that this embodiment of the present invention is not limited to time-shifted data that includes commercial breaks. For example, time-shifted data that includes at least one other break (e.g., an end (or remainder) of program data, updated information on program data, a sequel to program data, etc.).

FIG. **7** illustrates a system for adding auxiliary data to time-shifted data in accordance with one embodiment of the present invention. Specifically, the system **70** includes a controller **710** in communication with a remote control **770** (e.g., as operated by a user of the system), a processor **740** and a plurality of tuners **722**, **724**, wherein the tuners **722**, **744** are configured to receive data on a plurality of channels from antenna **780**, and to access data on a particular channel (or a particular frequency), as selected by either the controller **710** or the processor **740**. For example, a user (via the remote control **770** and the controller **710**) may select a particular channel to watch or record. By way of another example, the processor **740** may select a particular channel if it needs to acquire auxiliary data or program data that needs to be recorded (discussed in greater detail below).

Data received by the tuners **722**, **724** is then provided to the decoders **732**, **734**, respectively, where the data is processed (e.g., amplified, decoded, de-packetized, etc.) and provided to the processor **740**. The processed data can then either be displayed on the display **750** or stored in memory **760**, so that it can be displayed at a future time. It should be appreciated that the present invention is not limited to the system shown in FIG. **7**. First of all, FIG. **7** does not show every component included in a receiver/DVR. Those skilled in the art will understand that FIG. **7** shows key components, and that other (common) components are not shown for the sake of simplicity. For example, a receiver/DVR that further includes video amplifiers, audio amplifiers, analog-to-digital converters, multiplexors, additional processors (e.g., video processor, audio processor, PIP processor, etc.), fewer processors (e.g., combining the controller **710** and the processor **740**, etc.), additional/fewer tuners, and additional/fewer memory devices is within the spirit and scope of the present invention.

It should also be appreciated that the memory shown in FIG. **7** is not limited to any particular type of memory, and all memory devices general known to those skilled in the art (e.g., hard drives, disk drives, RAM, ROM, etc.) are within the spirit and scope of the present invention. Further, the memory **760** may exist as a single memory, or as multiple memories locally and/or remotely located. For example, a first memory may be located inside the processor **740**, a second memory may be external to the receiver/DVR, etc. It should further be appreciated that while FIG. **7** illustrates that data is received via antenna **780**, the present invention is no so limited. As discussed above with respect to FIG. **1**, data can be provided over any uni-directional or bi-directional data path, including, but not limited to satellites, cables, fiber-optics, telephone lines, wide area networks, local area networks and/or wireless data paths.

By way of example only, a user (via the remote control **770**) may decide to record a sitcom that starts at 8:00 on channel **247** on Monday evening. The request would be provided to the processor **740** via the controller **710**. At 8:00 on Monday evening, the processor **740** would set the tuner **722** to channel **247**. The sitcom would then be retrieved, processed and stored in memory **760**. A week later, the user (via the remote control **770**) may decide to watch the sitcom, or time-shifted data. The request would be provided to the processor **740** via the controller **710**. The processor **740** would then stream the time-shifted data to the display **750**, so that it could be watched by the user. In the response to the request, the processor **740** would also acquire auxiliary data. The auxiliary data could be acquired from either the memory **760** (if previously received) or from the content owner or content provider (e.g., via antenna **780** or the like (e.g., satellite, cable, etc.)).

In one embodiment of the present invention, the processor **740** uses information included in the time-shifted data and/or linked to the time-shifted data (e.g., in memory) to acquire the auxiliary data. For example, the time-shifted data (or data linked thereto) may identify the channel that carried the time-shifted data. The processor **740** could then set the tuner **722** to this channel (e.g., **247**) to receive the auxiliary data. In this embodiment, channel **247** is used to not only broadcast program data (e.g., sitcoms, sports, movies, etc.), but also to broadcast auxiliary data. However, if there is not enough bandwidth on channel **247** to broadcast both program and auxiliary data, then a different channel (e.g., channel **1247**) could be used to broadcast auxiliary data for channel **247**. The different channel could either be identified in the time-shifted data or in a look-up table, linking channel **247** to channel **1247**. The look-up table, which could also link a program ID number or a time slot to a particular channel, could be stored in RAM or ROM in processor **740**, or in memory **760**.

Because auxiliary data may require less bandwidth, different types of auxiliary data could be carried on the same channel. For example, channel **1247** could carry auxiliary data for channel **247** and channel **248**, auxiliary data for first program data and for second program data, auxiliary data for a first segment and for a second segment, etc., wherein each type of auxiliary data includes data that identify the channel, program or segment for which it pertains. For example, if the auxiliary data is provided in a plurality of packets, channel data (or data that could be used to determine channel data) (e.g., via a look-up table) could be include in at least one packet (e.g., in a packet's header, payload, etc.).

It should be appreciated that the processor **740** may be configured to set the secondary tuner **724** to the channel that includes the auxiliary data. This is done so that the primary tuner **722**, which may be in use by the user (e.g., to buffer live television, to record another program, etc.), is left unchanged. In fact, in a preferred embodiment, the system would include a dedicated tuner that is not accessible to the user and used solely (or at least primarily) to acquire auxiliary data. It should also be appreciated that the processor may further be configured to add auxiliary data to program data, regardless of whether the program data is time-shifted. In other words, if program data is being viewed in real-time (i.e., not time-shifted), then the processor could be used to add auxiliary data (retrieved in real-time) to the program data (retrieved in real-time). Such an embodiment could be used to display, for example, a sitcom and a news ticker, both of which are broadcasted at substantially the same time. Such an embodiment could also be used to display, for example, first and second program data, both of which are broadcasted at substantially the same time, and can be displayed together to create (together with proper glasses) a 3D affect. If, however, the program data is time-shifted, then the processor could be used to add auxiliary data (retrieved in response to playing the previously recorded program data) to the program data (previously recorded).

The foregoing embodiment is well suited for a uni-directional network, such as satellite. However, in a bi-directional network, such as cable, fiber-optics, wide area network, local area network, or satellite with a return system (e.g., phone line, satellite transmitter, etc.), the auxiliary data could be requested from a content provider or a content owner. For example, the time-shifted data could include self-identifying information (e.g., ID number), which could be provided (e.g., together with date and/or time) to the content provider or content owner, requesting the auxiliary data. This would allow the auxiliary data (which could be provided in a response to the request, over a channel identified in a response to the request, over a channel identified in a look-up table, etc.) to be tailored to not only the time and/or date of playback of the time-shifted data, but to the time-shifted data itself. For example, auxiliary data for a soap opera may be different than auxiliary data for a sporting event, even if both are being played back at the same time. In such a system, additional data could also be used to tailor the auxiliary data to the user. For example, the content provider may have demographic data on the user, and the processor **740** may have information on his/her viewing habits (e.g., programs that have been recorded, programs that have been viewed, etc.). This information, together with the type of time-shifted data, and the time and/or day it is being played, could be used to tailor auxiliary data specifically for the user.

Regardless of the particular method used to acquire auxiliary data (e.g., acquiring it from the same channel that carried the program data, acquiring it from a different channel, sending a request for auxiliary data, etc.), a program may be stored on the receiver (e.g., in memory in the processor **740**, in the memory **760**, etc.) to perform the functions of acquiring and displaying auxiliary data without any intervention from the user. For example, in response to the user pressing the "play" button on the remote control **770**, the processor **740** would not only function to play the time-shifted data, but also to automatically acquire auxiliary data (which may require changing the channel of the primary tuner **722**, changing the channel of the secondary tuner **724**, sending a request to the content provider, etc.) and to automatically display (at an appropriate time) the auxiliary data on the display **750**. Preferably, this should be done without any user intervention, so that the process is seamless to the user. That being said, a user may be able to program the receiver/DVR (e.g., during set-up) to enable/disable the receiving and/or displaying of auxiliary data (or a portion thereof). For example, a user who is recording a first sporting event and watching a second sporting event, either in real-time or time-shifted, may not want to receive updates (e.g., in the form of a news ticker) on the first sporting event. Thus, a user may be able to program the processor **740** to display only program data, and not auxiliary data, or filter the auxiliary data so that only certain information is displayed, or certain information is not displayed.

In one embodiment of the present invention, the processor **740** is configured to display auxiliary data only when the time-shifted data is being played, and not when the time-shifted data is in rewind or fast forward. In other words, if the user enters a command (via the remote control **770**) to rewind the time-shifted data, so that the time-shifted data is shown on the display **750** going backwards, or enters a command to fast forward the time-shifted data, so that the time-shifted data is shown on the display **750** going forwards, the auxiliary data is not displayed during these times. It is only displayed when the time-shifted data is being played, in a forward direction, and at a normal (or original) speed.

In another embodiment of the present invention, the processor **740** is further configured to display auxiliary data when the time-shifted data is in rewind. In other words, if the user enters a command to rewind the time-shifted data, so that the time-shifted data is shown on the display **750** going backwards, the processor **740** displays the auxiliary data during this time. In accordance with this embodiment, the processor **740** may be configured to buffer the time-shifted data and the auxiliary data (together) so that the rewind command can be used to play both the time-shifted data and the auxiliary data (together) in reverse. For example, if the time-shifted data is a sitcom, and the auxiliary data is a transparent logo for Pepsi™, and the user enters a command to play the sitcom, then the processor **740** may be configured to display (or play) the sitcom on the display **750** along with the Pepsi™ logo. The processor **740** may then buffer (or store) (e.g., in memory **760**) the played portions of the sitcom with the Pepsi™ logo, allowing the processor **740** to play (from the buffer) the sitcom in reverse together with the Pepsi™ logo if the user enters a rewind command. This would also allow the processor **740** to pause the data (together), and then play the data (together). Preferably, the buffered data should be stored separate from the time-shifted data, so that the time-shifted data (or a portion thereof) can be played at a later time with different auxiliary data.

In another embodiment of the present invention, the processor **740** is further configured to display auxiliary data when the time-shifted data is in fast forward. In other words, if the user enters a command to fast forward the time-shifted data, so that the time-shifted data is shown on the display **750** going forward, the processor **740** displays the auxiliary data during this time. It should be appreciated that in order to do this, the auxiliary data needs to be received, or stored, prior to (or immediately after) the time-shifted data is played. For example, in the prior instance of a sitcom and a Pepsi™ logo, because the logo does not change during playback, the processor **740** can add the logo to the time-shifted data regardless of whether the data is being played in reverse, or fast forward. By way of another example, if the auxiliary data is received before the time-shifted data is

played, then the processor **740**, in response to a fast forward command, could display the time-shifted data going forward together with the auxiliary data going forward. In other words, both sets of data could be displayed (together) while they are being fast forwarded. In this example, the processor **740** could be configured to receive and store auxiliary data for the time-shifted data stored in the memory **760** (e.g., once a week, once a day, once an hour, etc.) in anticipation that the time-shifted data may be played. By way of another example, the processor could be configured to download auxiliary data (e.g., as a chunk of data) at the time the time-shifted data is being played. The downloaded data can then be processed (e.g., unzipped, decompressed, etc.) and played together with the time-shifted data (or a portion thereof).

It should be appreciated that in one embodiment of the present invention, the memory **760**, or a portion thereof, may be remotely located from the processor **740** (e.g., at the content provider, etc.). In such a system, program data could be stored remotely from the processor **740**, and requested by the user (e.g., like an on-demand video system). As with other embodiments of the present invention, the program data (as stored) could be accessed by the processor **740** and played on the display **750**. During play, the processor **740** could also be configured to access auxiliary data, and display the auxiliary data together with the program data on the display **750**.

FIG. **8** illustrates a method of adding auxiliary data to time-shifted data. Specifically, the method, which starts at step **810**, involves recording program data at step **820**. When the program data is played at step **830**, auxiliary data is retrieved at step **840**. This can be, for example, in response to a request to play the program data, in response to accessing program data from memory, in response to playing program data, etc. At step **850**, both auxiliary data and program data are played at the same time on the display (e.g., as PIP, POP, etc.). In an alternate embodiment, the program data is split into a plurality of segments, and auxiliary data is played between segments. The playing of both program data and auxiliary data (either consecutively or concurrently) continues until the program data is over, ending the method at step **860**.

Having thus described multiple embodiments of a system and method for inserting auxiliary data into time-shifted data, it should be apparent to those skilled in the art that certain advantages of the system have been achieved. It should also be appreciated that various modifications, adaptations, and alternative embodiments thereof may be made within the scope and spirit of the present invention. For example, in certain embodiments of the invention, it is described that a processor is used to display both auxiliary and time-shifted data. It should be appreciated that the processor may also (or instead) initiate the display of auxiliary and/or time-shifted data by controlling (or providing data to) another device (e.g., a multiplexor, a mixer, an adder, a multiplier, another processor (e.g., PIP processor, video processor, etc.), video memory, etc.). The invention is further defined by the following claims.

What is claimed is:

**1**. A digital video recorder (DVR) for time shifting at least one video program, said video program being transmitted over a data distribution system, comprising:

a tuner for receiving a plurality of video programs, wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system, (ii) said tuner can be tuned to said single channel to receive said plurality of video programs, and (iii) at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

a memory device for storing said plurality of video programs, allowing said one of said plurality of video programs to be played back at a later time;

a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, a second command initiates playback of said one of said plurality of video programs from said memory device, and a third command instructs said DVR to receive and store said plurality of video programs; and

at least one processor configured to (i) provide said one of said plurality of video programs in its entirety to a display device in response to receiving said second command during a first period of time, (ii) provide said one of said plurality of video programs in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in said first playback state, and (iii) provide only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said one of said plurality of video programs, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.

**2**. The DVR of claim **1**, further comprising a wireless transmitter in communication with said at least one processor and said memory device, said wireless transmitter being configured to transmit said one of said plurality of video programs in its entirety or said portion of said one of said plurality of programs at least indirectly to said display device, said display device being remotely located from said DVR.

**3**. The DVR of claim **1**, further comprising at least one other tuner, wherein said at least one other tuner allows said DVR to receive at least one other video program while said tuner is being used to receive said plurality of video programs, said at least one other video program being selected by said user.

**4**. The DVR of claim **1**, wherein said one of said plurality of video programs includes at least primary and secondary video content, and said first and third portions of said one of said plurality of video programs consists of said primary video content.

**5**. The DVR of claim **4**, wherein said second portion of said one of said plurality of video programs consists of said secondary video content and said memory device is further configured to store at least one time when said second portion begins and at least one time when said second portion ends.

**6**. The DVR of claim **1**, wherein said first period of time is a period of time that begins when said one of said plurality of video programs is stored on said memory device and

available to be viewed and ends within a predetermined time thereafter, said predetermined time being less than one week.

**7**. The DVR of claim **1**, wherein said single channel is stored in said memory and said at least one processor is configured to tune said tuner to said single channel in response to said controller receiving said third command.

**8**. The DVR of claim **1**, wherein data communicated via said single channel is compressed prior to transmission and said at least one processor is configured to decompress said data after its have been received so that said one of said plurality of video programs or said portion of said one of said plurality of video programs can be displayed, depending on when said second command is received and said playback state of said DVR.

**9**. The DVR of claim **5**, wherein said secondary video content comprises at least one advertisement.

**10**. The DVR of claim **1**, wherein said at least one processor is further configured to (i) retrieve said portion of said one of said plurality of video programs from said memory if said second command is received during said second period of time and said DVR is in said second playback state, and (ii) retrieve said one of said plurality of video programs in its entirety from said memory device if another second command is received at a time thereafter and said DVR is switched to said first playback state at or before said time thereafter.

**11**. A method for time shifting at least one video program transmitted to a digital video recorder (DVR) over a data distribution system, comprising:

receiving a plurality of video programs, wherein said plurality of video programs are transmitted as the same time and are received by a single tuner in said DVR, and at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion;

receiving a third command from at least one user of said DVR, said third command indicating a desire to use said single tuner to receive said plurality of video programs and to store said plurality of video programs on at least one memory device in said DVR;

storing said plurality of video programs on said at least one memory device in said DVR in response to receiving said third command from said at least one user of said DVR;

receiving a second command from said at least one user of said DVR, said second command indicating a desire to playback at least a portion of said one of said plurality of video programs;

receiving a first command from said at least one user of said DVR, said first command indicating a playback state of said DVR; and

providing said at least a portion of said one of said plurality of video programs to a display device in response to receiving said second command from said at least one user of said DVR;

wherein said step of providing said at least a portion of said one of said plurality of video programs to said display device further comprises (i) providing said one of said plurality of video programs to said display device in response to receiving said second command during a first period of time, (ii) providing said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said first playback state, and (iii) providing only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said video program, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state;

wherein said second period of time is a period of time after said first period of time.



**12**. The method of claim **11**, wherein said step of providing said at least a portion of said one of said plurality of video programs to a display device further comprises transmitting said at least a portion of said one of said plurality of video programs to said display device via a transmission path that includes at least one wireless connection, said display device being remotely located from said DVR.

**13**. The method of claim **11**, wherein said step of storing said plurality of video programs on said at least one memory device in said DVR further comprises storing at least one time of when said second portion of said video program begins and at least one time of when said second portion of said video program ends.

**14**. The method of claim **11**, wherein said one of said plurality of video programs includes at least primary and secondary video content, said portion of said video program that is provided to said display device if said second command is received during said second period of time and said DVR is in said second playback state consists of said primary video content, and said secondary video content includes at least one advertisement.

**15**. The method of claim **11**, further comprising the steps of:

compressing said plurality of video programs prior to said plurality of video programs being transmitted over said data distribution system, and

decompressing said plurality of video programs after said plurality of video programs have been received by said DVRr and before said one of said plurality of video programs or portion thereof is provided to said display device.

**16**. The method of claim **11**, further comprising the step of tuning said single tuner to a particular channel at a particular time in response to receiving said third command, said particular channel and said particular time being stored in said at least one memory device in said DVR.

**17**. The method of claim **16**, further comprising the step of receiving a fourth command from said at least one user of said DVR, said fourth command indicating a desire to record a second video program, which is accomplished using another tuner if said second video program is being transmitted to said DVR while said plurality of video programs are being transmitted to said DVR.

**18**. A digital video recorder (DVR) for time shifting at least one of a plurality of video programs, said one of said plurality of video programs consisting of first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion, comprising:

a first tuner for receiving data on said plurality of video programs, wherein said data on one of said plurality of video programs is transmitted together with said data

on other ones of said plurality of video programs, so that said first tuner receives said data on said one of said plurality of video programs at the same time that it receives data on said other ones of said plurality of video programs;

at least one memory device for storing said data on said plurality of video programs, including at least said one of said plurality of video programs;

a controller for receiving commands including at least a first command for setting a playback state of said DVR, a second command for initiating a playback of said one of said plurality of video programs from said memory device, and a third command for initiating said reception and said storage of said data on said plurality of video programs; and

at least one processor for (i) providing said first, second and third portions of said one of said plurality of video programs respectively to a display device in response to receiving said second command during a first portion of time, (ii) providing said first, second and third portions of said one of said plurality of video programs respectively to said display device in response to receiving said second command during a second period of time if said DVR is in a first playback state, and (iii) providing said first and third portions of said one of said plurality of video programs respectively to said display device in response to receiving said second command during said second period of time if said DVR is in a second playback state, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said DVR is in said second playback state.

**19**. The system of claim **18**, wherein said third command further results in said first tuner being tuned to a particular frequency to receive said data on said plurality of video programs, said particular frequency being provided by a content provider and stored on said DVR.

**20**. The system of claim **18**, wherein said second portion comprises at least one commercial and said data on said plurality of video programs is packetized, with individual packets being linked at least indirectly to individual ones of said plurality of video programs and to individual channels associated with content owners thereof.

* * * * *