Nos. 2025-1364, 2025-1365, 2025-1430

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

DIGITAL BROADCASTING SOLUTIONS, LLC,

*Appellant*,

v.

DISH NETWORK L.L.C., DISH TECHNOLOGIES L.L.C.,

*Cross-Appellants.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2023-00976, IPR2023-00977

# PRINCIPAL AND RESPONSE BRIEF FOR CROSS-APPELLANTS DISH NETWORK L.L.C. AND DISH TECHNOLOGIES L.L.C.

July 21, 2025


Eliot D. Williams
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001
202.639.7700
eliot.williams@bakerbotts.com

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road, Bldg. 1, Ste. 200
Palo Alto, California 94304-1007
650.739.7500
hop.guy@bakerbotts.com

Kurt Pankratz
BAKER BOTTS L.L.P.
2001 Ross Avenue, Ste. 900
Dallas, TX 75201
214.953.6584
kurt.pankratz@bakerbotts.com

Thomas B. Carter Jr.
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
713.229.1108
thomas.carter@bakerbotts.com

*Attorneys for Cross-Appellants,*
*DISH Network L.L.C. and DISH*
*Technologies L.L.C.*

# PATENT CLAIM LANGUAGE AT ISSUE

## ’122 Patent Claim 1

| | |
|---|---|
| **1[Pre]** | A digital video recorder (DVR) for time shifting at least one video program, said video program being transmitted over a data distribution system, comprising: |
| **1[a][i]** | a tuner for receiving a plurality of video programs, wherein (i) said plurality of video programs are transmitted at the same time on a single channel within said data distribution system, |
| **1[a][ii]** | (ii) said tuner can be tuned to said single channel to receive said plurality of video programs, and |
| **1[a][iii]** | (iii) at least one of said plurality of video programs includes at least first, second and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion; |
| **1[b]** | a memory device for storing said plurality of video programs, allowing said one of said plurality of video programs to be played back at a later time; |
| **1[c]** | a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first playback state to a second playback state, a second command initiates playback of said one of said plurality of video programs from said memory device, and a third command instructs said DVR to receive and store said plurality of video programs; and |
| **1[d][i]** | at least one processor configured to (i) provide said one of said plurality of video programs in its entirety to a display device in response to receiving said second command during a first period of time, |
| **1[d][ii]** | (ii) provide said one of said plurality of video programs in its entirety to said display device in response to receiving said second command during a second period of time if said DVR is in said first playback state, and |
| **1[d][iii]** | (iii) provide only a portion of said one of said plurality of video programs to said display device in response to receiving said second command during said second period of time if said DVR is in said second playback state, said portion of said one of said plurality of video programs including at least said first and third portions of said one of said plurality of video programs, wherein said third portion is provided to said display device immediately following said first portion if said second command is received during said second period of time and said |

| | |
|---|---|
| | DVR is in said second playback state; |
| **1[e]** | wherein said second period of time is a period of time after said first period of time. |

### ’710 Patent Claim 1

| | |
|---|---|
| **1[Pre]** | A digital video recorder (“DVR”) for time shifting at least a portion of a transmitted video program, comprising: |
| **1[a][i]** | a tuner for receiving said video program as transmitted, said video program including at least first, second, and third portions, wherein said second portion as transmitted is configured to follow said first portion, and said third portion as transmitted is configured to follow said second portion; |
| **1[b]** | a memory device for storing said video program, allowing at least a portion of said video program to be played back at a later time; |
| **1[c]** | a controller configured to receive commands from a user of said DVR, wherein a first command changes said DVR from a first payback state to a second playback state, and a second command initiates playback of said video program from said memory device; |
| **1[d][i]** | at least one processor configured to (i) provide said video program in its entirety to a display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time, |
| **1[d][ii]** | (ii) provide said video program in its entirety to said display device in response to receiving said second command if said second command is received during a second period of time and said DVR is in said first playback state, and |
| **1[d][iii]** | (iii) provide only a portion of said video program to said display device in response to receiving said second command if said second command is received during said second period of time and said DVR is in said second playback state, said portion of said video program including at least said first and third portions of said video program, wherein said third portion of said video program is provided to said display device immediately following said first portion of said video program if said second command is received during said second period of time and said DVR is in said second playback state; |
| **1[e]** | wherein said second period of time is a period of time after said first period of time. |

## ’710 Patent Claim 17

17. The method of claim 11, wherein said step of receiving said video program further comprises receiving said video program, said at least one time of when said second portion of said video program begins, and said at least one time of when said second portion of said video program ends from a satellite, wherein each one of said at least one times is received by said DVR after said video program is stored on said memory device.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1364

**Short Case Caption** Digital Broadcasting Solutions, LLC v. DISH Network L.L.

**Filing Party/Entity** DISH Network L.L.C. and DISH Technologies L.L.C.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/28/2025

Signature: /s/ Eliot D. Williams

Name: Eliot D. Williams

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| DISH Network L.L.C. | | EchoStar Corp. |
| DISH Technologies L.L.C. | | DISH DBS Corp. |
| | | DISH Orbital Corp. |
| | | DISH Network Corp. |
| | | BlackRock Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Ali Dhanani | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................................ 1

II. JURISDICTIONAL STATEMENT ........................................................ 1

III. STATEMENT OF THE ISSUES ........................................................ 1

IV. STATEMENT OF THE CASE ........................................................ 2

A. The Challenged Patents ........................................................ 2

B. The Prior Art ........................................................ 4

1. *Casagrande* ........................................................ 4

2. *Dow* ........................................................ 7

3. *Russ* ........................................................ 8

4. Miller ........................................................ 9

C. The IPR Proceedings ........................................................ 10

V. SUMMARY OF ARGUMENT ........................................................ 11

VI. ARGUMENT ........................................................ 14

A. Standard of Review ........................................................ 14

B. ’122 Patent: The Board Correctly Determined That the Prior Art Renders Obvious the “Third Command” Limitation ........................ 15

1. DBS Forfeited Its New Argument on the “Third Command” ........................................................ 17

2. Substantial Evidence Supports the Board’s Finding That the Prior Art Teaches or Suggests the “Third Command” Even Under DBS’s New Argument ........................................ 21

C. ’710 and ’122 Patents: The Board Correctly Determined That the Prior Art Renders Obvious the “First Command” Limitation ............ 24

1. The Board Correctly Construed “First Command” .................. 25

2. Substantial Evidence Supports That *Casagrande* Discloses a “First Command” ................................................ 31

D. The Board Correctly Found That the Combination of *Casagrande* and *Russ* Renders Obvious The “At Least One Processor Configured To . . .” Limitation of the ’122 Patent ............ 33

1. The Board Correctly Found that *Casagrande* and *Russ* Render Obvious the "First Command" and "Second Command" As Relied on By Limitation 1[d][iii] of the '122 Patent ....................33

(a) DBS forfeited any argument that the "plain language" of the claimed "first command" and "second command" requires a temporal relationship ....................33

(b) Substantial evidence supports the Board's conclusion that Casagrande and Russ render Limitation 1[d][iii] obvious ....................34

2. Substantial Evidence Supports the Board's Finding that *Casagrande* and *Russ* Render Obvious the "First Command" and "Second Command" As Relied on By Limitation 1[d][iii] of the '122 Patent ....................39

3. Independent Claims 11 and 18....................42

E. Substantial Evidence Supports the Board's Finding That the Combination of *Casagrande* and *Russ* Renders Obvious Claims 1, 2, 3-11, 13-16, 18, and 19 of the '710 Patent....................42

F. Substantial Evidence Supports the Board's Conclusion That the Combination of *Dow* and *Russ* Renders Obvious Claims 1-16, 18, and 19 of the '710 Patent....................42

1. The Board Correctly Found That *Dow* and *Russ* Render Obvious Limitation 1[d][i] of the '710 Patent....................42

(a) The Board did not violate the APA ....................42

(b) Supreme Court precedent provides no mechanism to challenge the Board's decision....................44

(c) The Board properly construed the "first period of time" of limitation 1[d][i] of the '710 Patent....................45

(d) Substantial evidence supports the Board's Finding that the combination of Dow and Russ disclose the claimed "first period of time" and "second period of time"....................49

G. The Board Incorrectly Found That the Combination of *Casagrande* and *Russ* Did Not Renders Obvious Claim 17 of the '710 Patent....................53

1. The Board committed legal error by performing an anticipation analysis rather than an obviousness analysis for claim 17 .....53

2. The Board ignored DISH's obviousness theory .....55

3. The Court should reverse the Board's conclusion as to Claim 17 .....58

VII. CONCLUSION.....59

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
350 F.3d 1365 (Fed. Cir. 2003) ....................................................................27

*3M Innovative Props. Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) ....................................................................28

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) ........................................................................14

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
977 F.2d 1555 (Fed. Cir. 1992) ....................................................................20

*Cohesive Techs., Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) ....................................................................55

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)........................................................................................14

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)........................................................................................14

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017) ..............................................................54, 58

*Dean Witter Reynolds, Inc. v. Fernandez*,
741 F.2d 355 (11th Cir. 1984) ......................................................................20

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ..............................................................30, 31

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
81 F.4th 1368 (Fed. Cir. 2023) ......................................................................15

*Finnigan Corp. v. Int'l Trade Comm'n*,
180 F.3d 1354 (Fed. Cir. 1999) ....................................................................20

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
423 F.3d 1343 (Fed. Cir. 2005) ....................................................................27

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) ....................................................................30

*Genentech, Inc. v. Hospira, Inc.*,
946 F.3d 1333 (Fed. Cir. 2020) ..................................................................15

*Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*,
825 F.3d 1360 (Fed. Cir. 2016) ..................................................................43

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
195 F.3d 1322 (Fed. Cir. 1999) ..................................................................30

*Graham v. John Deere Co. of Kan. City*,
383 U.S. 1 (1966)........................................................................................15

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*,
124 F.4th 1345 (Fed. Cir. 2025) .......................................................55, 56, 57

*In re Baxter*,
656 F.2d 679 (C.C.P.A. 1981)....................................................................30

*In re Dembiczak*,
175 F.3d 994 (Fed. Cir. 1999) ....................................................................15

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ...........................................................14, 15

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) ...........................................................19, 20, 21

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ..................................................................58

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ..................................................................20

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ...........................................................20, 25

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...............................................................15, 41, 52

*L.E.A. Dynatech, Inc. v. Allina*,
49 F.3d 1527 (Fed. Cir. 1995) ....................20

*Laryngeal Mask Co. Ltd. v. Ambu A/S*,
618 F.3d 1367 (Fed. Cir. 2010), *rehearing & rehearing en banc denied* ..........29

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ....................46, 48

*Nike, Inc. v. Adidas AG*,
955 F.3d 45 (Fed. Cir. 2020) ....................44

*Novartis AG v. Torrent Pharm. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ....................19, 28

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................29, 48

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................19

*Pub. Serv. Comm'n of the Commonwealth of Ky. v. Fed. Energy Regul. Comm'n*,
397 F.3d 1004 (D.C. Cir. 2005) (Roberts, J.) ....................43

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ....................15

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015) ....................20

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018) ....................15

*Santarus, Inc. v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) ....................28

*SAS Institute Inc. v. Iancu*,
584 U.S. 357 (2018)....................44, 45

*Seabed Geosols. (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) ....................29

*Shockwave Med., Inc. v. Cardiovascular Sys., Inc.*,
No. 2023-1864, -- F.4th --, 2025 WL 1922023 (Fed. Cir. July 14, 2025) .........59

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
977 F.3d 1232 (Fed. Cir. 2020) ......................................................................14, 46

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015).............................................................................................14, 46

*Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ......................................................................27, 46

## STATEMENT OF RELATED CASES

No appeal in or from the same action was previously before this or any other appellate court. Below are cases known to counsel to be pending in any tribunal that will directly affect or be affected by this Court's decision in the pending appeal:

- *Digital Broadcasting Solutions, LLC v. DISH Network L.L.C.*, Case No. 1:23-cv-02946-CNS-SBP (D. Colo.).

## I. INTRODUCTION

Digital Broadcasting Solutions, LLC ("DBS") sued DISH Network L.L.C. and DISH Technologies L.L.C. (collectively, "DISH") asserting infringement of two patents. DISH responded with *inter partes* review ("IPR") petitions challenging all 39 asserted claims. This appeal arises from the final written decisions issued by the Patent Trial and Appeal Board ("Board") in both proceedings invalidating all but one claim of those patents.

## II. JURISDICTIONAL STATEMENT

This is an appeal pursuant to 35 U.S.C. § 141(c) from the Final Written Decisions of the Patent Trial and Appeal Board of the United States Patent & Trademark Office entered on December 9, 2024, in *Inter Partes* Review Nos. IPR2023-00976 and IPR2023-00977. *See* Appx1-Appx174.

DBS timely filed a notice of appeal on January 13, 2025. DISH timely filed a notice of cross-appeal on February 7, 2025. This Court therefore has jurisdiction over this appeal under 35 U.S.C. §§ 141 and 319 and 28 U.S.C. § 1295(a)(4)(A).

## III. STATEMENT OF THE ISSUES

1. Whether the Board had substantial evidence to find the prior art discloses the claimed "third command" from the '122 Patent.

2. Whether the Board correctly declined to construe the claimed "first command" from the '710 and '122 Patents with a negative limitation where the claim

language and specification are silent on that negative limitation with respect to the "first command."

3. Whether substantial evidence supports the Board's finding that the combination of *Casagrande* and *Russ* renders obvious the "at least one processor configured to . . ." limitations of the '122 and '710 Patents.

4. Whether substantial evidence supports the Board's finding that the combination of *Dow* and *Russ* renders obvious claims 1-16, 18, and 19 of the '710 Patent.

5. Whether the Board erred in its conclusion that claim 17 of the '710 Patent was not shown to be unpatentable based on its application of an anticipation analysis, rather than an obviousness analysis as proposed by DISH.

## IV. STATEMENT OF THE CASE

### A. The Challenged Patents

U.S Patent No. 8,929,710 (the "'710 Patent") was filed on October 24, 2011, and issued on January 6, 2015. Appx175 at (22), (45). U.S. Patent No. 9,538,122 (the "'122 Patent") was filed on November 17, 2014, and issued on January 3, 2017. Appx187 at (22), (45). The '710 Patent and '122 Patent (collectively, the "Asserted Patents") "relate[] to the storage and play back of time-shifted data, and more particularly to a system and method for adding auxiliary data to data that has been time-shifted." Appx180, 1:16-19. During prosecution of the '710 Patent, the

Examiner rejected the claims twice over the prior art. *See, e.g.*, Appx549-Appx554; Appx583-Appx592. All original claims 1-20 were cancelled and new claims added, after which the Examiner issued a Notice of Allowability. Appx623-Appx625 (quoting claim renumbered as independent claim 9). The challenged claims added during prosecution have limited support in the specification. At best, the challenged claims relate to the patent's purported embodiment where "the auxiliary data is removed only after its value has diminished." Appx175, Abstract.

The Asserted Patents admit that it was already known in the art that "[d]igital video recorders ('DVRs'), like TIVO™, [were] commonly used to record data (e.g., video, audio, etc.), allowing it to be played back at a later time." Appx180, 1:21-23. The patent refers to this concept as "time-shifting," which "allows the recorded data (in its original form) to be played back at a later time." *Id.*, 1:24-25. Thus, "the user can re-watch the [recorded] program (or a portion thereof), or skip a portion of the program." *Id.*, 1:43-45.

Because of the then-existing ability to skip over portions of programs, the Asserted Patents purport to recognize the dilemma that time-shifting functions presented to content owners and content providers. Namely, "it allows the user to skip commercials, or paid advertisements, which can decrease the value of the program to the content owner, the content provider and advertisers." *Id.*, 1:45-49.

### B. The Prior Art

#### 1. *Casagrande*

U.S. Patent No. 8,510,771 to Casagrande et al. entitled "Methods and apparatus for filtering content from a presentation stream using signature data" ("*Casagrande*"), was filed on May 4, 2009, published on June 24, 2010, and issued on August 13, 2013. Appx708 at (22), (45). Because *Casagrande* is a patent that was filed and published before the '710 Patent's potential priority date, *Casagrande* is prior art under at least §§ 102(a) and (e).

*Casagrande* describes systems and methods for identifying locations within a presentation stream (i.e., video program) for filtering data segments from the stream. Appx708, Abstract. *Casagrande* uses metadata to "identify boundaries of segments within the presentation stream, such as segments of a show and interstitials (e.g., commercials) of the show." *Id.* After identifying those segments, *Casagrande* allows playback of selected segments from the presentation stream and omitting others from the stream. Appx733, 3:1-5, 3:20-29. *Casagrande* also discloses that the show may be associated with "playback restrictions" that restrict user operations or otherwise "prevent the user from maintaining" certain types of playback control, including outputting the stream "without skipping over" any segments, "regardless of whether a user provides input requesting . . . skipping." *Id.*, 4:20-32; Appx734, 6:1-3; Appx741, 19:63-20:2.

*Casagrande* discloses a DVR that plays back a recorded program received via a satellite with the ability to perform traditional time-shifting functions, e.g., fast-forwarding, as well as *skipping over commercial breaks*. *See* Appx732, 1:22-26. *Casagrande* teaches that "a user may be restricted from temporally moving through particular identified segments." Appx733, 4:20-23. In other words, during a first period of time, *Casagrande*'s DVR will "automatically output particular segments of a presentation stream without skipping over or otherwise fast forwarding through the segments, regardless of whether a user provides input" requesting skipping or fast forwarding. *Id.*, 4:23-27. As shown below, *Casagrande*'s Figure 8 provides "a graphical representation of the first A/V stream received by the receiving device and a second A/V stream outputted by the receiving device." Appx732, 1:59-61; Appx719, Fig. 8.



FIG. 8

*Casagrande*'s first A/V stream 704A includes sequential segments (segments 802 and 806, respectively) separated by interstitial 804 (e.g., a commercial), where removing interstitial 804 results in the device maintaining the order of segments 802 and 806 to form the second A/V stream 712A. Appx719, Fig. 8. If there are no corresponding restrictions to time-shifting the stream, then the DVR's control logic will (a) detect all interstitial content boundaries using the metadata's location information and signature data, (b) remove all interstitials from the stream, and (c) output a second stream containing only primary video content. *See, e.g.*, Appx738, 13:5-31.

When there are restrictions to time-shifting the stream, *Casagrande* teaches that its DVR's control logic will output the stream in its entirety, or, alternatively,

(a) detect some or all of the interstitials using the metadata's location information and signature data, (b) replace some or all of the detected interstitials, and (c) output a second stream containing primary video content along with partial or entirely new interstitials. *See, e.g.*, Appx743, 24:31-56.

**2. *Dow***

U.S. Patent No. 7,251,413 to Dow et al., entitled "System and method for improved blackfield detection" ("*Dow*"), was filed on April 26, 2002, and issued on July 31, 2007. Appx746 at (22), (45). Because *Dow* issued more than one year before the '710 Patent's potential priority date, *Dow* is prior art under at least §§ 102(a), (b), and (e).

*Dow* is directed towards "[s]ystems and methods for providing enhanced navigation of stored digital video content based upon an event index." Appx746, Abstract. Specifically, *Dow* teaches the "detection of events in a video signal or data stream." Appx760, 3:52-54.

According to *Dow*, a video program "contains content of varying natures, for example, program segments and commercials." Appx763, 9:48-49. "These portions of content are viewed sequentially in a normal presentation, such as during a television broadcast[.]" *Id.*, 9:49-52. *Dow* teaches that its "commercial indexer 140 may detect events, analyze event patterns, and store data regarding identified transitions in content." Appx761, 6:61-64. "The data stored regarding the identified

transitions in content may then be used by the program navigator 150 to provide enhanced playback options, such as commercial skipping." *Id.*, 6:64-67.

*Dow* describes a control interface module that prompts control signals through a user interface. Appx770, 24:16-20, 24:54-56. Similarly, *Dow*'s interface module "define[s] one or more control signals for toggling the commercial skip function between active and inactive modes[.]" *Id.*, 24:29-32. Thus, a user of *Dow*'s DVR may view television programs according to one of two playback states: a first state, where commercial-skipping is inactive; and a second state, where commercial-skipping is active.

*Dow* teaches that during certain time periods, commercial-skipping is always inactive because the DVR prohibits toggling to the DVR's commercial-skipping function. *Id.*, 24:43-48. During these times, users are prohibited from enabling the commercial-skipping function and, thus, must watch the entire video program. Appx403-Appx404, ¶240.

**3. *Russ***

U.S. Patent Application Publication No. 2006/0225105 by Russ, entitled "Networked multi-room system ad insertion" ("*Russ*"), is a U.S. patent application publication that was filed on April 5, 2005, and published on October 5, 2006. Appx775 at (22), (43). Because *Russ* published more than one year before the '710 Patent's potential priority date, *Russ* is prior art under at least §§ 102(a), (b), and (e).

*Russ* describes the insertion of replacement material "into a presentation from a tuned source in a networked multi-room system (NMS) with a primary device and at least one remote device." Appx775, Abstract. Specifically, *Russ* utilizes presentation metadata to display secondary content within a previously recorded presentation stream. *See* Appx784-Appx785 ¶¶ [0022], [0023], [0026]-[0031].

*Russ* describes "trick mode" or "trick play" functionality as the user's ability to, for example, "pause, fast forward, rewind, skip ahead, or skip back" when watching content. Appx785, ¶ [0032]. *Russ* teaches that "a user's trick play functionality could be restricted while viewing a portion of the presentation, such as commercials." *Id.* ¶ [0033]. *Russ* teaches using a multipurpose tag to command a primary device to "preclude trick play for only a specified length of time, such as two weeks[,]" after which, a user may utilize trick play functionality. Appx785-Appx786 ¶¶ [0034]-[0035]. Thus, *Russ* teaches a technique where a user must view the entire presentation stream during a first time period (e.g., two weeks) but only a portion of the same presentation stream if viewed during a second time period occurring after the first time period.

#### 4. Miller

U.S. Patent Application Publication No. 2009/0165057 by Miller, et al. entitled "Concurrent program content processing apparatus, systems, and methods" ("*Miller*"), is a U.S. patent application filed on December 20, 2007, and published

on June 6, 2009. Appx2244 at (22), (43). *Miller* is prior art under at least §§ 102(a), (b), and (e).

Like *Casagrande*, *Miller* teaches a set-top box ("STB") receiving signals via a satellite network and explains that the signal will "include a plurality of multiplexed programs . . . [that] may be communicated as a plurality of program content streams that are multiplexed upon a single carrier channel." Appx2250 ¶ [0002]; Appx2252 ¶ [0029]. *Miller* also discloses that "[p]rogram content portions may comprise MPEG ('Motion Picture Experts Group') packets that contain compressed and/or audio, video, and/or other data." Appx2252 ¶ [0029].

### C. The IPR Proceedings

On May 26, 2023, DISH filed petitions for *inter partes* review of claims 1-19 of the '710 Patent and claims 1-20 of the '122 Patent. Appx201-Appx286; Appx1757-Appx1842. The Board instituted *inter partes* review on December 11, 2023. Appx996-Appx1028; Appx2382-Appx2423. The Board held oral arguments on September 10, 2024. Appx1611-Appx1666. The Board issued final written decisions on December 9, 2024. Appx1-Appx79; Appx80-Appx174.

For the '710 Patent, the Board found all claims unpatentable except claim 17. Specifically, the Board found claims 1, 2, 3-11, 13-16, 18, and 19 unpatentable as obvious over *Casagrande* in view of *Russ* and claims 1-16, 18, and 19 unpatentable as obvious over *Dow* in view of *Russ*. Appx77. For the '122 Patent, the Board found

all claims (1-20) unpatentable as obvious over *Casagrande* in view of *Russ* and *Miller*. Appx173.

## V. SUMMARY OF ARGUMENT

The claims of the ’710 Patent and ’122 Patent relate generally to a system for skipping portions of a video program such as commercials. DBS first added these claims during prosecution—entirely replacing a set of claims directed to an unrelated invention—in 2014. At that time, systems for commercial-skipping technology were well established and known in the art, including DISH’s own AutoHop system, which DBS now accuses of infringement. DISH’s AutoHop system launched in 2012 and is generally described in the *Casagrande* prior art reference. The claims that DBS added have no support in the specification and, in any event, provide no novel improvements over the prior art.

Indeed, the Board’s decisions invalidating claims 1-16, 18, and 19 of the ’710 Patent and claims 1-20 of the ’122 Patent are firmly grounded in both the factual record and controlling law and should be affirmed with respect to the invalidations. The Board conducted a thorough analysis of the asserted prior art—*Casagrande*, *Russ*, *Miller*, and *Dow*—and correctly determined that each and every limitation of these claims is taught or rendered obvious by these references, either individually or in combination. The Board’s claim constructions were based on the intrinsic evidence and consistent with Federal Circuit precedent, properly declining to import

unclaimed negative limitations or artificially narrow the scope of the claims beyond their plain and ordinary meaning.

DBS's appeal offers no basis for reversal. Many of DBS's arguments on appeal were not presented to the Board and are therefore forfeited. Where DBS addresses the merits of arguments raised below, its positions are contrary to the claim language, the specification, and the prosecution history. The Board correctly rejected DBS's attempt to read a negative limitation into the "first command" and "third command" limitations—limitations that the claims themselves do not require, and for which the specification provides no support. The Board's construction is not only consistent with the claim language, but also with the open-ended "comprising" transition and the Federal Circuit's repeated admonition not to narrow claims absent clear disclaimer or lexicography.

The Board's obviousness findings are supported by substantial evidence, including detailed expert testimony and specific citations to the prior art. The Board properly credited the testimony of DISH's expert, Dr. Jeffay, and found that a person of ordinary skill in the art would have been motivated to combine the teachings of the cited references to arrive at the claimed inventions. The Board also correctly found that the prior art discloses the "third command" and "first command" limitations, as well as the "at least one processor configured to . . ." limitations, and

that the combinations of *Casagrande*, *Russ*, *Miller*, and *Dow* render the claims obvious.

DBS's remaining arguments—such as its proposed narrow construction of "first period of time" and its assertion of procedural error—are unavailing. The Board's claim construction is supported by the intrinsic record and does not exclude disclosed embodiments. The Board also provided DBS with adequate notice and opportunity to address all issues, and its decision is fully consistent with the Administrative Procedure Act and Supreme Court precedent.

In sum, the Board's decisions that DBS challenges are the product of a correct application of the law to the facts for which DBS fails to identify any reversible error. The Board's findings are supported by substantial evidence, its claim constructions are correct, and its legal conclusions are sound. The Board's determinations of unpatentability should be affirmed in their entirety.

On DISH's cross-appeal, the Board committed legal error when it improperly applied the standard for anticipation to claim 17 of the '710 Patent rather than obviousness over *Casagrande* and *Russ*. Specifically, the Petition explained and was supported by expert testimony that a POSA would have understood *Casagrande*'s disclosure of transmitting commercial-location information "separately" from the video stream to encompass transmission after storage. But rather than evaluating this theory, the Board wrongly required *Casagrande* to

expressly disclose the timing of transmission and dismissed the Petition's argument as unsupported without substantive analysis. The Board's flawed analysis warrants vacatur and remand of the Board's decision as to claim 17.

# VI. ARGUMENT

## A. Standard of Review

This Court reviews legal conclusions de novo and factual findings for substantial evidence. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 271-72 (Fed. Cir. 2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)[1]). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

"The Board's claim constructions . . . are determinations of law reviewed de novo where based on intrinsic evidence, with any Board findings about facts extrinsic to the patent record reviewed for substantial-evidence support." *St. Jude Med., LLC v. Snyders Heart Valve LLC*, 977 F.3d 1232, 1238 (Fed. Cir. 2020) (citing, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325-27 (2015)).

[1] Hereinafter, internal citations omitted unless otherwise noted.

"Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact." *In re Gartside*, 203 F.3d at 1316; *see also In re Dembiczak*, 175 F.3d 994, 998 (Fed. Cir. 1999). Those underlying facts include the "scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966)). A finding as to the scope and content of the prior art is reviewed for substantial evidence, which considers whether "the Board reasonably found that a skilled artisan would have understood that [disclosure]." *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1340 (Fed. Cir. 2020). "Whether a skilled artisan would have been motivated to combine references or would have had a reasonable expectation of success in combining references are questions of fact reviewed for substantial evidence." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1374 (Fed. Cir. 2023); *see also Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018).

### B. '122 Patent: The Board Correctly Determined That the Prior Art Renders Obvious the "Third Command" Limitation

The independent claims of the '122 Patent (claims 1, 11, and 18) all require a "third command" that instructs a DVR to both receive and store "said plurality of video programs." For example, independent claim 1 recites:

> a controller configured to receive commands from a user of said DVR, wherein . . . a ***third command*** instructs said DVR to receive and store said plurality of video programs

Appx198, 12:10-16[2]; *see also* Appx199, 13:40-44 (claim 11); Appx200, 15:9-15 (claim 18). The "plurality of video programs" is defined earlier in claim 1 as:

> a tuner for receiving ***a plurality of video programs***, wherein (i) said plurality of video programs are ***transmitted at the same time*** on a single channel within said data distribution system, (ii) ***said tuner*** can be tuned to said single channel to ***receive said plurality of video programs***,

Appx198, 11:63-12:6. Likewise, independent claims 11 and 18 similarly define the "plurality of video programs" to be transmitted at the same time and received by a single tuner (a component in a DVR that receives and processes signals from television channels, Appx196, 7:39-55). Appx199, 13:31-39 (claim 11); Appx199-Appx200, 14:65-15:5 (claim 18).

For the first time on appeal, DBS argues that the combination of *Casagrande*, *Russ*, and *Miller* cannot render obvious the "third command" limitation in the '122 Patent because, according to DBS, those references only disclose recording two or more video programs received at different times. Br. 12. DBS's new arguments are both forfeited on appeal and wrong on the merits.

---

[2] All emphasis added unless otherwise noted.

### 1. DBS Forfeited Its New Argument on the "Third Command"

Faced with the Board's decision finding the prior art discloses the "third command," DBS pivots to a new argument purportedly grounded in claim construction. DBS, however, never requested any construction of the "third command" before the Board. *See* Appx2428; Appx2438-Appx2444. Even now, DBS notably fails to offer a specific construction for the "third command." Instead, DBS merely recites the claim language when it accuses the Board of reading out the antecedent requirements for the "said plurality of video programs" in the "third command," in which the video programs are "transmitted at the same time on a single channel" and received on the same "tuner." Br. 12. DBS then argues—without explanation—that the claim language precludes a DVR that "could record two or more video programs received at different times" from meeting the "third command" limitation. *See id.*

DBS forfeited its new argument on the construction of the "third command" when it failed to raise these arguments to the Board. *See* Appx2428; Appx2438-Appx2444. That is, DBS never argued to the Board that the "third command" requires the DVR to receive and store two or more video programs "received at the same time," but rather focused on whether the "third command" stores "a plurality of" (i.e., at least two) video programs. In its Patent Owner Response, DBS argued that *Casagrande* failed to disclose the "third command" because "the claimed 'third

command instructs said DVR to receive and store said plurality of video programs,' ***not only a single program***." Appx2447-Appx2448. DBS repeated this argument in its Surreply when it argued that the "third command" must be "a *single* command that results in the reception and storage of a *plurality* of video programs." Appx2615-Appx2616.

The hearing transcript that DBS cites in its brief only highlights the difference between what it actually argued on "third command" and its current claim-construction argument. *See* Br. 16-17. For example, DBS argued that the "third command" would not have been obvious because "it would have been highly unconventional . . . to have one command that is going to start saving ***multiple programs***." *Id.* (quoting Appx1643, 33:4-9). DBS reemphasized its sole dispute with the claimed "third command"—that *Casagrande* does not disclose a command that receives and stores ***multiple*** video programs—when it argued that "[t]here is simply no disclosure anywhere [in *Casagrande*] of one command that stores ***multiple streams***" and "it comes purely down to the fact that the claim requires pressing one command to initiate the storage of ***multiple programs***, which is simply not disclosed." Appx1643, 33:14-22.

Accordingly, the Board resolved the only disputed interpretation of the claimed "third command"—whether *Casagrande* discloses a "third command" that instructs a DVR to receive and store ***multiple*** video programs—when it held that

"*Casagrande* teaches or suggests the use of a memory device . . . for storing ***a plurality of video programs*** because the language of claim 1[c] does not place any limits regarding *how* the plurality of video programs are stored." Appx122. In making this finding, the Board did not expressly construe "third command." Rather, the Board simply responded to DBS's arguments that the "third command" requires storing multiple video programs in a manner that "'was at least commensurate with' [DBS's] presentation of [the] issue." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1066-67 (Fed. Cir. 2018); *see also Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1327-28 (Fed. Cir. 2017).

DBS now pivots to a new purported aspect of the claimed "third command," namely whether it requires recording multiple video programs received at the same time or at different times. But DBS never raised this issue before the Board, either in briefing or at the oral hearing.

Having failed to properly raise the claim-construction argument to the Board, DBS is precluded from doing so before this Court. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020) ("Meritorious or not, [DBS] never presented these arguments to the Board. And therein lies the problem. Because [DBS] failed to present these claim construction arguments to the Board, [DBS] forfeited both arguments."). This Court's review of the Board's decisions is "confined to the 'four corners'" of the record below, and DBS is "not be permitted

to raise arguments on appeal that were not presented to the [Board]." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 450 (Fed. Cir. 2015); *see also In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004). Any such arguments are forfeited. *Id.* This rule ensures:

> a clear presentation of the issue to be resolved, an adequate opportunity for response and evidentiary development by the opposing party, and a record reviewable by the appellate court that is properly crystallized around and responsive to the asserted argument.

*Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1346-47 (Fed. Cir. 2001); *see also Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999).

DBS also has not provided any "exceptional circumstances" to excuse its forfeiture. *In re Google*, 980 F.3d at 863. Nor could it. An appellate court will consider a forfeited argument only if:

> (i) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (ii) the proper resolution is beyond any doubt; (iii) the appellant had no opportunity to raise the objection at the district court level; (iv) the issue presents 'significant questions of general impact or of great public concern[;]' or (v) the interest of substantial justice is at stake.

*L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995); *see also Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360–61 (11th Cir. 1984); *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1575 (Fed. Cir. 1992). DBS's forfeited claim-construction argument does not fall into any of these

"exceptional circumstances." *In re Google*, 980 F.3d at 863. Therefore, the Court should "decline to address the merits of [DBS]'s proposed claim constructions[]" with respect to the "third command." *Id.* at 864.

### 2. Substantial Evidence Supports the Board's Finding That the Prior Art Teaches or Suggests the "Third Command" Even Under DBS's New Argument

Even if DBS's belated argument were not forfeited, it fails on the merits.

***First***, DBS focuses its entire argument on whether the Board considered the antecedent basis for "said plurality of video programs." *See* Br. 17-20. But DBS ignores the Board's findings that *Casagrande*, *Russ*, and *Miller* separately disclose or collectively render obvious the limitations addressing the antecedent basis where those limitations require the "plurality of video programs" be "transmitted at the same time on a single channel" and a "tuner [that] can be tuned to said single channel to receive said plurality of video programs." Appx106-Appx114. DBS thus commits the very error it attributes to the Board: ignoring the antecedent basis for "plurality of video programs" and the Board's findings that the prior art discloses these requirements.

DBS aims to cabin the Board's relevant findings solely to *Casagrande*, but the Board also made findings with respect to the other prior art in the ground, including *Miller*. Specifically, the Board noted that *Miller* discloses "a tuner operable to receive a multiplexed signal via a satellite network, Appx109 (quoting

Appx2250 ¶ 2), and credited DISH's expert testimony that a POSA "would have found it obvious to have implemented *Casagrande*'s A/V stream as multiple video programs communicated ***at the same time*** on a single channel," Appx109-Appx110. In other words, a POSA would have understood how to use "Miller's teachings in *Casagrande*'s tuner to be capable of tuning to a single channel to receive a plurality of multiplexed video programs." *Id.* Therefore, the Board concluded:

> In view of the sufficiency of the disclosures of the prior art and the supporting testimony of [DISH's expert] Dr. Jeffay, which we find persuasive because it is supported by the disclosures of the prior art, we find that Petitioner demonstrates the teaching of this limitation by the combination of the prior art, as well as the rationale to combine the prior art and the reasonable expectation of success of the combination.

Appx111.

DBS fails to challenge any of these findings on appeal. Even under DBS's argument that a "third command" requires recording two or more video programs received at the same time, DBS has not explained how the combination of *Casagrande*, *Russ*, and *Miller* fails to teach this limitation.

***Second***, DBS does not challenge the substantial evidence supporting the Board's finding with respect to the "third command" that *Casagrande* "teaches or suggests the use of a memory device . . . for storing a ***plurality*** of video programs." Appx122. For example, as shown in the below annotated figure, *Casagrande* teaches a "user input 1523 directing the operation of the receiving device 1510,"

with the operation including "[t]he receiving device 1510, by way of the control logic 1520, [being] configured to receive the first A/V stream 1504 . . . and store the A/V stream 1504 in the storage unit 1516" (further depicted in Figure 15 below). Appx740, 18:54-67; *see also* Appx1920-Appx1921 ¶ 126.



FIG. 15

Appx1787 (citing Appx725, Fig. 15). As the Board explained, claim 1 "does not place any limits regarding *how* the plurality of video programs are stored." Appx122. Therefore, "plural video programs could be stored in respective separate portions of storage in any order, or they could be stored in sequential order in a single portion of storage (e.g., memory or disk)." *Id.*

* * *

Accordingly, the Board properly interpreted the "third command" limitation and responded to the arguments that DBS made at the time. DBS's new arguments on the meaning of "third command" are forfeited on appeal. Moreover, DBS fails to challenge the Board's findings that the prior art, including *Casagrande* and *Miller*, discloses the claim limitation even under DBS's belated interpretation. The Board's decision therefore should be affirmed. To the extent this Court disagrees, the decision should be vacated and remanded for the Board to consider the grounds not reached below in the first instance. *See* Appx172-Appx173.

### C. '710 and '122 Patents: The Board Correctly Determined That the Prior Art Renders Obvious the "First Command" Limitation

The independent claims of the '710 Patent (claims 1, 9, and 18) and '122 Patent (claims 1, 11, and 18) recite two commands. For example, claim 1 of the '122 Patent recites:[3] "a ***first command*** changes said DVR from a first playback state to a second playback state" and "a ***second command*** initiates playback of said one of said plurality of video programs from said memory device." Appx198, 12:12-16; *see also* Appx199, 13:49-55 (claim 11) ("second command indicating a desire to playback at least a portion of said one of said plurality of video programs" and "first command indicating a playback state of said DVR"); Appx200, 15:9-15 (claim 18)

[3] For ease of reference, the citations in this section refer only to the '122 Patent.

("a first command for setting a playback state of said DVR" and "a second command for initiating a playback of said one of said plurality of video programs").

On appeal, DBS argues that the Board misconstrued the "first command" limitation based on what the claims recite for the "second command." This argument fails because it finds no support in the specification or the claim language of the challenged patents.

### 1. The Board Correctly Construed "First Command"

The Board properly construed "first command" when it "decline[d] to include the negative limitation that the 'first command' can never initiate playback of the video program" and instead applied the plain and ordinary meaning of the term. Appx101.

***First***, as with all claim construction, the analysis "must begin and remain centered on the language of the claims themselves[.]" *Interactive Gift Express*, 256 F.3d at 1331. Here, nothing in the claim language recites a restriction that only the "second command" is capable of initiating playback. Instead, the "first command," as claimed, uses inclusive language, requiring only that the playback state of the DVR be changed from a first playback state to a second playback state. *See* Appx198 at 12:17-37. Even DBS acknowledged this plain language, as the Board noted in its decision. Appx18 (citing Appx2609); Appx2609 ("The plain language

of the claim requires that the 'first command changes said DVR from a first playback state to a second playback state[.]'" (quoting Appx198, 12:11-13)).

It does not render the claimed "second command" superfluous by declining to read in the negative playback initiation limitation to "first command" absent any indication from the specification to do so. The "first command" and "second command" terms could have different meanings where the "first command" both changes playback states and initiates playback and the "second command" separately initiates playback. *See* Appx18. DBS's response to this logic is to falsely accuse the Board of adding a different negative limitation to the "second command": "the Board's position requires importing an additional unclaimed negative limitation (i.e., the 'second command initiates playback of said one of said plurality of video programs from said memory device [*but does not change said DVR from the first playback state to the second playback state*]')." Br. 25. DBS offers no support for this reading of the Board's decision and could not because the Board did not "necessarily interpret[]" the "second command" as not changing the playback state. *Id.* Even if the "first command" and "second command" both involved changing a DVR "from a first playback state to a second playback state" ***and*** "initiat[ing] playback of said of one of said plurality of video programs," the two commands are not superfluous because the claim language still requires two ***separate*** commands to instruct these actions.

Moreover, as the Board correctly explained, DBS's argument assumes that the first and second commands "are tied together in claim 1" despite there being "no indication in claim 1 that the 'first command' and 'second command' are related or linked." Appx97-Appx98; *see also, e.g.*, *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) ("'[T]he use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation.'"); *see also 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003). For example, the Board points out that "even if the 'first command' changed the playback state and initiated playback, we discern nothing in the claim precluding that there could be intervening events—like playback being paused—wherein the 'second command' would nonetheless be used to initiate playback in accordance with claim limitations 1[d][i]–[iii]." Appx97-Appx98. In other words, a first command could set the playback state and either initiate playback or not, while a second command always initiates playback for other segments of the video program, which may occur, for example, after an intervening event like a pause, stop, or user selection of a different program at a later time. *See id.*; *see also* Appx1649-Appx1650, 39:3-40:12.

***Second***, no other intrinsic evidence, including the specification, supports importing the negative limitation requested by DBS. *See Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*, 853 F.3d 1272, 1281 (Fed. Cir. 2017) ("It is axiomatic

that we will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history."; *see also 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013)).

DBS overly relies on written-description cases like *Inphi* and *Novartis* to argue that a negative limitation may be supported by the specification of the challenged patents here. *See* Br. 27-28. But, as this Court has explained, claimed negative limitations are supported where "the specification describes ***a reason*** to exclude the relevant [element.]" *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012). Here, the specification never states that the first command cannot initiate playback, as DBS contends is required.

On appeal, DBS identifies for the first time[4] a portion of the '122 Patent's specification that describes an embodiment where:

> ***For example***, in response to <u>the user pressing the "play" button</u> on the remote control 770, the processor 740 would not only function to play the time-shifted data, but also to automatically acquire auxiliary data . . . and to automatically display (at an appropriate time) the auxiliary data on the display 750 . . . <u>That being said, a user may be able to program the receiver/DVR (e.g., during set-up) to enable/disable the receiving and/or displaying of auxiliary data (or a portion thereof)</u> . . . Thus, a

[4] DBS provided no support from the specification to the Board to show the "first command" cannot initiate playback. *See* Appx98-Appx99 ("[A]side from the literal language of claim 1, both Patent Owner and [its expert] Dr. Freedman cite no written description support for the argued (but unclaimed) negative limitation that the 'first command' of claim 1 does not initiate playback.").

> user may be able to program the processor 740 to display only program data, and not auxiliary data, or filter the auxiliary data so that only certain information is displayed, or certain information is not displayed.

Br. 28 (first emphasis added) (quoting Appx197, 9:61-10:14). According to DBS, because this one "example" teaches a "first command" that corresponds to "program[ming] the receiver/DVR" to "enable/disable the [] displaying of auxiliary data" and the "second command" corresponds to "pressing the 'play' button . . . to play the time-shifted data," the claimed "first command" can ***never*** initiate playback. Br. 28.

Even if the portion of the specification that DBS identifies did describe a "first command" that could not initiate playback—it does not—this Court generally does not import a feature from one embodiment into the claim language. *See, e.g.*, *Laryngeal Mask Co. Ltd. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010), *rehearing & rehearing en banc denied* ("[W]e do not generally limit claims to the preferred embodiment"); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Here, the specification says nothing about whether the "first command" can initiate playback. And where the specification is merely silent on a negative limitation, that silence cannot support the negative limitation. *See Seabed Geosols.*

*(US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1288 (Fed. Cir. 2021) ("The specification never mentions gimbaled or non-gimbaled geophones, nor does it provide a reason to exclude gimbals. That silence does not support reading the claims to exclude gimbaled geophones.").

***Finally***, the Board's construction of the "first command" is further supported by the claims' use of the open-ended "comprising" term in the preamble introducing the "first command." *See, e.g.*, Appx198, 11:60-12:16 ("A digital video recording (DVR) for time shifting at least one video program . . . ***comprising***: . . . ."). This Court has repeatedly explained that "[t]he transitional term 'comprising' . . . is inclusive or open-ended and does not exclude additional, unrecited elements or method steps." Appx100 (quoting *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1327 (Fed. Cir. 1999)); *see also Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."); *see also In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981). DBS's only response to this caselaw is to rely on *Dippin' Dots*, which states that although using "comprising" raises a presumption that the list of claim elements is nonexclusive, that presumption "does not reach into each [claim element] to render every word and phrase therein open-ended." Br. 29 (quoting *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007)). That

case, however, merely held that a claim term ("beads") cannot be impermissibly broadened beyond the "narrowly defined [] claim term" as described by the claim language itself to encompass something else ("irregular particles"). *Dippin' Dots*, 476 F.3d at 1343. By contrast, here, the Board rejected a narrowing of the claims to exclude from the "first command" a function (initiating playback) that the claim language itself is silent on with respect to the "first command."

### 2. Substantial Evidence Supports That *Casagrande* Discloses a "First Command"

Substantial evidence supports the Board's finding that *Casagrande* teaches a "first command" under the proper interpretation in which the "first command" may also initiate playback of the video program. *See* Appx117-Appx119.

> As Petitioner persuasively shows, *Casagrande* teaches that "a user may *select* by way of the *user input 1523* whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514," corresponding to the selection by the user of the second playback state, which we find is sufficient to teach or suggest the claimed change of the DVR from a first playback state to a second playback state, as performed by the "first command" of claim 1[c].

Appx119 (quoting Appx1788). DBS does not challenge this finding on appeal.

Instead, DBS's only argument is that the Board erred in claim construction, so that *Casagrande*'s "select[ion] by way of the user input 1523" cannot be the claimed "first command" because the user input also "command[s] the receiving device 1510 <u>to output</u> the first A/V stream 1504 to the display device 1514 for

presentation." Br. 30-31 (quoting Appx741, 19:15-18). In other words, according to DBS, the "first command" disclosed by *Casagrande* also initiates playback. *See id.* This argument fails at least because the Board did not err in claim construction.

Separately, DBS's argument fails because *Casagrande* teaches a "first command" even under DBS's own narrow construction. As DISH explained to the Board, "[e]ven if the claimed 'first command' must not initiate playback, *Casagrande* teaches changing the DVR's playback state to a second playback state because it teaches that the user 'may select . . . whether the first A/V stream . . . or the second A/V stream . . . is outputted to the display device." Appx118 (quoting Appx741, 19:63-66); Appx2578. Because this selection may be overwritten by the system, the user selection does not guarantee that playback of the requested stream is initiated. *Id.*; Appx741-Appx742, 19:15-19, 19:64-20:2. DBS does not address this teaching from *Casagrande* on appeal.

### D. The Board Correctly Found That the Combination of *Casagrande* and *Russ* Renders Obvious The "At Least One Processor Configured To . . ." Limitation of the '122 Patent

#### 1. The Board Correctly Found that *Casagrande* and *Russ* Render Obvious the "First Command" and "Second Command" As Relied on By Limitation 1[d][iii] of the '122 Patent

##### *(a) DBS forfeited any argument that the "plain language" of the claimed "first command" and "second command" requires a temporal relationship*

DBS argues that "[t]he Board did not expressly address the relationship between the 'first command' and 'second command'" in Limitation 1[d][iii] of the '122 Patent. Br. 35. Specifically, DBS asserts that the claims require the claimed DVR to have "received the 'first command' at some point before it received the 'second command.'" *Id.* at 36. For the first time in this appeal, DBS argues "the plain language of the claim indicates" a temporal relationship between the commands because they "are named 'first' and 'second.'" *Id.* at 35. As a threshold matter, this Court should not consider this argument because DBS chose not to present it to the Board.

DBS had ample opportunity to raise claim construction issues with the Board. Indeed, DBS proposed a claim construction interpretation of "first command" that only asserted "a POSITA would not interpret the 'first command' of independent claim 1 as being capable of initiating playback of the video program." Appx2440; Appx2609. Instead, the entirety of DBS's argument to the Board that a relationship

exists between the "first command" and "second command" is a single sentence in its POR: "Further, in the third scenario, the 'first command' to set the DVR in the 'second playback state' must be received before the 'second command' initiating playback is received." Appx2458. DBS cites only its expert declaration, which does nothing but provide a word-for-word recitation of the same conclusory statement without further evidentiary support. *See* Appx2523, ¶81.

As discussed above, this Court need not consider arguments that DBS failed to present to the tribunal whose decision is on review. *See supra* § VI.B.1. Thus, this Court may disregard any arguments the "plain language" of the claims requires a temporal relationship between the "first command" and "second command."

*(b) Substantial evidence supports the Board's conclusion that Casagrande and Russ render Limitation 1[d][iii] obvious*

Regarding the alleged relationship between the "first command" and "second command" in Limitation 1[d][iii], the FWD cited to its analysis of Limitation 1[d][ii]. Appx142. Limitation 1[c] recites the "first command changes said DVR from a first playback state to a second playback state." Appx198, 12:11-13. Limitations 1[d][ii] and 1[d][iii] recite how the claimed DVR performs during a period of time based on whether it is in the first playback state or second playback state. Analyzing these limitations and the evidence of record, the Board found "there is no indication in the claim that the 'first command' and 'second command' are linked or related." Appx135.

The FWD explained that the claims require "there be a controller configured to receive a 'first command' that changes a DVR from a first playback state to a second playback state." *Id.* The FWD states "[u]nder limitation 1[c], the switch could be used to set the playback state, which is received by the controller of the DVR, and under limitation 1[d][ii], the system only makes a determination of whether the DVR is set in a first playback state." Appx135-Appx136. Thus, the FWD concludes "the switch could be set to a certain playback state and it could remain at that setting through repeated intervening playback events under limitations 1[c] and 1[d][ii], which would not require the specific timing sequence that Patent Owner argues is required." Appx136.

Applying this reasoning, the Board concluded that "the combination of *Casagrande* and *Russ* teaches or suggests limitation 1[d][iii]." Appx143. The Board explained *Casagrande* discloses the "first command" wherein "a user may select a certain playback stream, that is, a certain playback that may or may not contain commercials, and the user may choose and playback specific video segments." Appx136 (citing Appx733, 4:1–8; Appx741, 19:63–66). Specifically, the Petition explained *Casagrande*'s teaching that "a user may select by way of the user input 1523 whether the first A/V stream 1504 or the second A/V stream 1512 is outputted to the display device 1514," corresponding to the claimed first and second playback states. Appx1778 (citing Appx741, 19:63-66; Appx1919, ¶123). *Casagrande*

explains: "[t]he receiving device 710A is operable to receive a first A/V stream 704" that "includ[es] at least one segment of a show, [and] at least one interstitial of the show. . . ." *Id.* (citing Appx739, 15:21-24; Appx742, 21:28-32; Appx1919, ¶123). *Casagrande* teaches that, "the receiving device 710 filters particular portions from the first A/V stream 704 to output a second A/V stream 712 for presentation by the display device 714." Appx1778-Appx1779 (citing Appx739, 15:30-34). The "second A/V stream" has the interstitials (e.g., commercials) removed from the first A/V stream. Appx1779 (citing Appx1930, ¶145). Thus, *Casagrande* teaches a "first command" wherein a user selects between a first playback state (i.e., playback of the entire first A/V stream) and a second playback state (i.e., playback of the second A/V stream, excluding commercials). *Id.* (citing Appx1919-Appx1920, ¶124).

*Casagrande* teaches a "second command" wherein "a user may be presented with a menu of available segments of the television program, and may select one or more of the available segments for presentation." Appx733, 4:1-4; Appx1920, ¶125. *Casagrande* discloses "[b]ased upon user selection of particular segments from the selection menu, the receiving device responsively outputs the selected segments." Appx733, 4:4-8; Appx1920, ¶125.

*Casagrande*'s process whereby a user "effectively view[s] a subset of the segments of an A/V stream in the original temporal order of the segments, skipping output of undesignated segments of the A/V stream." Appx1795 (citing Appx743,

24:23-26; Appx1930, ¶145). This process is shown in *Casagrande*'s Figure 8, annotated below. Appx1795 (citing Appx738, 13:5-8; Appx1931, ¶146).




In *Casagrande*, "a first A/V stream 704 includes a first A/V segment 802 of a show, an interstitial 804 and a second A/V segment 806 of the show." Appx1795-Appx1796 (citing Appx738, 13:13-15; Appx1931, ¶146). "[T]he boundary 808 (e.g., the ending boundary of segment 802) is the starting point at which the interstitial 804 is to be filtered from the first A/V stream 704A" and "boundary 810 (e.g., the beginning boundary of segment 806) is the ending point at which the interstitial 804 is to be filtered from the first A/V Stream 704A." Appx1796 (citing Appx738, 13:23-28; Appx1931, ¶146). *Casagrande* explains that "[a]s a result of the filtering . . . second segment 806 [third portion] is outputted immediately

following the first segment 802 [first portion]." *Id.* (citing Appx738, 13:29-31; Appx1931, ¶146).

Even under DBS's narrow claim construction that the "first command" and "second command" share a temporal relationship, the user interaction described in *Casagrande* renders obvious the claims. *See* Appx2579. A POSA would have found it obvious to allow the user to first designate a desired program, or program variant to watch (i.e., to select whether a complete first stream, or a shortened second stream is desired, corresponding to the first command) followed by a second command to indicate that selection is complete and playback should begin. *Id.* (citing Appx2564, ¶9). Such an approach to a user interface (i.e., permitting user selections, followed by a second interaction to show that selection is complete and processing of the selections by the system should begin) was well-known, often described as a "confirmation dialog" or "confirmation prompt" and provides a way to ensure user selection was intentional, not erroneous, and complete. *Id.*

As the Petition established, to the extent *Casagrande* does not disclose preventing commercial-skipping for a discrete period of time, *Russ* teaches that a content provider may find it desirable to prevent trick play in certain situations. Specifically, *Russ* discloses "trick play functionality" for skipping commercials that "could be restricted," particularly suggesting to "preclude trick play for only a specified length of time, such as two weeks." Appx1791 (citing Appx786, ¶[0035];

Appx1925, ¶135). *Russ* further teaches "a tag corresponding with a commercial could expire after a period of time." *Id.* (citing Appx786, ¶[0035]; Appx1925-Appx1926, ¶136). Thus, *Russ* discloses the desirability of having a first period of time wherein the user must watch the entire A/V stream, including commercials, regardless of whether the user requested playback of a commercial-free stream. *Id.* (citing Appx1925-Appx1926, ¶136). Similarly, *Russ* discloses the desirability of having a second period of time (i.e., once the restriction expires) in which the user may elect to skip the commercials or not. Appx1791-Appx1792 (citing Appx1925-Appx1926, ¶136). Accordingly, the Board's decision that *Casagrande* and *Russ* render obvious Limitation 1[d][iii] is supported by substantial evidence.

### 2. Substantial Evidence Supports the Board's Finding that *Casagrande* and *Russ* Render Obvious the "First Command" and "Second Command" As Relied on By Limitation 1[d][iii] of the '122 Patent

DBS argues that *Casagrande* and *Russ* fail to disclose or render obvious the claimed "first period of time" wherein commercials are non-skippable and "second period of time" wherein commercials are skippable. Br. 37. The Board properly rejected this argument because it is based on an improper interpretation of the grounds presented in the Petition and the teachings of *Casagrande* and *Russ*.

As explained above, *Casagrande* discloses a process whereby a user may elect to view a "first A/V stream" that includes interstitials (e.g., commercials) or a "second A/V stream" that has the interstitials removed. *See supra* § VI.D.1. The

Petition explained that a POSA would have looked to *Russ*'s disclosure of restricting trick play functionality "for only a specified length of time, such as two weeks" when implementing the system of *Casagrande*. Appx1791 (citing Appx786, ¶[0035]; Appx1925, ¶135). Specifically, the Petition detailed how a POSA "would have recognized that *Russ*'s limits on the use of trick-play based on time periods was applicable to the various types of trick-play described in *Casagrande*, such as automatically skipping interstitials (e.g., commercials)." Appx1739 (citing Appx1926-Appx1927, ¶137).

The Board acknowledged that "Petitioner relies on *Russ*'s teaching of restricting skipping commercials during playback for a certain time and this teaching is combined with *Casagrande*, wherein once the restriction expires the user may elect to skip the commercials or not." Appx135 (citing Appx1793). Accordingly, the Board concluded that the combination of *Casagrande* and *Russ* teach "upon the expiration of the first period of time, there is a second period of time, and the playback state determines whether commercials are played (or not)." *Id.*

DBS argues to this Court, as it did to the Board, that *Russ*'s commercial slot replacement scheme would not result in the claimed system whereby commercials are non-skippable or skippable depending on time. Br. 37-38. However, the Petition never relied on *Russ*'s commercial replacement scheme. DISH's position has always been clear that a POSA would have known to implement *Russ*'s time-based

restrictions on trick-play functionality in the commercial-skipping system of *Casagrande*. *See* Appx1793 ("A POSA would have found it obvious to apply the time-based nature of the restrictions on trick-play taught in *Russ* as a way to implement the various 'playback restrictions' found in *Casagrande*, including the restriction on skipping commercials entirely.). In other words, *Casagrande* already discloses a system where a user may elect to view commercials or not and *Russ* teaches that it would have been obvious to restrict the user's ability to elect to skip the commercials for a period of time. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416.

DBS also argues that *Russ*'s trick-play restrictions cannot satisfy the claim limitation because its trick-play preclusion "is commercial based, not time based." Br. 40. The Board properly found this argument unpersuasive. Appx134. As an initial matter, the asserted patents do not draw this distinction between "commercial based" and "time based" that DBS relies on. Further, the Board correctly noted that this argument again focuses on "*Russ* individually, where, in combination [with *Casagrande*], it is the time of restriction expiry, and the status of the playback state, that determines whether a commercial can be skipped or not." *Id.*

### 3. Independent Claims 11 and 18

DBS incorporates its arguments regarding Limitation 1[d] for independent Claims 11 and 18 but provides no further substantive arguments. Br. 41. Accordingly, the Board correctly found the combination of *Casagrande*, *Russ*, and *Miller* renders the corresponding limitations of those claims obvious for the same reasons discussed above.

## E. Substantial Evidence Supports the Board's Finding That the Combination of *Casagrande* and *Russ* Renders Obvious Claims 1, 2, 3-11, 13-16, 18, and 19 of the '710 Patent

DBS incorporates its arguments regarding Limitations 1[c] and 1[d] of the '122 Patent for the corresponding limitations of independent claims 1, 9, and 18 of the '710 Patent. Br. 42. Accordingly, the Board correctly found the combination of *Casagrande*, *Russ*, and *Miller* renders the corresponding limitations of those claims obvious for the same reasons discussed above.

## F. Substantial Evidence Supports the Board's Conclusion That the Combination of *Dow* and *Russ* Renders Obvious Claims 1-16, 18, and 19 of the '710 Patent

### 1. The Board Correctly Found That *Dow* and *Russ* Render Obvious Limitation 1[d][i] of the '710 Patent

#### *(a) The Board did not violate the APA*

DBS argues that "the Board acted arbitrarily and capriciously, violating the APA" in finding the combination of *Dow* and *Russ* rendered obvious the claimed "at least one processor configured to (i) provide said video program in its entirety to a

display device in response to receiving said second command regardless of a playback state of said DVR if said second command is received during a first period of time." Br. 43. Specifically, DBS asserts that the Petition only presented anticipation arguments regarding *Dow* and did not expressly rely on *Russ*, therefore the Board was precluded from finding obviousness based on the combination of *Dow* and *Russ*. However, "[t]he critical question for compliance with the APA and due process is whether [the other party] received 'adequate notice of the issues that would be considered, and ultimately resolved, at that hearing.'" *Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1367 (Fed. Cir. 2016) (quoting *Pub. Serv. Comm'n of the Commonwealth of Ky. v. Fed. Energy Regul. Comm'n*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) (Roberts, J.)).

This Court should reject DBS's argument because the Board found the Petition sufficiently demonstrated how the combination of *Dow* and *Russ* satisfied Limitation 1[d][i] of the '710 Patent. Specifically, the Board noted how the Petition "states that, in the combination, *Russ* explains '[t]he commercial slot could also preclude trick play for only a specified length of time, such as two weeks' and that '*Russ* discloses the desirability of having a *first time period* wherein the user must watch the entire A/V stream, including commercials, such as when the operator or programmer has placed a two-week restriction on skipping commercials." Appx56-Appx57 (quoting Appx269-Appx270). The Board concluded "this reference back

to 'the first period of time' shows that Petitioner relies on the combination of *Dow* and *Russ* for the teaching of limitation 1[d][i]." Appx57.

Indeed, DBS's POR demonstrates they had notice of the Petition's reliance on *Dow* and *Russ* for limitation 1[d][i]. When addressing this limitation, DBS explained "[a]ccording to Petitioner, a POSITA 'would have understood that combining *Russ*'s techniques with *Dow*'s teachings allows the content provider to obtain additional revenue from showing advertisements to users who value watching the program during the initial release period.'" Appx2482 (quoting Appx270). DBS erroneously concluded "there is no motivation to combine *Dow* and *Russ*. *Id.* Had DBS truly been without notice of the Petition's reliance on *Dow* and *Russ* for this limitation, it would not have needed to address the motivations to combine the references in this section. Thus, DBS cannot now raise a violation of the APA as it "had—and took advantage of—an opportunity to respond to the disputed references." *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 54 (Fed. Cir. 2020).

*(b) Supreme Court precedent provides no mechanism to challenge the Board's decision*

DBS next argues that the Board's finding that *Dow* and *Russ* render limitation 1[d][i] obvious goes against the Supreme Court's decision in *SAS Institute Inc. v. Iancu*, 584 U.S. 357, 365 (2018). Br. 45. This argument, however, improperly attempts to expand the Supreme Court's decision.

DBS relies on its same arguments presented regarding the alleged APA violation that the Petition "did not assert that *Russ* is being used to teach or suggest claim element 1[d][i]." Br. 46. DBS asserts the Board's conclusion that *Dow* and *Russ* render limitation 1[d][i] obvious was not "'in accordance with' or 'in conformance to' the petition." *SAS*, 584 U.S. at 365; Br. 45. Thus, DBS incorrectly concludes "the Board is adopting arguments on behalf of Petitioner/Cross-Appellant that could have been, but were not, raised by Petitioner/Cross-Appellant during the '976 IPR in violation of the Supreme Court's and this Court's case law." Br. 47-48.

Nothing in *SAS* suggests, however, that the Board's decisions are limited in the manner that DBS asserts. Indeed, *SAS* addressed a completely different question: "When the Patent Office initiates an inter partes review, must it resolve *all* of the claims in the case, or may it choose to limit its review to only *some* of them?" *SAS*, 584 U.S. at 359. DBS does not argue that the Board failed to address all claims and grounds of unpatentability raised in the Petition. Instead, DBS asserts that the Board improperly looked to evidence from other claim limitations to reach its conclusion regarding limitation 1[d][i]. Br. 47. As discussed above, the Board did not err in its analysis of limitation 1[d][i]. *See supra* §§ VI.C-VI.D. *SAS* has no bearing on this inquiry.

*(c) The Board properly construed the "first period of time" of limitation 1[d][i] of the '710 Patent*

The Board did not commit legal error in refusing to adopt DBS's improperly

narrow construction of "first period of time" as used in limitation 1[d][i] of the '710 Patent. *See* Appx12. "The Board's claim constructions . . . are determinations of law reviewed de novo where based on intrinsic evidence, with any Board findings about facts extrinsic to the patent record reviewed for substantial-evidence support." *St. Jude Med.*, 977 F.3d at 1238 (citing *Teva Pharms.*, 574 U.S. at 325-27). DBS argues that the plain language of claim 1 requires that the "first period of time" begin *after* the entire video program has been transmitted to the DVR. Br. 48. This interpretation departs from the term's plain and ordinary meaning and is inconsistent with the specification and claims.

This Court has found it "axiomatic that [it] will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history." *Wasica*, 853 F.3d at 1281. Where a preferred embodiment in the specification describes the invention in a particular way—and even if it is the sole example—it is improper to import those limitations into the claims "absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The Board properly rejected DBS's proposed construction of "first period of time" for two reasons. First, DBS's construction improperly excludes embodiments listed in the '710 Patent's specification. Second, DBS ignores that the claims only

require the "first period of time" occur before the claimed second period of time regardless of when the program is received. *See* Appx185, 12:15-16. While the claimed "first period of time" certainly includes embodiments that do not begin until after the program is received, nothing requires that the claims be limited to only those embodiments.

When arguing for its construction of a "first period of time," DBS highlights portions of the specification and prosecution history discussing recording/storing the content before playing it back in its entirety. Br. 48-49. This construction, however, would exclude DVR buffering or storing "live" content, which the specification purports to describe as part of the invention. Indeed, DBS argues that "the buffering embodiment does not disclose the scenario" relied on by the Board in rejecting its proposed construction because it relates to content being viewed in real-time. Br. 52. However, the specification expressly teaches the embodiments that DBS's construction excludes:

> It should be appreciated that the term ***"time-shifted data," as used herein is not limited to data that is recorded and watched hours or days later***. For example, most DVRs include a buffer, which buffers data that is being viewed in real-time. The buffer is used so that ***live data can be paused*** for a predetermined period of time (determined by the size of the buffer). However, ***pausing a program and then pressing "play," results in a program that is time-shifted, if only by a couple of seconds***.

Appx182, 5:1-13. Accordingly, the specification makes clear that "real-time" or "live" content falls within the scope of "time-shifted" data. *Id.* The preamble of

claim 1 of the ’710 Patent states the claim covers “[a] digital video recorder (‘DVR’) for ***time shifting*** at least a portion of a transmitted video program.” Appx185, 11:46-47. However, DBS provides no explanation why the claims should not be read to include this embodiment. Indeed, DBS presents no evidence that supports limiting the claims to only embodiments displaying videos that have been entirely transmitted.

Similarly, DBS argues that dependent claims 6 and 14 support its construction because each defines a first period of time as some period of time that runs after “transmission” of the content. Br. 49. However, claims 6 and 14 include limitations that do not appear in independent claim 1. *Phillips*, 415 F.3d at 1314-15 (“[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.”); *Liebel-Flarsheim*, 358 F.3d at 910 (“[W]here the limitation that is sought to be ‘read into’ an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.”). Thus, it would be improper to limit the scope of claim 1’s “first period of time” based upon claims 6 and 14. That claims 6 and 14 include further limitations does not support DBS’s attempts to narrow the first period of time to begin after transmission of the video program.

Finally, DBS argues the Board ignored statements made during prosecution of the ’710 Patent. Br. 54. The Board acknowledged, however, this Court’s

precedent that "the prosecution history can inform whether the inventor limited the claim scope in the course of prosecution" but properly concluded nothing in "the prosecution history reflects the disavowal that Patent Owner argues." Appx11-Appx12. The Board found "the applicant's remarks that the DVR 'stores a video program and plays at least a portion of the video program back at a later time' and to 'play the program as it was originally recorded' is consistent with playback from a program that is being buffered, which would not require the entire program to have been stored before 'a first period of time' starts." Appx12 (citing Appx613-Appx614). DBS's citation to "a mere example does not serve as a disclaimer of scope." *Id.*

Because the claims require only that the "first period of time" occur before the "second period of time," and because DBS's proposed construction would exclude expressly mentioned embodiments, this Court should reject DBS's proposed construction.

*(d) Substantial evidence supports the Board's Finding that the combination of Dow and Russ disclose the claimed "first period of time" and "second period of time"*

For the combination of *Dow* and *Russ*, DBS largely repeats its arguments that the Petition failed to render obvious an alleged temporal relationship between the claimed "first period of time" wherein commercials are non-skippable and the claimed "second period of time" wherein commercials are skippable. *See, e.g.*, Br.

57. Substantial evidence supports the Board's conclusion that the combination of *Dow* and *Russ* renders limitation 1[d] obvious. For the same reasons discussed above with regards to *Casagrande* and *Russ*, the Board properly found a POSA would have found these claim limitations obvious in view of *Russ*'s restrictions on trick-play functionality. *See supra* §§ VI.C-VI.D.

DBS presents additional flawed arguments that rely on mischaracterizations of the teachings of *Dow* and *Russ* and the actual combination proposed in the Petition. First, DBS argues that DISH's assertion that "the 'first period of [time] begin[s] upon completion of transmission of the program'" is flawed because it "contradicts Petitioner/Cross-Appellant's previous position that '*Dow*'s exemplary "live view" and "delayed view" modes . . . squarely fall within the claimed "first period of time."''" Br. 60 (quoting Appx1229). DBS's argument improperly conflates the *Dow* anticipation and *Dow*/*Russ* obviousness grounds in the Petition. As discussed above, the claims do not require that the "first period of time" start after the program is received by the DVR. *See supra* § VI.F.1.(c). Thus, the Petition asserted *Dow*'s "live view" and "delayed view" fell within the proper construction of the "first period of time" for the purposes of its anticipation analysis. Appx270. The Petition's obviousness analysis for the combination of *Dow* and *Russ*, however, does not rely on these viewing modes. Instead, the Petition explained how a POSA would have known to apply *Russ*'s trick-play restrictions to create the claimed "first

period of time" and "second period of time" in the system of *Dow*. Appx1229. Thus, the Board's conclusion is consistent with the unpatentability grounds presented in the Petition.

Next, DBS argues a POSA would not have been motivated to combine *Dow* and *Russ* because "*Dow's* pre-modified system does not impose any time-based restrictions on the user's ability to play back a stored video program without commercials." Br. 60. As an initial matter, DBS's argument mischaracterizes the teachings of *Dow* that expressly contemplate "a time delay" in enabling commercial-skipping. Appx770, 24:43-48. Thus, *Dow* contemplates the need to restrict commercial-skipping in certain situations despite the fact that "consumers desire the ability to quickly and accurately avoid commercials in recorded programs." Appx759, 1:31-32. Further, the Petition and Dr. Jeffay explained that *Russ* teaches "the local cable operator or the presentation programmer" may desire to prevent commercial-skipping. Appx269 (quoting Appx785, ¶[0033]); Appx58-Appx59. Accordingly, a POSA would have understood that *Russ* "discloses the desirability of having a first time period wherein the user must watch the entire A/V stream, including commercials, such as when the operator or programmer has placed a two-week restriction on skipping commercials. Appx269-Appx270 (citing Appx440, ¶344); Appx58-Appx59.

Lastly, DBS argues that there is no motivation to combine *Dow* and *Russ*

because "there is no evidence in *Dow* of a decrease in 'attractiveness for advertising'" or "that content providers in *Dow* either (a) suffer from reduced ad revenues because of *Dow*'s unrestricted commercial-skipping feature, or (b) would experience an increase in ad revenues if *Dow*'s system was modified to restrict its commercial skipping feature." Br. 61-62. It is axiomatic that "[t]he obviousness analysis cannot be confined by . . . the explicit content of issued patents." *KSR*, 550 U.S. at 419. "Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418. The Petition explained "a POSA would have understood that combining *Russ*'s techniques with *Dow*'s teachings allows the content provider to obtain additional revenue from showing advertisements to users who value watching the program during the initial release period while still appealing to viewers who are willing to delay watching the program until commercial skipping becomes available." Appx270 (citing Appx439-Appx440 ¶343); Appx58-Appx59. Accordingly, the Board's decision is properly based on the "background knowledge possessed by a person having ordinary skill in the art[.]" *KSR*, 550 U.S. at 418.

### G. The Board Incorrectly Found That the Combination of *Casagrande* and *Russ* Did Not Renders Obvious Claim 17 of the ’710 Patent

#### 1. The Board committed legal error by performing an anticipation analysis rather than an obviousness analysis for claim 17

Claim 17 was the only claim that the Board found not unpatentable. DBS does not dispute that *Casagrande* teaches that its DVR receives program start and stop times separately from the program itself. Claim 17 merely adds to the parent claims that the DVR receives the start and stop times of the program (or commercials embedded therein) ***after*** that program is stored on the DVR. As to this element, the Petition noted that trivial variation was obvious because:

> [A] POSA would have understood that [*Casagrande*’s commercial] location information that includes “each one of said at least one times” may be received after storage of the video stream and/or that receiving the location information after storage of the video stream would be obvious in view of Casagrande’s teaching and suggestion.

Appx250. The Board erred by failing to address DISH’s obviousness rationale. Instead, the Board performed an anticipation analysis based solely on *Casagrande*’s disclosure. In particular, the Board stated: “Petitioner was required to demonstrate by a preponderance of the evidence that *Casagrande* teaches that the location information it relies upon was sent after the storage of the video stream.” Appx50 (citing Appx718, Fig. 7). But DISH’s theory was ***not*** that *Casagrande* expressly teaches that element, only that *Casagrande* renders obvious the element via disclosure of sending the commercial “location information” either “together or

separately from" the video stream. Appx250; *see also*Appx214 ("claims 1-19 of the '710 Patent are obvious over Casagrande in view of Russ under 35 U.S.C. §103").

The Board's error here was nearly identical to the one this Court found justified *reversal* of the Board's findings in *CRFD Research, Inc. v. Matal*, which involved remarkably similar facts. 876 F.3d 1330 (Fed. Cir. 2017). In *CRFD*, the Board upheld various claims reciting transmission of data session information "after discontinuation" of that data session. *Id.* at 1344-45. The petitioner there relied on a prior art reference ("Bates") and argued that the limitation was obvious "in view of Bates alone," which taught "that transfer can occur at a variety of user-chosen times, which could include after discontinuation." *Id.* at 1346. However, the Board's analysis of the ground failed to consider whether Bates rendered the limitation obvious, and instead relied primarily on its finding that Bates did not anticipate the claim element. *Id.* at 1345. This Court held the Board's approach was legally erroneous, noting: "Even if a reference's teachings are insufficient to find anticipation, that same reference's teachings may be used to find obviousness." *Id.* Indeed, the Court went further concluding that there were "two predictable choices for when the Bates system would transmit [session] information, providing a person of ordinary skill with a simple design choice as to whether to specify transmission after [the session] . . . ," a conclusion that led the Court to reverse the Board and hold the claims obvious as a matter of law. *Id.* at 1347, 1349.

Just as in *CRFD*, the Board here improperly conflated obviousness with anticipation by focusing on what *Casagrande* expressly teaches rather than what a POSA would have found obvious in view of *Casagrande*. As this Court has explained, "[t]he tests for anticipation and obviousness are different." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008). It is legal error for a FWD to be "based in part on a conflation between the relevant standards for obviousness and anticipation." *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1355 (Fed. Cir. 2025).

**2. The Board ignored DISH's obviousness theory**

Claim 17 depends from claim 11 (which depends from claim 9) and further recites:

> wherein said step of receiving said video program further comprises receiving said video program, said at least one time of when said second portion of said video program begins, and said at least one time of when said second portion of said video program ends from a satellite, wherein each one of said at least one times is received by said DVR after said video program is stored on said memory device.

Appx186, 14:10–17. The FWD does not dispute that *Casagrande* discloses receiving the claimed "at least one time of when said second portion of said video program begins," and "said at least one time of when said second portion of said video program ends from a satellite." Instead, the FWD concludes that *Casagrande* does not disclose that those times are "received by said DVR after said video program is stored on said memory device." Appx48-Appx50.

*Casagrande*'s DVR either receives each program's commercial location information at the same time as the program or at a time before or after the program. The Petition specified "*Casagrande* teaches that '[t]he location information 706 may be transmitted to the receiving device 710 together or ***separately*** from the first A/V stream 704.'" Appx250 (quoting Appx737, 12:52-54). Based on this *Casagrande* teaching, the Petition explained a POSA would have found it obvious "that the location information that includes 'each one of said at least one times' may be received after storage of the video stream." *Id.* (citing Appx387, ¶204). In other words, DISH's argument was that *Casagrande*'s teaching toward "separately" sending the information would have suggested having the DVR receive the information "at a different time" than the program. *Id. See also* Appx1224.

This simple understanding was confirmed by DISH's expert, who noted that *Casagrande* explicitly disclosed an approach where the location information was sent in response to "a query from the DVR after the program had been recorded, which reduc[es] the amount of consumed bandwidth." Appx327, ¶72 (citing Appx741, 20:18-47). The Board asserted that this part of *Casagrande* was "newly raised evidence at [the] oral hearing." Appx49. To the contrary, as noted above, Dr. Jeffay cited and relied upon this section in his opening declaration. Regardless, that teaching is unnecessary for the DISH's obviousness analysis, as it merely corroborates Dr. Jeffay's testimony that a skilled artisan would have been motivated

by Casagrande's disclosure of transmitting the location information separately to do so separately ***in time***.

DBS argued in its POR that *Casagrande*'s use of "separately" meant on a different channel, not at a different time. Appx1081 (citing Appx1151-Appx1152, ¶94). DBS's only alleged support for this conclusion is Figure 7 of *Casagrande* showing "different channels for 'A/V stream704' and the 'location information 706.'" *Id.*

In reply, DISH showed *Casagrande* also discloses "the communication interface 1502 may receive the supplemental content 1506 and the location information 1508 by employing the same technology used to receive the first A/V stream." Appx1224 (quoting Appx740, 18:6-9). Dr. Jeffay further explained *Casagrande* discloses "together or separately" receiving this information "from a satellite." Appx1224-Appx1225 (quoting Appx387, ¶¶202-203). A POSA would have found DBS's reading of *Casagrande*'s disclosure of "separately" receiving the location information to be overly narrow and unsupported. Appx1225. Thus, DISH demonstrated a POSA would have understood that the term "separately" in *Casagrande* could have referred to a temporal separation therefore rendering obvious transmitting the location information after the video program is stored on the memory device. *Id.*

The FWD improperly adopted DBS's argument that *Casagrande*'s failure to expressly state that "separately" means at separate times limits *Casagrande*'s disclosure to transmitting on different channels. The FWD specifies that "the evidence of record shows only that *Casagrande* transmits the location information in a separate signal than the A/V stream." Appx50 (citing Appx718, Fig. 7). This argument improperly conflates obviousness with anticipation, focusing exclusively on what *Casagrande* expressly shows rather than what a POSA would have found obvious in view of *Casagrande*. In rejecting DISH's arguments as conclusory and unsupported, the FWD fails to substantively explain or analyze why DISH's obviousness theory fails. *See* Appx50. "[I]t is not adequate to summarize and reject arguments without explaining why the [Board] accepts the prevailing argument." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). Thus, the Board erred in failing to address DISH's actual obviousness theory.

**3. The Court should reverse the Board's conclusion as to Claim 17**

Just as in *CRFD*, the Court here should reverse, and not merely remand the Board's flawed decision as to claim 17. Just like *CRFD*, the purported distinction between the claim element and the prior art has to do with whether certain information about a data session is transmitted before or after that data session. In *CRFD*, the data session was a browsing session. Here, the session is a television broadcast. In both cases, sending that information after the session ends was a

"simple design choice as to whether to specify transmission after discontinuation." *CRFD*, 876 F.3d at 1347. No support existed in the record below for rejecting DISH's obviousness claims other than the narrow anticipation-style analysis relied on by the Board. *See Shockwave Med., Inc. v. Cardiovascular Sys., Inc.*, No. 2023-1864, -- F.4th --, 2025 WL 1922023, at *9 (Fed. Cir. July 14, 2025) ("There was thus no evidence in the record supporting the Board's obviousness finding as to claim 5, and reversal rather than vacatur is thus appropriate.").

Moreover, *Casagrande*'s explicit statement that the information could be sent "separately" would have merely reinforced the skilled artisan's motivation to design the system such that the information about the program is sent once transmission of the program is complete. *See, e.g.*, Appx732, 2:53-65; Appx735, 7:20-32; Appx737, 12:52-54; Appx387, ¶203. The Board's decision to find the claims not unpatentable was clearly erroneous. Just as in *CRFD*, the Board's conclusion to the contrary was caused by its inflexible application of an anticipation analysis instead of DISH's proposed obviousness analysis. And just as in *CRFD*, this Court should reverse.

## VII. CONCLUSION

For the foregoing reasons, DISH respectfully requests the Court affirm the Board's determination that claims 1-16, 18, and 19 of the '710 Patent and claims 1-20 of the '122 Patent would have been obvious over the prior art and reverse the

Board's determination that claim 17 of the '710 Patent would not have been obvious over the prior art.

Date: July 21, 2025

*/s/ Eliot D. Williams*


Eliot D. Williams
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001
202.639.7700
eliot.williams@bakerbotts.com

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road, Bldg. 1, Ste. 200
Palo Alto, California 94304-1007
650.739.7500
hop.guy@bakerbotts.com

Kurt Pankratz
BAKER BOTTS L.L.P.
2001 Ross Avenue, Ste. 900
Dallas, TX 75201
214.953.6584
kurt.pankratz@bakerbotts.com

Thomas B. Carter Jr.
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
713.229.1108
thomas.carter@bakerbotts.com

*Attorneys for Cross-Appellants, DISH Network L.L.C. and DISH Technologies L.L.C.*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This filing complies with the type-volume limitation of Federal Circuit Rule 32(a) or Federal Circuit Rule 28.1.

X  The filing contains 14,300 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f) or

_The filing uses a monospaced typeface and contains_____ lines of text, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f)

2. This filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

X The filing has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in a 14 point Times New Roman font, or

__ The filing has been prepared in a monospaced typeface using in a ___ characters per inch_________ font.

July 21, 2025

*/s/ Eliot D. Williams*
Eliot D. Williams

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 21st day of July 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Eliot D. Williams*
Eliot D. Williams